07 - 2 3 8          ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

07 - 2 3 8

**Case No. _____ –CIV.(_____)**

Filed on _____ _____

|  |  |
|---|---|
| Agnes Carvel Estate, London, England ) | |
| by Pamela Carvel, Delaware Ancillary Administrator ) | **COMPLAINT** |
| Plaintiff ) | |
| v. ) | |
| Leonard Ross ) | |
| and ) | |
| John/Jane Doe 1-20 ) | |
| Doe Corp. 1-20 ) | |
| Defendants ) | |

2007 MAY -2  PM 2:13

# COMPLAINT TO DISAFFIRM ACTIONS OF LEONARD ROSS & DISQUALIFY SURROGATE ANTHONY SCARPINO

Pamela Carvel, appearing *pro se*
Delaware Ancillary Administrator
28 Old Brompton Road, Suite 158
London SW7 3SS England
US tel/fax 1 954 524 1909

## TABLE OF CONTENTS

| | |
|---|---|
| COMPLAINT TO DISAFFIRM & DISQUALIFY<br>NATURE OF ACTION | PAGE 1 |
| FEDERAL JURISDICTION & VENUE | PAGE 2 |
| PARTIES | PAGE 5 |
| BRIEF BACKGROUND | PAGE 6 |
| DISAFFIRMATION OF KNOWN FRAUDS | PAGE 13 |
| STATUTORY DISQUALIFICATION | PAGE 22 |
| CONCEALED RELATIONSHIP WITH BANKERS TRUST | PAGE 23 |
| CONCEALED RELATIONSHIP WITH FRANK STRENG | PAGE 24 |
| HUDSON VALLEY BANK LOANS | PAGE 26 |
| RULINGS CONTRARY TO LAW DEMONSTRATING BIAS | PAGE 27 |
| CONCLUSION | PAGE 33 |

## TABLE OF CITATIONS

*Blacker v. Thatcher*, 145 F. 2d 255 certiorari denied 324 U.S. 848. . . . . . . . 3

*Fell v. McCready*, 236 App Div 390 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lawrence v. Nelson*, 143 U.S. 215, 222 . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Leighton v. Roper*,
300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537 . . . . . . . . . . 3, 28

*Liteky v. U.S.*, 510 U.S. 540, 557 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Markham v. Allen*, 326 U.S. 490, 494. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Matter of Blodgett*, 168 Misc 898 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Matter of Cook*, 244 NY 63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Matter of Fabbri*, 2 NY2d 236. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Matter of Martin*, 255 NY 248 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Matter of Leopold*, 259 NY 274  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Matter of Rubin*, 147 Misc 2d 981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Matter of Slensby*, 169 Misc 292, 295 . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Matter of Smith*, 254 NY 283, 289 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Matter of Stanley*, 240 A.D.2d 268;660 N.Y.S.2d 107;
1997 N.Y. App. Div. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Matter of Stiehler*, 133 Misc 2d 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Matter of Von Deilen*, 154 Misc 877 . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McMaster v. Gould*, 240 N.Y. 379. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Pennoyer v. Neff*, 95 U.S. 714 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Pufahl v. Parks*, 299 U.S. 217 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Security Trust Co. v. Black Riv. Nat. Bank,* 187 U.S. 211 . . . . . . . . . . . . . . . 3

*Smither v. St.Lukes* 281 AD2d 127 (Nassau Surrogate's Court, File No. 284028, Dec.No. 274) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33. . . . . . . . . . . 3

*Williams v. Jones*, 166 NY 522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12 *Del. C.* 3802(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 *U.S.C.* 241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 *U.S.C.*242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

18 U.S.C. 641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

18 *U.S.C.*1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 *U.S.C.*1117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 U.S.C 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 *U.S.C.*1962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 *U.S.C.*1964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 *U.S.C.*2314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 *U.S.C.*2315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 *U.S.C.*ch. 95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

18 *U.S.C* ch..96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26 U.S.C.7201 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

28 *U.S.C.* 455(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

28 U.S.C. 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

42 *U.S.C.* 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 *U.S.C.* 1985(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Estates Powers and Trusts Law*
*EPTL* 11-1.1 [b] [22] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*EPTL* 11-1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*EPTL* 13-1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*EPTL* 13-1.3(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*EPTL* 13-3.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Florida Statute(F.S.) 733.707.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Florida Statute(F.S.) 733.607(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.R.C. 2056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

I.R.C. 2523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*New York Real property Law* sec. 268 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Revenue Procedures 89-20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Revenue Procedures 89-21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Revenue Procedures 90-30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Revenue Procedures 90-31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Surrogate's Court Procedure Act ("SCPA")* . . . . . . . . . . . . . . . . . . . . . . . 27
*SCPA* 1310(3)(f) . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*SCPA* 1610(2) . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*SCPA* 1810 . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*SCPA* 1811(1) . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*SCPA* 2110 (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*SCPA* 2301, 2302 (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Treasury Regulation Section 25.2702-(c)(1) . . . . . . . . . . . . . . . . . . . . . . . 11

*U.S. Constitutional Amendments* I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*U.S. Constitutional Amendments* V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*U.S. Constitutional Amendments* XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Case No. _____ –CIV.(_____)

| | |
|---|---|
| Agnes Carvel Estate, London, England ) | |
| by Pamela Carvel, Delaware Ancillary Administrator ) | **COMPLAINT** |
| Plaintiff ) | |
| v. ) | |
| Leonard Ross ) | |
| and ) | |
| John/Jane Doe 1-20 ) | |
| Doe Corp. 1-20 ) | |
| Defendants ) | |

## COMPLAINT TO DISAFFIRM ACTIONS OF LEONARD ROSS & DISQUALIFY SURROGATE ANTHONY SCARPINO

Plaintiff Agnes Carvel Estate ("Estate") of London, England by Pamela Carvel, personal representative and Delaware Ancillary Administrator, in the above styled cause sues Leonard Ross, former personal attorney to Agnes Carvel, and unidentified parties, for this complaint avers:

## NATURE OF ACTION

1.      Plaintiff Agnes Carvel Estate seeks orders of the District Court 1) for discovery to identify, quantify and assert damages inflicted on the Estate and its Delaware ancillary administration by defendant Leonard Ross,

1

and others yet to be identified; 2) to disaffirm all individual and professional acts taken by Ross in the name of Agnes Carvel or the Estate; 3) to discover the extent of Ross' fraudulent acts and those with whom he conspired to defraud the Estate; and 4) to statutorily disqualify Westchester County New York Surrogate Anthony Scarpino in all Carvel estate matters because of convert conflicts of interest, bias, failure to follow the law, violations of Constitutional rights, and possibly bribery, in collusion with Ross and Agnes Carvel's adversaries, so as to fraudulently convert Carvel assets estimated to have a value in excess of $300 million.

## **FEDERAL JURISDICTION & VENUE**

2.    District Court has jurisdiction under 28 *U.S.C.* 1331 for civil actions arising under the Constitution and laws of the United States; and also under 28 U.S.C. 1332 for diversity of citizenship.

3.    District court has subject matter jurisdiction (*28 U.S.C. 1332 (a)(2)* and *(c)(2)*) for the matter of an English foreign estate's creditor's claim in excess of $75,000, and between citizens of a State and a foreign state. Leonard Ross is a citizen of New York (*28 U.S.C 1332(a)(2))*.

4.    There exist questions of U.S. Constitutional law including (but not limited to) possible criminal intent and/or conspiracy to procure the

2

deaths of Thomas, and later, Agnes Carvel during the commission of a felony; to defraud and embezzle; to steal and/or fraudulently convert Agnes Carvel's property to strangers; to transport stolen property of across state lines by mail or by wire; to negotiate stolen U.S. government instruments; and to deny Agnes Carvel, her Estate and her fiduciary the fundamental, substantive and material rights to equal treatment, due process, and protection from violations of civil rights. (*U.S. Constitutional Amendments* I, V, XIV; 18 *U.S.C.* Sec. 241, 242, 1111, 1117, 1962, 1964, 2314, 2315, ch. 95, 96; 42 *U.S.C.* Sec.1983, 1985(3)).

5.    The Supreme Court of the United States has often reaffirmed the power of the Federal courts to take jurisdiction over executors and administrators without regard to the provisions of State statutes [*Leighton v. Roper*, 300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537; *Markham v. Allen*, 326 U.S. 490, 494; *Blacker v. Thatcher*, 145 F. 2d 255, certiorari denied 324 U.S. 848; *Pufahl v. Parks*, 299 U.S. 217; *Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33; *Security Trust Co. v. Black Riv. Nat. Bank,* 187 U.S. 211; *Lawrence v. Nelson*, 143 U.S. 215, 222].

6.    Westchester Surrogate's Court cannot and does not have the exclusive adjudication power over this foreign estate and its foreign

3

administrations. In *McMaster v. Gould*, the general rule was followed on the authority of *Pennoyer v. Neff* (p. 733), which held that "proceedings in a court of justice to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law." [*Leighton v. Roper*, 300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537; *Pennoyer v. Neff*, 95 U.S. 714; *McMaster v. Gould*, 240 N.Y. 379]. Beneficiaries and creditors are not within the jurisdiction of New York and are not notice in New York proceedings.

7.    The largest claim (over $200 million) to recover assets of the Estate is in Delaware. Therefore the largest theft of assets and greatest fraud against the Estate, its Delaware administrator, its beneficiaries and its creditors is in Delaware. Delaware is the correct venue because the apparent frauds by Ross (in New York and elsewhere) were intended to prevent the recovery of the value of Agnes' Delaware corporate interests, the most substantial asset claimed by the Estate. Ross' acts that defrauded Agnes Carvel also defrauded Delaware creditors and contract obligations owed by Agnes Carvel (12 *Del. C.* 3802(b)). On information and belief the denial of funds to the Delaware ancillary administration (A- *i o* ) was intended to obstruct professional legal representation that is necessary, essential and

4

indispensable for the Delaware ancillary administrator to carry out her fiduciary obligations and duties for Agnes Carvel, for the Estate's legitimate beneficiaries, and for the laws of Delaware and the United States.

## PARTIES

8.    Plaintiff, Agnes Carvel Estate by its Delaware ancillary administrator Pamela Carvel, is a citizen of the United Kingdom, having a mailing address: Agnes Carvel Estate, 28 Old Brompton Road, Suite 158, London SW7 3SS England, United Kingdom.    Plaintiff is defined as a foreign citizen *(28 U.S.C. 1332 (c)(2))*.

9.    Defendant, Leonard Ross is a lawyer licensed in New York with a mailing address: Ross & Matza, 265 Sunrise Highway, Suite 65, Rockville Centre, New York 11570.

