## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Agnes Carvel Estate, London, England ) <br> by Pamela Carvel, Delaware Ancillary Administrator) <br> Pamela Carvel, Fiduciary-Creditor, on behalf of ) <br>   herself and others similarly situated ) <br>          Plaintiff ) <br>        v. ) <br> Leonard Ross ) <br>      and ) <br> John/Jane Doe 1-20 ) <br> Doe Co. 1-20 ) <br>       Defendants ) <br> ) | **AMENDED** <br> **COMPLAINT** <br><br> **DEMAND FOR** <br> **JURY TRIAL** <br><br> Case No. <br> 07-cv-00238 JJF |

**COMPLAINT TO DISAFFIRM ACTIONS,
DISQUALIFICATION OF SURROGATE ANTHONY SCARPINO,
RECOVER DAMAGES FOR FRAUDULENT CONSPIRACY,
AND
DEMAND FOR JURY TRIAL**

Pamela Carvel, appearing *pro se*
Delaware Ancillary Administrator
28 Old Brompton Road, Suite 158
London SW7 3SS England
US tel/fax  1 954 524 1909

# TABLE OF CONTENTS

TABLE OF CITATIONS                              PAGE i

NATURE OF ACTION                                PAGE 2

FEDERAL JURISDICTION                            PAGE 5

VENUE                                           PAGE 7

PARTIES                                         PAGE 9

 "DOE" DEFENDANTS
        PAGE 10

BACKGROUND AND FACTS OF THE CASE                PAGE 11

DISAFFIRMATION OF ACTIONS IN KNOWN FRAUDS       PAGE 28

STATUTORY DISQUALIFICATION                      PAGE 32

CONCEALED RELATIONSHIP WITH BANKERS TRUST       PAGE 33

CONCEALED RELATIONSHIP WITH FRANK STRENG        PAGE 34

HUDSON VALLEY BANK LOANS                        PAGE 36

RULINGS CONTRARY TO LAW
    DEMONSTRATING BIAS                          PAGE 38

COUNTS 1-3                                      PAGE 44
    FRAUD; CONSPIRACY TO COMMIT FRAUD
(Delaware, Florida, New York)

COUNT 4                                         PAGE 45
    ABUSE OF PROCESS

COUNTS  5 TO 20                                 PAGE 46
    CONSPIRACY TO INTERFERE WITH RIGHTS
    IN VIOLATION OF 18 *U.S.C.* § 241, § 242, § 245, § 1111, §
    1117;
    28 *U.S.C.* § 1343; 42 *U.S.C.* § 1981, § 1982, § 1983, § 1985,

§ 1986, § 1988; *U.S. Constitutional Amendments* I, V, IX, XIV

COUNTS 21-26                                        PAGE 48
    VIOLATIONS OF 18 U.S.C. § 1961, (RICO),
    § 1341, § 1343, § 1952, § 2314, § 2315

DEMAND FOR JUDGMENT AND TRIAL BY JURY        PAGE 53

PLAINTIFFS' AVERMENT REGARDING RULE 11, FRCP   PAGE 53

CONCLUSION                                     PAGE 54

# TABLE OF CITATIONS

*Blacker v. Thatcher*, 145 F. 2d 255 certiorari denied 324 U.S. 848. . . . . . . . 6

*Fell v. McCready*, 236 App Div 390 . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Lawrence v. Nelson*, 143 U.S. 215, 222 . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Leighton v. Roper*,
300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537 . . . . . . . 6, 7, 39

*Liteky v. U.S.*, 510 U.S. 540, 557 (1994) . . . . . . . . . . . . . . . . . . . . . . . 32, 42

*Markham v. Allen*, 326 U.S. 490, 494. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Matter of Blodgett*, 168 Misc 898 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Matter of Cook*, 244 NY 63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Matter of Fabbri*, 2 NY2d 236. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Matter of Martin*, 255 NY 248 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Matter of Leopold*, 259 NY 274 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Matter of Rubin*, 147 Misc 2d 981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Matter of Slensby*, 169 Misc 292, 295 . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Matter of Smith*, 254 NY 283, 289 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Matter of Stanley*, 240 A.D.2d 268;660 N.Y.S.2d 107;
1997 N.Y. App. Div . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Matter of Stiehler*, 133 Misc 2d 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Matter of Von Deilen*, 154 Misc 877 . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*McMaster v. Gould*, 240 N.Y. 379. . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 7

*Pennoyer v. Neff*, 95 U.S. 714 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 7

*Pufahl v. Parks*, 299 U.S. 217. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Security Trust Co. v. Black Riv. Nat. Bank,* 187 U.S. 211. . . . . . . . . . . . . . 6

*Smither v. St.Lukes* 281 AD2d 127 (Nassau Surrogate's Court, File No. 284028, Dec.No. 274) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33. . . . . . . . . . 6

*Williams v. Jones*, 166 NY 522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## **Federal Statutes**

18 *U.S.C.* 241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 46

18 *U.S.C.*242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 46

18 *U.S.C.*245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 46

18 *U.S.C.*371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. 641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

18 *U.S.C.*1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 46

18 *U.S.C.*1117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 46

18 *U.S.C.*1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 48, 49, 52

18 U.S.C 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 46, 48, 49, 52

18 *U.S.C.*1952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 48

18 *U.S.C.*1961-68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 5, 48

18 *U.S.C.*1962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 52

18 *U.S.C.*1964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 6

18 *U.S.C.*1965 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

18 *U.S.C.*2314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 48, 49

18 *U.S.C.*2315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 48, 49

26 U.S.C.7201 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

28 *U.S.C.* 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 32, 42

28 *U.S.C.* 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 *U.S.C.* 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 *U.S.C.* 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 *U.S.C.* 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 46

42 *U.S.C.* 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 46

42 *U.S.C.* 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 46

42 *U.S.C.* 1985(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 *U.S.C.* 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 46

42 *U.S.C.* 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 46

*Federal Rules of Civil Procedure* Rule 8(e) . . . . . . . . . . . . . . . . . . . . 54

*Federal Rules of Civil Procedure* Rule 9(f) . . . . . . . . . . . . . . . . . . . 53

*Federal Rules of Civil Procedure* Rule 11 . . . . . . . . . . . . . . . . 53, 54

*Federal Rules of Civil Procedure Rule 20(a)* . . . . . . . . . . . . . . . . . . 9

*Federal Rules of Civil Procedure* Rule 71 . . . . . . . . . . . . . . . . . . 52

I.R.C. 501(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

I.R.C. 2056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

I.R.C. 2523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Revenue Procedures 89-20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Revenue Procedures 89-21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Revenue Procedures 90-30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Revenue Procedures 90-31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

Treasury Regulation Section 25.2702-(c)(1) . . . . . . . . . . . . . . . . . . . 20

*U.S. Constitutional Amendments* I . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*U.S. Constitutional Amendments* V . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*U.S. Constitutional Amendments* IX . . . . . . . . . . . . . . . . . . . . . . . . . 5

*U.S. Constitutional Amendments* XIV . . . . . . . . . . . . . . . . . . . . . . . . 5

## Delaware Statutes

12 *Del. C.* 3802(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## Florida Statutes

*Florida Statute(F.S.) 733.707*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Florida Statute(F.S.) 733.607(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## New York Statutes

*Estates Powers and Trusts Law*
*EPTL* 11-1.1 [b] [22] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*EPTL* 11-1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*EPTL* 13-1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39, 43

*EPTL* 13-1.3(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*EPTL* 13-3.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*New York Real property Law* sec. 268 . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Surrogate's Court Procedure Act* ("*SCPA*")
*SCPA* 1310(3)(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*SCPA* 1610(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*SCPA* 1810 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

*SCPA* 1811(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*SCPA* 2110 (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*SCPA* 2301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

*SCPA* 2302 (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | |
| Agnes Carvel Estate, London, England ) | |
|   by Pamela Carvel, Delaware Ancillary Administrator) | |
| Pamela Carvel, Fiduciary-Creditor, on behalf of ) | **AMENDED** |
|   herself and others similarly situated ) | **COMPLAINT** |
|        Plaintiff ) | |
|        v. ) | **DEMAND FOR** |
| Leonard Ross ) | **JURY TRIAL** |
|     and ) | |
| John/Jane Doe 1-20 ) | Case No. |
| Doe Co. 1-20 ) | 07-cv-00238 JJF |
|       Defendants ) | |
| _____) | |

## COMPLAINT TO DISAFFIRM ACTIONS, DISQUALIFICATION OF SURROGATE ANTHONY SCARPINO, RECOVER DAMAGES FOR FRAUDULENT CONSPIRACY, AND DEMAND FOR JURY TRIAL

Plaintiffs Agnes Carvel Estate ("Estate") of London, England by Pamela Carvel as fiduciary to Agnes Carvel, Delaware Ancillary Administrator for the Estate, and Agnes Carvel's personal representative for the time in question (through May 2, 2007, date filed); and Pamela Carvel fiduciary-creditor, on behalf of herself and others similarly situated, (collectively referred to as "Plaintiffs), in the above styled cause sue Leonard Ross, attorney, proxy, and fiduciary for Agnes Carvel , and sue unidentified parties, for this Amended Complaint avers:

1

## NATURE OF ACTION

1.      Notice of Lawsuit and Request For Waiver of Service of Summons was served on Leonard Ross to no avail. No response having been submitted by Ross, Plaintiffs herewith amend the Complaint and serve it with the Summons issued by the District Court to Leonard Ross.