10.    There is intentional interference with business relationships, contractual relationships, and intentional obstruction of the rights of Agnes Carvel, the Estate, the Estate's Delaware administration, and the Estate's fiduciary, Pamela Carvel, and an attempt to prevent the Estate's pursuit of substantial Delaware claims to Agnes' assets, so that strangers may divert Agnes' assets and profit.

5

11.     Conspiracy in the conversion of assets, and oppression of the rights and the ability of Pamela Carvel to perform her fiduciary obligations, acts across state lines and may result in the identification of intentional civil and criminal acts in violation of Federal laws involving additional parities who may be identified by discovery. The Estate reserves the right to amend this complaint as necessary to include others.

## BRIEF BACKGROUND

12.     Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History.

13.     Tom's wife Agnes died on August 4, 1998 while residing in London, England.  Agnes was a United Kingdom citizen since birth. The High Court of Justice for England and Wales admitted her last Will and Testament dated July 7, 1995 for probate without contest.   Pamela was appointed the sole executor and sole personal representative under that Will. That Will was never contested and remains in force.  The Will provide that anyone who harmed or litigated against Agnes Carvel in life, or litigated against her estate shall not inherit.

6

14.    Agnes never received one penny of income from Tom's estate in violation of the terms of Tom's alleged Last Will, thereby creating tax fraud by the fraudulent elections of QTIP and marital deductions (I.R.C. 2056, 2523; 18 U.S.C. Sec. 371, 641; 26 U.S.C. Sec. 7201 et seq). Agnes' death from stroke was procured deliberately by stress from the fraudsters who stole control by foregry of charities the Carvels founded and funded. Agnes' death was to silence Agnes' accusations that resulted in several felony convictions by the New York Attorney General.

15.    Agnes and Pamela are the only fiduciaries denied by Westchester Surrogate's Court equal indemnification of legal fees and litigation expenses because they are also the only "whistleblowers" concerning criminal activities. Carvel investigators assisted New York State Attorney Generals Abrams and Spitzer in felony convictions for financial fraudsters operating in connection with Thomas Carvel's estate (William Zuga (twice), Francis Zarro). The U.S. Attorney in another matter convicted another Carvel estate fraudster, William Fugazy, for perjury.

16.    The Carvels also assisted the New York Attorney General in charity fraud investigations that forced the ouster of two alleged Carvel charity managers for charity frauds and self-dealing, but not before the duo

7

installed their "loyalist" cronies to litigate against Agnes using restricted charitable gifts thereby creating additional tax fraud (I.R.C. 501(c)(3)). The foundation usurpers fear loosing control of misappropriated Carvel assets. The fraudsters' intention was stated in a manifesto written on February 18, 1992 (A-1) in the midst of the Attorney General's fraud investigations: removing Robert Davis and Mildred Arcadipane "**provides family with opportunity to assume control of Foundation, Estate and Agnes' assets.**" Nothing could more clearly demonstrate the **intent** to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates.

17.    The week before Tom died he estimated the family worth to exceed $250 million in cash and real estate, of which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock (a Delaware corporation). The week after Tom was found dead, Agnes was told there was less than $40 million and that virtually none of it belonged to her.   Agnes and Pamela also knew first hand that Tom and Agnes owned everything jointly with rights of survivorship, but deeds, stock and banks accounts were diverted by theft of records  or altered by forgery.

8

18.    Not one original document can be found for the sale of jointly owned Carvel Corp. stock on November 21, 1989. No documents bear an ink signature of Tom or Agnes. All three original stock certificates, all issued on January 13, 1986 to "Thomas Carvel and Agnes Carvel, Joint Tenants", remained in Agnes Carvel's possession (Nos. NB 853, 857,863). The stock certificates were never endorsed to transfer joint ownership at any time. No stock powers were used to transfer joint ownership. Secretary Mildred Arcadipane or attorney Robert Davis signed many alleged sale documents instead of the Carvels, although neither fraudster had power of attorney to act on the Carvels' behalf. Other documents have signature-only pages that do not match the preceding pages that alleged to contain agreement terms. Although reference to payments by notes for approximately $100 million was found, such payments are totally missing.

19.    The copies of stock sale documents, produced by the fraudsters after Thomas Carvel's death, allege a sale of only half the stock owned by Tom and Agnes, i.e. only 660,646 shares not 1,321,292 shares. The missing 660,646 shares (No. NB 863) appear to constitute the missing $100 million that Thomas Carvel intended to investigate with his niece Pamela Carvel (who is a member of the Association of Certified Fraud Investigators in the

9

U.S. and U.K.) before his suspiciously timed death occurred. Tom's falsified death certificate and possible murder is the subject of another proceeding to exhume his body to establish cause of death.

20. Agnes Carvel, as surviving joint owner, was defrauded out of the alleged sale proceeds by a series of fraudulent bank and trust transactions involving Hudson Valley Bank, Bank of New York (on probation for money-laundering violations), NatWest Bank, Barnett Bank and the fraudsters who boast close personal relationships to the officers of the banks.

21. The banks allowed Arcadipane and Davis to fax instructions to move millions of Carvel money in and out of Tom, Agnes and Bruce Carvel's personal bank accounts without the knowledge or consent of Tom, Agnes or Bruce and without any "power of attorney" to act on any Carvels' behalf (18 U.S.C. Sec. 1343). Investigations by the New York State Department of Banking confirmed Pamela's discovery that Davis altered at least $4.75 million in U.S. Treasury Bills and Notes held by Hudson Valley Bank to appear to give Agnes ownership; but in actuality, Davis was covering up his previous manipulations of ownership title resulting in the theft of over $15 million sale proceeds in Hudson Valley Bank that belonged to Agnes as surviving joint owner. When Pamela uncovered the theft, the

10

$4.75 million that had been allegedly transferred to Agnes was then fraudulently converted to a Florida trust without Agnes' knowledge. The Florida trustees then withheld the money from Agnes and her estate; however, they pay Ross' expenses and legal fees. The trustees, who were cohorts of Davis and Arcadipane, obstructed further investigations into the theft. These Florida trustees pay themselves and their attorneys millions from Agnes' money to litigate against Agnes, while Agnes received nothing but the tax bill.

22.    After the sale of Carvel stock was allegedly agreed, Arcadipane and Davis backdated documents allegedly creating the "Thomas Carvel Charitable Remainder Unitrust" for deferring Carvel stock sale proceeds from capital gains tax (Treasury Regulation Section 25.2702-(c)(1); Revenue Procedures 89-20, 89-21, 90-30, and 90-31). Tom and Agnes Carvels' jointly owned stock certificates were never surrendered or transferred on March 1, 1989, the date that their stock was allegedly contributed to the "unitrust". No stock power was used to transfer the stocks. The "unitrust" was a sham to give Arcadipane and Davis power over Carvel money and power to obstruct the income payable to Tom and Agnes if they began asking questions (which is what they did to Agnes).

23.    The original trust allegedly contained eight trustees.    After Tom's death, Arcadipane and Davis alleged that four trustees, who were "Carvel" employees, had been removed leaving only Arcadipane, Davis and the two trustees who were the least knowledgeable about "Carvel" business affairs – Adele Alexander, Tom's niece and Mary Ellen Cerrato, the wife of a friend.    Arcadipane and Davis ran the trust without the knowledge or consent of the other two trustees.    Allegedly no records were kept.    When Agnes sought to remove Arcadipane and Davis as fiduciaries for fraud and demanded accountings from the trustees, Arcadipane, Davis and Cerrato cut off mandatory distributions to Agnes, but continued to use Agnes' money to pay their own legal fees to cover-up the phony trust creation and to litigate against Agnes' income rights.    The unitrust was a fraud intended to evade taxes and make the Carvels prisoners of the trustees. On information and belief, over $10 million was diverted from the alleged original funding of the trust ($24 million instead of $35 million).

24.    Agnes Carvel's ownership of approximately $200 million taxable proceeds of the sale of Carvel Corp. stock (a Delaware corporation), and subsidiaries retained by Tom in the sale, disappeared after Tom's death. Although Ross as Agnes' attorney assisted in several investigations to

discover the whereabouts of the diverted funds, once Ross became New York ancillary administrator he colluded with those who divert the funds to wipe away Agnes' claims.

## DISAFFIRMATION OF ROSS' ACTIONS IN KNOWN FRAUDS

25.     New York *Estates Powers and Trusts Law* sec. 13-3.6 (*EPTL* 13-3.6) (also see *New York Real property Law* sec. 268) states as follows:

"A fiduciary may, for the benefit of creditors or others interested in property held in trust, treat as void any act done, or disposition or agreement made in fraud of the rights of any creditor, including himself, interested in such property, and a person who fraudulently receives, takes or in any manner interferes with the property of a deceased or insolvent person is liable to such fiduciary or a receiver for such property or the value thereof, and for all damages caused by such act to the trust estate.

A creditor of a deceased insolvent debtor, having a claim against the estate of such debtor exceeding in amount the sum of one hundred dollars may, without obtaining a judgment on such claim, in like manner, for the benefit of himself and other creditors interested in such property, treat as void any act done or disposition or agreement made in fraud of creditors or maintain an action to set aside such act, disposition or agreement.

Such claim, if disputed, may be established in such action.

The judgment in such action may provide for the sale of the property involved, when a disposition thereof is set aside, and for the payment of the proceeds thereof into the appropriate surrogate's court to be administered according to law."

13

26.     Pamela Carvel as the Estate's personal representative and Delaware administrator disaffirms the fraudulent acts by Ross resulting in the conversion of Agnes Carvel's property held in the so-called "Thomas Carvel Charitable Remainder Unitrust" ("unitrust"), the so-called "Agnes Carve 1991 Trust", "Chain Locations of America, Inc." ("Chain"), Andreas Holdings Corp. ("Andreas"), and all other agreements Ross made allegedly on behalf of Agnes Carvel or the Estate. Ross' negligence and fraud upon the Estate's administrator, creditors and beneficiaries includes his failure to: demand accountings; demand backup; conduct a fraud investigation for missing assets; seek to remove conflicted directors with a known history of engaging in alleged business deals with felons; enforce the terms and intent of Agnes Carvel's uncontested Will.

27.     The so-called "Thomas Carvel Charitable Remainder Unitrust" was allegedly funded with jointly owned Carvel Corp. stock. Agnes Carvel never surrendered the stock certificates. The stock certificates were never endorsed. No stock power was used to transfer the stock. No records exist for the first years of the alleged unitrust  No accountings were rendered. Ross as Agnes' attorney failed to follow through with Agnes' litigation to compel accountings. Ross as administrator refused to assert Agnes'

14

ownership of the whole of the trust that was apparently diverted to the trustees by fraud. Contrary to the Estate's express written prohibition and without notice to the Estate or any of its beneficiaries, Ross entered into an agreement to close the trust in exchange for only several hundred thousand dollars on which he would be paid commission. The body of the trust went to Agnes' adversaries who usurped control of the Carvel charities ("foundation usurpers"). Agnes was defraud out of between $25-35 million, and damages, by a conspiracy to convert her stock ownership to strangers.