2.      This action is not against the assets of the Estate, but against the Defendants for fraudulent conversion of Carvel assets, to compel them to return stolen assets, to disgorge themselves of their ill-gotten gains, and for damages Defendants caused Plaintiffs.

3.      Plaintiffs by Pamela Carvel (a member of the Association of Certified Fraud Examiners in the U.S. and U.K., who has no legal training or professional legal experience) are compelled to appear *pro se* after Pamela was compelled to spend all her disposable resources to defend Agnes Carvel, her aunt and an elder person, against harassment, intimidation, fraudulent conversion, violations of inalienable rights, and obstruction of Agnes Carvel's control of Carvel assets. All attempts to seek voluntary compliance, restitution, and reimbursement are obstructed by Defendants using the very Carvel assets denied to Plaintiffs to litigate against Plaintiffs rights.

2

4.    Leonard Ross, as attorney, proxy, and fiduciary to Agnes Carvel since 1991, represented Agnes Carvel and the Estate in matters concerning Delaware corporations, Delaware assets, and Delaware claims. Contrary to express written prohibition by the Delaware ancillary administration, Ross acted to wipe out Plaintiffs' Delaware claims without due process and without notice to interested parties and creditors. Ross harmed Plaintiffs by failing and refusing to assert Delaware claims in New York, and by actively and aggressively obstructing Pamela Carvel's ability to assert such claims New York.

5.    Although Ross has an intimate knowledge of the crimes against Plaintiffs, Ross failed and refused to defend and protect the Plaintiffs' rights and interests once Ross covertly agreed by stipulation to be paid from Agnes Carvel's stolen assets on the consent of Plaintiffs' abusers and long-standing adversaries in litigation. Ross further conspired to commit acts in a criminal enterprise to damage Plaintiffs' claims in exchange for profit to himself and his co-conspirators.

6.    Upon information and belief, Defendants engaged in an enterprise within the definition contained in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 *U.S.C.* §1961-68, §1961(4). The

3

named Defendant together with the Doe defendants conduct activities prohibited by 18 *U.S.C.* §1962.

7.      Plaintiffs seek orders from the District Court:

1)      for discovery to identify, quantify and assert damages inflicted on Plaintiffs by Defendant Leonard Ross and others yet to be identified through discovery;

2)      to disaffirm all individual and professional acts taken by Defendants in the name of Plaintiffs;

3)      to discover the extent of Defendants' criminal acts and those with whom they conspired to defraud Plaintiffs;

4)      to statutorily disqualify the acts of Westchester County New York Surrogate Anthony Scarpino in all Carvel estate matters because of covert conflicts of interest, bias, failure to follow the law, violations of Constitutional rights of Plaintiffs, and apparent bribery in collusion with Defendants so as to fraudulently convert Plaintiffs assets to Defendants;

5)      for original damages as of 1990 in an value estimated in excess of $300 million, of which approximately $250 million are Delaware assets.

6)      for taxes, penalties, statutory interest on the original damages, and for triple damages pursuant to RICO statutes.

4

## FEDERAL JURISDICTION

8.    United States District Court for the District of Delaware has original jurisdiction over this action pursuant to 28 *U.S.C.* §1331 (federal questions) for civil actions arising under the Constitution and laws of the United States; including but not limited to: 18 *U.S.C.* §241 (conspiracy against rights), §242 (deprivation of rights), §245 (protected activities), §1111 (felony murder), §1117 (conspiracy to murder), §1341(frauds and swindles), §1343 (fraud by wire), §1952 (aid of racketeering), §1961, et seq. (RICO), §1964 (a),(c) (civil RICO remedies), §2314 (transportation of stolen securities), §2315 (receipt of stolen moneys); 28 *U.S.C.* §455 (disqualify judge), §1343 (civil rights); 42 *U.S.C.* §1981(equal rights), §1982 (property rights), §1983 (deprivation of rights), §1985 (conspiracy against rights), §1988 (proceeding in civil rights); and under the First (redress of grievances); Fifth (due process), Ninth (other rights), and Fourteenth (equal treatment) Amendments to the Constitution of the United States.

9.    This Court has supplemental jurisdiction over the state claims herein pursuant to 28 *U.S.C.* §1367, as Plaintiffs assert state claims arising from a common nucleus of operative facts with Plaintiffs' Federal claims.

10.    Plaintiffs amend Complaint to include 18 *U.S.C.* §1664 on the information and belief that events since the original filing and future discovery will prove that Defendants conspired to abuse Plaintiffs assets, to fraudulently evade payments due Plaintiffs, to evade taxes in fraud against government agencies, and to evade payment of any judgment to creditors.

11.    The Supreme Court of the United States has often reaffirmed the power of the Federal courts to take jurisdiction over executors and administrators without regard to the provisions of State statutes (*Leighton v. Roper*, 300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537; *Markham v. Allen*, 326 U.S. 490, 494; *Blacker v. Thatcher*, 145 F. 2d 255, certiorari denied 324 U.S. 848; *Pufahl v. Parks*, 299 U.S. 217; *Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33; *Security Trust Co. v. Black Riv. Nat. Bank,* 187 U.S. 211; *Lawrence v. Nelson*, 143 U.S. 215, 222).

12.    Westchester Surrogate's Court cannot and does not have the exclusive adjudication power over this foreign estate and its foreign administrations in Delaware, Florida and London. As demonstrated below, apparent criminal acts statutorily disqualify the Westchester Surrogate. In *McMaster v. Gould*, the general rule was followed on the authority of *Pennoyer v. Neff* (p. 733), which held that "proceedings in a court of justice

6

to determine the personal rights and obligations of parties over whom that court has no jurisdiction do not constitute due process of law." [*Leighton v. Roper*, 300 N.Y. 434; 91 N.E.2d 876; 1950 N.Y.18 A.L.R.2d 537; *Pennoyer v. Neff*, 95 U.S. 714; *McMaster v. Gould*, 240 N.Y. 379]. The Estate's beneficiaries and creditors are not within the jurisdiction of New York and have never been noticed in New York proceedings.

## VENUE

13.    Delaware is the correct venue for this Amended Complaint because the Defendants' apparent crimes and acts that defrauded Agnes Carvel in Delaware also defrauded the Estate's ancillary administration in Delaware, defrauded Delaware claimants and creditors, and violated Delaware statutory and contract obligations owed by Agnes Carvel (12 *Del. C.* §3802(b) (1994)).

14.    Venue lies in this district under because Agnes Carvel, her estate and Pamela Carvel as her fiduciary are deemed "aliens" as foreign citizens.

15.    Venue in this district is proper under 18 *U.S.C.* §1965. This Amended Complaint alleges RICO violations and therefore invokes the venue provisions of the RICO statute. Justice demands that Delaware

7

District Court hear this case, as provided in 18 *U.S.C.* §1965(b), because apparent criminal enterprise, bribery and political corruption in New York denied Plaintiffs the right to redress grievance in New York, and denied jurisdiction over non-New York debts and denied that New York law protects a foreign fiduciary or Delaware ancillary administration interests n estate assets (A-11).

16.    The largest claim (over $200 million) to recover stolen assets of Agnes Carvel is in Delaware. Therefore the largest theft of assets and greatest fraud against Plaintiffs is in Delaware. Delaware is the correct venue because the apparent frauds by Defendants elsewhere were intended to prevent the recovery of the value of Agnes' Delaware corporate interests, the most substantial asset claimed.

17.    On information and belief, the denial of funds to the Delaware ancillary administration (A-10) was intended to obstruct professional legal representation that is necessary, essential and indispensable for the Delaware ancillary administrator to carry out her fiduciary obligations and duties for Agnes Carvel, for Agnes' legitimate beneficiaries and creditors, and for the laws of Delaware and the United States.

8

**PARTIES**

18.    Plaintiffs, are deemed a citizen of the United Kingdom, having a mailing address:  Agnes Carvel Estate, 28 Old Brompton Road, Suite 158, London SW7 3SS England, United Kingdom. Plaintiffs are defined as a foreign citizen (*28 U.S.C. 1332 (c)(2))*. Plaintiffs are amended pursuant to *Federal Rules of Civil Procedure Rule 20(a)* that states, "all persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action."