28.    The so-called "Agnes Carvel 1991 Trust" diverted over $10 million of Agnes' assets without knowledge or consent of Agnes. Approximately $5 million of that money came for the alteration of purchase receipts for U.S. Treasury bills and notes held at Hudson Valley Bank. Bank of New York closed over 20 of Agnes' passbook accounts allegedly using "lost passbook affidavits" although Agnes had the passbooks. When Agnes asked for accountings and refused to sign a release without accounting demanded by the trustees, Agnes was cut-off at the trustees' "discretion".

29.    Under Florida statute (F.S. 733.707; 733.607(2)) and the trust agreement, upon Agnes death the trustees "discretion" ended. Pursuant to a Florida Appellate Court decision (A-3), Pamela Carvel as personal

15

representative became the "intended beneficiary" of the trust to be paid funeral expenses, debts, taxes, and estate administrative expenses. Without Pamela's knowledge or participation as personal representative, Ross entered into a stipulation for payment to himself, excluding Pamela as personal representative. Ross admitted in a telephone conversation with PAmela that he and the attorney hire by Pamela for the Estate would be paid their fees and expenses (approximately $3 million), without threat of surcharge, in exchange for obstructing all funds from reaching Pamela. The stipulation violates Florida statutes and the trust agreement and defrauds the Estate and Pamela as fiduciary and creditor.

30.    Chain Locations of America, Inc. (a New York real estate corporation) was jointly owned by Tom and Agnes with rights of survivorship. It was alleged to Agnes after Tom;s death that she had no interest in the corporation. Pamela's investigations proved Agnes never gave up her ownership interest. Westchester Surrogate's Court conceded only 50% ownership to Agnes after she was dead and after the corporation had been looted of all its property and cash. The only money left in the company was $2 million protected by Agnes and Pamela away from the reach of Agnes' adversaries in an escrow account.

16

31.    Chain's triple-net rental real estate was valued at $8 million in 1990 at Tom's date of death. Chain's triple-net income was approximately $500-$700,000 per year. Almost the only legitimate expense was a "management fee" set at approximately 4%, an industry standard. By 2007 Chain should have been worth over $20 million. Chain's alleged value is only the $2 million protect by the Carvels.

32.    Ross refused to hire fraud examiners to determine whether the conflicted directors engaged in tax fraud, self-dealing, embezzlement or other frauds. Ross failed to claim any unpaid income due Agnes; failed to demand amended tax returns; failed to assert any damages for defrauding Agnes out of ownership; failed to identify unjust enrichment or to seek restitution; failed to indemnify Agnes and Pamela's legal fees as directors equal to that indemnified by the corporation for the conflicted directors who defrauded Agnes. Ross' negligence defrauded Agnes and her estate out of over $20 million, and damages, from a conspiracy to convert Agnes' corporate ownership to strangers.

33.    Andreas Holdings Corp. (a Delaware corporation) purports to be a merger of former Carvel Corp. wholly owned subsidiaries retained by Tom and Agnes Carvel. Agnes was joint owner of Carvel Corp.    On

17

information and belief the merger documents are fraudulent, incorrect in form, and do not reflect Agnes' ownership. In 1995, Agnes and Pamela as Andreas directors sued in Chancery Court to establish the ownership and whether the merger was valid. Lawrence Fay (deceased) attorney to foundation usurpers who diverted control of the Carvels' charities with the stated intent to prohibit family control, submitted a perjured affidavit in Delaware stating that the ownership matter was already before the Westchester Surrogate for determination. Later, in tape-recorded minutes Fay states that he knew the determination wasn't before the Westchester court. Eight years later, the foundation usurpers' attorney stated to the Surrogate that the matter was not before the Westchester court and had never been before the Westchester court. The Surrogate directed that the matter be determined in Delaware. With that Pamela as Delaware administrator sought the Estate's assets to pay for asserting the Estate's claim. The Surrogate refused stating that no law in New York provides for payment to a Delaware ancillary administrator (who is also the Estate's executor) (A-10). The intent became clear. Agnes was denied justice in her lifetime by perjury. Her estate would be denied justice by default for not having funds to

18

prosecute the claim, while the Surrogate withheld over $20 million in Estate assets in New York.

34.     Ross as attorney and administrator was negligent in New York by failing to correctly valued Andreas. The opening balance sheet shows over $20 million in assets (A-13). Ross accepted less than $10 million as reflected in Tom's estate, and didn't care to look further. (Other documents could indicate that the sum missing may be $40 million.)    The same directors who looted Chain were conflicted directors in Andreas. Ross as attorney and administrator failed to do anything about the perjury by Fay. As in Chain, Ross failed and refused the Estate's request to hire professionals to determine embezzlement, tax fraud, money laundering, or other possible crime although these same directors had been involved with financial fraudsters who were convicted by the New York attorney General and U.S. Attorney. Ross' negligence defrauded Agnes and her estate out of over $20 million, and damages, from a conspiracy to convert Agnes' corporate ownership to strangers.

35.     A New York Law Journal Article written by Eve Markewich (A-14), the attorney hired by Pamela to represent the Estate in New York, she anonymously describes the numerous violations of disciplinary rules and

19

ethical codes inflicted on Agnes Carvel by her adversaries. Ross failed to seek damages on Agnes' behalf; failed to file any professional complaint; failed to assert significant violations of elder law, by Surrogate's Court, Agnes' adversaries and other fiduciaries and their attorneys, that was directed against Agnes Carvel to procure her death. Conspiracies to deprive Agnes of life, not to mention other Constitutional rights, are crimes that Ross ignored. Ross allowed all legal fees for those who harmed Agnes to be paid in full without fee applications to the Court, thereby diminishing Agnes' income.

36.    The foundation usurpers allege that they represent the intended beneficiary of the Carvel estates. Although Ross as Agnes' attorney assisted her is taking back her charity from the usurpers, once Agnes died and the usurpers controlled the purse strings paying Ross, he never again assert their stated criminal intentions of the usurpers or their abuse of Agnes' restricted charitable gifts to litigate to deprive Agnes on income. The Westchester decision on an "Agreement" determined that a will contract exclusively between Tom and Agnes to not change their wills and not make "gratuitous transfers" was valid only if Agnes had unrestricted disposal of her income. The usurpers alleged to be the remainder beneficiary of the Carvel estates;

20

however, that decision came after Agnes had been denied income for 13 years, and only after Agnes was dead for 5 years. The usurpers obstructing the distribution of income to Agnes, thereby voids the Agreement.

37.    Ross defrauds the Estate, its beneficiaries and its creditors by "rejecting" all payments for Agnes' income – all funeral expenses, legacies, all executor's expenses, etc.    Ross fails and refuses to assert Agnes' enforcement of the Agreement contract or the obstructions by the foundation usurpers that make the Agreement void.

38.    By Surrogate's Court's determination in the "Agreement" decision, Agnes was entitled to dispose of any and all income without restriction in order to validate the marital deduction. A testamentary plan made during Agnes' life is a valid disposition of Agnes' income, if not, tax fraud exists for which there is no statute of limitation. Enforcement of the testator's intention is required by law (*EPTL* 13-1.3(e); *Smither v. St.Lukes* 281 AD2d 127 (Nassau Surrogate's Court, File No. 284028, Dec.No. 274); *Matter of Fabbri*, 2 NY2d 236; *Matter of Martin*, 255 NY 248; *Matter of Cook*, 244 NY 63; *Williams v. Jones*, 166 NY 522; *Fell v. McCready*, 236 App Div 390; *Matter of Stiehler*, 133 Misc 2d 253; *Matter of Blodgett*, 168 Misc 898; *Matter of Von Deilen*, 154 Misc 877; *Matter of Smith*, 254 NY

21

283, 289). Ross not only fails to enforce Agnes' intentions, her "rejects" them, causing damages, by conspiracy to defraud the legitimate named beneficiaries.

39.    Pamela Carvel is the beneficiary of Agnes' personal property under the Will. An attorney in Tennessee had EE Savings Bonds in Agnes' name valued at approximately $40,000. Ross as New York administrator has jurisdiction limited to New York. When the Tennessee attorney asked Ross for the address of Agnes' executor, Pamela, to send her the bonds, Ross redirected the bond to his office on the pretense that he would delivery them to Pamela. Ross stole the bonds from Pamela and fraudulently converted the stolen property to commissionable estate property by denying Pamela the inheritance.

## STATUTORY DISQUALIFICATION

40.    The Estate also asks that the District Court determine the statutory disqualification of Westchester County Surrogate Anthony Scarpino in all matters relating to the property and claims of Agnes Carvel because of his violations of civil rights guaranteed by the Constitution and laws of the United States.

22

41.    In several estates, Surrogate Scarpino repeatedly demonstrated that he lacks personal and professional "conscience" required to determine his own need to recuse himself. Surrogate Scarpino's demonstrates bias, repeated failure to disclose conflicts with the appearance of impropriety, prejudice, failure to follow the law, and suspected bribery in a conspiracy denying Agnes Carvel and Pamela Carvel's Constitutional rights.

## CONCEALED RELATIONSHIP WITH BANKERS TRUST

42.    Anthony Scarpino was employed by Bankers Trust Company. In the Estate of Edmond McCormick, Bankers Trust Company appears as an executor along with the widow Suzanne McCormick. Like Agnes Carvel, Suzanne is denied all income from her husband's estate and denied the equal payment of her legal fees to Bankers Trust. When Suzanne learned that Surrogate Scarpino worked for the Bank, she asked that he recuse himself from the case because of the appearance of bias. Surrogate Scarpino refused. As the apparent bias continued to favor Bankers Trust against the estate beneficiary and co-executor, denying the widow all funds, Suzanne picketed the Bank and newspapers revealed the apparent conflict of interest between Surrogate Scarpino and the Bank. When Suzanne asked for the disqualification of Surrogate Scarpino, only then did he cite media attention

23

as the reason for his recusal, not disqualifiaction. Recusal came only after the decisions irreparably harming Suzanne were threaten by disqualification.

43.     Although Bankers Trust was the only bank for the Estate of Thomas Carvel, even after his recusal in the McCormick case the Surrogate failed to disclose his relationship in the Carvel case.

## CONCEALED RELATIONSHIP WITH FRANK STRENG

44.     Westchester attorney Frank Streng worked for Surrogate Scarpino on the Surrogate's transition committee from Supreme Court. Neither Streng nor the Surrogate disclosed their relationship in cases together. In the Estate of Margaret McKeown, Streng was accused of collusion in the forgery of assignments to defraud creditors. Margaret's son Kevin McKeown asked that Streng be disqualified. The Surrogate denied the motion.