19.    Defendant, Leonard Ross is a lawyer licensed in New York with a mailing address: Ross & Matza, 265 Sunrise Highway, Suite 65, Rockville Centre, New York 11570. Leonard Ross knowingly and intentionally committed acts and omissions over Delaware assets and effecting Delaware claim issues, in collusion with co-conspirators in Delaware and elsewhere. Defendants knew of their harmful acts in Delaware and outside Delaware would damage Plaintiffs' claims and assets in Delaware. Defendants' acts in Delaware and effect on Delaware issues were

9

a direct and foreseeable result of the conduct in furtherance of the conspiracy and criminal enterprise against Plaintiffs.

20.    There is intentional interference with business relationships, contractual relationships, and intentional obstruction of the rights of Plaintiffs, and an attempt to prevent Plaintiffs' pursuit of substantial Delaware claims to Carvel assets, so that strangers may divert Carvel assets and profit.

21.    Plaintiffs assert that the People and governmental entities of the United States, on behalf of whom Plaintiffs also complain, are harmed. On information and belief, co-conspirators who induced Ross to breach his duty of loyalty and fiduciary obligations also damage others, through tax fraud, money laundering, and charity fraud.

## "DOE" DEFENDANTS

22.    Upon information and belief, Defendants John/Jane Doe 1-20 and Doe Co. 1-20 are individuals and businesses, to be identified upon subsequent discovery, which participated in the activities described herein. Plaintiffs are ignorant of the true names, capacities, nature and extent of participation in the course of conduct alleged here and therefore, sues these defendants by such fictitious names. Plaintiffs will, if necessary, seek leave

of Court to further amend this Amended Complaint to reflect the true names and capacities of the defendants designated herein as Doe defendants when their identities and liabilities become known. "Doe" defendants, participated as co-conspirators in the violations alleged in this Amended Complaint, performed acts, and made statements in furtherance thereof. Such Doe defendants as co-conspirators aided, abetted, or participated in the enterprises identified below in the commission of the wrongful acts or otherwise caused the damages suffered by Plaintiffs.

## BACKGROUND AND FACTS OF THE CASE

23.    Thomas Carvel was renowned for the "Carvel" soft ice cream franchise system and his genius for in-house advertisements for "Carvel" products. "Carvel" innovations and advertisements are archived at the Smithsonian Institution's National Museum of American History.  Agnes Carvel advanced the first money to her future husband Tom to begin the couple's joint business relationship that lasted over 50 years. Tom's brother Bruce Carvel (Pamela's father) created the first Carvel continuous ice cream freezers and formulas that became the trademark of Carvel products. Only the Carvels are denied benefit of the Carvels' life's work.

24.    Agnes Carvel died on August 4, 1998 while residing in London, England. Agnes was a United Kingdom citizen since birth. The High Court of Justice for England and Wales admitted her last Will and Testament dated July 7, 1995 for probate without contest. Pamela Carvel was appointed the sole executor and sole personal representative under that Will. On June 11, 2007, Pamela Carvel was replaced with a Judicial Trustee named by Agnes Carvel's adversaries. This change is contested. Nonetheless, Agnes Carvel's Will was never contested and remains in force. The Will provides that anyone who harmed or litigated against Agnes Carvel in life, or litigated against her estate shall not inherit.

25.    Agnes never received one penny of income from Tom's estate in violation of the terms of Tom's alleged Last Will, thereby creating tax fraud by the fraudulent elections of QTIP and marital deductions (I.R.C. 2056, 2523; 18 U.S.C. Sec. 371, 641; 26 U.S.C. Sec. 7201 et seq). Agnes' death from stroke was procured deliberately by stress from the fraudsters who stole control by forgery of charities that the Carvels founded and funded. Agnes' death was to silence Agnes' accusations against those who may have conspired with her attorney, Leonard Ross, in the theft and

12

conversion of Carvel assets. Those accusations resulted in several felony convictions thus far.

26.    For approximately seven years, Ross gave the appearance of being an honest lawyer who assisted Agnes and Pamela Carvel in investigations of criminal activities in Thomas Carvel's estate, in corporations claimed by Agnes Carvel, and in stolen Carvel charities. Ross' information, along with the efforts of Pamela Carvel's investigators, assisted the F.B.I., the New York Attorney General, and the U.S. Attorney in successfully obtaining felony convictions for financial and real estate frauds harming Agnes Carvel in Thomas Carvel's estate.

27.    Ross was directed by Pamela to recover damages caused Agnes, Pamela, and the Estate from those whose gross mismanagement and collusion in felony activities harmed Plaintiffs. Ross refused, asserting that such endeavors would not put any more money in his pocket. These fraudsters eventually became Ross' source of income. Without the fraudsters' consent and connections with the Surrogate, Ross might get almost nothing. Before Ross colluded with the fraudsters, the Surrogate denied his fee applications.

28.    Agnes and Pamela are the only fiduciaries denied by Westchester Surrogate's Court equal indemnification of legal fees and litigation expenses because they are also the only "whistleblowers" concerning criminal activities, including apparent bribery of the Surrogate by the Carvels' adversaries. Carvel investigators assisted New York State Attorney Generals Abrams and Spitzer in felony convictions for financial fraudsters operating in connection with Thomas Carvel's estate (William Zuga (twice), Francis Zarro). The U.S. Attorney in another matter convicted another Carvel estate fraudster, William Fugazy, for perjury.

29.    The Carvels also assisted the New York Attorney General in charity fraud investigations that forced the ouster of two alleged Carvel charity managers for charity frauds and self-dealing, but not before the duo installed their "loyalist" cronies to litigate against Agnes using restricted charitable gifts thereby creating additional tax fraud (I.R.C. 501(c)(3)). Those who stole the identity of the "Thomas and Agnes Carvel Foundation" and "International Institute of Health Foods" fear loosing control of misappropriated multi-million dollar Carvel assets.

30.    The fraudsters' intention was stated in a manifesto written on February 18, 1992 (A-1) in the midst of the Attorney General's fraud

investigations: removing Robert Davis and Mildred Arcadipane "**provides family with opportunity to assume control of Foundation, Estate and Agnes' assets.**" Nothing could more clearly demonstrate the **intent** to defraud Agnes Carvel of her assets in her lifetime and defraud the Carvels' legitimate charitable intentions for their estates.

31.    Ross was Agnes Carvel's attorney in foundation matters for almost seven years, including the years of the New York Attorney General's investigations. Ross acted as Agnes Carvel's proxy in foundation matters for several years during which he identified numerous grant frauds. When Pamela Carvel directed Ross to take action in New York to enforce the stated and implied intentions of Agnes Carvel, he refused. When Ross was directed to continue the investigations into obvious criminal activities using forensic accountants, Ross refused. Ross refused all requests to oppose the fraud and abuse of the Carvels restricted charitable gifts. Pamela later learned that Ross entered into covert stipulations with the foundation usurpers and other adverse litigants for payments to Ross only if he obstructed all funds from reaching Pamela.

32.    The week before Tom died he estimated the family worth to exceed $250 million in cash, U.S. Treasury securities, and real estate, of

which approximately $200 million were the proceeds from the sale of jointly owned Carvel Corp. stock (a Delaware corporation). The week after Tom was found dead, Agnes was told there was less than $40 million and that virtually none of it belonged to her. Agnes and Pamela also knew first hand that Tom and Agnes owned everything jointly with rights of survivorship, but deeds, stock and banks accounts were diverted by theft of records or altered by forgery.

33.    Not one original document can be found for the sale of jointly owned Carvel Corp. stock on November 21, 1989. No documents bear an ink signature of Tom or Agnes. All three original stock certificates (Nos. NB 853, 857, 863), all issued on January 13, 1986 to "Thomas Carvel and Agnes Carvel, Joint Tenants", remained in Agnes Carvel's possession. The stock certificates were never endorsed to transfer joint ownership at any time.  No stock powers were used to transfer joint ownership. Secretary Mildred Arcadipane or attorney Robert Davis signed many alleged sale documents instead of the Carvels, although neither fraudster had power of attorney to act on the Carvels' behalf.  Other documents have signature-only pages that do not match the preceding pages that alleged to contain agreement terms.

Although reference to payments by notes for approximately $100 million was found, such payments are totally missing.

34.    The copies of stock sale documents, produced by the fraudsters after Thomas Carvel's death, allege a sale of only half the stock owned by Tom and Agnes, i.e. only 660,646 shares not 1,321,292 shares. The missing 660,646 shares (No. NB 863) appear to constitute the missing $100 million that Thomas Carvel intended to investigate with his niece Pamela Carvel before his suspiciously timed death occurred. Tom's death certificate was falsified apparently to evade autopsy. Tom's possible murder is the subject of another proceeding to exhume his body to establish cause of death.