45.     Although the Will was uncontested, Surrogate Scarpino refused to grant probate for 2 years, thereby denying Streng's accuser, Kevin McKeown, standing as executor of the estate. Kevin McKeown discovered that Streng was advertising his relationship with the Surrogate on the Internet. Only after Kevin demanded Surrogate Scarpino's disqualification

did the Surrogate recuse himself, leaving in place the obstruction to probate and the edict that no motions could be filed without prior court approval.

46.     Frank Streng was attorney for Pamela Carvel as executor for Agnes Carvel. Neither Streng nor Scarpino disclosed the relationship even after Surrogate Scarpino recused himself from the McKeown case. When Pamela asked Streng to oppose the Ross accountings and $3 million in legal fees, Streng refused stating he had acquire a conflict of interest favoring Ross and Markewich over the Estate's executor who was Streng's client. Streng submitted a motion to withdraw as Pamela's lawyer. Pamela asked the Surrogate to recuse himself based on the recusal in the McKeown case. The Surrogate refused and granted Streng's withdrawal leaving Pamela without legal counsel. Subsequently, Surrogate Scarpino denied all motions by Pamela for reimbursement of her funds expended on the Estate's behalf to pay legal counsel. Streng refused to account for the monies he was paid.

47.     Eventually, the Surrogate ordered a court conference to establish payment of Pamela's new counsel. Reimbursement to Pamela was denied by all of Agnes' adversaries, including Ross. No other fiduciary, except Agnes, is denied indemnification of legal fees. No other fiduciary, except Agnes, is required to pay administrative expense out of their own

pocket and then seek reimbursement. The bias against the Carvels is obvious.

## HUDSON VALLEY BANK LOANS

48.    Agnes Carvel's only adversaries for 17 years have been the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets (A-1). On the same document (#11;A-2) the acceptable "loyalists" to become successor members and directors is listed "Hudson Valley" generically, i.e. anyone from Hudson Valley Bank will be a loyalist to the foundation usurpers.

49.    As soon as Tom's was found dead, the usurpers moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed as an alleged foundation member and director. Soon again, the Bank's other major controlling stockholder, Robert Abplanalp, was also installed. When Abplanalp died, his daughter replaced him. She too is a major controlling stockholder in the Bank. Griffin and the Abplanalps authorized the abuse of Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving any income. Westchester Democratic Chairman and politico Marc Oxman, who was inflicted on Agnes Carvel as guardian ad litem to stress her to

26

death, is on the Hudson Valley Bank Development Board. The Board is described as a group to promote the Bank's interests. Pamela discovered that the Bank was involved in the wire transfers of funds without Tom or Agnes' consent, alterations of the ownership of U.S. Securities, and other bank frauds. The Bank holds more control of Carvel money than any Carvel.

50.    Trials in the Carvel matters began on September 10, 2001, on October 1, 2001 Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000 (A-19). On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000 (A-20). Neither of these loans were disclosed. The average citizen cannot know whether these "loans" are repaid by Surrogate Scarpino or just "written off" as a cost of doing business. Given Surrogate Scarpino's decisions favoring the foundation usurpers, there is the appearance of impropriety, even bribery.

## RULINGS CONTRARY TO LAW DEMONSTRATING BIAS

51. Throughout all these conflicts, the most troubling bias is demonstrated by ruling that are contrary to statue and law, such as New York *Surrogate's Court Procedure Act* (*"SCPA"*) and *Estates Powers and Trust Law* (*"EPTL"*) .

27

a)      *SCPA* 1811 (1), requires that funeral expense shall be paid out of the <u>first</u> money received by the New York administrator.  Agnes' funeral expenses remain un-reimbursed to Pamela for eight years.

b)      *SCPA* 1310(3)(f) allows payment of up to $15,000 is permitted to a relative who paid funeral expenses without formal estate administration. Ross "rejects" the payment of funeral expenses in his accounting. Pamela's petition to Surrogate Scarpino for payment of approximately $6,000 for Agnes' funeral is denied.

c)      *SCPA* 1610(2) requires that the decedent's foreign and domestic debts must be considered; domestic creditors are not given preference if the assets are insufficient. Surrogate Scarpino prematurely distribute the <u>gross</u> amount of Agnes' assets to the foundation usurpers as alleged "remaindermen", without restrictions, before any accounting even identified the debts and administrative expenses of the executor and the Estate.

d)      The Surrogate adopted the foundation usurpers misleading partial quote from *Leighton v. Roper* 300 N.Y. 934 stating that a foreign representative has no standing to sue or be sued in New York. The true quote goes on to say that this generalization is not true and there are exceptions such as in *Leighton v. Roper.* Nonetheless, the Surrogate perpetuated this

28

generalization by repeatedly denying Pamela as foreign executor legal standing in New York.

 e) *SCPA* 1810 provides that "Nothing prevents a claimant from commencing an action on his claim at law or in equity." After repeatedly denying payment and legal standing to the executor, Surrogate Scarpino then restrained the executor for going to "any other court". The effect is to make it impossible for Pamela, the executor as creditor to be paid.

 f) *EPTL* 13-1.3 requires that all property and any income are subject to the payment of debts and administrative expenses. "Residuary dispositions" abate before other dispositions. After prematurely distributing the gross amount of Agnes' income and principal to the "remaindermen", the Surrogate struck all accounting claims asserted by Pamela against those funds, thereby converting a beneficiary of merely the remainder into the principal beneficiary standing ahead of Agnes Carvel who was denied the income in her lifetime.

 52. *EPTL* 11-1.1 (b) (13) and (22), respectively, empower fiduciaries (including administrators) to contest any claim or settle any claim in favor of the estate and to pay administration expenses including reasonable counsel fees. Indeed, a fiduciary may exercise, in his or her

discretion, the above powers unilaterally, even without the consent of co-fiduciaries (Matter of Leopold, 259 NY 274; *Matter of Rubin*, 147 Misc 2d 981). Further, "every estate fiduciary, by virtue of his office, is entitled to the custody of the assets of the estate or fund. When there are two or more fiduciaries, each possesses an equal right in this regard" (*Matter of Slensby*, 169 Misc 292, 295).

53.     Nor is it relevant that the fiduciary may be able to recover the costs of the proceedings pursuant to *SCPA* 2301, 2302 (2) and 2110 (1). A fiduciary should be able to use estate funds to cover administration costs (*EPTL* 11-1.1 [b] [22]; *Matter of Rubin*, 147 Misc 2d 981). The litigation costs at issue herein are such administration costs since they are related to the recovery of estate assets (*Matter of Stanley*, 240 A.D.2d 268;660 N.Y.S.2d 107;1997 N.Y. App. Div.)

54.     The Surrogate placed no restraint whatsoever on disbursements by the executors in Thomas Carvel's estate, including the disbursement of assets belonging to Agnes Carvel held in the hands of Thomas Carvel's executors. Legal fees were paid without prior or subsequent consent of the beneficiary or the court. This freedom to draw down Carvel property at will remained with Tom's executors despite Agnes Carvel's warning that the

30

executor's were engaging in fraudulent business practices with known fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and U.S. and New York Attorney Generals' prosecutions convicted William Zuga twice (2002, 2003) for real estate fraud, convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds, and convicted William Fugazy (1997) for bankruptcy perjury. Several million dollars were lost to Agnes Carvel by Thomas' executors' collusion with these felons, BUT only the whistleblowers Agnes and Pamela Carvel are denied indemnification of legal fees from Thomas or Agnes' estate assets.

55. It is clear enough that only strangers are becoming millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses. One-sided funding of litigation can demonstrate nothing other than the intent to fraudulently convert estate and trust assets away from the intended beneficiaries.

56. The U.S. Supreme Court in *Liteky v. U.S.*, 510 U.S. 540, 557 (1994), clearly requiring disqualification under the circumstances presented here:

"Section 455(a) provides that a judge "shall disqualify himself in any

31

proceeding in which his impartiality might reasonably be questioned." For present purposes, it should suffice to say that Section 455 (a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or finding". The plain language of 28 U.S.C. 455(b)(2) is clear: "(a)   Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

57. Surrogate Scarpino repeatedly does not observe even his own precedent for recusal. This demonstrates a lack of the necessary "conscience" needed for a judge to recuse himself. After that point, and when the bias becomes as extreme as it is here, the matter becomes one for a decision from outside the conflicted jurisdiction. Surrogate Scarpino's bias is effecting the international administration of the Estate, its beneficiaries and its creditors, who are not within the Surrogate's jurisdiction and are therefore denied substantive due process. The favors shown to the "remaindermen" over the primary beneficiary Agnes, and over her intentions is a violation of Constitutional protection for equal treatment.

58.    *EPTL* 13-1.3 provides, "Whenever the provisions of this section are inconsistent with the intent of the testator to prefer certain beneficiaries, interest abates as necessary to give effect to the testator's intentions. Beneficiaries whose rights are impaired by contravention of the order of abatement are entitled to be indemnified." Agnes' intentions as expressly written in her <u>uncontested</u> Will is to deny inheritance to anyone who litigated against her in life or against her estate.

## CONCLUSION

59.    Only discovery can determine the conspiracy that exists here. Only Delaware is far enough removed from the political quagmire in New York to provide a fair platform for discovery. Delaware holds the most significant asset claims of the estate if a conspiracy denied Agnes Carvel the proceeds of the sale of jointly owned Carvel Corp. stock. The overwhelming extent of the game played between Ross and Surrogate Scarpino is merely touched on in these pages. The crimes that plagued the Carvels are eating away at beneficiaries every day. Some means to enforce Constitutional rights in Surrogate's Courts must be found.

33

WHEREFORE, Plaintiff Agnes Carvel Estate seeks orders by the District Court:

1) for discovery to identify, quantify and assert damages, inflicted on the Estate, and its Delaware ancillary administration, by defendant Leonard Ross, and others yet to be identified;

2) to disaffirm all individual and professional acts taken by Ross in the name of Agnes Carvel or the Estate;

3) to discover the extent of Ross' fraudulent acts and those with whom he conspired to defraud the Estate, and the damages therefrom; and

4) to statutorily disqualify Westchester County New York Surrogate Anthony Scarpino in all Carvel estate matters because of convert conflicts of interest, bias, failure to follow the law, violations of Constitutional rights, and possibly bribery, in collusion with Ross and Agnes Carvel's adversaries, so as to fraudulently convert Carvel assets estimated to have a value in excess of $300 million.