35.    Agnes Carvel, as surviving joint owner, was defrauded out of the alleged sale proceeds by a series of fraudulent bank and trust transactions involving Hudson Valley Bank, Bank of New York (on probation for money-laundering violations), NatWest Bank, Barnett Bank, and the fraudsters who boast close personal relationships to the owners and officers of the banks.

36.    The banks allowed Arcadipane and Davis to fax instructions to move millions of Carvel money in and out of Tom, Agnes and Bruce Carvel's personal bank accounts without the knowledge or consent of Tom,

Agnes or Bruce and without any "power of attorney" to act on any Carvels' behalf (18 U.S.C. Sec. 1343). Investigations by the New York State Department of Banking confirmed Pamela's discovery that Davis altered at least $4.75 million in U.S. Treasury Bills and Notes held by Hudson Valley Bank to appear to give Agnes ownership; but in actuality, Davis was covering up his previous manipulations of ownership title resulting in the theft of over $15 million sale proceeds in Hudson Valley Bank that belonged to Agnes as surviving joint owner. When Pamela uncovered the theft, the $4.75 million that had been allegedly transferred to Agnes was then fraudulently converted to a Florida trust without Agnes' knowledge.

37.    The so-called "Agnes Carvel 1991 Trust" diverted over $10 million of Agnes' assets without knowledge or consent of Agnes. Approximately $5 million of that money came for the alteration of purchase receipts for U.S. Treasury bills and notes held at Hudson Valley Bank. Bank of New York closed over 20 of Agnes' passbook accounts, totally about $1 million, allegedly using "lost passbook affidavits" although Agnes had the passbooks. Bank of New York transferred another $4 million of unitrust distributions from Agnes' personal accounts without Agnes' knowledge or consent.

38.    Agnes was cut-off at the trustees' "discretion" when Ross commenced demands for accountings. The trustees stopped all distributions after Ross advised Agnes not to sign a "Receipt, Release and Indemnity Agreement" wherein the trustees would be forgiven all past acts, never required to account, Agnes would give blanket approval of all unknown disbursements, and the trustees would be indemnified.

39.    Under Florida statute (F.S. 733.707; 733.607(2)) and the trust agreement, upon Agnes death the trustees "discretion" ended. Pursuant to a Florida Appellate Court decision (A-3), the Estate became the "intended beneficiary" of the trust to be paid funeral expenses, debts, taxes, and estate administrative expenses (A-6, para. 2). Without Pamela's knowledge or participation as personal representative, Ross entered into a stipulation for payment to himself, excluding Pamela as personal representative. Ross admitted in a telephone conversation with Pamela that he and the attorney hire by Pamela for the Estate would be paid their fees and expenses (approximately $4 million), without threat of surcharge, in exchange for obstructing all funds from reaching Pamela. The stipulation violates Florida statutes and the trust agreement, and defrauds the Estate and Pamela as fiduciary and creditor.

40.     Ross assisted Pamela in the investigations into criminal activities of the trustees. Ross had information from the banks that Agnes never consented to the transfer of almost $10 million dollars into the trustees' control. After Agnes death, Ross refused to pursue the mandatory trust payments under Florida statutes to Pamela as executor for funeral expenses, debts, and administrative expenses. Ross entered into covert stipulations with the trustees that only Ross' expenses would be paid. Ross, as New York ancillary administrator, sought to be exempt from any claims procedure the Florida Court might impose (A-5, para.4).

41.     Ross and the trustees, who were cohorts of Davis and Arcadipane, obstructed further investigations into the theft of Agnes' funds. These Florida trustees pay themselves, their attorneys, Ross, and the foundation usurpers, with millions from Agnes' money, to litigate against Agnes. Agnes and her estate received nothing but the tax bill.

42.     After the sale of Carvel stock was allegedly agreed, Arcadipane and Davis backdated documents allegedly creating the "Thomas Carvel Charitable Remainder Unitrust" for deferring Carvel stock sale proceeds from capital gains tax (Treasury Regulation Section 25.2702-(c)(1); Revenue Procedures 89-20, 89-21, 90-30, and 90-31). Tom and

Agnes Carvels' jointly owned stock certificates were never surrendered or transferred on March 1, 1989, the date that their stock was allegedly contributed to the "unitrust". No stock power was used to transfer the stocks. The "unitrust" was a sham to give Arcadipane and Davis power over Carvel money and power to obstruct the income payable to Tom and Agnes if they began asking questions (which is what they did to Agnes).

43.     The original trust allegedly contained eight trustees. After Tom's death, Arcadipane and Davis alleged that four trustees, who were "Carvel" employees, had been removed leaving only Arcadipane, Davis and the two trustees who were the least knowledgeable about "Carvel" business affairs – Adele Alexander, Tom's niece and Mary Ellen Cerrato, the wife of a friend. Arcadipane and Davis ran the trust without the knowledge or consent of the other two trustees. Allegedly no records were kept. When Agnes sought to remove Arcadipane and Davis as fiduciaries for fraud and demanded accountings from the trustees, Arcadipane, Davis and Cerrato cut off mandatory distributions to Agnes, but continued to use Agnes' money to pay their own legal fees to cover-up the phony trust creation and to litigate against Agnes' income rights.

44.    The unitrust was a fraud intended to evade taxes and make the Carvels prisoners of the trustees. On information and belief, over $10 million was diverted from the alleged original funding of the trust ($24 million instead of $35 million). The phony unitrust defraud Agnes out of the sale proceeds of Agnes' jointly owned Carvel stock and converted that money, tax-free, to Agnes' adversaries.

45.    Ross as Agnes' attorney failed to follow through with Agnes' litigation to compel accountings. Ross as administrator refused to assert Agnes' ownership of the whole of the trust that was apparently diverted to the trustees by fraud. Ross admits under oath that there were no funding documents in the trustees' records; no records indicating the legitimate transfer of stock; however, Ross refused to act on the Estate's behalf to claim the proceeds for Agnes. Contrary to Pamela's express written prohibition and without notice to the Estate, its beneficiaries or its creditors, Ross entered into an agreement to close the trust in exchange for only several hundred thousand dollars on which he would be paid commission. The body of the trust went to the foundation usurpers. Agnes was defrauded out of between $25-35 million, and damages, by a conspiracy to convert her stock ownership to strangers.

46.    The claim in Delaware to Carvel Corp stock ownership is part of the claim to ownership of Andreas Holdings Corp. ("Andreas", a Delaware corporation). Andreas purports to be a merger of former Carvel Corp. wholly owned subsidiaries retained by Tom and Agnes Carvel. Agnes was joint owner of Carvel Corp. On information and belief, the merger documents are fraudulent, incorrect in form, and do not reflect Agnes' ownership. In 1995, Agnes and Pamela as Andreas' directors sued in Delaware Chancery Court to establish the ownership and whether the merger was valid. Lawrence Fay (deceased) attorney to foundation usurpers, who diverted control of the Carvels' charities with the stated intent to prohibit family control of Carvel assets, submitted a perjured affidavit in Delaware stating that the ownership matter was already before the Westchester Surrogate for determination. Later, in tape-recorded minutes Fay stated that he knew the determination wasn't before the Westchester court. Eight years later, the foundation usurpers' attorney stated to the Surrogate that the matter was not before the Westchester court and had never been before the Westchester court. The Surrogate directed that the matter be determined in Delaware, knowing the damage to Agnes' interest was already done. With that, Pamela as Delaware administrator sought the Estate's assets to pay for

asserting the Estate's claim. The Surrogate refused funding stating that no law in New York provides for payment to a Delaware ancillary administrator (who is also the Estate's executor) (A-11, para. 3). The intent became clear. Agnes was denied justice in her lifetime by perjury. Her estate would be denied justice by default for not having funds to prosecute the claim, while the Surrogate withheld over $20 million in Estate assets in New York for benefit only to Agnes' adversaries.

47.    Ross failed and refused to assist Pamela in asserting claims for necessary funds because of his covert agreements for his own profit. Ross as attorney and administrator was negligent in New York by failing to correctly valued Andreas. The opening balance sheet shows over $20 million in assets (A-13). Ross accepted less than $10 million as reflected in Tom's estate, and didn't care to look further. (Other documents could indicate that the sum missing may be $40 million.) The same directors who looted Chain Locations of America, Inc. (a New York corporation) were conflicted directors in Andreas. Ross as attorney and administrator failed to do anything about the perjury by Fay. Ross failed and refused the Estate's request to hire professionals to determine embezzlement, tax fraud, money laundering, or other possible crimes although these same directors had been

24

involved with financial fraudsters who were convicted by the New York Attorney General and U.S. Attorney. Ross' negligence defrauded Plaintiffs out of over $20 million, and damages, from a conspiracy to convert Agnes' corporate ownership to strangers.