Signed this 25 day of April 2007

Agnes Carvel Estate
by Pamela Carvel, appearing *pro se*
28 Old Brompton Road, Suite 158
London SW7 3SS England
US tel/fax 1 954 524 1909

34

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Case No. _____–CIV.(_____)

Filed on _____

_____

)
Agnes Carvel Estate, London, England )
  by Pamela Carvel, Delaware Ancillary Administrator ) **COMPLAINT**
          Plaintiff )
          v. )
Leonard Ross )
          and )
John/Jane Doe 1-20 )
Doe Corp. 1-20 )
          Defendants )
_____)

## COMPLAINT TO DISAFFIRM ACTIONS OF LEONARD ROSS & DISQUALIFY SURROGATE ANTHONY SCARPINO

# APPENDIX

Pamela Carvel, appearing *pro se*
Delaware Ancillary Administrator
28 Old Brompton Road, Suite 158
London SW7 3SS England
US tel/fax  1 954 524 1909

TEL NO. 40. 867 5200    Dec 26.91 15:46 P 11

THE THOMAS AND AGNES CARVEL FOUNDATION

AG CONFERENCE
February 18, 1992

1) Original basis for investigation resulted in
   substantially supporting Foundation position as to CEIC
   transaction - no impropriety; no sweetheart deal; no TC
   gift to his employees. Had AG accepted explanation
   given by RMD and MA at outset, the waste on both sides
   would have been avoided.

2) "Suitability" is a manufactured issue without any clear
   standards; if equivalent to removal for cause, we win.
   Practically, resignation of 3 Members plays into hands
   of family; counter-productive from AG viewpoint to
   impose family control on future operations of
   Foundation. Resignations of RMD and MA discredits them
   and provides family with opportunity to assume control
   of Foundation, or at least Estate and Agnes' assets.

3) Money recovery for CEIC price adjustment:

   -   basis is totally artificial; no firm offer to
       Foundation in September which Foundation could
       have accepted.

   -   in any event, practical difficulty of recovery
       from limited partners; will AG accept assignment
       of CEIC 11% in any escrow fund balance (i.e.
       $1.0MM balance = $110,000). Recovery from
       Estate is meaningless since Foundation is
       beneficiary of Estate.

4) Tuition payments:

   Iona - MA has paid.

   Pace - Foundation is seeking to recover from Pace or
          Chris, possibly from CEIC balance.  (MA is
          considering guaranty of payment?)

   St. Anthony's - Foundation will undertake recovery.

   Amended 990PF will be filed  - deficiency in
          distributions covered by excess distributions
          in subsequent years.

(1)

LACE-000494

A-1

CARMEL                    TEL NO.407 967 5200                Dec 28 92  15 06 P.03

5)  How to protect confidentiality of any settlement.

6)  MA money payments:

    - Tuition  - see above
    - Loans    - Surrogate Court will decide
    - CEIC profit  - no basis for recovery from
      her; her profit reduced by any price
      adjustment recovery.  Her "profits" are
      small in relation to TC generosity in
      stock options.
    - Stock redemption profit  - she would have made
      more if she didn't redeem.

7)  MA resignations:

    - Retain Membership to prevent family control.
    - Designate her successor  and she agrees to
      resign in 1993, or on Agnes' death.
    - Resign as director and officer.

8)  Litigation will further waste Foundation funds.  AG
    should wish to avoid.

9)  CEIC sale benefitted Foundation:

    - excess business holdings
    - provided cash to fund mandatory distribution
    - sale at "fair value" when no other market
      available

10) Melfe to attend.

11) Successor Members:

    Sal Molella
    Ann McHugh's son
    Jim O'Connor
    Hudson Valley
    Dave Malane

12) Amended 990 PF for 11/30/89

13) Revised budget - shortfall in grants for 1992 without
    reduction in legal expense.

(2)

TACF-000495

A-2

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2006*

**PAMELA CARVEL,** as voluntary limited guardian for **AGNES CARVEL,**
Appellant,

v.

**BETTY GODLEY,** as Co-Trustee of The Agnes Carvel 1991 Trust,
**LAWRENCE NEWMAN,** as Co-Trustee of the Agnes Carvel 1991 Trust,
**ETHEL G. REDDY, BANK OF NEW YORK TRUST COMPANY OF
FLORIDA,** and **THE THOMAS AND AGNES CARVEL FOUNDATION,**
Appellees.

No. 4D05-203

October 11, 2006

STONE, J.

Pamela Carvel, personal representative of the estate of Agnes Carvel (interchangeably "Pamela" or "the estate"), appeals two orders: (1) an order granting defendants/counterplaintiffs' motion for summary judgment on their counterclaim seeking judicial approval of their accountings, and (2) an order compelling payment of initial out of pocket attorney's fees but denying payment for future submissions. The appellees, Betty Godley and Lawrence Newman, are the co-trustees of The Agnes Carvel 1991 Trust (trust). We reverse.

This appeal represents one small portion of a complex body of litigation between these and other parties, here and in New York. The issue before this court is one of first impression: whether a personal representative has standing to claim for a trust accounting as a beneficiary or just as a creditor, where the settlor and the estate are, essentially, the same party.

Timeline of instruments/conveyances, proceedings:

Ice cream magnate Thomas Carvel predeceased his wife Agnes in 1990. The couple was childless. Prior to his death, they executed mutual wills and a reciprocal agreement that restricted subsequent modifications and conveyances. The wills named the Tom and Agnes

Carvel Foundation as residuary beneficiary. Thinking her first will was lost, Agnes executed a second will in 1990 with no changes. In 1991, Newman's office prepared the trust documents for the revocable trust at issue here, and Agnes transferred substantial assets to fund it. The first section of the trust stated:

> The Trustees shall retain such property, IN TRUST, for the following purposes:
>
> (a) To pay any part or all of the income and such sums from or any part or all of the principal of the trust as the Trustees, in their discretion, from time to time determine for any reason whatsoever to, for, or on behalf of the Grantor. Any income not so paid shall annually be added to principal.
>
> (b) On the death of the Grantor, to pay her funeral expenses, debts and the expenses of administering her estate, and to dispose of the remaining income and principal of the trust, including any property received by the trust as a result of the Grantor's death pursuant to her will or otherwise, as provided in the other articles of this agreement.

The third section allowed the trustees to distribute the remaining trust res to the foundation after payment of income to Agnes for life and payment of all of her funeral expenses, debts, and expenses of administering her estate. The trust's tangible personal property was to be distributed to Agnes' relatives and friends.

Agnes made a third will in 1995, which was substantially different from her other wills and which named a different entity as residuary beneficiary, contrary to the estate plan she and her husband had initiated together.

Agnes' niece, Pamela, as her voluntary guardian, originally brought the instant action in Florida court, in September 1995, seeking a trust accounting, damages for breach of fiduciary duty, removal of trustees, and injunctive relief. Her grounds were that the trust was paying no income to Agnes who was still alive, the trustees had been taking excessive commissions, had mismanaged trust funds and provided no accountings to Agnes, and made unsubstantiated distributions.

**A-4**

The trustees filed a counterclaim, seeking judicial approval of accountings made for the period of 1991 through 1994, releasing and discharging the trustees from any and all liability. Because the voluntarily submitted accountings addressed the main count of her complaint, in December 1995, Pamela moved for voluntary dismissal of her complaint without prejudice. This left her a counterclaim defendant in the only pending action in Florida. Pamela filed her answer, affirmative defenses, and objections to the counterclaim in January 1998, expanding the timeframe of accountings sought to 1996.

Agnes passed away in 1998. Litigation surrounding the Carvel estates continued both in Florida and New York, challenging the validity of the reciprocal wills agreement between Tom and Agnes. In Florida, the trustees filed a motion for summary judgment as to their counterclaim. In the motion, the trustees stated that Pamela had asserted objections only to the 1991–1995 accountings, a statement rebutted by Pamela's inclusion of 1996 in her answer. Filing accountings up to the end of 2003 concurrently with this motion, the trustees asked that these be approved. More responses and replies were filed; Pamela's answer expanded the timeframe of objected-to accountings to all past, present, and future distributions.

Three motions were heard at a hearing in November 2004: Pamela's motion to compel payment of attorney's fees, and the trusts' motions for summary judgment and for a procedure to expedite determination and systematic payment of outstanding claims and obligations of the trust.

Counsel for the trust argued Pamela's lack of standing. The foundation's attorney stated that each of Pamela's requests for expenses must be "carefully scrutinized," showing detailed time records and services rendered, despite the fact that the very accountings for which approval was sought include none of this detail on the expense side. Another wrinkle was the request of counsel for the ancillary administrator of Agnes' New York estate, who asked that his client be exempted from any claims procedure the trial court might impose. In other words, only Pamela, the domiciliary executrix, should have to succumb to the trial court's restrictions on the trust-mandated payment of estate expenses.

Pamela's attorney reiterated that all Pamela was asking was to reserve the right, if the estate expenses exceeded the monies still held in trust, "to look back at the Trust accountings for the purposes of determining

**A-5**

whether there were inappropriate distributions and payments made in derogation of the rights" given to the estate by the trust instrument.

The trial court entered its order granting the summary judgment approval of the accountings from 1991 through the end of 2003, and another, compelling payment of initial out-of-pocket attorney's fees but denying payment of future submissions. A third order, establishing a procedure for the expeditious determination of claims against the trust, is not at issue in this appeal.

<u>Standing to maintain objections or assert claims for accountings of the trust</u>

"Generally, one has standing to sue when he or she has a sufficient interest at stake in the controversy which will be affected by the outcome of the litigation." *Provence v. Palm Beach Taverns, Inc.*, 676 So. 2d 1022, 1024 (Fla. 4th DCA 1996); *Brown v. Firestone*, 382 So. 2d 654, 662 (Fla. 1980). The trust instrument clearly and unambiguously lists payment of Agnes' debts at time of death and her estate claims and expenses as one of the two stated purposes of the trust. This provision is not at the discretion of the trustees. As a result, the estate, while not an income or residual beneficiary, is an intended beneficiary. The foundation's remainder interest is contingent because it is predicated upon the existence of property left in the trust after the specific condition precedent is satisfied. *See TeGrotenhuis v. Rice*, 744 So. 2d 1057, 1058 (Fla. 4th DCA 1999).

"The question of whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish." *Moyer v. Graham*, 285 So. 2d 397, 402 (Fla. 1973). We know the purpose of the trust; it tells us in express terms. A known beneficiary is owed the same duty and is entitled to the same remedy as the party to a contract. *First Am. Title Ins. Co. v. First Title Serv. Co. of the Fla. Keys Inc.*, 457 So. 2d 467, 473 (Fla. 1984); *DeMay v. Dependable Ins. Co.*, 638 So. 2d 96, 97 (Fla. 2d DCA 1994). Based on these general principles, the estate has standing to call for an accounting, just as Agnes herself would have.