48.    Chain Locations of America, Inc. (a New York real estate corporation) was jointly owned by Tom and Agnes with rights of survivorship. It was falsely alleged to Agnes after Tom's death that she had no interest in the corporation. Pamela's investigations proved Agnes never gave up her ownership interest. Westchester Surrogate's Court conceded only 50% ownership to Agnes after she was dead and after the corporation had been looted of all its property and cash. The only money left in the company was $2.8 million protected by Agnes and Pamela away from the reach of Agnes' adversaries in an escrow account. Ross allowed even those preserved assets to be looted after they were returned to the corporation.

49.    Chain's triple-net rental real estate was valued at $8 million in 1990 at Tom's date of death.  Chain's triple-net income was approximately $500-$700,000 per year. Almost the only legitimate expense was a "management fee" set at approximately 4%, an industry standard used by Thomas Carvel.  By 2007, Chain should have been worth over $20 million.

Chain's alleged value by Ross is less than the $2 million, nearly on third less than the sum protect by the Carvels in escrow.

50.    Ross refused to hire fraud examiners to determine whether the conflicted directors engaged in tax fraud, self-dealing, embezzlement or other frauds. Ross failed to claim any unpaid income due Agnes; failed to demand amended tax returns; failed to assert any damages for defrauding Agnes out of ownership; failed to identify unjust enrichment or to seek restitution; failed to indemnify Agnes and Pamela's legal fees as directors equal to that indemnified by the corporation for the conflicted directors who defrauded Agnes. Ross' negligence defrauded Agnes and her estate out of over $20 million, and damages, from a conspiracy to convert Agnes' corporate ownership to strangers.

51.    Agnes Carvel's ownership of approximately $200 million taxable proceeds of the sale of Carvel Corp. stock (a Delaware corporation), and subsidiaries retained by Tom in the sale, disappeared after Tom's death. Although Ross as Agnes' attorney assisted in several investigations to discover the whereabouts of the diverted funds, once Ross became New York ancillary administrator he colluded with those who divert the funds to wipe away Agnes' claims.

26

52.    More than being grossly negligent in the representation of Agnes' interests, long known to Ross, Ross actively and aggressively assisted in the obstruction of Pamela Carvel's right to equal representation as a fiduciary, equal funding as a fiduciary, and equal access to relevant records, so as to obstruct Pamela's further investigations into the crimes of Defendants. Ross refused to assist, and obstructed reimbursement to Pamela for funeral expenses; refused and obstructed reimbursement to Pamela for legal fees advanced for Estate attorneys used by Ross as ancillary administrator; refused and obstructed all professional assistance needed to assert Carvel claims to assets. The purpose has been to drive Pamela Carvel into the same destitution that Agnes Carvel was left in at her death.

53.    Ross has known, become aware, and was made aware on every apparent criminal act perpetrated against the Carvels. As an officer of the court, Ross has an ethical obligation to report the illicit activities of other attorneys. He has not. Ross has been assured approximately $4-5 million for "fees and expenses" for betraying the rights and interests of the Carvels.

## DISAFFIRMATION OF ACTIONS IN KNOWN FRAUDS

54.      New York *Estates Powers and Trusts Law* sec. 13-3.6 (*EPTL*

13-3.6) (also see *New York Real property Law* sec. 268) states as follows:

"A fiduciary may, for the benefit of creditors or others interested in
property held in trust, treat as void any act done, or disposition or
agreement made in fraud of the rights of any creditor, including
himself, interested in such property, and a person who fraudulently
receives, takes or in any manner interferes with the property of a
deceased or insolvent person is liable to such fiduciary or a receiver for
such property or the value thereof, and for all damages caused by such
act to the trust estate.

A creditor of a deceased insolvent debtor, having a claim against the
estate of such debtor exceeding in amount the sum of one hundred
dollars may, without obtaining a judgment on such claim, in like
manner, for the benefit of himself and other creditors interested in such
property, treat as void any act done or disposition or agreement made in
fraud of creditors or maintain an action to set aside such act, disposition
or agreement.

Such claim, if disputed, may be established in such action.

The judgment in such action may provide for the sale of the property
involved, when a disposition thereof is set aside, and for the payment of
the proceeds thereof into the appropriate surrogate`s court to be
administered according to law."

55.      Pamela Carvel as the Estate's personal representative (1998-

2007) and Delaware administrator disaffirms the fraudulent acts by Ross and

Doe defendants unknown to Plaintiffs at this time, resulting in the

conversion of Agnes Carvel`s property held in the so-called "Thomas Carvel

28

Charitable Remainder Unitrust" ("unitrust"), the so-called "Agnes Carve 1991 Trust", "Chain Locations of America, Inc." ("Chain"), Andreas Holdings Corp. ("Andreas"), and all other agreements Defendants made allegedly on behalf of Plaintiffs. Ross' negligence and fraud upon the Estate's administrator, creditors and beneficiaries includes his failure to: demand accountings; demand backup; conduct a fraud investigation for missing assets; seek to remove conflicted directors with a known history of engaging in alleged business deals with felons; enforce the terms and intent of Agnes Carvel's uncontested Will.

56.    The Defendants acts and omissions harming Delaware claims are not accidental, or from lack of knowing. In a New York Law Journal Article written by Eve Markewich (A-14), the attorney hired by Pamela to represent the Estate in New York, she anonymously describes the numerous violations of disciplinary rules and ethical codes inflicted on Agnes Carvel by her adversaries. Ross failed to seek damages on Agnes' behalf; failed to file any professional complaint; failed to assert significant violations of elder law, by Surrogate's Court, Agnes' adversaries, other fiduciaries, and their attorneys, that were directed against Agnes Carvel to procure her death. Conspiracies to deprive Agnes of life, not to mention other Constitutional

29

rights, are crimes that Ross ignored with intent. Ross allowed all legal fees for those who harmed Agnes to be paid in full without fee applications to the Court, thereby diminishing Agnes' income and assets.

57.    The foundation usurpers allege that they represent the intended beneficiary of the Carvel estates. Although Ross as Agnes' attorney assisted her is taking back her charity from the usurpers, once Agnes died and the usurpers controlled the purse strings paying Ross, he never again assert the stated criminal intentions of the usurpers, or their abuse of Agnes' restricted charitable gifts to litigate to deprive Agnes of income. The Westchester decision on an "Agreement" determined that a will contract, exclusively between Tom and Agnes to not change their wills and not make "gratuitous transfers", was valid only if Agnes had unrestricted disposal of her income. The usurpers alleged to be the remainder beneficiary of the Carvel estates; however, that decision came after Agnes had been denied income for 13 years, and only after Agnes was dead for 5 years. The usurpers obstructing the distribution of income to Agnes and her designated successors, thereby voids the Agreement.

58.    Defendants defraud Plaintiffs by "rejecting" all payments from Agnes' income – all funeral expenses, legacies, all executor's expenses, etc.

Ross fails and refuses to assert Agnes' enforcement of the Agreement contract, or assert that the obstructions by the foundation usurpers make the Agreement void.

59.    By Surrogate's Court's determination in the "Agreement" decision, Agnes was entitled to dispose of any and all income without restriction in order to validate the marital deduction. A testamentary plan made during Agnes' life is a valid disposition of Agnes' income, if not, tax fraud exists for which there is no statute of limitation. Enforcement of the testator's intention is required by law (*EPTL* 13-1.3(e); *Smither v. St.Lukes* 281 AD2d 127 (Nassau Surrogate's Court, File No. 284028, Dec.No. 274); *Matter of Fabbri*, 2 NY2d 236; *Matter of Martin*, 255 NY 248; *Matter of Cook*, 244 NY 63; *Williams v. Jones*, 166 NY 522; *Fell v. McCready*, 236 App Div 390; *Matter of Stiehler*, 133 Misc 2d 253; *Matter of Blodgett*, 168 Misc 898; *Matter of Von Deilen*, 154 Misc 877; *Matter of Smith*, 254 NY 283, 289). Ross not only fails to enforce Agnes' intentions, her "rejects" them, causing damages, by conspiracy to defraud the legitimate named beneficiaries.

60.    Pamela Carvel is the beneficiary of Agnes' personal property under the Will. An attorney in Tennessee had EE Savings Bonds in Agnes'

name valued at approximately $40,000. Ross as New York administrator has jurisdiction limited to New York. When the Tennessee attorney asked Ross for the address of Agnes' executor, Pamela, to send her the bonds, Ross redirected the bond to his office on the pretense that he would delivery them to Pamela. Ross stole the bonds from Pamela and fraudulently converted the stolen property to commissionable estate property by denying Pamela the inheritance.