This result is in accord with analogous principles, such as that intended third party beneficiaries of testamentary documents have

4

**A-6**

standing to bring legal and accounting malpractice actions if they are able to show "that the testator's intent as expressed in the will is frustrated by the negligence of the testator's attorney." *Hare v. Miller, Canfield, Paddock & Stone*, 743 So. 2d 551, 553 (Fla. 4th DCA 1999); *Espinosa v. Sparber, Shevin, Shapo, Rosen, and Heilbronner*, 612 So. 2d 1378, 1380 (Fla. 1993); *Passell v. Watts*, 794 So. 2d 651, 652 (Fla. 2d DCA 2001); *Kinney v. Shinholser*, 663 So. 2d 643, 647 (Fla. 5th DCA 1995).

Further, section 731.201(21), Florida Statutes, defines an interested person, for the purposes of wills and trusts, as "any person who may reasonably be expected to be affected by the outcome of the particular proceeding involved. In any proceeding affecting the estate or the rights of a beneficiary of the estate, the personal representative of the estate shall be deemed an interested person." So Pamela, as Agnes' personal representative, has standing in any proceeding affecting the estate's rights. In *Barley v. Barcus*, 877 So. 2d 42 (Fla. 5th DCA 2004), the Fifth District held that a widow/personal representative had standing, as an interested person, to file a motion for appointment of a trustee of a residuary trust for which she was not a trustee but a contingent remainder beneficiary.

Section 733.707(3), Florida Statutes, mandates payment of estate expenses by a revocable trust when the estate's funds are insufficient:

> Any portion of a trust with respect to which a decedent who is the grantor has at the decedent's death a right of revocation, as defined in paragraph (e), either alone or in conjunction with any other person, is liable for the expenses of the administration and obligations of the decedent's estate to the extent the decedent's estate is insufficient to pay them as provided in s. 733.607(2).

Here, the trust was revocable. Even had the trust instrument been silent, the trust would have borne the responsibility of payment to the extent that the estate has no money to pay. Section 733.607(2), Florida Statutes, referenced in the statute above, states "the personal representative is entitled to payment from the trustee of a trust described in s. 733.707(3), in the amount the personal representative certifies in writing to be required to satisfy the insufficiency." The record reflects that written demand for payment was provided to the trustees.

Propriety of summary judgment

5

**A-7**

Summary judgment is only appropriate in the absence of issues of material fact. *Real Estate World Fla. Commercial, Inc. v. Piemat, Inc.*, 920 So. 2d 704, 706 (Fla. 4th DCA 2006). Relevant factual issues remaining in dispute in the case are whether or not the trust has sufficient funds available to pay the estate's claims as required by the decedent, whether or not Pamela has submitted written claims to the trust, and whether these have been paid. These disputes alone are sufficient to prevent summary judgment.

Going further, the trial court listed lack of standing and mootness as the legal reasons for denying Pamela's objections. However, the estate/Pamela had standing. The record also reflects that she did not waive her objections.

In its order granting the summary judgment approval of the accountings from 1991 through the end of 2003, the trial court stated that Pamela's answer applied only to accountings through 1995. The record shows that her subsequent pleadings make clear her ongoing objection, predicated on the need to preserve trustee accountability and to first pay estate claims, prior to distribution to the foundation.

The order's effect on the estate is significant because judicial approval effectively defeats any trustee accountability. The estate's interest, as intended beneficiary of a condition precedent, is superior to that of the foundation as remainderman.

The trust must be administered as written and intended. We reverse the summary judgment approval of the accountings with instructions to utilize the trial court's ordered procedure, recognizing the interests of all beneficiaries as described in this opinion, to resolve all outstanding estate claims. The estate's ongoing attorney's fees are to be subject to the same procedure.

POLEN and FARMER, JJ., concur.

\*       \*       \*

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Gary Vonhof, Judge; L.T. Case No. 501995CP003258XXTRIY.

Michael A. Dribin of Broad and Cassel, Miami, for appellant.

6

**A-8**

Matthew Triggs and Stephanie Reed Traband of Proskauer Rose LLP, Boca Raton, and Hal Neier of Friedman Kaplan Seiler & Adelman LLP, New York, for Appellee-Betty Godley and Lawrence Newman.

Juan C. Antunez of Stokes McMillan & Maracini, P.A., Miami, and Steven J. Fink of Orrick, Herrington & Sutcliffe, LLP, New York, for Appellee-The Thomas and Agnes Carvel Foundation.

***Not final until disposition of timely filed motion for rehearing.***

**A-9**

**SURROGATE'S COURT: WESTCHESTER COUNTY**
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Application of Pamela Carvel
to Receive Funds From Agnes
Carvel's NY Estate for the Estate's
Delaware Ancillary Administration
Expenses

**DECISION**

**File No. 2165/1998**

AGNES CARVEL,

Deceased.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

In this miscellaneous proceeding, Pamela Carvel ("Pamela"), as the United Kingdom

domiciliary executrix and  Delaware ancillary administrator of the estate of Agnes Carvel,

("Agnes"), seeks an order pursuant to SCPA 2102 (2) and (4): (i) directing Leonard Ross

("Ross"), as New York ancillary administrator c.t.a. of Agnes' estate, to pay $500,000 for

anticipated Delaware ancillary administration expenses; (ii) directing Ross to reimburse

Pamela for prospective expenses incurred by her as Delaware ancillary administrator; (iii)

directing Ross to deliver all legal files in his control to Pamela, and (iv) directing Ross to

provide full documentation and all assets in his possession as New York ancillary

administrator.  The petition is opposed by the Thomas and Agnes Carvel Foundation ("the

Foundation") and by Ross.  The Foundation has moved to dismiss the petition on several

grounds.  Ross has also cross-moved for dismissal.

The motion and cross motion are granted as limited by this decision, and the petition

is dismissed.  The motion and cross motion are denied in all other respects.

Agnes died on August 4, 1998, a resident and domiciliary of the United Kingdom.

Her last will and testament was admitted to probate in the United Kingdom, and Pamela

**A-10**

## ESTATE OF AGNES CARVEL.
### File No. 2165/1998

was appointed the representative of Agnes' United Kingdom estate. Thereafter, Pamela filed a petition with this court seeking the appointment of her designee, Ross, as ancillary administrator c.t.a. of Agnes' New York estate, in order to marshal Agnes' New York assets and to represent Agnes' estate in numerous pending and projected litigations. The petition was granted.

In 1991, Agnes created an inter vivos trust (the "1991 Trust" or the "trust"). The trust instrument requires the trustees to pay all of Agnes' "funeral expenses, debts and the expenses of administering her estate...", and also to pay "[a]; estate, succession, legacy, transfer and inheritance taxes, federal, state and other which may be payable by reason of...[Agnes'] death, whether in respect of property passing under this agreement or in respect of property not passing under this agreement..." The trust has a situs in the State of Florida.

The primary thrust of the instant petition is to provide Pamela with access to the assets of Agnes' New York ancillary estate to fund a litigation in Delaware where Pamela, as the Delaware ancillary administrator of Agnes' estate, will claim ownership of the stock of an entity known as Andreas Corporation ("Andreas"). This application must fail for several reasons. First, it is axiomatic that attorney' fees cannot be allowed for future services (see, Matter of Rubin, 147 Misc. 2d 981, Matter of Starbuck, 225 App. Div. 689). In addition, the Surrogates' Court Procedure Act makes no provision for satisfying non-New York administration expenses out of a New York ancillary estate. The role of the ancillary administrator is to collect estate assets in New York, satisfy New York creditors, and,

2

**A-11**

## ESTATE OF AGNES CARVEL.
### File No. 2165/1998

unless the court directs otherwise, distribute the balance, if any, to the domiciliary fiduciary (see, Matter of Gennert, 96 App. Div. 8).   Since the Foundation is a creditor of the New York ancillary estate to the extent of the residuary thereof (see, Matter of Carvel, NYLJ, Apr. 15, 2002, at 29, col. 6), it would be prejudiced by the use of New York-based assets to pursue an out-of-state litigation.   More importantly, the New York ancillary estate is not the fund of first resort for payment of the administration expenses of Agnes' estate.   The 1991 Trust is funded with several million dollars and, by its terms, is the source for payment of all debts, administration expenses and tax liabilities of Agnes' estate, both domestic and foreign.   Although this court has jurisdiction over the 1991 Trust, it has deferred, with certain limited exceptions not applicable here, the determination of the reasonableness of all such obligations to the courts of Florida (see, Matter of Carvel, NYLJ, July 9, 2003, at 27, col. 1).   This would necessarily include expenses incurred by Pamela, as Delaware ancillary administrator.

Pamela's application to have the court direct Ross, as ancillary administrator c.t.a., to deliver the assets in his possession to Pamela as domiciliary executrix and/or Delaware ancillary administrator is likewise dismissed.   In Matter of Carvel, (NYLJ, Apr. 15, 2002, at 29, col. 6),  the court directed Ross to "hold [the assets of the ancillary estate] subject to the further order of this Court ..."   Nothing has transpired since that decision to warrant a different disposition at this time.   The ultimate disposition of the assets of the ancillary estate will be determined upon the settlement of Ross' account as ancillary administrator c.t.a.

3

**A-12**

## ESTATE OF AGNES CARVEL.
### File No. 2165/1998

Finally, Pamela's application to compel delivery of Agnes' legal files in the possession of Ross   is denied.  Pamela has failed to refute Ross' contention that he appropriately marshaled the legal files belonging to Agnes and is utilizing them in his capacity as New York ancillary administrator c.t.a.  Pamela has also failed to refute Ross' allegation that she has received copies of all legal documents relating to the litigations. Pamela may obtain copies of all such documents, provided the cost of providing such copies is not borne by the ancillary estate.

Settle Order.