## STATUTORY DISQUALIFICATION

61.    The Estate also asks that the District Court determine the statutory disqualification of Westchester County Surrogate Anthony Scarpino acts in all matters relating claims of Agnes Carvel because of his violations of civil rights guaranteed by the Constitution and laws of the United States. Statutory disqualification is not a matter of estate administration (*Liteky v. U.S.*, 510 U.S. 540, 557 (1994); 28 U.S.C. 455(a), (b)(2)). It is a matter of the violation of Constitutional rights by examples occurring in Surrogate's Court. No court, no judge of the United States is above the law protecting citizens.

62.    In several estates, Surrogate Scarpino repeatedly demonstrated that he lacks personal and professional "conscience" required to determine

32

his own need to recuse himself. Surrogate Scarpino's demonstrates bias, repeated failure to disclose conflicts with the appearance of impropriety, prejudice, failure to follow the law, and suspected bribery in a conspiracy denying Plaintiffs' Constitutional rights.

## CONCEALED RELATIONSHIP WITH BANKERS TRUST

63.     Anthony Scarpino was employed by Bankers Trust Company. In the Estate of Edmond McCormick, Bankers Trust Company appears as an executor along with the widow Suzanne McCormick. Like Agnes Carvel, Suzanne is denied all income from her husband's estate and denied the equal payment of her legal fees as that given to Bankers Trust. When Suzanne learned that Surrogate Scarpino worked for the Bank, she asked that he recuse himself from the case because of the appearance of bias. Surrogate Scarpino refused. As the apparent bias continued to favor Bankers Trust against the estate's beneficiary and co-executor, denying the widow all funds, Suzanne picketed the Bank and newspapers revealed the apparent conflict of interest between Surrogate Scarpino and the Bank. When Suzanne asked for the disqualification of Surrogate Scarpino, only then did he cite media attention as the reason for his recusal, not disqualification.

Recusal came only after the decisions irreparably harming Suzanne were threaten by possibly being invalid from disqualification.

64.    Although Bankers Trust was the only bank for the Estate of Thomas Carvel, even after his recusal in the McCormick case the Surrogate failed to disclose his relationship in the Carvel case.

## CONCEALED RELATIONSHIP WITH FRANK STRENG

65.    Westchester attorney Frank Streng worked for Surrogate Scarpino on the Surrogate's transition committee from Supreme Court. Neither Streng nor the Surrogate disclosed their relationship in cases together. In the Estate of Margaret McKeown, Streng was accused of collusion in the forgery of assignments to launder funds stolen from Red Cross 9/11 accounts and to defraud creditors. Margaret's son Kevin McKeown asked that Streng be disqualified. The Surrogate denied the motion.

66.    Although the Will was uncontested, Surrogate Scarpino refused to grant probate for 2 years, thereby denying Streng's accuser, Kevin McKeown, standing as executor of the estate. Kevin McKeown discovered that Streng was advertising his relationship with the Surrogate on the Internet. Only after Kevin demanded Surrogate Scarpino's disqualification

did the Surrogate recuse himself, leaving in place the obstruction to probate and the edict that no motions could be filed without prior court approval.

67.    Frank Streng was attorney for Pamela Carvel as executor for Agnes Carvel. Neither Streng nor Scarpino disclosed the relationship even after Surrogate Scarpino recused himself from the McKeown case. When Pamela asked Streng to oppose the Ross accountings and $3 million in legal fees (now almost $4 million), Streng refused, stating he had acquire a conflict of interest favoring Ross and Markewich over Pamela, the Estate's executor who was Streng's client. Streng submitted a motion to withdraw as Pamela's lawyer. Pamela asked the Surrogate to recuse himself based on the recusal in the McKeown case. The Surrogate refused and granted Streng's withdrawal leaving Pamela without legal counsel. Subsequently, Surrogate Scarpino denied all motions by Pamela for reimbursement of her funds expended on the Estate's behalf to pay legal counsel. Streng refused to account for over $1 million in the monies he was paid with the Surrogate's approval.

68.    Eventually, the Surrogate ordered a court conference to establish payment of Pamela's new counsel. Reimbursement to Pamela was denied by all of Agnes' adversaries, including Ross. No other fiduciary,

except Agnes, is denied indemnification of legal fees. No other fiduciary, except Agnes, is required to pay administrative expense out of their own pocket and then seek reimbursement. The bias against the Carvels is obvious and demonstrable with hard evidence.

## HUDSON VALLEY BANK LOANS

69.    Agnes Carvel's only adversaries for 17 years have been the foundation usurpers whose written stated intent is to prohibit Carvel control of Carvel assets (A-1). On the same document (#11;A-2) the acceptable "loyalists" to become successor members and directors is listed "Hudson Valley" generically, i.e. anyone from Hudson Valley Bank will be a loyalist to the foundation usurpers.

70.    As soon as Tom's was found dead, the usurpers moved to the Hudson Valley Bank Building. Soon thereafter the Bank's chairman and major controlling stockholder, William Griffin, was installed as an alleged foundation member and director. Soon again, the Bank's other major controlling stockholder, Robert Abplanalp, was also installed. When Abplanalp died, his daughter replaced him. She too is a major controlling stockholder in the Bank. Griffin and the Abplanalps authorized the abuse of Agnes' restricted charitable gifts to litigate to prevent Agnes from receiving

36

any income. Westchester Democratic Chairman and politico Marc Oxman, who was inflicted on Agnes Carvel as guardian ad litem to stress her to death, is on the Hudson Valley Bank Development Board. The Board is described as a group to promote the Bank's interests. Pamela discovered that the Bank was involved in the wire transfers of funds without Tom or Agnes' consent, alterations of the ownership of U.S. Securities, and other bank frauds. The Bank holds more control of Carvel money than any Carvel.

71.     Trials in the Carvel matters began on September 10, 2001, on October 1, 2001 Hudson Valley Bank gave Surrogate Scarpino a "loan" for $200,000 (A-19, see Amended Appendix). On December 30, 2004, Hudson Valley Bank gave the Surrogate another "loan" for $100,000 (A-20, see Amended Appendix). On information and belief, another $100,000 or more was "loaned" by Hudson Valley Bank to the Surrogate. None of these loans were disclosed although Griffin appeared at non-jury trials before Surrogate Scarpino alleging to be the most knowledgeable person concerning alleged foundation matters.

72.     The average citizen cannot know whether these "loans" are repaid by Surrogate Scarpino, someone else, or just "written off" as a cost of doing business. Given Surrogate Scarpino's decisions favoring the

foundation usurpers against Agnes as sole beneficiary, there is more than the appearance of impropriety, even bribery.

## RULINGS CONTRARY TO LAW DEMONSTRATING BIAS

73. Throughout all these conflicts, the most troubling bias is demonstrated by rulings that are contrary to statue and law, such as New York *Surrogate's Court Procedure Act* ("*SCPA*") and *Estates Powers and Trust Law* ("*EPTL*") .

a)    *SCPA* 1811 (1), requires that funeral expense shall be paid out of the <u>first</u> money received by the New York administrator.  Agnes' funeral expenses remain un-reimbursed to Pamela for nine years.

b)    *SCPA* 1310(3)(f) allows payment of up to $15,000 is permitted to a relative who paid funeral expenses without formal estate administration. Ross "rejects" the payment of funeral expenses in his accounting. Pamela's petition to Surrogate Scarpino for payment of approximately $6,000 for Agnes' funeral is denied.

c)    *SCPA* 1610(2) requires that the decedent's foreign and domestic debts must be considered; domestic creditors are not given preference if the assets are insufficient. Surrogate Scarpino prematurely distribute the <u>gross</u> amount of Agnes' assets to the foundation usurpers (his loan bankers) as

38

alleged "remaindermen", without restrictions, before any accounting even identified the debts and administrative expenses of the executor and the Estate.

d)    The Surrogate adopted the foundation usurpers misleading partial quote from *Leighton v. Roper* 300 N.Y. 934 stating that a foreign representative has no standing to sue or be sued in New York. The true quote goes on to say that this generalization is not true and there are exceptions such as in *Leighton v. Roper*. Nonetheless, the Surrogate perpetuated this generalization by repeatedly denying Pamela as foreign executor legal standing in New York.

e)    *SCPA* 1810 provides that "Nothing prevents a claimant from commencing an action on his claim at law or in equity."  After repeatedly denying payment and legal standing to Pamela as executor in New York, Surrogate Scarpino then restrained Pamela individually and as executor from going to "any other court". The effect is to make it impossible for Pamela, the executor as creditor to be paid from estate assets.

f)    *EPTL* 13-1.3 requires that all property and any income are subject to the payment of debts and administrative expenses. "Residuary dispositions" abate before other dispositions. After prematurely distributing

the gross amount of Agnes' income and principal to the "remaindermen", the Surrogate struck all accounting claims asserted by Pamela against those funds, thereby converting a beneficiary of merely the remainder into the principal beneficiary standing ahead of Agnes Carvel who was denied the income in her lifetime.