Dated: White Plains, New York
        June 30, 2004

HON. ANTHONY A. SCARPINO, JR.
**Westchester County Surrogate**

TO:   Pamela Carvel
       Suite 158
       28 Old Brompton Road
       London SW7 3SS

       c/o P.O. Box 58
       Cranbury, New Jersey 08512-0058

       Blank Rome LLP
       The Chrysler Building
       405 Lexington Avenue
       New York, New York 10174

       Orrick, Herrington & Sutcliffe LLP
       666 Fifth Avenue
       New York, New York 10103

4

A-13

ANDREAS HOLDINGS
BEGINNING BALANCE

| DESCRIPTION | ALL AMERICAN SPORTS CITY | CHAUNCEY ADVERTISING | TOTAL |
|---|---|---|---|
| CASH | 125,478.21 | 31,689.23 | 157,167.44 |
| ACCOUNTS RECEIVABLE | 92,441.00 | 10,074,085.16 | 10,166,526.16 |
| CURRENT ACCOUNT | | (88,421.11) | (88,421.11) |
| INVENTORY | 3,159.58 | | 3,159.58 |
| PREPAID REAL ESTATE TAX | 49,348.74 | | 49,348.74 |
| INVESTMENT IN REAL ESTATE: | | | |
| LAND | 5,034,110.00 | | 5,034,110.00 |
| DWELLING | 391,502.00 | | 391,502.00 |
| AUX. BUILDING | 572,276.00 | | 572,276.00 |
| GOLF COURSE | 1,502,298.00 | | 1,502,298.00 |
| TENNIS COURT | 40,488.00 | | 40,488.00 |
| CARVEL LAKE | 1,451,662.00 | | 1,451,662.00 |
| NEW CLUB HOUSE | 1,446,413.00 | | 1,446,413.00 |
| DEP. AUTOS, TRUCKS & CARTS | 40,972.00 | | 40,972.00 |
| FURNITURE & FIXTURES | 60,275.00 | | 60,275.00 |
| DEP. FURNITURE & FIXTURES | | | |
| MACHINERY & EQUIPMENT | 103,449.00 | | 103,449.00 |
| DEP. MACHINERY & EQUIPMENT | | | |
| TOTAL ASSETS | 10,913,771.53 | 10,017,353.28 | 20,931,124.81 |
| ACCOUNTS PAYABLE | 22,427.00 | 0.00 | 22,427.00 |
| CUSTOMERS DEPOSIT | 200.00 | | 200.00 |
| DUE TO CHAIN LOCATIONS | 102,897.53 | | 102,897.53 |
| SALES TAX PAYABLE | 2,084.00 | | 2,084.00 |
| ACCRUED LIABLITIES | 24,603.00 | 0.00 | 24,603.00 |
| EXCHANGE | (3,500.00) | | (3,300.00) |
| COMMON STOCK | 10,765,060.00 | | 10,765,060.00 |
| CAPITAL STOCK | | 2,500.00 | 2,500.00 |
| RETAINED EARNINGS | | 10,014,953.28 | 10,014,853.28 |
| TOTAL LIABILITIES & RETAINED EARNINGS | 10,913,771.53 | 10,017,353.28 | 20,931,124.81 |

HFR

A-13

The New York Law Journal

Getting Grounded On Ethical Dilemmas
Eve Rachel Markewich

Monday, February 14, 2005

A few years ago, I became involved in an estate litigation well after the will had been admitted to probate. It was astounding to me that none of the following issues had been raised in the probate proceeding:

• The will was drafted by an attorney who never met the decedent, or even spoke to him on the telephone. Rather, communications were between the decedent's corporate attorneys and the draftsperson of the will.

• The will purportedly was part of a larger estate plan for the decedent and his wife, yet no attorney ever spoke to the wife, literally until the documents — including her mirror will — were executed.

• The wife was never advised to seek separate counsel, and never asked to consent to joint representation.

• The attorney supervising the execution of the documents was not an estates practitioner, and had not been involved in any of the estate planning discussions, yet he was charged with "explaining" the documents, which were not simple, to the wife.

• The wills named several executors, two of whom were corporate attorneys involved in the estate planning process, although they were not the ultimate drafters of the documents. One of these lawyers also was named as a beneficiary.

Although these events occurred several years ago, they serve as a useful jumping off point for a review of basic ethical precepts that should inform the day-to-day practice of estates practitioners. [1]

It is a truism that a lawyer must exercise independent professional judgment on behalf of a client, and may not be influenced by the interests of other people (DR 5-107; EC 5-21). At a minimum, one would think a lawyer has an obligation to speak to a client when performing personal services. Although actual client interaction is not required by the Disciplinary Rules, the Ethical Considerations and the Model Rules of Professional Conduct (MRPC) come close to mandating direct communication. See EC 7-8, which requires an attorney to "exert best efforts to ensure that decisions of the client are made only after the client has been informed of relevant considerations," and which encourages the attorney to initiate the decision-making process, and MRPC 1.4 directing the attorney to keep her client reasonably informed regarding the status of a matter and to provide explanation to the extent necessary to enable the client to make informed decisions.

**A-14**

## Joint Representation

Despite the absence of a rule on point for basic representation, for a lawyer engaged in a joint representation, or representation of multiple clients with possible conflicts, person-to-person discussions are essential, at least for disclosure purposes. DR 5-105(C) requires that clients have "full disclosure of the implications of the simultaneous representation and the advantages and risks involved." DR 5-105(C) [§1200.24(C)]. [2]

DR 5-105(A) [§1200.24(A)] provides that "A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests." Although one does not, intuitively, think of mutual estate planning between spouses as implicating the conflict rules, to some extent, every time a couple approaches you for estate planning, the possibility must be considered. If the plan is essentially to follow the rules of intestacy, then no conflict exists. If the plan varies the intestacy rules, the issue of conflict must at least be addressed.

The American College of Trust and Estate Counsel (ACTEC) advises that when taking on a joint representation of spouses, the disclosure conversation should be had at the beginning of the client relationship, in order to give the clients the opportunity to define the scope and nature of the representation. See, ACTEC, Commentaries on the Model Rules of Professional Conduct, 3d Ed. 1999 (ACTEC Commentaries), Commentary on MRPC 1.2.

In joint representation, the understanding is that no confidences exist that may not be shared with the other spouse, or considered when making estate planning decisions. The ACTEC model retainer agreement for joint representation includes a form disclosure, and requires that the clients sign their consent. [3] Best practice rules include a review of the document with the client, specific advice that each client may utilize separate counsel, and in some situations even advising the clients to take the consent document home to consider the implications. Written consent not only helps to ensure informed consent, it also protects the lawyer — at a later date — from a claim of impropriety, and protects the ultimate documents from claims of overreaching.

Once written consent has been obtained, the attorney's obligation to ensure lack of conflict continues throughout the course of the representation. Thus, DR 5-105(B) [§1200.24(b)] precludes you from continuing multiple representation of clients "if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing different interests . . . "

What sorts of situations, in estate planning, bring these rules into play? Potential drafting conflicts arise most often, but not solely, when one or more spouses has been previously married, or has children outside the marriage. They can also arise where one spouse owns

**A-15**

a close corporation or a partnership, or simply when one or the other has a close relationship with his or her family, or wants to ensure that family money does not go to the in-laws. Many lawyers forget to consider conflict issues when dealing with close friends or family, or long-term client relationships. That oversight should be avoided at all costs.

One issue that arises in the joint representation of spouses relates to gift-splitting. Let's say John, your long-term client, has been in the habit of gifting part of his business to his children on an annual basis, taking advantage of valuation discounts and the annual exclusion. He has always limited himself to the annual gift exclusion amounts under the Internal Revenue Code, so when he remarries, it seems to make sense to increase the amount of those gifts, and split them with Mary, even to the point of taking advantage of Mary's available unified credit allowance. John tells you he thinks this is a great idea, but he neglects to tell you that Mary has children of her own. However, if John follows your advice, Mary may be using up her available unified credit, which she may or may not have intended to use for future gifts to her own children, either during life or after death.

By preparing a gift-tax return for Mary's signature, you are, in effect, representing her. DR 5-105(C) [§1200.24(C)] requires "full disclosure of the implications of the simultaneous representation and the advantages and risks involved" in representing multiple clients. Certainly, under any situation involving gifts as tax and estate planning tools, the attorney must review these issues with both clients. Moreover, the attorney must ensure that the gist of the information is imparted to both parties, even though one may be far more fluent in the ins and outs of such matters than the other. If you never actually speak to one of the spouses until the date the instrument is to be executed, the opportunity to explore potential conflicts may be lost. Obviously, the same applies if the attorney's practice is to transmit documents like gift tax returns through one spouse, without explaining the implications to the other.

**Executors and Beneficiaries**

Estates lawyers surely spotted the *Putnam* and *Weinstock* issues in the scenario set forth at the top of this article, but for the uninitiated, a brief review is in order. [4] In *Matter of Weinstock*, the Court of Appeals denied letters testamentary to attorneys who had drafted a will for an 82-year-old woman, where the will nominated the lawyers as executors, although the testator's first interaction with the lawyers was when they drafted her will. The Court's reasoning was based on EC 5-6, which states that an attorney should not consciously influence a client to name the attorney as a fiduciary in an instrument.

In response to *Weinstock*, the Legislature enacted Surrogate's Court Procedure Act (SCPA) §2307-a in 1995, [5] requiring disclosure to the testator, prior to executing the will, regarding commissions and legal fees and requiring written acknowledgment by the testator, in the presence of a witness, of such disclosure. SCPA §2307-a was amended recently [6] to provide that the written acknowledgment be in an instrument separate from the will (although it may be attached to the will) and it must contain a provision that, absent execution of the acknowledgment, commissions are limited to one-half the commissions allowed by statute, thus eliminating any excuses by the attorney for failing to provide

**A-15**

disclosure to the client.

*Matter of Putnam* involved a bequest of the testator's residuary estate to her attorney, who was also the draftsperson of the will. There, the Court of Appeals upheld the bequest, but admonished attorneys to have the will drawn by another attorney if their clients intend to leave a bequest to the attorney or the attorney's family. Underlying that admonition is the concern that, based on the confidential nature of the attorney-client relationship, in a situation where an attorney is named as a beneficiary in a will, he is "peculiarly susceptible to the charge that he unduly influenced or overreached the client." (EC 5-5)

## Maintaining Confidences

Conflict issues often present a much more benign appearance than we imagine. Assume the following situation: Your 50 year-old client who is worried about his recently widowed 80-year-old mother asks you, with what appears to be the best intentions, to review Mom's will and update her estate plan. In particular, Sonny is worried that Mom's plan, which was a typical one mirroring Dad's — to spouse for life and then to children — does not adequately cover anticipated expenses for Sonny's sister's disabled daughter, Dolly, and has no tax-saving bells and whistles. Sonny tells you just to add the cost of services to Mom to his bill.

Sonny describes Mom as eccentric, and says she lives with 10 cats, but he stresses that she has all her marbles. Sonny also tells you that, although Mom understands that she is "rich," Dad always handled the family finances through his business accountant, and Sonny doubts whether Mom really understands the enormity of her $15 million in assets. Sonny also says that Mom has become quite deaf, so he suggests you have the preliminary conversations with him, and then speak to Mom only later.

A number of issues could surface in this scenario, the first being addressed by DR 5-107(A), which prohibits an attorney to accept compensation for legal services from one other than the client, without consent after full disclosure. Accordingly, you send Mom a retainer agreement, with full disclosure of your representation of Sonny, and she signs it.

A week later, you meet with Mom. You follow all the rules. You meet with her alone. You tell her that the will you are proposing is essentially the same as the wills she and Dad did years ago, except that instead of leaving everything to Sonny and his sister, outright, you are creating sprinkle trusts for the children and grandchildren, with special provisions for Dolly. Mom looks at you and says "My children are wealthy. They don't need the money, and their children will be well provided for." She further explains to you that, although she went along with Sonny's suggestion that she retain you, she has already been to see her neighbor's lawyer-daughter, and executed a will leaving her estate to the Foundation for Homeless Cats. She tells you this organization is important to her, because it will take care of animals who may be the "brothers and sisters" of her own cats.