74.    *EPTL* 11-1.1 (b) (13) and (22), respectively, empower fiduciaries (including administrators) to contest any claim or settle any claim in favor of the estate and to pay administration expenses including reasonable counsel fees. Indeed, a fiduciary may exercise, in his or her discretion, the above powers unilaterally, even without the consent of co-fiduciaries (*Matter of Leopold*, 259 NY 274; *Matter of Rubin*, 147 Misc 2d 981). Further, "every estate fiduciary, by virtue of his office, is entitled to the custody of the assets of the estate or fund. When there are two or more fiduciaries, each possesses an equal right in this regard" (*Matter of Slensby*, 169 Misc 292, 295).

75.    Nor is it relevant that the fiduciary may be able to recover the costs of the proceedings pursuant to *SCPA* 2301, 2302 (2) and 2110 (1). A fiduciary should be able to use estate funds to cover administration costs (*EPTL* 11-1.1 [b] [22]; *Matter of Rubin*, 147 Misc 2d 981). The litigation

costs at issue herein are such administration costs since they are related to the recovery of estate assets (*Matter of Stanley*, 240 A.D.2d 268;660 N.Y.S.2d 107;1997 N.Y. App. Div.)

76.     The Surrogate placed no restraint whatsoever on disbursements by the executors in Thomas Carvel's estate, including the disbursement of assets belonging to Agnes Carvel held in the hands of Thomas Carvel's executors who cavorted with felons. Legal fees were paid without prior or subsequent fee applications, and without notice to, or consent from, the beneficiary or the court. This freedom to draw down Carvel property at will remained with Tom's executors despite Agnes Carvel's warning that the executor's were engaging in fraudulent business practices with known fraudsters. This freedom to draw down Carvel property remained even after the FBI investigations and U.S. and New York Attorney Generals' prosecutions convicted William Zuga twice (2002, 2003) for real estate fraud, convicted attorney Francis Zarro (2004) for 13 felony counts of financial frauds, and convicted William Fugazy (1997) for bankruptcy perjury. Several million dollars were lost to Agnes Carvel by Thomas' executors' collusion with these felons, BUT only the whistleblowers Agnes

and Pamela Carvel are denied indemnification of legal fees from Thomas or Agnes' estate assets.

77.   It is clear enough that only strangers are becoming millionaires from Carvel money, and only the Carvels cannot equally be indemnified for fiduciary expenses. One-sided funding of litigation can demonstrate nothing other than the intent to fraudulently convert estate and trust assets away from the intended beneficiaries.

78.      The U.S. Supreme Court in *Liteky v. U.S.*, 510 U.S. 540, 557 (1994), clearly requiring disqualification under the circumstances presented here, stated:

> "Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." For present purposes, it should suffice to say that Section 455 (a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or finding".   The plain language of 28 U.S.C. 455(b)(2) is clear: "(a)  Any justice, judge, or magistrate of the

United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

79.    Surrogate Scarpino repeatedly does not observe even his own precedent for recusal. This demonstrates a lack of the necessary "conscience" needed for a judge to recuse himself.  After that point, and when the bias becomes as extreme as it is here, the matter becomes one for a decision from outside the conflicted jurisdiction. Surrogate Scarpino's bias is effecting the international administration of the Estate, its beneficiaries and its creditors, who are not within the Surrogate's jurisdiction and are therefore denied substantive due process. The favors shown to the "remaindermen" over the primary beneficiary Agnes, and over her intentions is a violation of Constitutional protection for equal treatment.

80.    *EPTL* 13-1.3 provides, "Whenever the provisions of this section are inconsistent with the intent of the testator to prefer certain beneficiaries, interest abates as necessary to give effect to the testator's intentions. Beneficiaries whose rights are impaired by contravention of the order of abatement are entitled to be indemnified."  Agnes' intentions as expressly written in her <u>uncontested</u> Will is to deny inheritance to anyone who litigated against her in life or against her estate.

43

## COUNTS 1-3
## FRAUD; CONSPIRACY TO COMMIT FRAUD
### (Delaware, Florida, New York)

81.    Each of the allegations contained in paragraphs 1-80 is incorporated herein by reference.

82.    Defendants knowing, malicious, reckless and unwarranted denial of payment of debts and expenses to Plaintiffs is in furtherance of obstruction of the identification and prosecution of a conspiracy to defraud Plaintiffs. Defendants act in contradiction and in violation of Delaware, Florida, and New York laws against fraud, conversion, and fraudulent transfers. Defendants are liable to Plaintiffs, jointly and severally for these violations.

83.    Plaintiffs believe Defendants' acts to be part of an organized political and criminal enterprise that operates a "probate mafia" where all parties acted in agreement and concordance, both written and spoken, in the activities to deny assets to Plaintiffs for the benefit of Defendants as the Carvels' adversaries in litigation.

84.    Defendants conspired to obstruct investigation and to conceal their acts under their perjury, false statements, fraudulent transfers, false

court filings, fraudulent intent, and fraudulent acts in violation of Federal laws and State laws.

85.    Plaintiffs seek all their compensatory damages against Defendants and Doe defendants unknown to Plaintiffs at this time.

## COUNT 4
## ABUSE OF PROCESS

86.    Each of the allegations contained in paragraphs 1-85 is incorporated herein by reference.

87.    Pamela Carvel disaffirms for fraud all acts by Defendants alleged to be on behalf of, or in the named of, Plaintiffs. Plaintiffs assert substantive misrepresentations of material facts were made by Defendants to divert assets, ownership, and control. Such misrepresentations to the Plaintiffs and the Delaware court constitute abuse of process.

88.    Plaintiffs seek costs and all their compensatory damages against Defendants responsible for the wrongful abuse of process, and from Doe defendants unknown to Plaintiffs at this time.

45

**COUNTS  5 TO 20**
**CONSPIRACY TO INTERFERE WITH RIGHTS IN VIOLATION OF**
**18 *U.S.C.* §241, §242, §245, §1111, §1117;**
**28 *U.S.C.* §1343; 42 *U.S.C.* §1981, §1982, §1983, §1985,**
**§1986, §1988; *U.S. Constitutional Amendments* I, V, IX, XIV**

89.    Each of the allegations contained in paragraphs 1-88 is incorporated herein by reference.

90.    Defendants did unlawfully, wilfully, and knowingly conspire with each other to deny Plaintiffs their guaranteed rights under the laws of the United States.

91.    Defendants conspired to deprive, either directly or indirectly, Plaintiffs' rights under the United States Constitution, including Plaintiffs rights to life, liberty, and happiness free from fear, extortionary threats of financial ruin, and intimidation for assertion of guaranteed rights; rights to compensation for taking of their property; rights to due process; rights to equal protection of the laws; rights to pursue an occupation, business or profession free from deprivation or undue interference; and rights guaranteed by law.

92.    Defendants acted in furtherance of the conspiracy as more fully set out above. This conspiracy was motivated by greed to fraudulent transfer the property of Plaintiffs, to harm and cause the death of Agnes as an elder

46

person, to deprive Agnes' successors in interest of all benefit of income, and to deny legitimate claims any successful assertion by obstructing all financial resources required in the legal system. Such invidious discriminatory animus was behind the conspirators' action so as to judicially prevail in their wrongful intent, fraudulent acts, and material misrepresentations.

93.    As a direct result of Defendants' wrongful conduct, Plaintiffs suffered damages in the form of economic loss, including income losses, out-of-pocket losses, opportunity losses, and deprivation of Plaintiffs civil and Constitutional rights.

94.    Plaintiffs' also seek mental and physical damages, anguish, emotional distress, and stress causing felony murder of Agnes Carvel, and possibly Thomas Carvel.

95.    Plaintiffs seek professional fees, litigation costs, and all litigation-related expenses.

96.    Plaintiffs seek all their compensatory damages against Defendants and Doe defendants unknown to Plaintiffs at this time.

## COUNTS 21-26
## VIOLATIONS OF 18 U.S.C. §1961, (RICO), §1341, §1343, §1952,§2314, §2315

97.    Each of the allegations contained in paragraphs 1-96 is incorporated herein by reference.

98.    Plaintiffs assert that Defendants engaged in a pattern that contains a sequence of events that all have the same and common purpose. Such purpose is one of egregiously deliberate, calculated and malicious, fraud and conspiracy, which is a "pattern of racketeering activity". Defendants did unlawfully, knowingly, and intentionally conduct and participate in the conduct and affairs of the enterprise.

99.    Defendants did unlawfully, willfully, and knowingly conspire with each other. The goal of the conspiracy was to deprive Plaintiffs of money and property, and to obstruct, delay, and affect claims by Plaintiffs against Defendants and others, through financial deprivation and hardship. Each defendant participated in the systematic effort to defraud Plaintiffs in creditor claims and estate administration due process in Delaware.