Besides addressing issues surrounding Mom's capacity to create a new will, what do you do? You may not reveal the estate plan to Sonny, or to anyone else. DR 4-101(B)

A-16

[§1200.19(B)] prohibits you from revealing a confidence or secret of a client, except under very specific circumstances not present here. Your obligation to Mom to hold her confidence is not tempered by the fact that you also represent Sonny, or even by the fact that you have ongoing estate planning discussions with Sonny, including aggressive gift planning for Sonny and his wife, premised on the expectation that they will succeed to a good share of Mom and Dad's wealth.

The situation, here, is markedly different from the case with John and Mary, where you also represent two parties. Why? Because with John and Mary you were engaged for a joint representation and, if you followed ACTEC's recommendation, you explained to them at the outset that you would consider all communications with each of them to be devoid of confidentiality with respect to the other, and you obtained signed consents from them to proceed on that basis. Here, in contrast, you represent Mom separately.

Nor are you relieved of your obligations of confidentiality because Sonny is picking up the bill for Mom. DR 5-107(B) prohibits an attorney to allow "a person who recommends, employs, or pays the lawyer to render legal service for another to direct or regulate his or her professional judgment in rendering such legal services, or to cause the lawyer to compromise the lawyer's duty to maintain the confidences and secrets of the client under DR 4-101(B)." If you feel you have learned something that impairs the interests of another client, you have the right to refuse the representation, or to withdraw, but the confidentiality requirement still exists. Even when it appears that breaching the confidentiality would do no harm, and would serve what you consider to be a better good, the attorney's obligation is to maintain the confidence.

Administration of Estates

Conflict situations arise in estates practice during the administration of an estate, as well. Returning to the case described at the beginning of this article, after the will was admitted to probate, during the early stages of administration of the estate, the income beneficiary of the testamentary trust was represented by the same lawyer who represented the remainder beneficiary, a not-for profit entity, and also was a director of the remainder beneficiary. Is this necessarily a precluded representation? Probably not, to start. Indeed, ACTEC notes that it is often appropriate for an attorney to represent multiple clients with common interests in estate or trust administration, emphasizing that estate administration is usually nonadversarial in nature. See, ACTEC Commentaries, Commentary on Rule 1.7. Assuming nothing unusual is happening, and the clients consent, this type of dual representation should be OK. However, in the case cited, the added wrinkle is that the lawyer is a director of the remainder entity. Therefore, the representation may implicate DR 5-101 [§1200.20] which states:

A lawyer shall not accept or continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property or personal interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer's interest.

A-16

Here, there may have been a business interest the lawyer had, as director of the remainder, that was at odds with the income beneficiary's interest.

While one might take the position that the interests of income and remainder beneficiaries of a residuary trust are aligned, such is not always the case. Their interests may diverge, for example, if the executors and trustees retain underproductive property that is expected to greatly appreciate by the time the income interest terminates, but yields little or no income for the income beneficiary. Similarly, if the lawyer has an interest in the remainder, she may not fully scrutinize investment decisions of the trustee, in terms of whether there is an emphasis on income versus growth.

Notwithstanding that New York statutory law addresses a fiduciary's duty to all beneficiaries via the Principal and Income Act [7] and the Prudent Investor Act, [8] the focus here is on the attorney's ability (observed objectively) to exercise professional judgment on behalf of a client who has a different interest in the same subject matter in which the attorney has an interest. EC 5-3 states in part that "[t]he self-interest of a lawyer resulting from ownership of property in which the client also has an interest or which may affect property of the client may interfere with the exercise of free judgment on behalf of the client." The Ethical Considerations suggest that the attorney either decline or withdraw from representation unless the client consents after full disclosure. Another implication of this relationship is the requirement that an attorney "strive to avoid not only professional impropriety but also the appearance of impropriety." EC 9-6.

Although it may seem less substantive than actual impropriety, lawyers need always be alert to the appearance of impropriety. We need to ask ourselves, 'if I were one of these clients, and I received an unwanted result, would I question the lawyer's integrity?' Moreover, when representing multiple clients, we must remind ourselves that the conflict analysis is not static, but must be reviewed regularly. If you find yourself in doubt, call for help. Most bar associations have ethics hotlines that will help you find your way.

*Eve Rachel Markewich* is a member of the Blank Rome litigation department. *Barbara MacGrady*, an associate with the firm, assisted in the preparation of this article.

Endnotes:

1. Reference is made to New York's Code of Professional Responsibility, adopted by the New York State Bar Association on Jan. 1, 1970. The Code contains Canons, which are the underlying precepts for conduct; Ethical Considerations (ECs), which serve as aspirational guides for attorneys; and Disciplinary Rules (DRs), which are rules to be observed and which provide a basis for disciplinary actions against attorneys who fail to follow them. New York has not adopted the Model Rules of Professional Conduct (MRPC) issued by the American Bar Association, but its Code has rules corollary to the MRPC.

2. Bracketed sections refer to the Disciplinary Rules of the Code of Professional

Responsibility promulgated as joint rules of the Appellate Division of the Supreme Court and set forth in Part 1200 of Title 22 of New York Codes, Rules and Regulations (NYCRR).

3. See, ACTEC Engagement Letters: A Guide for Practitioners, ch. I at <a href="http://www.actec.org/"><u>www.actec.org/</u></a> publicInfoArk/comm/engltrch1.htm

4. Matter of Putnam, 257 N.Y. 140 (1931); Matter of Weinstock, 40 N.Y.2d 1 (1976). It would behoove the uninitiated to familiarize themselves with these cases and their practical effect in dealings with the Surrogates' Courts.

5. L. 1995, ch. 421.

6. L. 2004, ch. 709, effective Nov. 16, 2004.

7. Estates, Powers and Trusts Law (EPTL), art. 11-A.

8. EPTL §11-2.3.

A-18



**\*413470550MTG9\***

| Control Number | WIID Number | Instrument Type |
|---|---|---|
| 413470550 | 2001347-000226 | MTG |



## WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE
### (THIS PAGE FORMS PART OF THE INSTRUMENT)
### *** DO NOT REMOVE ***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

TYPE OF INSTRUMENT   MTG - MORTGAGE

FEE PAGES  15           TOTAL PAGES  15

### RECORDING FEES

| | |
|---|---|
| STATUTORY CHARGE | $5.25 |
| RECORDING CHARGE | $45.00 |
| RECORD MGT. FUND | $4.75 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| | |
| TOTAL FEES PAID | $55.00 |

### TRANSFER TAXES

| | |
|---|---|
| CONSIDERATION | $0.00 |
| | |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

| | |
|---|---|
| RECORDING DATE | 12/26/2001 |
| TIME | 15:53:00 |

### MORTGAGE TAXES

| | |
|---|---|
| MORTGAGE DATE | 10/01/2001 |
| MORTGAGE AMOUNT | $200,000.00 |
| EXEMPT | Yes |
| | |
| YONKERS | $0.00 |
| BASIC | $1,000.00 |
| ADDITIONAL | $475.00 |
| SUBTOTAL | $1,475.00 |
| MTA | $500.00 |
| SPECIAL | $0.00 |
| | |
| TOTAL PAID | $1,975.00 |

| | |
|---|---|
| SERIAL NUMBER | CS38184 |
| DWELLING | 1-2 Family |

**THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:
TOWN OF NORTH CASTLE**

WITNESS MY HAND AND OFFICIAL SEAL

*Leonard N. Spano*

LEONARD N. SPANO
WESTCHESTER COUNTY CLERK

Record & Return to:
HUDSON VALLEY BANK
CLOSING DEPT
HUDSON VALLEY BANK
YONKERS, NY 10707



*450690865MTGN*

| Control Number | WIID Number | Instrument Type |
|---|---|---|
| 450690865 | 2005069-000384 | MTG |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
**\*\*\* DO NOT REMOVE \*\*\***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

TYPE OF INSTRUMENT  MTG - MORTGAGE
FEE PAGES  19             TOTAL PAGES  19

### RECORDING FEES

| STATUTORY CHARGE | $6.00 |
|---|---|
| RECORDING CHARGE | $57.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| **TOTAL FEES PAID** | **$82.00** |

### TRANSFER TAXES

| CONSIDERATION | $0.00 |
|---|---|
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

| RECORDING DATE | 04/13/2005 |
|---|---|
| TIME | 10:58:00 |

### MORTGAGE TAXES

| MORTGAGE DATE | 12/30/2004 |
|---|---|
| MORTGAGE AMOUNT | $100,000.00 |
| EXEMPT | Yes |
| COUNTY TAX | $250.00 |
| YONKERS | $0.00 |
| BASIC | $500.00 |
| ADDITIONAL | $225.00 |
| SUBTOTAL | $975.00 |
| MTA | $250.00 |
| SPECIAL | $0.00 |
| **TOTAL PAID** | **$1,225.00** |

SERIAL NUMBER          CV91818
DWELLING                 1-2 Family
THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:

TOWN OF NORTH CASTLE

WITNESS MY HAND AND OFFICIAL SEAL

*Leonard N. Spano*

LEONARD N. SPANO
WESTCHESTER COUNTY CLERK

Record & Return to:
**HUDSON VALLEY BANK**
**21 SCARSDALE RD**

**YONKERS, NY 10707**

07 - 2 3 8

JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| AGNES CARVEL ESTATE | LEONARD ROSS; DOE 1-20; DOE CORP 1-20 |

**(b)** County of Residence of First Listed Plaintiff **LONDON, ENGLAND**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    **Nassau, NY**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) 954 524 1909
Pamela Carvel, Personal Representative, appearing pro se
28 Old Brompton Rd, Ste. 158, London SW73SS, England

Attorneys (If Known) 516 594 8150
265 Sunrise Highway, Ste. 65 Rockville Centre, NY 11570

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original
    Proceeding
☐ 2 Removed from
    State Court
☐ 3 Remanded from
    Appellate Court
☐ 4 Reinstated or
    Reopened
☐ 5 Transferred from
    another district
    (specify)
☐ 6 Multidistrict
    Litigation
☐ 7 Appeal to District
    Judge from
    Magistrate
    Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
U.S. Constitution Amendments 1,5,14
Brief description of cause:
breach of lease and conversion of rental income

**VII. REQUESTED IN**
**COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION
  UNDER F.R.C.P. 23

DEMAND $ 811,450.04

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☐ Yes  ☒ No

**VIII. RELATED CASE(S)**
**IF ANY**

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
5-2-7

SIGNATURE OF ATTORNEY OF RECORD
Pamela Carvel PROSE

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

$0\ 7\ -\ 2\ 3\ 8$

Civil Action No. _____

## ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___3___ COPIES OF AO FORM 85.

MAY 0 2 2007
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

PAMELA CARVEL
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action