100.   Defendants were knowledgeable of the fact that their fraudulent transfer of Carvel assets was a tortuous act under Delaware, Florida and

New York state laws. Plaintiffs do not currently know the full extent of the pattern of racketeering activity, including mail and wire fraud.

101.    Plaintiffs contend that Defendants' actions violate 18 *U.S.C.* §1341, §2314 §2315 as the U.S. mail was used as an instrument of the planning the fraud, conspiracy to commit fraud, and in the continuation of this fraud and transportation of stolen money, securities, and other assets across state lines.

102.    Defendants unlawfully, willfully, knowingly, and for the purpose of executing or attempting to execute a scheme and artifice to defraud Plaintiffs, and for obtaining money and property, did place and cause to be placed items in post office authorized depositories for mail. Defendants did cause to be delivered by mail, according to the directions thereon, by the United States Postal Service, the documents containing a means to fraudulently transfer Plaintiffs assets to Defendants. In furtherance of their scheme to defraud, Defendants used the U.S. mails to advance the misrepresentations of material facts of the fraudulent acts to Plaintiffs and to others, including various courts.

103.    In violation of 18 *U.S.C.* 1343, telephone, internet, and fax were used in the fraud, conspiracy to commit fraud, and in the continuation

49

of this fraud, and misrepresentation of material facts to Plaintiffs and others to thwart due process and Plaintiffs' property rights. One or more of the Defendants did unlawfully, willfully, and knowingly, and for the purpose of executing or attempting to execute a scheme and artifice to defraud Plaintiffs, and for obtaining money and property, transmit or cause to be transmitted by means of wire communications in interstate commerce transfers of Plaintiffs assets to third parties in lieu of to Plaintiffs.

104.    Defendants demonstrate bad faith intent to profit and to damage Plaintiffs by the misrepresentation of material facts. Defendants made their false representations for the purpose, and with the effect of attempting to deprive Plaintiffs of money and property by means of an artifice to defraud.

105.    Defendants' forced Plaintiffs to incur the substantial legal expenses to enforce inalienable rights guaranteed by the Constitution. Defendants abused legal proceedings commenced in bad faith, making substantive misrepresentations as part and parcel of the Defendants' unlawful and fraudulent scheme to damage and obtain money and property from Plaintiffs by means of a pattern of racketeering activity including repeated acts of deliberate, premeditated fraud and harassment. Defendants'

scheme and pattern of racketeering activity are open-ended and have persisted for more than one year.

106.    As a direct, proximate, and specifically intended consequence of Defendants' fraudulent scheme set forth above, Plaintiffs are injured personally, individually, in business and in property. Defendants' fraud prevented Plaintiffs' business activities and financial opportunities. Defendants' fraudulent actions were intended to force, and have forced, Plaintiffs to incur substantial litigation and other expenses investigating and exposing Defendants' scheme.

107.    Plaintiffs allege further that as a proximate cause Defendants' Pattern of Racketeering activities contributed to Plaintiffs' permanent and irreparable emotional, spiritual and financial harm and damage, all of which was intended to leave Plaintiffs destitute, unable to defend Plaintiffs rights, unable to investigate crimes against Plaintiffs, unable to carry out the Carvels' legitimate benevolent intentions, and unable to carry on normal business activities without fear of predatory harassment with the intent to fraudulently transfer all Carvel assets to Plaintiffs' victimizers.

108.   Plaintiffs also claim such compensatory damages, plus interest, as may be verified and claimed by the persons and entities upon whose behalf Plaintiffs also complain in accordance with *Federal Rules of Civil Procedure*("FRCP") Rule 71, such as any and all interest accrued by debt to the Internal Revenue Service of the U. S., during the period of continuing pattern of racketeering activity, by virtue of Defendants' obstruction of Plaintiffs' ability to collect taxable income, and by intentional tax fraud to evade taxes payable as a result of fraudulent estate tax exemption elections.

109.   Defendants, and any additional persons (including attorneys or law firms) whose financial or other support of, or participation in the conspiracy may hereafter be discovered, are liable to Plaintiffs, jointly and severally, for violating 18 *U.S.C.* §1962, 18 U.S.C. §1341, and 18 *U.S.C.* §1343.

110.   Defendants each knowingly committed or conspired to commit, or agreed with the commission of, at least one act described above in violation of RICO, or aided and abetted the commission of one or more such acts and thereby agreed with the objectives of the other Defendants.

111.   Plaintiffs are hereby entitled to recover from Defendants individually, jointly and severally, for threefold the damages sustained,

together with the costs of this suit, including a reasonable compensation for professional fees and expert fees rendered by a *pro se* litigant.

## DEMAND FOR JUDGMENT AND TRIAL BY JURY

112.  On the basis of all the foregoing, Plaintiffs demand judgment for the stated relief, in trial by jury.

## PLAINTIFFS' AVERMENT REGARDING RULE 11, FRCP

113.  Further extant evidence and argumentation, elucidating the pattern of racketeering activity, and information which will be acquired in the process of discovery, will establish the necessary preponderance of evidence as is required by the Court in accordance with the *Federal Rules of Civil Procedure*.

114.  In particular, with regard to Rule 11 of *FRCP*, Plaintiffs aver that all statements and allegations are true upon information, belief, and reasonable investigation, and further that this action is not brought with any purpose to harass or defame Defendants, and further that it is not of any nature that could be called frivolous.

115. Plaintiffs have, in good faith, attempted to balance the necessary requirements of specificity and particularity, under Rule 9(f) of *FRCP* to establish sufficiency of this pleading, with the requirements of

concision and directness under Rule 8(e) of *FRCP*, all in accordance with Rule 11 of *FRCP*.

## CONCLUSION

116.    Only discovery can determine the expanse of the conspiracy that exists here directed to damaging Plaintiffs and Plaintiffs' Delaware claims. Only Delaware is far enough removed from the political quagmire in New York to provide a fair platform for discovery. Delaware holds the most significant asset claims of the Plaintiffs' against a conspiracy to deny Agnes Carvel the proceeds of the sale of jointly owned Carvel Corp. stock and ownership of subsidiary Delaware corporations. The overwhelming extent of the game played between Defendants and Surrogate Scarpino is merely touched on in these pages. The crimes that plagued the Carvels are eating away at other estates and other beneficiaries every day. Some means to enforce Constitutional rights in Surrogate's Courts must be found.

117.    Plaintiffs seek orders from the District Court:

1)    for discovery to identify, quantify and assert damages inflicted on Plaintiffs by Defendant Leonard Ross and others yet to be identified through discovery;

2)    to disaffirm all individual and professional acts taken by Defendants in the name of Plaintiffs;

3)    to discover the extent of Defendants' criminal acts and those with whom they conspired to defraud Plaintiffs;

4)    to statutorily disqualify the acts of Westchester County New York Surrogate Anthony Scarpino in all Carvel estate matters because of covert conflicts of interest, bias, failure to follow the law, violations of Constitutional rights of Plaintiffs, and apparent bribery in collusion with Defendants so as to fraudulently convert Plaintiffs assets to Defendants;

5)    for original damages as of 1990 in a value estimated in excess of $300 million, of which approximately $250 million are Delaware assets.

6)    for taxes, penalties, statutory interest on the original damages, and for triple damages pursuant to RICO statutes.


Signed this 22 day of August 2007        _____
                                         Agnes Carvel Estate
                                         by Pamela Carvel, appearing *pro se*
                                         28 Old Brompton Road, Suite 158
                                         London SW7 3SS England
                                         US tel/fax  1 954 524 1909

55

Pamela Carvel
28 Old Brompton Road, Suite 158
London, SW7 3SS, England, U.K.          US TEL/FAX 1 954 524 1909


22 August 2007

United Stated District Court
District of Delaware
844 N. King Street
Wilmington, DE 19801

RE:    07-CV-00238-JJF

### AMEND COMPLAINT & AMENDED APPENDIX

Dear Sir/Madam,

Please file the enclosed original amended complaint and amended appendix. One copy is
also enclosed. and disk.

The Defendant did not return the Waiver of Service of Summons, and has not replied to
the original compliant.  It is my understanding that I am able to amend my complaint
before any responding papers are filed.

I will now serve the Summons already issued with the Amended Complaint and Amended
Appendix.

Please use the above US telephone and fax forwarding number because mail forwarding
takes a long time to reach England. The above US number will forward to England at my
expense.

Thank you for your valuable assistance.

Yours truly,

by Pamela Carvel









U.S. POSTAGE
NEW YORK, NY
10001
AUG 20 '07
AMOUNT
$5.05
00025297-16

19901

CLERK OF COURT
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
844 N. KING ST.
WILMINGTON, DELAWARE
19801    USA



PRIORITY
MAIL
UNITED STATES POSTAL SERVICE®
WWW.USPS.COM

CARUEL
38 GRANMPOND RD #108
LONDON SW7 3SS
ENGLAND U.K.