### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Agnes Carvel Estate, London, England ) by Pamela Carvel, Delaware Ancillary Administrator) Pamela Carvel, Fiduciary-Creditor, on behalf of herself and others similarly situated Plaintiff v. Leonard Ross and John/Jane Doe 1-20 Doe Co. 1-20 Defendants | **AMENDED COMPLAINT** **DEMAND FOR JURY TRIAL** Case No. 07-cv-00238 JJF |

**COMPLAINT TO DISAFFIRM ACTIONS,
DISQUALIFICATION OF SURROGATE ANTHONY SCARPINO,
RECOVER DAMAGES FOR FRAUDULENT CONSPIRACY,
AND
DEMAND FOR JURY TRIAL**

# AMENDED APPENDIX

Pamela Carvel, appearing *pro se*
Delaware Ancillary Administrator
28 Old Brompton Road, Suite 158
London SW7 3SS England
US tel/fax  1 954 524 1909

TEL NO.404 967 5200                    Dec 06 91  15:45 P 11

# THE THOMAS AND AGNES CARVEL FOUNDATION

## AC CONFERENCE
### February 15, 1992

1)  Original basis for investigation resulted in substantially supporting Foundation position as to CEIC transaction - no impropriety; no sweetheart deal; no TC gift to his employees. Had AC accepted explanation given by RMD and MA at outset, the waste on both sides would have been avoided.

2)  "Suitability" is a manufactured issue without any clear standards; if equivalent to removal for cause, we win. Practically, resignation of 2 Members plays into hands of family; counter-productive from AC viewpoint to impose family control on future operations of Foundation. Resignations of RMD and MA discredits them and provides family with opportunity to assume control of Foundation, or at least Estate and Agnes' assets.

3)  Money recovery for CEIC price adjustment:

    -   basis is totally artificial; no firm offer to Foundation in September which Foundation could have accepted.

    -   in any event, practical difficulty of recovery from limited partners; will AC accept assignment of CEIC 114 in any escrow fund balance (i.e. $1.0MM balance = $110,000). Recovery from Estate is meaningless since Foundation is beneficiary of Estate.

4)  Tuition payments:

    Iona - MA has paid.

    Pace - Foundation is seeking to recover from Pace or Chris, possibly from CEIC balance. (MA is considering guaranty of payment?)

    St. Anthony's - Foundation will undertake recovery.

    Amended 990PF will be filed - deficiency in distributions covered by excess distributions in subsequent years.

LACF-000494

A-1

CARMEL        TEL NO.407 967 5200        Dec 16 92 15 08 P 10

5) How to protect confidentiality of any settlement.

6) MA money payments:
- Tuition - see above
- Loans - Surrogate Court will decide
- CEIC profit - no basis for recovery from her; her profit reduced by any price adjustment recovery. Her "profits" are small in relation to TC generosity in stock options.
- Stock redemption profit - she would have made more if she didn't redeem.

7) MA resignations:
- Retain Membership to prevent family control.
- Designate her successor and she agrees to resign in 1993, or on Agnes' death.
- Resign as director and officer.

8) Litigation will further waste Foundation funds. AG should wish to avoid.

9) CEIC sale benefitted Foundation:
- excess business holdings
- provided cash to fund mandatory distribution
- sale at "fair value" when no other market available

10) Melfe to attend.

11) Successor Members:

   Sal Molella
   Ann McHugh's son
   Jim O'Conner
   Hudson Valley
   Dave Malane

12) Amended 990 PF for 11/30/89

13) Revised budget - shortfall in grants for 1992 without reduction in legal expense.

(3)

TACF-000495

A-2

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2006*

**PAMELA CARVEL,** as voluntary limited guardian for **AGNES CARVEL,**
Appellant,

v.

**BETTY GODLEY,** as Co-Trustee of The Agnes Carvel 1991 Trust,
**LAWRENCE NEWMAN,** as Co-Trustee of the Agnes Carvel 1991 Trust,
**ETHEL G. REDDY, BANK OF NEW YORK TRUST COMPANY OF
FLORIDA,** and **THE THOMAS AND AGNES CARVEL FOUNDATION,**
Appellees.

No. 4D05-203

October 11, 2006

STONE, J.

Pamela Carvel, personal representative of the estate of Agnes Carvel (interchangeably "Pamela" or "the estate"), appeals two orders: (1) an order granting defendants/counterplaintiffs' motion for summary judgment on their counterclaim seeking judicial approval of their accountings, and (2) an order compelling payment of initial out of pocket attorney's fees but denying payment for future submissions. The appellees, Betty Godley and Lawrence Newman, are the co-trustees of The Agnes Carvel 1991 Trust (trust). We reverse.

This appeal represents one small portion of a complex body of litigation between these and other parties, here and in New York. The issue before this court is one of first impression: whether a personal representative has standing to claim for a trust accounting as a beneficiary or just as a creditor, where the settlor and the estate are, essentially, the same party.

Timeline of instruments/conveyances, proceedings:

Ice cream magnate Thomas Carvel predeceased his wife Agnes in 1990. The couple was childless. Prior to his death, they executed mutual wills and a reciprocal agreement that restricted subsequent modifications and conveyances. The wills named the Tom and Agnes

**A-3**

Carvel Foundation as residuary beneficiary.  Thinking her first will was lost, Agnes executed a second will in 1990 with no changes.  In 1991, Newman's office prepared the trust documents for the revocable trust at issue here, and Agnes transferred substantial assets to fund it.  The first section of the trust stated:

> The Trustees shall retain such property, IN TRUST, for the following purposes:
>
> > (a) To pay any part or all of the income and such sums from or any part or all of the principal of the trust as the Trustees, in their discretion, from time to time determine for any reason whatsoever to, for, or on behalf of the Grantor.  Any income not so paid shall annually be added to principal.
> >
> > (b) On the death of the Grantor, to pay her funeral expenses, debts and the expenses of administering her estate, and to dispose of the remaining income and principal of the trust, including any property received by the trust as a result of the Grantor's death pursuant to her will or otherwise, as provided in the other articles of this agreement.

The third section allowed the trustees to distribute the remaining trust res to the foundation after payment of income to Agnes for life and payment of all of her funeral expenses, debts, and expenses of administering her estate.  The trust's tangible personal property was to be distributed to Agnes' relatives and friends.

Agnes made a third will in 1995, which was substantially different from her other wills and which named a different entity as residuary beneficiary, contrary to the estate plan she and her husband had initiated together.

Agnes' niece, Pamela, as her voluntary guardian, originally brought the instant action in Florida court, in September 1995, seeking a trust accounting, damages for breach of fiduciary duty, removal of trustees, and injunctive relief.  Her grounds were that the trust was paying no income to Agnes who was still alive, the trustees had been taking excessive commissions, had mismanaged trust funds and provided no accountings to Agnes, and made unsubstantiated distributions.

The trustees filed a counterclaim, seeking judicial approval of accountings made for the period of 1991 through 1994, releasing and discharging the trustees from any and all liability. Because the voluntarily submitted accountings addressed the main count of her complaint, in December 1995, Pamela moved for voluntary dismissal of her complaint without prejudice. This left her a counterclaim defendant in the only pending action in Florida. Pamela filed her answer, affirmative defenses, and objections to the counterclaim in January 1998, expanding the timeframe of accountings sought to 1996.

Agnes passed away in 1998. Litigation surrounding the Carvel estates continued both in Florida and New York, challenging the validity of the reciprocal wills agreement between Tom and Agnes. In Florida, the trustees filed a motion for summary judgment as to their counterclaim. In the motion, the trustees stated that Pamela had asserted objections only to the 1991–1995 accountings, a statement rebutted by Pamela's inclusion of 1996 in her answer. Filing accountings up to the end of 2003 concurrently with this motion, the trustees asked that these be approved. More responses and replies were filed; Pamela's answer expanded the timeframe of objected-to accountings to all past, present, and future distributions.

Three motions were heard at a hearing in November 2004: Pamela's motion to compel payment of attorney's fees, and the trusts' motions for summary judgment and for a procedure to expedite determination and systematic payment of outstanding claims and obligations of the trust.

Counsel for the trust argued Pamela's lack of standing. The foundation's attorney stated that each of Pamela's requests for expenses must be "carefully scrutinized," showing detailed time records and services rendered, despite the fact that the very accountings for which approval was sought include none of this detail on the expense side. Another wrinkle was the request of counsel for the ancillary administrator of Agnes' New York estate, who asked that his client be exempted from any claims procedure the trial court might impose. In other words, only Pamela, the domiciliary executrix, should have to succumb to the trial court's restrictions on the trust-mandated payment of estate expenses.

Pamela's attorney reiterated that all Pamela was asking was to reserve the right, if the estate expenses exceeded the monies still held in trust, "to look back at the Trust accountings for the purposes of determining

whether there were inappropriate distributions and payments made in derogation of the rights" given to the estate by the trust instrument.

The trial court entered its order granting the summary judgment approval of the accountings from 1991 through the end of 2003, and another, compelling payment of initial out-of-pocket attorney's fees but denying payment of future submissions. A third order, establishing a procedure for the expeditious determination of claims against the trust, is not at issue in this appeal.

<u>Standing to maintain objections or assert claims for accountings of the trust</u>

"Generally, one has standing to sue when he or she has a sufficient interest at stake in the controversy which will be affected by the outcome of the litigation." *Provence v. Palm Beach Taverns, Inc.*, 676 So. 2d 1022, 1024 (Fla. 4th DCA 1996); *Brown v. Firestone*, 382 So. 2d 654, 662 (Fla. 1980). The trust instrument clearly and unambiguously lists payment of Agnes' debts at time of death and her estate claims and expenses as one of the two stated purposes of the trust. This provision is not at the discretion of the trustees. As a result, the estate, while not an income or residual beneficiary, is an intended beneficiary. The foundation's remainder interest is contingent because it is predicated upon the existence of property left in the trust after the specific condition precedent is satisfied. *See TeGrotenhuis v. Rice*, 744 So. 2d 1057, 1058 (Fla. 4th DCA 1999).

"The question of whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish." *Moyer v. Graham*, 285 So. 2d 397, 402 (Fla. 1973). We know the purpose of the trust; it tells us in express terms. A known beneficiary is owed the same duty and is entitled to the same remedy as the party to a contract. *First Am. Title Ins. Co. v. First Title Serv. Co. of the Fla. Keys Inc.*, 457 So. 2d 467, 473 (Fla. 1984); *DeMay v. Dependable Ins. Co.*, 638 So. 2d 96, 97 (Fla. 2d DCA 1994). Based on these general principles, the estate has standing to call for an accounting, just as Agnes herself would have.

This result is in accord with analogous principles, such as that intended third party beneficiaries of testamentary documents have

standing to bring legal and accounting malpractice actions if they are able to show "that the testator's intent as expressed in the will is frustrated by the negligence of the testator's attorney." *Hare v. Miller, Canfield, Paddock & Stone*, 743 So. 2d 551, 553 (Fla. 4th DCA 1999); *Espinosa v. Sparber, Shevin, Shapo, Rosen, and Heilbronner*, 612 So. 2d 1378, 1380 (Fla. 1993); *Passell v. Watts*, 794 So. 2d 651, 652 (Fla. 2d DCA 2001); *Kinney v. Shinholser*, 663 So. 2d 643, 647 (Fla. 5th DCA 1995).

Further, section 731.201(21), Florida Statutes, defines an interested person, for the purposes of wills and trusts, as "any person who may reasonably be expected to be affected by the outcome of the particular proceeding involved. In any proceeding affecting the estate or the rights of a beneficiary of the estate, the personal representative of the estate shall be deemed an interested person." So Pamela, as Agnes' personal representative, has standing in any proceeding affecting the estate's rights. In *Barley v. Barcus*, 877 So. 2d 42 (Fla. 5th DCA 2004), the Fifth District held that a widow/personal representative had standing, as an interested person, to file a motion for appointment of a trustee of a residuary trust for which she was not a trustee but a contingent remainder beneficiary.

Section 733.707(3), Florida Statutes, mandates payment of estate expenses by a revocable trust when the estate's funds are insufficient:

> Any portion of a trust with respect to which a decedent who is the grantor has at the decedent's death a right of revocation, as defined in paragraph (e), either alone or in conjunction with any other person, is liable for the expenses of the administration and obligations of the decedent's estate to the extent the decedent's estate is insufficient to pay them as provided in s. 733.607(2).

Here, the trust was revocable. Even had the trust instrument been silent, the trust would have borne the responsibility of payment to the extent that the estate has no money to pay. Section 733.607(2), Florida Statutes, referenced in the statute above, states "the personal representative is entitled to payment from the trustee of a trust described in s. 733.707(3), in the amount the personal representative certifies in writing to be required to satisfy the insufficiency." The record reflects that written demand for payment was provided to the trustees.

Propriety of summary judgment

5

**A-7**

Summary judgment is only appropriate in the absence of issues of material fact. *Real Estate World Fla. Commercial, Inc. v. Piemat, Inc.*, 920 So. 2d 704, 706 (Fla. 4th DCA 2006). Relevant factual issues remaining in dispute in the case are whether or not the trust has sufficient funds available to pay the estate's claims as required by the decedent, whether or not Pamela has submitted written claims to the trust, and whether these have been paid. These disputes alone are sufficient to prevent summary judgment.

Going further, the trial court listed lack of standing and mootness as the legal reasons for denying Pamela's objections. However, the estate/Pamela had standing. The record also reflects that she did not waive her objections.

In its order granting the summary judgment approval of the accountings from 1991 through the end of 2003, the trial court stated that Pamela's answer applied only to accountings through 1995. The record shows that her subsequent pleadings make clear her ongoing objection, predicated on the need to preserve trustee accountability and to first pay estate claims, prior to distribution to the foundation.

The order's effect on the estate is significant because judicial approval effectively defeats any trustee accountability. The estate's interest, as intended beneficiary of a condition precedent, is superior to that of the foundation as remainderman.

The trust must be administered as written and intended. We reverse the summary judgment approval of the accountings with instructions to utilize the trial court's ordered procedure, recognizing the interests of all beneficiaries as described in this opinion, to resolve all outstanding estate claims. The estate's ongoing attorney's fees are to be subject to the same procedure.

POLEN and FARMER, JJ., concur.

*     *     *

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Gary Vonhof, Judge; L.T. Case No. 501995CP003258XXTRIY.

Michael A. Dribin of Broad and Cassel, Miami, for appellant.

6

**A-8**

Matthew Triggs and Stephanie Reed Traband of Proskauer Rose LLP, Boca Raton, and Hal Neier of Friedman Kaplan Seiler & Adelman LLP, New York, for Appellee-Betty Godley and Lawrence Newman.

Juan C. Antunez of Stokes McMillan & Maracini, P.A., Miami, and Steven J. Fink of Orrick, Herrington & Sutcliffe, LLP, New York, for Appellee-The Thomas and Agnes Carvel Foundation.

***Not final until disposition of timely filed motion for rehearing.***

7

**A-9**

**SURROGATE'S COURT: WESTCHESTER COUNTY**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Application of Pamela Carvel
to Receive Funds From Agnes
Carvel's NY Estate for the Estate's            **DECISION**
Delaware Ancillary Administration
Expenses                                       **File No. 2165/1998**

<div align="center">

AGNES CARVEL,

Deceased.

</div>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

In this miscellaneous proceeding, Pamela Carvel ("Pamela"), as the United Kingdom domiciliary executrix and Delaware ancillary administrator of the estate of Agnes Carvel, ("Agnes"), seeks an order pursuant to SCPA 2102 (2) and (4): (i) directing Leonard Ross ("Ross"), as New York ancillary administrator c.t.a. of Agnes' estate, to pay $500,000 for anticipated Delaware ancillary administration expenses; (ii) directing Ross to reimburse Pamela for prospective expenses incurred by her as Delaware ancillary administrator; (iii) directing Ross to deliver all legal files in his control to Pamela, and (iv) directing Ross to provide full documentation and all assets in his possession as New York ancillary administrator. The petition is opposed by the Thomas and Agnes Carvel Foundation ("the Foundation") and by Ross. The Foundation has moved to dismiss the petition on several grounds. Ross has also cross-moved for dismissal.

The motion and cross motion are granted as limited by this decision, and the petition is dismissed. The motion and cross motion are denied in all other respects.

Agnes died on August 4, 1998, a resident and domiciliary of the United Kingdom. Her last will and testament was admitted to probate in the United Kingdom, and Pamela

<div align="right">

**A-10**

</div>

**ESTATE OF AGNES CARVEL.**
**File No. 2165/1998**

was appointed the representative of Agnes' United Kingdom estate. Thereafter, Pamela

filed a petition with this court seeking the appointment of her designee, Ross, as ancillary

administrator c.t.a. of Agnes' New York estate, in order to marshal Agnes' New York assets

and to represent Agnes' estate in numerous pending and projected litigations. The

petition was granted .

In 1991, Agnes created an inter vivos trust (the "1991 Trust" or the "trust"). The trust

instrument requires the trustees to pay all of Agnes' "funeral expenses, debts and the

expenses of administering her estate...", and also to pay "[a]; estate, succession, legacy,

transfer and inheritance taxes, federal, state and other which may be payable by reason

of...[Agnes'] death, whether in respect of property passing under this agreement or in

respect of property not passing under this agreement..." The trust has a situs in the State

of Florida.

The primary thrust of the instant petition is to provide Pamela with access to the

assets of Agnes' New York ancillary estate to fund a litigation in Delaware where Pamela,

as the Delaware ancillary administrator of Agnes' estate, will claim ownership of the stock

of an entity known as Andreas Corporation ("Andreas"). This application must fail for

several reasons. First, it is axiomatic that attorney' fees cannot be allowed for future

services (see, Matter of Rubin, 147 Misc. 2d 981, Matter of Starbuck, 225 App. Div. 689).

In addition, the Surrogates' Court Procedure Act makes no provision for satisfying non-New

York administration expenses out of a New York ancillary estate. The role of the ancillary

administrator is to collect estate assets in New York, satisfy New York creditors, and,

2

## ESTATE OF AGNES CARVEL.
### File No. 2165/1998

unless the court directs otherwise, distribute the balance, if any, to the domiciliary fiduciary

(see, Matter of Gennert, 96 App. Div. 8).   Since the Foundation is a creditor of the New

York ancillary estate to the extent of the residuary thereof (see, Matter of Carvel, NYLJ,

Apr. 15, 2002, at 29, col. 6), it would be prejudiced by the use of New York-based assets

to pursue an out-of-state litigation.   More importantly, the New York ancillary estate is not

the fund of first resort for payment of the administration expenses of Agnes' estate.   The

1991 Trust is funded with several million dollars and, by its terms, is the source for

payment of all debts, administration expenses and tax liabilities of Agnes' estate, both

domestic and foreign.   Although this court has jurisdiction over the 1991 Trust, it has

deferred, with certain limited exceptions not applicable here, the determination of the

reasonableness of all such obligations to the courts of Florida (see, Matter of Carvel, NYLJ,

July 9, 2003, at 27, col. 1).   This would necessarily include expenses incurred by Pamela,

as Delaware ancillary administrator.

Pamela's application to have the court direct Ross, as ancillary administrator c.t.a.,

to deliver the assets in his possession to Pamela as domiciliary executrix and/or Delaware

ancillary administrator is likewise dismissed.   In Matter of Carvel, (NYLJ, Apr. 15, 2002, at

29, col. 6), the court directed Ross to "hold [the assets of the ancillary estate] subject to

the further order of this Court ..."   Nothing has transpired since that decision to warrant a

different disposition at this time.   The ultimate disposition of the assets of the ancillary

estate will be determined upon the settlement of Ross' account as  ancillary administrator

c.t.a.

3

**A-12**

## ESTATE OF AGNES CARVEL.
### File No. 2165/1998

Finally, Pamela's application to compel delivery of Agnes' legal files in the possession of Ross   is denied.  Pamela has failed to refute Ross' contention that he appropriately marshaled the legal files belonging to Agnes and is utilizing them in his capacity as New York ancillary administrator c.t.a.  Pamela has also failed to refute Ross' allegation that she has received copies of all legal documents relating to the litigations. Pamela may obtain copies of all such documents, provided the cost of providing such copies is not borne by the ancillary estate.

Settle Order.

Dated: White Plains, New York
    June 30, 2004

HON. ANTHONY A. SCARPINO, JR.
**Westchester County Surrogate**


TO:    Pamela Carvel
    Suite 158
    28 Old Brompton Road
    London SW7 3SS

    c/o P.O. Box 58
    Cranbury, New Jersey 08512-0058

    Blank Rome LLP
    The Chrysler Building
    405 Lexington Avenue
    New York, New York 10174

    Orrick, Herrington & Sutcliffe LLP
    666 Fifth Avenue
    New York, New York 10103

4

**A-12a**

ANDREAS HOLDINGS
BEGINNING BALANCE

| DESCRIPTION | ALL AMERICAN SPORTS CITY | CHAUNCEY ADVERTISING | TOTAL |
|---|---|---|---|
| CASH | 125,478.21 | 31,689.23 | 157,167.44 |
| ACCOUNTS RECEIVABLE | 92,441.00 | 10,074,085.16 | 10,166,526.16 |
| CURRENT ACCOUNT | | (88,421.11) | (88,421.11) |
| INVENTORY | 3,158.58 | | 3,158.58 |
| PREPAID REAL ESTATE TAX | 49,348.74 | | 49,348.74 |
| INVESTMENT IN REAL ESTATE: | | | |
| LAND | 5,034,110.00 | | 5,034,110.00 |
| DWELLING | 391,502.00 | | 391,502.00 |
| AUX. BUILDING | 572,276.00 | | 572,276.00 |
| GOLF COURSE | 1,502,298.00 | | 1,502,298.00 |
| TENNIS COURT | 40,488.00 | | 40,488.00 |
| CARVEL LAKE | 1,451,662.00 | | 1,451,662.00 |
| NEW CLUB HOUSE | 1,446,413.00 | | 1,446,413.00 |
| DEP. AUTOS, TRUCKS & CARTS | 40,972.00 | | 40,972.00 |
| FURNITURE & FIXTURES | 60,275.00 | | 60,275.00 |
| DEP. FURNITURE & FIXTURES | | | |
| MACHINERY & EQUIPMENT | 103,449.00 | | 103,449.00 |
| DEP. MACHINERY & EQUIPMENT | | | |
| TOTAL ASSETS | 10,913,771.53 | 10,017,353.28 | 20,931,124.81 |
| ACCOUNTS PAYABLE | 22,427.00 | 0.00 | 22,427.00 |
| CUSTOMERS DEPOSIT | 200.00 | | 200.00 |
| DUE TO CHAIN LOCATIONS | 102,897.53 | | 102,897.53 |
| SALES TAX PAYABLE | 2,084.00 | | 2,084.00 |
| ACCRUED LIABLITIES | 24,603.00 | 0.00 | 24,603.00 |
| EXCHANGE | (3,500.00) | | (3,500.00) |
| COMMON STOCK | 10,765,060.00 | | 10,765,060.00 |
| CAPITAL STOCK | | 2,500.00 | 2,500.00 |
| RETAINED EARNINGS | | 10,014,853.28 | 10,014,853.28 |
| TOTAL LIABILITIES & RETAINED EARNINGS | 10,913,771.53 | 10,017,353.28 | 20,931,124.81 |

H F R

A-13

The New York Law Journal

Getting Grounded On Ethical Dilemmas
Eve Rachel Markewich

Monday, February 14, 2005

A few years ago, I became involved in an estate litigation well after the will had been admitted to probate. It was astounding to me that none of the following issues had been raised in the probate proceeding:

• The will was drafted by an attorney who never met the decedent, or even spoke to him on the telephone. Rather, communications were between the decedent's corporate attorneys and the draftsperson of the will.

• The will purportedly was part of a larger estate plan for the decedent and his wife, yet no attorney ever spoke to the wife, literally until the documents — including her mirror will — were executed.

• The wife was never advised to seek separate counsel, and never asked to consent to joint representation.

• The attorney supervising the execution of the documents was not an estates practitioner, and had not been involved in any of the estate planning discussions, yet he was charged with "explaining" the documents, which were not simple, to the wife.

• The wills named several executors, two of whom were corporate attorneys involved in the estate planning process, although they were not the ultimate drafters of the documents. One of these lawyers also was named as a beneficiary.

Although these events occurred several years ago, they serve as a useful jumping off point for a review of basic ethical precepts that should inform the day-to-day practice of estates practitioners. [1]

It is a truism that a lawyer must exercise independent professional judgment on behalf of a client, and may not be influenced by the interests of other people (DR 5-107; EC 5-21). At a minimum, one would think a lawyer has an obligation to speak to a client when performing personal services. Although actual client interaction is not required by the Disciplinary Rules, the Ethical Considerations and the Model Rules of Professional Conduct (MRPC) come close to mandating direct communication. See EC 7-8, which requires an attorney to "exert best efforts to ensure that decisions of the client are made only after the client has been informed of relevant considerations," and which encourages the attorney to initiate the decision-making process, and MRPC 1.4 directing the attorney to keep her client reasonably informed regarding the status of a matter and to provide explanation to the extent necessary to enable the client to make informed decisions.

**A-14**

## Joint Representation

Despite the absence of a rule on point for basic representation, for a lawyer engaged in a joint representation, or representation of multiple clients with possible conflicts, person-to-person discussions are essential, at least for disclosure purposes. DR 5-105(C) requires that clients have "full disclosure of the implications of the simultaneous representation and the advantages and risks involved." DR 5-105(C) [§1200.24(C)]. [2]

DR 5-105(A) [§1200.24(A)] provides that "A lawyer shall decline proffered employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests." Although one does not, intuitively, think of mutual estate planning between spouses as implicating the conflict rules, to some extent, every time a couple approaches you for estate planning, the possibility must be considered. If the plan is essentially to follow the rules of intestacy, then no conflict exists. If the plan varies the intestacy rules, the issue of conflict must at least be addressed.

The American College of Trust and Estate Counsel (ACTEC) advises that when taking on a joint representation of spouses, the disclosure conversation should be had at the beginning of the client relationship, in order to give the clients the opportunity to define the scope and nature of the representation. See, ACTEC, Commentaries on the Model Rules of Professional Conduct, 3d Ed. 1999 (ACTEC Commentaries), Commentary on MRPC 1.2.

In joint representation, the understanding is that no confidences exist that may not be shared with the other spouse, or considered when making estate planning decisions. The ACTEC model retainer agreement for joint representation includes a form disclosure, and requires that the clients sign their consent. [3] Best practice rules include a review of the document with the client, specific advice that each client may utilize separate counsel, and in some situations even advising the clients to take the consent document home to consider the implications. Written consent not only helps to ensure informed consent, it also protects the lawyer — at a later date — from a claim of impropriety, and protects the ultimate documents from claims of overreaching.

Once written consent has been obtained, the attorney's obligation to ensure lack of conflict continues throughout the course of the representation. Thus, DR 5-105(B) [§1200.24(b)] precludes you from continuing multiple representation of clients "if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing different interests . . ."

What sorts of situations, in estate planning, bring these rules into play? Potential drafting conflicts arise most often, but not solely, when one or more spouses has been previously married, or has children outside the marriage. They can also arise where one spouse owns

**A-15**

a close corporation or a partnership, or simply when one or the other has a close relationship with his or her family, or wants to ensure that family money does not go to the in-laws. Many lawyers forget to consider conflict issues when dealing with close friends or family, or long-term client relationships. That oversight should be avoided at all costs.

One issue that arises in the joint representation of spouses relates to gift-splitting. Let's say John, your long-term client, has been in the habit of gifting part of his business to his children on an annual basis, taking advantage of valuation discounts and the annual exclusion. He has always limited himself to the annual gift exclusion amounts under the Internal Revenue Code, so when he remarries, it seems to make sense to increase the amount of those gifts, and split them with Mary, even to the point of taking advantage of Mary's available unified credit allowance. John tells you he thinks this is a great idea, but he neglects to tell you that Mary has children of her own. However, if John follows your advice, Mary may be using up her available unified credit, which she may or may not have intended to use for future gifts to her own children, either during life or after death.

By preparing a gift-tax return for Mary's signature, you are, in effect, representing her. DR 5-105(C) [§1200.24(C)] requires "full disclosure of the implications of the simultaneous representation and the advantages and risks involved" in representing multiple clients. Certainly, under any situation involving gifts as tax and estate planning tools, the attorney must review these issues with both clients. Moreover, the attorney must ensure that the gist of the information is imparted to both parties, even though one may be far more fluent in the ins and outs of such matters than the other. If you never actually speak to one of the spouses until the date the instrument is to be executed, the opportunity to explore potential conflicts may be lost. Obviously, the same applies if the attorney's practice is to transmit documents like gift tax returns through one spouse, without explaining the implications to the other.

## Executors and Beneficiaries

Estates lawyers surely spotted the *Putnam* and *Weinstock* issues in the scenario set forth at the top of this article, but for the uninitiated, a brief review is in order. [4] In *Matter of Weinstock*, the Court of Appeals denied letters testamentary to attorneys who had drafted a will for an 82-year-old woman, where the will nominated the lawyers as executors, although the testator's first interaction with the lawyers was when they drafted her will. The Court's reasoning was based on EC 5-6, which states that an attorney should not consciously influence a client to name the attorney as a fiduciary in an instrument.

In response to *Weinstock*, the Legislature enacted Surrogate's Court Procedure Act (SCPA) §2307-a in 1995, [5] requiring disclosure to the testator, prior to executing the will, regarding commissions and legal fees and requiring written acknowledgment by the testator, in the presence of a witness, of such disclosure. SCPA §2307-a was amended recently [6] to provide that the written acknowledgment be in an instrument separate from the will (although it may be attached to the will) and it must contain a provision that, absent execution of the acknowledgment, commissions are limited to one-half the commissions allowed by statute, thus eliminating any excuses by the attorney for failing to provide

**A-15a**

disclosure to the client.

*Matter of Putnam* involved a bequest of the testator's residuary estate to her attorney, who was also the draftsperson of the will. There, the Court of Appeals upheld the bequest, but admonished attorneys to have the will drawn by another attorney if their clients intend to leave a bequest to the attorney or the attorney's family. Underlying that admonition is the concern that, based on the confidential nature of the attorney-client relationship, in a situation where an attorney is named as a beneficiary in a will, he is "peculiarly susceptible to the charge that he unduly influenced or overreached the client." (EC 5-5)

## Maintaining Confidences

Conflict issues often present a much more benign appearance than we imagine. Assume the following situation: Your 50 year-old client who is worried about his recently widowed 80-year-old mother asks you, with what appears to be the best intentions, to review Mom's will and update her estate plan. In particular, Sonny is worried that Mom's plan, which was a typical one mirroring Dad's — to spouse for life and then to children — does not adequately cover anticipated expenses for Sonny's sister's disabled daughter, Dolly, and has no tax-saving bells and whistles. Sonny tells you just to add the cost of services to Mom to his bill.

Sonny describes Mom as eccentric, and says she lives with 10 cats, but he stresses that she has all her marbles. Sonny also tells you that, although Mom understands that she is "rich," Dad always handled the family finances through his business accountant, and Sonny doubts whether Mom really understands the enormity of her $15 million in assets. Sonny also says that Mom has become quite deaf, so he suggests you have the preliminary conversations with him, and then speak to Mom only later.

A number of issues could surface in this scenario, the first being addressed by DR 5-107(A), which prohibits an attorney to accept compensation for legal services from one other than the client, without consent after full disclosure. Accordingly, you send Mom a retainer agreement, with full disclosure of your representation of Sonny, and she signs it.

A week later, you meet with Mom. You follow all the rules. You meet with her alone. You tell her that the will you are proposing is essentially the same as the wills she and Dad did years ago, except that instead of leaving everything to Sonny and his sister, outright, you are creating sprinkle trusts for the children and grandchildren, with special provisions for Dolly. Mom looks at you and says "My children are wealthy. They don't need the money, and their children will be well provided for." She further explains to you that, although she went along with Sonny's suggestion that she retain you, she has already been to see her neighbor's lawyer-daughter, and executed a will leaving her estate to the Foundation for Homeless Cats. She tells you this organization is important to her, because it will take care of animals who may be the "brothers and sisters" of her own cats.

Besides addressing issues surrounding Mom's capacity to create a new will, what do you do? You may not reveal the estate plan to Sonny, or to anyone else. DR 4-101(B)

**A-16**

[§1200.19(B)] prohibits you from revealing a confidence or secret of a client, except under very specific circumstances not present here. Your obligation to Mom to hold her confidence is not tempered by the fact that you also represent Sonny, or even by the fact that you have ongoing estate planning discussions with Sonny, including aggressive gift planning for Sonny and his wife, premised on the expectation that they will succeed to a good share of Mom and Dad's wealth.

The situation, here, is markedly different from the case with John and Mary, where you also represent two parties. Why? Because with John and Mary you were engaged for a joint representation and, if you followed ACTEC's recommendation, you explained to them at the outset that you would consider all communications with each of them to be devoid of confidentiality with respect to the other, and you obtained signed consents from them to proceed on that basis. Here, in contrast, you represent Mom separately.

Nor are you relieved of your obligations of confidentiality because Sonny is picking up the bill for Mom. DR 5-107(B) prohibits an attorney to allow "a person who recommends, employs, or pays the lawyer to render legal service for another to direct or regulate his or her professional judgment in rendering such legal services, or to cause the lawyer to compromise the lawyer's duty to maintain the confidences and secrets of the client under DR 4-101(B)." If you feel you have learned something that impairs the interests of another client, you have the right to refuse the representation, or to withdraw, but the confidentiality requirement still exists. Even when it appears that breaching the confidentiality would do no harm, and would serve what you consider to be a better good, the attorney's obligation is to maintain the confidence.

Administration of Estates

Conflict situations arise in estates practice during the administration of an estate, as well. Returning to the case described at the beginning of this article, after the will was admitted to probate, during the early stages of administration of the estate, the income beneficiary of the testamentary trust was represented by the same lawyer who represented the remainder beneficiary, a not-for profit entity, and also was a director of the remainder beneficiary. Is this necessarily a precluded representation? Probably not, to start. Indeed, ACTEC notes that it is often appropriate for an attorney to represent multiple clients with common interests in estate or trust administration, emphasizing that estate administration is usually nonadversarial in nature. See, ACTEC Commentaries, Commentary on Rule 1.7. Assuming nothing unusual is happening, and the clients consent, this type of dual representation should be OK. However, in the case cited, the added wrinkle is that the lawyer is a director of the remainder entity. Therefore, the representation may implicate DR 5-101 [§1200.20] which states:

A lawyer shall not accept or continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property or personal interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer's interest.

**A-16a**

Here, there may have been a business interest the lawyer had, as director of the remainder, that was at odds with the income beneficiary's interest.

While one might take the position that the interests of income and remainder beneficiaries of a residuary trust are aligned, such is not always the case. Their interests may diverge, for example, if the executors and trustees retain underproductive property that is expected to greatly appreciate by the time the income interest terminates, but yields little or no income for the income beneficiary. Similarly, if the lawyer has an interest in the remainder, she may not fully scrutinize investment decisions of the trustee, in terms of whether there is an emphasis on income versus growth.

Notwithstanding that New York statutory law addresses a fiduciary's duty to all beneficiaries via the Principal and Income Act [7] and the Prudent Investor Act, [8] the focus here is on the attorney's ability (observed objectively) to exercise professional judgment on behalf of a client who has a different interest in the same subject matter in which the attorney has an interest. EC 5-3 states in part that "[t]he self-interest of a lawyer resulting from ownership of property in which the client also has an interest or which may affect property of the client may interfere with the exercise of free judgment on behalf of the client." The Ethical Considerations suggest that the attorney either decline or withdraw from representation unless the client consents after full disclosure. Another implication of this relationship is the requirement that an attorney "strive to avoid not only professional impropriety but also the appearance of impropriety." EC 9-6.

Although it may seem less substantive than actual impropriety, lawyers need always be alert to the appearance of impropriety. We need to ask ourselves, 'if I were one of these clients, and I received an unwanted result, would I question the lawyer's integrity?' Moreover, when representing multiple clients, we must remind ourselves that the conflict analysis is not static, but must be reviewed regularly. If you find yourself in doubt, call for help. Most bar associations have ethics hotlines that will help you find your way.

*Eve Rachel Markewich* is a member of the Blank Rome litigation department. *Barbara MacGrady*, an associate with the firm, assisted in the preparation of this article.

Endnotes:

1. Reference is made to New York's Code of Professional Responsibility, adopted by the New York State Bar Association on Jan. 1, 1970. The Code contains Canons, which are the underlying precepts for conduct; Ethical Considerations (ECs), which serve as aspirational guides for attorneys; and Disciplinary Rules (DRs), which are rules to be observed and which provide a basis for disciplinary actions against attorneys who fail to follow them. New York has not adopted the Model Rules of Professional Conduct (MRPC) issued by the American Bar Association, but its Code has rules corollary to the MRPC.

2. Bracketed sections refer to the Disciplinary Rules of the Code of Professional

A-17

Responsibility promulgated as joint rules of the Appellate Division of the Supreme Court and set forth in Part 1200 of Title 22 of New York Codes, Rules and Regulations (NYCRR).

3. See, ACTEC Engagement Letters: A Guide for Practitioners, ch. I at <a href="http://www.actec.org/"><u>www.actec.org/</u></a> publicInfoArk/comm/engltrch1.htm

4. Matter of Putnam, 257 N.Y. 140 (1931); Matter of Weinstock, 40 N.Y.2d 1 (1976). It would behoove the uninitiated to familiarize themselves with these cases and their practical effect in dealings with the Surrogates' Courts.

5. L. 1995, ch. 421.

6. L. 2004, ch. 709, effective Nov. 16, 2004.

7. Estates, Powers and Trusts Law (EPTL), art. 11-A.

8. EPTL §11-2.3.



*413470550MTG9*

| Control Number | WIID Number | Instrument Type |
|---|---|---|
| 413470550 | 2001347-000226 | MTG |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
*** DO NOT REMOVE ***

THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:

TYPE OF INSTRUMENT  <u>MTG - MORTGAGE</u>
FEE PAGES  15                TOTAL PAGES  15

**RECORDING FEES**

| STATUTORY CHARGE | $5.25 |
|---|---|
| RECORDING CHARGE | $45.00 |
| RECORD MGT. FUND | $4.75 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| TOTAL FEES PAID | $55.00 |

**TRANSFER TAXES**

| CONSIDERATION | $0.00 |
|---|---|
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

**MORTGAGE TAXES**

| MORTGAGE DATE | 10/01/2001 |
|---|---|
| MORTGAGE AMOUNT | $200,000.00 |
| EXEMPT | Yes |
| YONKERS | $0.00 |
| BASIC | $1,000.00 |
| ADDITIONAL | $475.00 |
| SUBTOTAL | $1,475.00 |
| MTA | $500.00 |
| SPECIAL | $0.00 |
| TOTAL PAID | $1,975.00 |

| SERIAL NUMBER | CS38184 |
|---|---|
| DWELLING | 1-2 Family |

RECORDING DATE      12/26/2001
            TIME      15:53:00

THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:
TOWN OF NORTH CASTLE

WITNESS MY HAND AND OFFICIAL SEAL

*Leonard N. Spano* (signature)

LEONARD N. SPANO
WESTCHESTER COUNTY CLERK

Record & Return to:
HUDSON VALLEY BANK
CLOSING DEPT
HUDSON VALLEY BANK
YONKERS, NY 10707

RECORD AND RETURN TO:

Section 1
Block 1
Lot(s) 11-17
Town of North Castle
County of Westchester

HUDSON VALLEY BANK
21 Scarsdale Road
Yonkers, New York 10707-3205
ATT: Closing Department
Loan No. 0062000489

56 912

——————[Space Above This Line For Recording Data]——————

# CREDIT LINE MORTGAGE

### WORDS USED OFTEN IN THIS DOCUMENT

(A) "Mortgage." The "Mortgage" means all the terms, covenants and conditions contained in these pages. This document, which is dated October 1, 2001, and which secures a revolving credit Obligation will be called the "Mortgage".

(B) "Borrower." Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, residing at 30 Brookwood Road, Bedford, New York 10506, sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C) "Lender." HUDSON VALLEY BANK, will be called "Lender." Lender is a State Chartered Bank, which was formed and which exists under the laws of the State of New York. Lender's address is 21 Scarsdale Road, Road, Yonkers, New York 10707.

(D) "Obligation." The obligation signed by Borrower and dated October 1, 2001, means the Home Equity Loan Agreement (the "Agreement") and extensions and renewals of that obligation executed in connection with this Mortgage.

The Agreement provides that the credit secured by the Property is an open-end revolving line of credit at a variable rate of interest. The maximum amount of all loan advances made to the Borrower under the Agreement and which may be secured by this Mortgage may not exceed $300,000.00--- Dollars (U.S. $300,000.00)(the "Credit Limit"). At any particular time, the outstanding obligation of Borrower to Lender under the Agreement may be any sum equal to or less than the Credit Limit plus interest and other charges owing under the Agreement and amounts owing under this Mortgage. Obligations under the Agreement, Mortgage and any riders thereto shall not be released even if all indebtedness under the Agreement is paid, unless and until we cause a Discharge of Mortgage to be executed and such Discharge is properly recorded. I have promised to pay this debt in monthly payments and to pay the debt in full by October 1, 2026.

(E) "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(F) "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

### BORROWERS TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Mortgage a/k/a Security Instrument. This means that, by signing this Mortgage a/k/a Security Instrument, I am giving Lender those rights that are stated in this Mortgage a/k/a Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Agreement;

(B) Pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 of this Mortgage a/k/a Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Mortgage a/k/a Security Instrument.

### DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described in (A) through (G) below:

(A) the Property which is located at 30 Brookwood Road, Bedford, New York 10506

This property is in Westchester County. It has the following legal description:

SEE SCHEDULE "A" ANNEXED HERETO AND MADE A PART HEREOF BY EXPRESS REFERENCE

SAID PREMISES BEING IMPROVED BY A ONE OR TWO FAMILY DWELLING.

(B) All buildings and other improvements that are located on the Property described in subparagraph (A) of this section;
(C) All rights in other property that I have as owner of the Property as described in subparagraph (A) of this section. These rights are known as "easements and appurtenances attached to the Property";
(D) All rights that I have in the land which lies in the street or roads in front of, or next to, the Property described in subparagraph (A) of this section;
(E) All fixtures that are now or in the future will be on the Property described in subparagraphs (A) and (B) or this section;
(F) All of the rights and property described in subparagraphs (B) through (E) of this section that I acquire in the future; and
(G) All replacements of or additions to the Property described in subparagraphs (B) through (F) of this section.

belcomig.hvb
**CREDIT LINE MORTGAGE** - (Home Equity Line of Credit)

(11/96)

A-19-1

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE Mortgage A/K/A SECURITY INSTRUMENT**

This Mortgage a/k/a Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary,to a limited extent, in different parts of the country. My promises and agreements are stated in "plain language."

<div align="center">COVENANTS</div>

I promise and I agree with Lender as follows:

**1. BORROWER'S PROMISE TO PAY**

I will pay to Lender on time principal and interest due under the Agreement and any prepayment and late charges due under the Agreement.

**2. MONTHLY PAYMENTS FOR TAXES AND INSURANCE**

**(A) Borrower's Obligations**

I will pay to Lender, if required, all amounts necessary to pay for taxes, assessments, water frontage charges and other similar charges, sewer rents, leasehold payments or ground rents (if any), hazard or property insurance covering the Property, and flood insurance (if any). If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Agreement,(i)I also will pay to Lender all amounts necessary to pay for mortgage insurance, and (ii)if, under Paragraph 8 below, instead of paying for mortgage insurance I am required to pay Lender an amount equal to the cost of mortgage insurance, I will pay this amount to Lender. I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless the law requires otherwise. I will make these payments on the same day that my monthly payments of principal and interest are due under the Agreement.

My payments under this Paragraph 2 will be for the items listed in (i)through(vi) below, which are called "Escrow Items":
(i) The estimated yearly taxes,assessments,water frontage charges and other similar charges,and sewer rents on the Property which under the law may be superior to this Mortgage a/k/a Security Instrument as a lien on the Property. Any claim, demand or charge that is made
against property because an obligation has not been fulfilled is known as a "lien";
(ii) The estimated yearly leasehold payments or ground rents on the Property (if any);
(iii) The estimated yearly premium for hazard or property insurance covering the Property;
(iv) The estimated yearly premium for flood insurance covering the Property (if any);
(v) The estimated yearly premium for mortgage insurance (if any); and
(vi) The estimated yearly amount I may be required to pay Lender under Paragraph 8 below instead of the payment of the estimated yearly premium for mortgage insurance (if any).

Lender will estimate from time to time the amount I will have to pay for Escrow Items by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless the law requires Lender to use another method for determining the amount I am to pay. The amounts that I pay to Lender for Escrow Items under this Paragraph 2 will be called the "Funds." The Funds are pledged as additional security for all Sums Secured.

The law puts limits on the total amount of Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender for a "federally related mortgage loan" could require me to place in an "escrow account" under the federal law called the "Real Estate Settlement Procedures Act of 1974," as that law may be amended from time to time. If there is another law that imposes a lower limit on the total amount of Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(B) Lender's Obligations**

Lender will keep the Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity; or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Funds. Except as described in this Paragraph 2, Lender will use the Funds to pay the Escrow Items. Lender will give to me, without charge, an annual accounting of the Funds. That accounting must show all additions to and deductions from the Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Funds, for using the Funds to pay Escrow Items, for making a yearly analysis of my payments of Funds or for receiving, verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Funds and if the law permits Lender to make such a charge. Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with my loan, unless the law does not permit Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Funds unless either (i) Lender and I agree in writing, at the time I sign this Mortgage a/k/a Security Instrument, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds.

<div align="right">Page 2 of 9 pages</div>

**(C) Adjustments to the Funds**

Under the law, there is a limit on the amount of Funds Lender may hold. If the amount of Funds held by Lender exceeds this limit, then the law requires Lender to account to me in a special manner for the excess amount of Funds.  There will be an excess amount if, at any time, the amount of Funds which Lender is holding or keeping is greater than the amount of Funds Lender is allowed to hold under the law.  If, at any time, Lender has not received enough Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items in full.  Lender will determine the number of monthly payments I have in which to pay that additional amount, but the number of payments will not be more than twelve.
When I have paid all of the Sums Secured, Lender will promptly refund to me any Funds that are then being held by Lender. If, under Paragraph 21 below, either Lender acquires or sells the Property, then before the acquisition or sale, Lender will use any Funds which Lender is holding at the time of the acquisition or sale to reduce the Sums Secured.

## 3. APPLICATION OF BORROWER'S PAYMENTS

Unless the law requires otherwise, Lender will apply each of my payments under the Agreement and under Paragraphs 1 and 2 above in the following order and for the following purposes:
First, to pay any prepayment charges due under the Agreement;
Next, to pay the amounts due to Lender under Paragraph 2 above;
Next, to pay interest due;
Next, to pay principal due; and
Last, to pay any late charges due under the Agreement.

## 4. BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS

I will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents and any other charges and fines that may be imposed on the Property and that may be superior to this Mortgage a/k/a Security Instrument. I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will do this either by making the payments to Lender that are described in Paragraph 2 above or, if I am not required to make payments under paragraph 2, by making the payments on time to the person owed them. (In this Mortgage a/k/a Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so. If I make payment to Lender under Paragraph 2, I will give Lender all notices or bills that I receive for the amounts due under this Paragraph 4.

I will promptly pay or satisfy all liens against the Property that may be superior to this Mortgage a/k/a Security Instrument. However, this Mortgage a/k/a Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Mortgage a/k/a Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Borrower a notice identifying the superior lien. Borrower shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

## 5. BORROWER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE OR PROPERTY INSURANCE

I will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage, including floods and flooding. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. If I do not maintain the insurance coverage described above, Lender may obtain insurance coverage to protect Lender's rights in the Property in accordance with Paragraph 7 below.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (A) it is not economically feasible to make the repairs or restoration; or (B) the use of the proceeds for that purpose would lessen the protection given to Lender by this Mortgage a/k/a Security Instrument; or (C) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Mortgage a/k/a Security Instrument, then the proceeds will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage a/k/a Security Instrument. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

**Page 3 of 9 pages**

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of any of my monthly payments under the Agreement and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

If Lender acquires the Property under Paragraph 21 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

## 6. BORROWER'S OBLIGATIONS TO OCCUPY THE PROPERTY, TO MAINTAIN AND PROTECT THE PROPERTY, AND TO FULFILL ANY LEASE OBLIGATIONS; BORROWERS LOAN APPLICATION

### (A) Borrower's Obligations to Occupy the Property

I will occupy the Property and use the Property as my principal residence within sixty days after I sign this Mortgage a/k/a Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

### (B) Borrower's Obligations to Maintain and Protect the Property

I will keep the Property in good repair. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate.

I will be "in default" under this Mortgage a/k/a Security Instrument if I fail to keep any promise or agreement made in this Mortgage a/k/a Security Instrument. I will also be in default under this Mortgage a/k/a Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is, a legal action or proceeding to require the Property, or any part of the Property, to be given up) is begun and Lender determines, in good faith, that this action or proceeding could result in a court ruling (i) that would require forfeiture of the Property or (ii) that would materially impair the lien of this Mortgage a/k/a Security Instrument or Lender's rights in the Property. I may correct the default by obtaining a court ruling that dismisses the legal action or proceeding, if Lender determines, in good faith, that this court ruling prevents forfeiture of my interests in the Property and also prevents any material impairment of (i) the lien created by this Mortgage a/k/a Security Instrument or (ii) Lender's rights in the Property. If I correct the default, I will have the right to have enforcement of this Mortgage a/k/a Security Instrument discontinued, as provided in Paragraph 18 below, even if Lender has required immediate payment in full.

### (C) Borrower's Obligations to Fulfill Any Lease Obligations

If I do not own but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

### (D) Borrower's Loan Application

If, during the application process for the loan that I promise to pay under the Agreement, I made false or inaccurate statements to Lender about information important to Lender in determining my eligibility for the loan, Lender will treat my actions as a default under this Mortgage a/k/a Security Instrument. False or inaccurate statements about information important to Lender would include a misrepresentation of my intentions to occupy the Property as a principal residence. This is just one example of a false or inaccurate statement of important information. Also, if during the loan application process I failed to provide Lender with information important to Lender in determining my eligibility for the loan, Lender will treat this as a default under this Mortgage a/k/a Security Instrument.

## 7. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY

If:(A)I do not keep my promises and agreements made in this Mortgage a/k/a Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture or to enforce laws or regulations) Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Lender must give me notice before Lender may take any of these actions.

I will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 7. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the Agreement rate. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this paragraph. This Mortgage a/k/a Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

## 8. MORTGAGE INSURANCE

If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Agreement, I will pay the premiums for the mortgage insurance. If, for any reason, the mortgage insurance coverage lapses or ceases to be in effect, I will pay the premiums for substantially equivalent mortgage insurance coverage. However, the cost of this mortgage insurance coverage must be substantially equivalent mortgage insurance coverage. However the cost of this mortgage insurance coverage must be substantially equivalent to the cost to me of the previous mortgage insurance coverage, and the alternate mortgage insurer must be approved by Lender.

Page 4 of 9 pages

A-19-4

If substantially equivalent mortgage insurance coverage is not available, Lender will establish a "loss reserve" as a substitute for the mortgage insurance coverage. I will pay to Lender each month an amount equal to one-twelfth of the yearly mortgage insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the mortgage insurance would have covered. Lender may choose to no longer require loss reserve payments, if mortgage insurance coverage again becomes available and is obtained. The mortgage insurance coverage must be in the amount and for the period of time required by Lender. The Lender must approve the insurance company providing the coverage.

I will pay the mortgage insurance premiums, or the loss reserve payments, until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law. Lender may require me to pay the premiums, or the loss reserve payments, in the manner described in Paragraph 2 above.

## 9. LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

## 10. AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY

A taking of property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking either is equal to, or greater than, the amount of Sums Secured immediately before the taking, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by a fraction. That fraction is as follows: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

Unless Lender and I agree otherwise in writing or unless the law requires otherwise, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking is less than the amount of the Sums Secured immediately before the taking, the proceeds will be used to reduce the Sums Secured.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of any of my monthly payments under the Agreement and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

## 11. CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS

### (A) Borrower's Obligations

Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Agreement or under this Mortgage a/k/a Security Instrument. Even if Lender does this, however, that person and I will both still be fully obligated under the Agreement and under this Mortgage a/k/a Security Instrument.

Lender may allow those delays or changes for a person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Agreement or under this Mortgage a/k/a Security Instrument, even if Lender is requested to do so.

### (B) Lender's Rights

Even if Lender does not exercise or enforce any right of Lender under this Mortgage a/k/a Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 21 below to demand that I make immediate payment in full of the amount that I owe to Lender under the Agreement and under this Mortgage a/k/a Security Instrument.

## 12. OBLIGATIONS OF BORROWER AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS

Any person who takes over my rights or obligations under this Mortgage a/k/a Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Mortgage a/k/a Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Mortgage a/k/a Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Mortgage a/k/a Security Instrument.

If more than one person signs this Mortgage a/k/a Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Mortgage a/k/a Security Instrument. Lender may enforce Lender's rights under this Mortgage a/k/a Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Agreement: (A) that person is signing this Mortgage a/k/a Security Instrument only to give that person's rights in the Property to Lender under the terms of this Mortgage a/k/a Security Instrument; and (B) that person is not personally obligated to pay the Sums Secured; and (C) that person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Mortgage a/k/a Security Instrument or the Agreement without that person's consent.

### 13. LOAN CHARGES

If the loan secured by this Mortgage a/k/a Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Agreement.

### 14. NOTICES REQUIRED UNDER THIS MORTGAGE A/K/A SECURITY INSTRUMENT

Any notice that must be given to me under this Mortgage a/k/a Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at the address stated in the section above titled "Description of the Property." A notice will be given to me at a different address if I give Lender a notice of my different address. Any notice that must be given to Lender under this Mortgage a/k/a Security Instrument will be given by mailing it to Lender's address stated in subparagraph (C) of the section above titled "Words Used Often In This Document." A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address. A notice required by this Mortgage a/k/a Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

### 15. LAW THAT GOVERNS THIS MORTGAGE A/K/A SECURITY INSTRUMENT

This Mortgage a/k/a Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Mortgage a/k/a Security Instrument or of the Agreement conflicts with the law, all other terms of this Mortgage a/k/a Security Instrument and of the Agreement will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Mortgage a/k/a Security Instrument and of the Agreement which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

### 16. BORROWER'S COPY

I will be given one conformed copy of the Agreement and of this Mortgage a/k/a Security Instrument.

### 17. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Lender may require immediate payment in full of all Sums Secured by this Mortgage a/k/a Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Mortgage a/k/a Security Instrument.

If Lender requires immediate payment in full under this Paragraph 17, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Mortgage a/k/a Security Instrument without giving me any further notice or demand for payment.

### 18. BORROWER'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS MORTGAGE A/K/A SECURITY INSTRUMENT DISCONTINUED

Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Mortgage a/k/a Security Instrument discontinued. I will have this right at any time before sale of the Property under any power of sale granted by this Mortgage a/k/a Security Instrument or at any time before a judgment has been entered enforcing this Mortgage a/k/a Security Instrument if I meet the following conditions: (A) I pay to Lender the full amount that would be due under this Mortgage a/k/a Security Instrument and the Agreement as if immediate payment in full had never been required; and (B) I correct my failure to keep any of my other promises or agreements made in this Mortgage a/k/a Security Instrument; and (C) I pay all of Lender's reasonable expenses in enforcing this Mortgage a/k/a Security Instrument including, for example, reasonable attorney's fees; and (D) I do whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Mortgage a/k/a Security Instrument, and my obligations under the Agreement and under this Mortgage a/k/a Security Instrument continue unchanged.

If I fulfill all of the conditions in this Paragraph 18, then the Agreement and this Mortgage a/k/a Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Mortgage a/k/a Security Instrument discontinued if Lender has required immediate payment in full under Paragraph 17 above.

*Page 6 of 9 pages*

A-19-6

### 19. AGREEMENT HOLDER'S RIGHT TO SELL THE AGREEMENT OR AN INTEREST IN THE AGREEMENT; BORROWER'S RIGHT TO NOTICE OF CHANGE OF LOAN SERVICER

The Agreement, or an interest in the Agreement, together with this Mortgage a/k/a Security Instrument, may be sold one or more times. I may not receive any prior notice of these sales.

The entity that collects my monthly payments due under the Agreement and this Mortgage a/k/a Security Instrument is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Agreement; there also may be one or more changes of the Loan Servicer unrelated to a sale of the Agreement. The law requires that I be given written notice of any change of the Loan Servicer. The written notice must be given in the manner required under Paragraph 14 above and under applicable law. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice will contain any other information required by the law.

### 20. CONTINUATION OF BORROWER'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY

The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection are called "Environmental Laws." I will not do anything affecting the Property that violates Environmental Laws, and I will not allow anyone else to do so.

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Paragraph 20. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Laws and the substances considered hazardous for purposes of the Paragraph 20 are called "Hazardous Substances."

I will not permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property, and I will not allow anyone else to do so. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. However, I may permit the presence on the property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and I may use or store these small quantities on the Property. In addition, unless the law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

If I know of any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws, I will promptly notify the Lender in writing. If the government notifies me (or I otherwise learn) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, I will promptly take all necessary remedial actions as required by Environmental Laws.

### 21. LENDER'S RIGHTS IF BORROWER FAILS TO KEEP PROMISES AND AGREEMENTS

Except as provided in Paragraph 17 above, if all of the conditions stated in subparagraphs (A),(B) and (C) of this Paragraph 21 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Agreement and under this Mortgage a/k/a Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require immediate payment in full under this Paragraph 21 only if all of the following conditions are met:

(A) I fail to keep any promise or agreement made in this Mortgage a/k/a Security Instrument, including the promise to pay when due the Sums Secured.
(B) Lender sends to me, in the manner described in Paragraph 14 above, a notice that states:
    (i) The promise or agreement that I failed to keep;
    (ii) The action that I must take to correct that default;
    (iii) A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;
    (iv) That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another person may acquire the Property by means of foreclosure and sale;
    (v) That if I meet the conditions stated in Paragraph 18 above, I will have the right to have Lender's enforcement of this Mortgage a/k/a Security Instrument discontinued and to have the Agreement and this Mortgage a/k/a Security Instrument remain fully effective as if immediate payment in full had never been required; and
    (vi) That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Agreement and under this Mortgage a/k/a Security Instrument, and to present any other defenses that I may have.

(C) I do not correct the default stated in the notice from Lender by the date stated in that notice.

Page 7 of 9 pages

A-19-7

**22. LENDER'S OBLIGATION TO DISCHARGE THIS MORTGAGE A/K/A SECURITY INSTRUMENT**

When Lender has been paid all amounts due under the Agreement and under this Mortgage a/k/a Security Instrument, Lender will discharge this Mortgage a/k/a Security Instrument by delivering a certificate stating that this Mortgage a/k/a Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

**23. AGREEMENTS ABOUT NEW YORK LIEN LAW**

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Mortgage a/k/a Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (A) hold all amounts which I receive and which I have a right to receive from Lender under the Agreement as a "trust fund"; and (B) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Paragraph 23.

**24. RIDERS TO THIS MORTGAGE A/K/A SECURITY INSTRUMENT**

If one or more riders are signed by Borrower and recorded together with this Mortgage a/k/a Security Instrument, the promises and agreements of each rider are incorporated as a part of this Mortgage a/k/a Security Instrument. [Check applicable box(es)]

[X] Adjustable Rate Rider    [ ] Condominium Rider    [ ] 1-4 Family Rider

[ ] Graduated Payment Rider    [ ] Planned Unit Development Rider    [X] Due on Transfer Rider

[ ] Balloon Rider    [ ] Rate Improvement Rider    [ ] Second Home Rider

[XX] Other(s) [specify] Schedule "A"

### REQUEST FOR NOTICE OF DEFAULT
### AND FORECLOSURE UNDER SUPERIOR
### MORTGAGES OR DEEDS OF TRUST

THIS MORTGAGE IS SUBJECT AND SUBORDINATE TO a certain mortgage dated March 14, 1997 by Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, Mortgagors, to Norwest Mortgage of New York Inc., Mortgagee, in the principal amount of $310,000.00 and was recorded on March 28, 1997, in the office of the Clerk of the County of Westchester, State of New York, at Liber 22593, Map 335; Which mortgage was assigned by Norwest Mortgage of New York Inc., as Assignor, to Norwest Mortgage Inc., as Assignee, by Assignment of Mortgage dated March 9, 1998 and recorded on August 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 157,; Which mortgage was further assigned by Norwest Mortgage Inc., as Assignor, to First Union National Bank of North Carolina, as Trustee, as Assignee, by Assignment of Mortgage dated April 25, 1997 and recorded on May 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 159

Borrower and Lender request the holder of any superior mortgage or deed of trust to notify Lender in writing, at Lender's address on page 1 of this Mortgage, if the Borrower is required to make "Immediate Payment In Full" and if there is "foreclosure and sale" under that superior mortgage or deed of trust.

*BY SIGNING BELOW*, I accept and agree to the promises and agreements contained in pages 1 through 8 of this Mortgage a/k/a Security Instrument and in any rider(s) signed by me and recorded with it.

Witnesses:

_____

_____

_____ (Seal)
Anthony A. Scarpino, Jr.

_____ (Seal)
Eleanor L. Scarpino

STATE OF NEW YORK, WESTCHESTER COUNTY ss

On the 1st day of October, in the year 2001 before me, the undersigned personally appeared Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names is subscribed to the within instrument and acknowledged to me that they executed the same in their capacities, and that by their signatures on the instrument, the individuals or the person upon behalf which the individuals acted, executed the instrument.

_____
Notary Public

BRANDON R SALL
NOTARY PUBLIC, State of New York
No. 02SA4656812
Qualified in Westchester County
Commission Expires March 24, 20__

Page 9 of 9 pages

A-19-9

## RIDER ANNEXED TO AND MADE A PART OF MORTGAGE

**DATED October 1, 2001, BETWEEN Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, AS MORTGAGORS, AND Hudson Valley Bank, AS MORTGAGEE.**

The provisions contained in this Rider shall be deemed to amend and supplement the above-captioned Mortgage. If Lender transfers the Mortgage, Lender shall have the right to delete this Rider in its entirety from the Mortgage. Borrower and Lender hereby further covenant and agree as follows:

### 25. IMPROVEMENT OF PREMISES

The real property described in this mortgage is improved by a one or two family dwelling only.

### 26. IF LENDER REQUIRES IMMEDIATE PAYMENT IN FULL

In addition to the rights and remedies provided Lender in Paragraph 20 of the Mortgage, if Lender requires immediate payment in Full, Borrower shall pay interest of the unpaid principal then due on the Obligation at either the interest rate described in the Obligation or at the maximum rate permitted by law, whichever shall be higher.

### 27. SALE IN ONE PARCEL IN FORECLOSURE

If Lender brings a lawsuit for foreclosure and sale, and if the Property consists of two or more separate parcels of land, Borrower agrees that Lender may have the Property sold in the lawsuit in one parcel.

### 28. ESTOPPEL CERTIFICATE

Within ten (10) days after written request from Lender, Borrower will sign a certificate, called and "Estoppel Certificate", stating the amount due on this Mortgage and whether Borrower has any defense against Borrower's debt to Lender under this Mortgage.

### 29. ADDITIONAL SECURITY

In addition to the Property described in the Mortgage, Borrower gives Lender rights in the following Property:

(A)  All mineral, oil and gas rights and profits, water, water rights and water stock that are part of the property described in Paragraph (A) of that section of the Mortgage captioned "Description of the Property";

(B)  All rights that Borrower has in the land which lies in the streets or road in front of, or next to, the property described in Paragraph (A) of that section of the Mortgage captioned "Description of Property";

(C)  All fixtures on the property described in Paragraph (A) and (B) of that section of the Mortgage captioned "Description of the Property". Usually, fixtures are items that are physically attached to buildings, such as hot water heaters;

(D)  All of the property in Paragraph (B) through (D) of that section of the Mortgage captioned "Description of the Property" and Paragraph (A) and (B) of this section, that I acquire in the future, and all rights described in Paragraphs (B) through (D) of that section of the Mortgage captioned "Description of the Property", and Paragraphs (A) and (B) of this section;

(E)  All replacements of or additions to the property described in Paragraphs (B) through (D) of that section of the Mortgage captioned "Description of the Property", and Paragraphs (A) and (B) of this section;

(F)  All fixtures that: (i) are on the property described in Paragraphs (A) and (B) of that section of the Mortgage captioned "Description of the Property", and (ii) Borrower acquires in the future, except for those fixtures that under the law are "consumer goods" and that Borrower acquires more than ten (10) days after the date of the Obligation; and

(G)  All replacements of or additions to the fixtures that are on the property described in Paragraphs (A) and (B) of that section of the Mortgage captioned "Description of the Property", except for those replacements and additions that are: (i) made to fixtures that under the law are "consumer goods"; and (ii) made more than ten (10) days after the date of the Obligation.

### 30. SUBORDINATE MORTGAGE

THIS MORTGAGE IS SUBJECT AND SUBORDINATE TO a certain mortgage dated March 14, 1997 by Anthony A. Scarpino, Jr. and Eleanor L. Scarpino, Mortgagors, to Norwest Mortgage of New York Inc., Mortgagee, in the principal amount of $310,000.00 and was recorded on March 28, 1997, in the office of the Clerk of the County of Westchester, State of New York, at Liber 22593, Map 335; Which mortgage was assigned by Norwest Mortgage of New York Inc., as Assignor, to Norwest Mortgage Inc., as Assignee, by Assignment of Mortgage dated March 9, 1998 and recorded on August 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 157; Which mortgage was further assigned by Norwest Mortgage Inc., as Assignor, to First Union National Bank of North Carolina, as Trustee, as Assignee, by Assignment of Mortgage dated April 25, 1997 and recorded on May 2, 1999 in the office of the Clerk of the County of Westchester, State of New York, at Liber 25926, Map 159

BY SIGNING BELOW,  Borrower(s) accepts and agrees to the terms and provisions contained in this Rider.

Witnesses:

_____                          _____ (Seal)
                                                 Anthony A. Scarpino, Jr.

_____                          _____ (Seal)
                                                 Eleanor L. Scarpino

A-19-10

## DUE-ON-TRANSFER RIDER

**NOTICE: THIS RIDER ADDS A PROVISION TO THE SECURITY INSTRUMENTS ALLOWING THE LENDER TO REQUIRE AN INCREASE IN THE OBLIGATION INTEREST RATE AND TO CHANGE OTHER OBLIGATION TERMS UPON TRANSFER OF THE PROPERTY.**

This Due-On-Transfer Rider is made this 1st of October, 2001, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, Or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Obligation to  (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

30 Brookwood Road, Bedford, New York 10506

**AMENDED COVENANT.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further agree as follows:

A.  **TRANSFER OF THE PROPERTY; ASSUMPTION**

Uniform Promise 19 of the Security Instrument is amended to read as follows:

17.  **AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS TRANSFERRED**

If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Security Instrument which does not relate to a transfer of rights of occupancy in the property, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, Lender may, at Lender's option, declare all sums secured by this Security Instrument to be immediately due and payable.

If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with Paragraph 15 hereof. Such notice shall provide a period of not less than thirty (30) days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by Paragraph 20 hereof.

Lender may consent to a sale or transfer if: (1) Borrower causes to be submitted to Lender information required by Lender to evaluate the transferee as if a new loan were being made to the transferee; (2) Lender reasonably determines that Lender's security will not be impaired and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable; (3) interest will be payable on the sums secured by this Security Instrument at a rate acceptable to Lender; (4) changes in the terms of the Obligation and this Security Instrument required by Lender are made, including, for example, periodic adjustment in the interest rate, a different final payment date for the loan, and addition of unpaid interest to principal; and (5) the transferee signs an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Obligation and in this Security Instrument, as modified if required by Lender. To the extent permitted by applicable law, Lender also may charge a reasonable fee as a condition to Lender's consent to any sale or transfer.

Borrower will continue to be obligated under the Obligation and this Security Instrument unless Lender releases Borrower in writing.

IN WITNESS WHEREOF, Borrower has executed this Due-On-Transfer Rider.

Witnesses:

_____          _____ (Seal)
                                          Anthony A. Scarpino, Jr.

_____          _____ (Seal)
                                          Eleanor L. Scarpino

## CREDIT LINE FIXED/ADJUSTABLE RATE RIDER

THIS CREDIT LINE FIXED/ADJUSTABLE RATE RIDER is made this 1st day of October, 2001, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Home Equity Loan Agreement (the "Agreement") to HUDSON VALLEY BANK, a State Chartered Bank, (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

30 Brookwood Road, Bedford, New York 10506

THE AGREEMENT CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE AGREEMENT LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. ADJUSTABLE INTEREST RATE

(A) Change Dates
The interest rate I will pay may change on the first day of each month following a change in the Prime Rate. Each date on which my interest rate could change is called a "Change Date."

(B) The Index
The Home Equity Loan Agreement provides for an initial interest rate of 6.500%, which will adjust based on the indicated index for a period of twelve (12) months. After this initial twelve (12) month period, the Agreement provides for changes in the interest rate which will begin on the 1st day of October, 2002. Thereafter, my interest rate and monthly payments will be calculated as follows:

(a) The Annual Percentage Rate applicable to my Home Equity Loan is adjustable and may increase or decrease based on changes in the highest prime rate published daily in the *Wall Street Journal's* listing of "Money Rates" (the "Index"). If the *Wall Street Journal* ceases to publish the Index, the Agreement Holder will choose a substitute index that is based upon comparable information and, if necessary, a substitute margin, so that the change in the Index results in substantially the same rate as required under the previous Index.

(b) The Annual Percentage Rate for the monthly billing period during which any advance (including the first advance) is made will be the value of the Index, as determined from the Prime Rate as published in the *Wall Street Journal's* listing of "Money Rates" on the first day of the month preceding the date of this loan, plus 1.000 percentage points. The corresponding Daily Periodic Rate is the Annual Percentage Rate divided by 365. Any increase or decrease in the Annual Percentage Rate will be effective on the first day of the monthly billing period.

(C) Calculation of Changes
Before each Change Date, the Agreement Holder will calculate my new interest rate by adding 1.000 points (1.000%) to the Current Index. Subject to the limits stated in Section 1(D) below, this will be my new interest rate until the next Change Date.

The Agreement Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes
The Annual Percentage Rate that I may be charged at any time will not exceed the initial Annual Percentage Rate plus eight (8.0%) percent, not to exceed the New York State usury rate ceiling applicable at the closing, currently 16.00%.

(E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes
The Agreement Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

2. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.
If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Agreement and in this Security Instrument. Borrower will continue to be obligated under the Agreement and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

By Signing Below, Borrower accepts and agrees to the terms and covenants contained in this Credit Line Fixed/Adjustable Rate Rider.

_____ (Seal)
Anthony A. Scarpino, Jr.

_____ (Seal)
Eleanor L. Scarpino

A-19-13



Fidelity National Title Insurance Company of New York

TITLE NO. 01-3702-56952-W

**SCHEDULE A-1 (*Description*)**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of North Castle, County of Westchester and State of New York, shown and designated as Lot No. 17 on a certain map, "Subdivision Map of Middle Patent Estates, West, situate in the Town of North Castle, Westchester County", completed October 26, 1964 by Ralph M. McDonald and filed May 3, 1966 in the County Clerk's Office, Division of Land Records, as Map No. 14814, being more particularly bounded and described as follows:

BEGINNING at a point on the northerly side of Brookwood Road where the same is intersected by the division line between Lots 17 and 18 on the above mentioned map;

Said point of beginning also being 209.66 feet westerly from the westerly end of a curve connecting the northerly side of Brookwood Road and the westerly side of Mianus Drive;

RUNNING THENCE along the northerly side of Brookwood Road the following courses and distances:

Westerly on a curve to the left having a radius of 575.00 feet, a length of 73.38 feet;

Westerly on a curve to the right having a radius of 30.00 feet, a length of 26.63 feet and;

Westerly on a curve to the left having a radius of 65.00 feet, a length of 55.08 feet to the division line between Lots 16 and 17 on the above mentioned map;

RUNNING THENCE along said division line North 15 degrees 23 minutes West 100.00 feet and North 27 degrees 03 minutes 20 seconds West 296.50 feet to a point;

RUNNING THENCE North 14 degrees 53 minutes 50 seconds East 227.89 feet to the division line between Lots 17 and 20 on the above mentioned map;

RUNNING THENCE along said division line South 75 degrees 44 minutes 55 seconds East 234.50 feet to the division line between Lots 8 and 17 on the above mentioned map;

RUNNING THENCE along said division line South 2 degrees 46 minutes 13 seconds East 517.49 feet to the point and place of beginning.

*THE POLICY TO BE ISSUED under this commitment will insure the title to such buildings and improvements on the premises which by law constitute real property.*

*FOR CONVEYANCING ONLY: Together with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.*

*SCHEDULE A-1 (Description)*



**\*450690865MTGN\***

| Control Number | WHID Number | Instrument Type |
|---|---|---|
| 450690865 | 2005069-000384 | MTG |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
**\*\*\* DO NOT REMOVE \*\*\***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**

TYPE OF INSTRUMENT   MTG - MORTGAGE
FEE PAGES   19          TOTAL PAGES   19

**RECORDING FEES**

| | |
|---|---|
| STATUTORY CHARGE | $6.00 |
| RECORDING CHARGE | $57.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| **TOTAL FEES PAID** | **$82.00** |

**MORTGAGE TAXES**

| | |
|---|---|
| MORTGAGE DATE | 12/30/2004 |
| MORTGAGE AMOUNT | $100,000.00 |
| EXEMPT | Yes |
| COUNTY TAX | $250.00 |
| YONKERS | $0.00 |
| BASIC | $500.00 |
| ADDITIONAL | $225.00 |
| SUBTOTAL | $975.00 |
| MTA | $250.00 |
| SPECIAL | $0.00 |
| **TOTAL PAID** | **$1,225.00** |

**TRANSFER TAXES**

| | |
|---|---|
| CONSIDERATION | $0.00 |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

RECORDING DATE        04/13/2005
TIME                         10:58:00

SERIAL NUMBER        CV91818
DWELLING                 1-2 Family
THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:

TOWN OF NORTH CASTLE

WITNESS MY HAND AND OFFICIAL SEAL

*Leonard N. Spano*

LEONARD N. SPANO
WESTCHESTER COUNTY CLERK

Record & Return to:
HUDSON VALLEY BANK
21 SCARSDALE RD

YONKERS, NY 10707

A-20

*PFC 15212w*

Parcel #: Section 1 Block 1 Lot 11-17 ✓

Loan Number : 0062000489

Prepared by: **Hudson Valley Bank**

Record and Return Address:

Hudson Valley Bank
21 Scarsdale Road
Yonkers, NY  10707 ✓

Loan Number: 0062000489

18?
1-2

## GAP
# NEW YORK CREDIT LINE MORTGAGE
### (Open End)

**WORDS OFTEN USED IN THIS DOCUMENT**

(A) "Mortgage" means this document, which is dated December 30, 2004. ✓

(B) "Borrower" means Anthony A. Scarpino, Jr and Eleanor L. Scarpino, who shall also be the person(s) who signs this Mortgage. Borrower will sometimes be referred to as "I" and shall be deemed to be plural if more than one person signs this Mortgage. Borrower's address is:

    30 Brookwood Road
    Bedford, NY  10506

(C) Lender" means  Hudson Valley Bank. Lender is a New York State Chartered Bank.  Lender's address is: 21 Scarsdale Road Yonkers, NY  10707.  Any communication to the Lender should be sent to: 21 Scarsdale Road Yonkers, NY  10707.

(D) "Agreement" means the Home Equity Line of Credit Agreement dated the same date as this Mortgage. Under the Agreement, I may borrow up to the maximum principal amount of One Hundred Thousand Dollars and 00/100ths (U.S. $100,000.00) subject to the terms of the Agreement. The amount I owe may fluctuate from time to time. Lender and I contemplate, as provided in the Agreement, that there will be a series of advances, payments and readvances during the period of time when I can "draw" against the line of credit. The aggregate amount of principal available to the Borrower will never exceed the maximum principal amount shown above. I agree that this Mortgage shall continue to secure all sums advanced under the terms of the Agreement including, without limitation, any sums that are advanced by Lender whether or not at the time the sums are advanced there is any principal sum outstanding under the Agreement. The parties to the Agreement intend that this Mortgage shall secure unpaid balances, and all other amounts due to Lender under this Mortgage and under the Agreement, including any extensions, renewals or modifications of the Agreement. For example, should the Agreement be amended to extend the period during which the Borrower can obtain advances, or a similar modification, this Mortgage will continue to secure the indebtedness owed under the Agreement.

(E) "Property" means the property that is described below in the section titled "Description of the Property."

(F) "Sums Secured" means the amounts described below in the paragraph titled "Borrower's Transfer to Lender of Rights in the Property." The Sums Secured by this Mortgage will not exceed the amounts owed under the Agreement together with any expenses/costs incurred by Lender due to Borrower's default in meeting Borrower's obligations under the Mortgage which qualify as Incidental Amounts.

(G) "Incidental Amounts" include amounts permitted under Part 648 of the New York Tax Regulations as disbursements made to protect the security of the Mortgage and the value of the Property, with interest on such disbursements at the periodic rate stated in the Agreement, including for example, where the payments represent:;

   (I) expenses incurred by Lender on behalf of Borrower in the event Borrower's failure to perform a covenant or obligation relating to maintaining the Property or preserving its value and protecting Lender's lien under this Mortgage that would result in an event of default under the terms of this Mortgage;

   (II) expenses incurred by Lender in the event of a foreclosure, including legal fees of Lender, and

A-20-1

Loan Number : 0063000480

(III)  Interest and late payment charges.

## CREDIT LINE MORTGAGE

This is a credit line mortgage as that phrase is defined in New York Real Property Law § 281. The Mortgage secures the original indebtedness and also the indebtedness created by future advances made under the Agreement within 30 years from the date this Mortgage is recorded, to the same extent and with the same priority of lien as if such future advances had been made at the time this Mortgage was recorded, although there may have been no advances made at the time of execution and acknowledgement of the Mortgage and although there may be no indebtedness outstanding at the time any advance is made. The total amount of indebtedness secured by this Mortgage at any one time shall not exceed the Maximum Principal Amount, plus interest, and plus any additional Incidental Amounts.  I have promised to pay this debt in monthly payments and to pay the debt in full by December 1, 2035.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant, and convey the Property to Lender subject to the terms of this Mortgage. This means that, by signing this Mortgage, I am giving Lender those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A)  Pay all the amounts that I owe Lender as stated in the Agreement;

(B)  Pay, with interest, any amounts that Lender spends under this Mortgage, to protect the value of the Property and Lender's rights in the Property;

(C)  Keep all of my other promises and agreements under this Mortgage.

## DESCRIPTION OF THE PROPERTY

I give lender rights in the Property described in (A) through (I) below:

(A)  The Property which is located at:

**30 Brookwood Road**
**Bedford NY 10506**

This Property is in Westchester County in the State of New York. It has the following legal description:

SEE ATTACHED "EXHIBIT A" FOR THE DESCRIPTION OF THE PROPERTY.

THE ABOVE MENTIONED PROPERTY IS OR WILL BE IMPROVED BY A 1-4 FAMILY DWELLING ONLY.

(B)  All buildings and other improvements that are located on the Property described in Paragraph (A) of this section;

(C)  All rights in other property that I have as owner of the Property described in Paragraph of this section included in the phrase "together with the appurtenances and all the estate and rights of the grantor in and to said premises" as described in §255 of New York's Real Property Law;

(D)  All rents or royalties from the Property described in Paragraph (A) of this section;

(E)  All mineral, oil and gas rights and profits, water rights and water stock that are part of the Property described in Paragraph (A) of this section;

(F)  All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in Paragraph (A) of this section;

(G)  All fixtures that are now or in the future will be on the Property described in Paragraphs (A) and (B) of this section, and all replacements of and additions to those fixtures, except for those fixtures, replacements and additions that under the law are "consumer goods" and that I acquire more than ten days after the date of the Agreement. Usually, fixtures are items that are physically attached to buildings, such as hot water heaters;  .

(H)  All of the rights and property described in Paragraphs (B) through (F) of this section that I acquire in the future; and

(I)  All replacements of or additions to the property described in Paragraphs (B) through (F)

A-20-2

and Paragraph (H) of this section.

Loan Number : 0052000489

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that except for the "exceptions" listed in any title insurance policy which insures Lender's rights in the Property: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender, and (C). There are no outstanding claims or charges against the Property except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE MORTGAGE**

This Mortgage contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary, to a limited extent, in different parts of the country. My promises and agreements are stated in "plain language."

I promise and I agree with Lender as follows:

**1.    BORROWER'S PROMISE TO PAY PRINCIPAL AND INTEREST UNDER THE AGREEMENT AND OTHER PAYMENT OBLIGATIONS**

I will promptly pay to Lender when due: principal, interest, prepayment, late charges and all other charges due under the Agreement.

**2.    AGREEMENTS ABOUT PAYMENTS OF TAXES AND INSURANCE**

I will pay, when due, all taxes, assessments, leasehold payments or ground rents (if any), and hazard insurance on the Property and mortgage insurance (if any). Lender specifically reserves to itself and its successors and assigns the unilateral right to require that I pay to it on the day monthly payments are due an amount equal to one-twelfth (1/12) of the yearly taxes, and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth (1/12) of yearly premium installments for hazard and mortgage insurance, all as Lender reasonably estimates initially and from time to time, as allowed by and in accordance with applicable law.

**3.    BORROWER'S OBLIGATION TO PAY CHARGES AND ASSESSMENTS AND TO SATISFY CLAIMS AGAINST THE PROPERTY**

I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be superior to this Mortgage. I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will do this by making the payments that are described in Paragraph 2 above when they are due, directly to the person, organization, governmental authority, or other party. Promptly after making any of those payments I will give Lender a receipt which shows that I have done so.

Any claim, demand or charge that is made against property because an obligation that has not been fulfilled is known as a "lien." I will promptly pay or satisfy all liens against the Property that may be superior to this Mortgage. However, this Mortgage does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (B) I, in good faith, argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up.

**4.    BORROWER'S OBLIGATIONS TO OBTAIN AND KEEP HAZARD INSURANCE ON THE PROPERTY**

I will obtain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies, and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. It is possible that the insurance policy will have provisions that may limit the insurance company's obligation to pay claims if the amount of coverage is too low. Those provisions are known as "coinsurance requirements." Lender may not require me to obtain an amount of coverage that is more than the larger of the following two amounts: either (i) the amount that I owe to Lender under the Agreement and under this Mortgage; or (ii) the amount necessary to satisfy the coinsurance requirements. In addition to the hazard insurance required above, if the Property is located in a Special Flood Hazard area I will obtain and maintain flood damage insurance coverage equal to the lower of the unpaid principal balance of the Agreement or the maximum amount available from time to time under the National Flood Insurance Act of 1968 as amended.

Loan Number : 0063000489

I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. Lender will have the right to hold the policies and renewal notices that I receive.

I will pay premiums on the insurance policies by making payments as described in Paragraph 2 above by paying the insurance company directly when the premium payments are due. If Lender requires, I will promptly give Lender all receipts of paid premiums and all renewal notices that I receive.

If there is a loss of or damage to the Property, I will promptly notify the insurance company and Lender. If I do not prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (a) it is not economically possible to make the repairs or restoration; or (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Mortgage; or (c) Lender and I have agreed in writing not to use the proceeds for this purpose. If the repair or restoration is not economically possible or if it would lessen Lender's protection under this Mortgage, then the proceeds will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. The use of the proceeds to reduce the amount that I owe to Lender will not be a prepayment that is subject to the prepayment charge provisions, if any, under the Agreement.

If I abandon the Property, or if I do not answer, within 30 days, a notice from the Lender stating that the insurance company has offered to settle a claim for insurance benefits, then Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. The 30-day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of my monthly payments under the Agreement and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes. If Lender acquires the Property under Paragraph 17 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the amount that I owe to Lender under the Agreement and under this Mortgage immediately before the Property is acquired by Lender or sold.

If I fail to maintain coverage as required in this section, I authorize Lender to obtain such coverage as Lender in its sole discretion determines appropriate to protect its interest in the Property in accordance with the provisions of paragraph 6. I understand and agree that any coverage Lender purchases may cover only its interest in the Property and may not cover my interest in the Property or any personal property therein. I also understand and agree that the premium for any such insurance may be higher than the premium I would pay for such insurance.

**5.     BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL OBLIGATIONS IN LEASE**

I will keep the Property in good repair. I will not destroy, damage or substantially change the Property, and I will not allow the Property to deteriorate.

**6.     LENDER'S RIGHT TO TAKE ACTION TO PROTECT THE PROPERTY**

If: (A) I do not keep my promises and agreements made in this Mortgage, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's right in the Property (such as for example, a legal proceeding in bankruptcy, in probate, for condemnation, or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions under this Paragraph 6 may include, for example, paying any sums secured by a lien which has priority over this Mortgage or any advance under the Agreement or this Mortgage, appearing in court, paying reasonable attorney's fees, paying any sums which I am required to pay under this Mortgage and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. I will pay to Lender any amounts which Lender spends under this Paragraph 6. I will also pay interest on those amounts at the same rate stated in the Agreement. However, if payment of interest at that rate would violate the law, I will pay interest on the amounts spent by Lender under this Paragraph 6 at the highest rate that the law allows. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this paragraph.

This Mortgage will protect Lender in case I do not keep this promise and pay those amounts with interest.

Loan Number : 0082000489

Although Lender may take action under this Paragraph 6, Lender does not have to do so.

## 7. LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before one of those inspections is made, Lender must give me notice stating a reasonable purpose for the inspection, that purpose must be related to Lender's rights in the Property.

## 8. AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY

A taking of property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A) to proceeds deriving from all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of the proceeds multiplied by the following amount: (A) the total amount that I owe to Lender under the Agreement and under this Mortgage immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me. The use of the proceeds to reduce the amount that I owe to Lender will not be a prepayment that is subject to the prepayment charge provisions, if any, under the Agreement.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, then Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. The 30 day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered. If any proceeds are used to reduce the amount of principal which I owe to Lender under the Agreement, that use will not delay the due date or change the amount of any of my monthly payments under the Agreement and under Paragraphs 1 and 2 above.

## 9. CONTINUATION OF LENDER'S RIGHTS

Even if lender does not exercise or enforce any right of Lender under this Mortgage or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will still have the right, under Paragraph 17 below, to demand that I make Immediate Payment in Full (See Paragraph 17 for a definition of this phrase) of the amount that I owe to Lender under the Agreement and under this Mortgage.

## 10. LENDER'S ABILITY TO ENFORCE MORE THAN ONE OF LENDER'S RIGHTS

Each of the Lender's rights under this Mortgage is separate. Lender may exercise and enforce one or more of those rights under law, one at a time or all at once.

## 11. OBLIGATIONS OF BORROWERS; AGREEMENTS CONCERNING CAPTIONS

If more than one person signs this Mortgage as Borrower, each of us is full obligated to keep all of Borrower's promises and obligations contained in this Mortgage. Lender may enforce Lender's rights under this Mortgage against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under the Agreement and under this Mortgage. However, if one of us does not sign the Agreement, then, (A) that person is signing this Mortgage only to give that person's rights in the Property to Lender under the terms of this Mortgage; (B) that person is not personally obligated to make payments or to act under the Agreement or under this Mortgage; and (C) agrees that Lender and anyone else who signs this Mortgage may agree to extend, modify, forbear or make any accommodations regarding the terms of this Mortgage or the Agreement without that person's consent. The captions and titles of this Mortgage are for convenience only. They may not be used to interpret or to define the terms of this Mortgage.

## 12. AGREEMENTS ABOUT GIVING NOTICES REQUIRED UNDER THIS MORTGAGE

Unless the law requires otherwise, any notice that must be given to me under this Mortgage will be given by delivering it or by mailing it addressed to me at the address stated in the section above titled "Description of the Property."

A-20-5

Loan Number : 0063000498

A notice will be delivered or mailed to me at a different address if I give Lender a notice of my different address. Any notice that must be given to Lender under this Mortgage will be given by mailing it to Lender's address stated in Paragraph (C) of the section above entitled "Words Used Often In This Document." A notice will be mailed to Lender at a different address if Lender gives me a notice of a different address. A notice required by this Mortgage is given when it is mailed or when it is delivered according to the requirements of this Paragraph 12.

### 13.    LAW THAT GOVERNS THIS MORTGAGE

This Mortgage is governed by Federal law and the law that applies to the place that the Property is located. If any term of this Mortgage conflicts with the law, all other terms of this Mortgage will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Mortgage which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

### 14.    BORROWER'S COPY OF THE AGREEMENT AND OF THIS MORTGAGE.

I will be given a copy of the Agreement and of this Mortgage. Those copies must show that the original Agreement and Mortgage have been signed. I will be given those copies either when I sign the Agreement and this Mortgage or after this Mortgage has been recorded in the proper official records.

### 15.    BORROWER'S OBLIGATION TO PAY MORTGAGE INSURANCE PREMIUMS

If Lender requires mortgage insurance as a condition of making the loan that I promise to pay under the Agreement, I will pay the premiums for that mortgage insurance. I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law. Lender may require me to pay the premiums in the manner described in Paragraph 2 above.

### 16.    TRANSFER OF THE PROPERTY OR OF A BENEFICIAL INTEREST IN BORROWER WHICH IS NOT A NATURAL PERSON

If all or any part of the Property or any interest in the Property is sold or transferred by me (or if Borrower is not a natural person but is a corporation, partnership, trust or other legal entity and if a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, except as otherwise provided, Lender may, at Lender's option, declare all the Sums Secured by this Mortgage to be immediately due and payable. This requirement is called 'Immediate Payment In Full." Lender shall have no right to declare all sums immediately due and payable in the event of (a) the creation of a lien or encumbrance subordinate to this Mortgage which does not relate to a transfer of rights of occupancy in the Property; (b) the creation of a purchase money security interest for household appliances; (c) a transfer by devise, decent or by operation of law upon the death of a joint tenant; or (d) the grant of any leasehold interest of three years or less containing an option to purchase.

If Lender exercises its option to declare Sums Secured by this Mortgage to be immediately due and payable, Lender shall give me notice of acceleration in accordance with Paragraph 12 hereof. Such notice shall provide for a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay the sums declared due. If I fail to pay such sums prior to the expiration of this period Lender may, without further notice or demand on me, invoke any remedies permitted by this Mortgage.

### 17.    LENDER'S RIGHTS IF I FAIL TO KEEP MY PROMISES AND AGREEMENTS

Except as provided in Paragraph 16 above, I will be in default:

(A)    I fail to make any payment required by this Mortgage or the Agreement when it is due;

(B)    I have engaged in or I engage in fraud or material misrepresentation, either by act or omission, in connection with this Mortgage and Agreement at any time during the application process or during the term of this Mortgage and Agreement; or

(C)    I act or fail to act in a way that adversely affects the Lender's security under this Mortgage or any right Lender has in such security under this Mortgage.

If a default occurs and all of the conditions stated in subparagraphs (D), (E) and (F) of this Paragraph 17 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Agreement and under this Mortgage. Lender may do this without making any further demand for payment. This requirement is called "Immediate payment in full."

Loan Number : 0062000496

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require immediate payment in full under Paragraph 17 only if all of the following conditions are met:

    (D)    I am in default

    (E)    Lender sends to me, in the manner described in Paragraph 12 above, a notice that states:

        (I)    The promise or agreement that I failed to keep;

        (II)    The action that I must take to correct that default;

        (III)    A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;

        (IV)    That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another person may acquire the Property by means of foreclosure and sale;

        (V)    That if I meet the conditions stated in Paragraph 18 below, I will have the right to have lender's enforcement of this Mortgage discontinued and to have the Note and this Mortgage remain fully effective as if immediate payment in full had never been required; and

        (VI)    That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Note and under this Mortgage, and to present any other defenses that I may have.

    (F)    I do not correct the default stated in the notice from the Lender by the date stated in that notice.

## 18.    MY RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS MORTGAGE DISCONTINUED

Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Mortgage discontinued. I will have this right at any time before a judgment has been entered enforcing this Mortgage if I meet the following conditions:

    (A)    I pay to Lender the full amount that then would be due under this Mortgage and the Agreement as if immediate payment in full had never been required; and

    (B)    I correct my failure to keep any of my other promises or agreements made in this Mortgage; and

    (C)    I pay all of Lender's reasonable expenses in enforcing this Mortgage including, for example reasonable attorneys' fees; and

    (D)    I do whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Security Instrument, and my obligations under the Agreement and under this Mortgage continue unchanged.

If I fulfill all of the conditions in this Paragraph 18, then the Agreement and this Mortgage will remain in effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Mortgage discontinued if Lender has required immediate payment in full under Paragraph 17 above.

## 19.    DISCONTINUANCE OF ENFORCEMENT

Lender may discontinue any proceedings Lender begins to enforce the terms of this Mortgage. Lender may do so in its sole discretion.

A-20-7

Loan Number : 008200848

**20.   LENDER'S RIGHTS TO RENTAL PAYMENTS FROM THE PROPERTY AND TO TAKE POSSESSION OF THE PROPERTY**

As additional protection for Lender, I give to Lender all of my rights to any rental payments from the Property. However, until Lender requires Immediate Payment In Full under Paragraph 17 above, or until I abandon the Property, I have the right to collect and keep those rental payments as they become due if I have not given any of my rights to rental payments from the Property to anyone else, and I will not do so without Lender's consent in writing. If Lender requires Immediate Payment In Full under Paragraph 17 above, or if I abandon the Property, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may:

    (A)    collect the rental payments, including overdue rental payments, directly from the tenants;

    (B)    enter on and take possession of the Property;

    (C)    manage the property; and

    (D)    sign, cancel and change leases.

I agree that if Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 19, the tenants may make those rental payments to Lender without having to ask whether I have failed to keep my promises and agreements under this Mortgage.

If there is a judgment for Lender in a lawsuit for foreclosure and sale, I will pay to Lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property.

All rental payments collected by Lender or by a receiver, other than rent paid by me under this Paragraph 20, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the amount that I owe to Lender under the Agreement and under this Mortgage. The costs of managing the Property may include receiver's fees, reasonable attorneys' fees, and the costs of any necessary bonds. Lender and the receiver will be obligated to account only for those rental payments that they actually receive.

**21.   DEFAULT NOTICE**

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, I MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF I HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE ME WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH I CAN EXERCISE THIS RIGHT.

**22.   LOAN CHARGES**

If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceed permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Agreement.

**23.   LENDER'S OBLIGATION TO DISCHARGE THIS MORTGAGE WHEN THE AGREEMENT AND THIS MORTGAGE ARE PAID IN FULL**

When Lender has been paid all amounts due under the Agreement, and under this Mortgage, Lender will discharge this Mortgage by delivering a certificate stating that this Mortgage has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

**24.   AGREEMENTS ABOUT NEW YORK LIEN LAW**

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that, if, on the date this Mortgage is recorded in the proper official records, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (A) hold all amounts, which I receive and which I have a right to receive from Lender under the Agreement, as a "trust fund"; and (B) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding these amounts as a "trust fund" means that I have a special responsibility under the law to use the amounts in the manner described in this Paragraph 24.

A-20-8

**PFC Abstract Corp.**
Issued on behalf of
*Chicago Title Insurance Company*

Title No.: *PFC15212 W*

## SCHEDULE A

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Town of North Castle, County of Westchester and State of New York, shown and designated as Lot No. 17 on a certain map, "Subdivision Map of Middle Patent Estates, West, situate, in the Town of North Castle, Westchester County", completed October 26, 1964 by Ralph M. McDonald and filed May 3, 1966 in the County Clerk's Office, Division of Land Records, as Map No. 14814, being more particularly bounded and described as follows:

**BEGINNING** at a point on the northerly side of Brookwood Road where the same is intersected by the division line between Lots 17 and 18 on the above mentioned map;

Said point of beginning also being 209.66 feet westerly from the westerly end of a curve connecting the northerly side of Brookwood Road and the westerly side of Mianus Drive;

**RUNNING THENCE** along the northerly side of Brookwood Road the following courses and distances:

1. westerly on a curve to the left having a radius of 575.00 feet, a length of 73.38 feet;

2. westerly on a curve to the right having a radius of 30.00 feet, a length of 26.63 feet and;

3. westerly on a curve to the left having a radius of 65.00 feet, a length of 55.08 feet to the division line between Lots 16 and 17 on the above mentioned map;

**RUNNING THENCE** along said division line North 15 degrees 23 minutes West 100.00 feet and North 27 degrees 03 minutes 20 seconds West 296.50 feet to a point;

**RUNNING THENCE** North 14 degrees 53 minutes 50 seconds East 227.89 feet to the division line between Lots 17 and 20 on the above mentioned map;

**FOR CONVEYANCING ONLY:**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

**TOGETHER** with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of the adjoining said premises.

PFG Abstract Corp.
issued on behalf of
Chicago Title Insurance Company

Title No.: PFC15212 W

## SCHEDULE A (continued)

**RUNNING THENCE** along said division line South 75 degrees 44 minutes 55 seconds East 234.50 feet to the division line between Lots 8 and 17 on the above mentioned map;

**RUNNING THENCE** along said division line South 2 degrees 46 minutes 13 seconds East 517.49 feet to the point and place of **BEGINNING.**

**SAID PREMISES** are also known as Section 1, Block 1, Lot 11.-17 of the Official Tax Map of the Town of North Castle.

**FOR CONVEYANCING ONLY:**

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of the adjoining said premises.

Loan Number: 0082000489

# EXHIBIT B



# HOME EQUITY LINE OF CREDIT
## AGREEMENT AND DISCLOSURE STATEMENT

This is the Agreement (the "Agreement"), dated December 30, 2004 governing your Home Equity Line of Credit ("Credit Account") with Hudson Valley Bank.

Read this Agreement carefully so that you know how your Credit Account works. As you read this Agreement remember that the terms "we", "us", and "our" refer to Hudson Valley Bank and to any other creditor to whom this Agreement is assigned. "You", "your", and "yours" refer to each person who signs this Agreement or has authority to use it. "Mortgage" means the mortgage, deed of trust, or deed to secure debt you are giving us on your house or condominium. Your account, any amount you owe, and our mortgage on your home may be sold or transferred to another creditor at anytime. If this happens, this Agreement and the Mortgage will remain in effect.

1.    **WHAT IS YOUR HOME EQUITY LINE OF CREDIT?**   It is a credit arrangement in which we make loans to you by advancing funds ("Advances") from your Credit Account at your direction, allowing you to repay such Advances and take additional Advances. You promise and agree to repay these Advances, any interest which accrues on them, and all other charges for which you are responsible under the terms of the Agreement.

2.    **USING YOUR CREDIT ACCOUNT / MINIMUM INITIAL ADVANCE.**   You may request Advances from your Credit Account by writing a Home Equity Line of Credit Check ("Draw Check") for the exact amount which you desire as long as it is in a minimum amount of $500.00. We may refuse to honor request for Advances below the minimum amount. You may also request Advances at the closing by completing a loan request form or other form of authorization that we may require. You may take advances for 360 Monthly Statement Periods after the date your Credit Account is opened ("Advanced Period").

A Monthly Statement Period is defined as successive intervals of approximately one month beginning on the date your Credit Account is opened and recurring regularly until your Credit Account is finally closed. Monthly Statement Periods occur regardless of whether there is a balance or any activity in your Credit Account or whether we have sent you a statement for the period. Your first Monthly Statement Period may be shorter than a month depending on when your Credit Account is opened.

3.    **DRAW CHECKS.**   You agree to notify us promptly in any of your Checks are lost or stolen. You also agree to cooperate with us or any law enforcement agency in any effort to investigate the circumstances surrounding the incident and efforts to minimize potential losses to you or stemming from it. You are responsible for the unauthorized use of lost or stolen Draw Checks unless the law prohibits us from holding you liable.

4.    **CREDIT LIMIT.**   We have assigned a Credit Limit of $100,000.00 on your Credit Account. You may not request an Advance that would cause your unpaid balance to exceed your Credit Limit. We are not required to pay any item which would cause you to exceed the amount of your Credit Limit. If we do make the advance, it does not mean your Credit Limit has been raised. We may require you to repay the amount over your Credit Limit at once. If you exceed your Credit Limit, you agree to pay a fee of $35.00 for each advance in excess of your Credit Limit.

5.    **PROMISE TO PAY.**   You promise to repay to us, in U.S. Dollars, all Advances charged to your Credit Account, plus finance charges and all other amounts due under this Agreement or the Mortgage. To avoid being in default, you must pay the total monthly Minimum Payment by the "Payment Due Date" shown on each billing statement we will send to you. In any event, you promise to pay the balance of your Credit Account at the termination of this Agreement.

6.    **MINIMUM MONTHLY PAYMENT.**   During the Advance Period, your monthly payments will be the amount of finance charges accrued plus credit life insurance premiums, if applicable, any fees and any amounts past due. You are not required, however, to obtain credit life insurance in connection with your Credit Account.

7.    **AVERAGE OUTSTANDING LINE BALANCE.**   In consideration of Hudson Valley Bank payment of closing costs, I agree to maintain an average outstanding balance of twenty five percent (25%) for the first two (2) years of the line and to keep the line open for two (2) calendar years.. I agree to reimburse Hudson Valley Bank for closing costs paid by them on my behalf in the event that I close the Line of Credit on or before two (2) calendar years of the date of this Agreement. I further agree to reimburse Hudson Valley Bank for closing costs paid on my behalf in the event that I fail to maintain an average outstanding balance of twenty five percent (25%) during the first two (2) calendar years of this Agreement or if I close this line prior to the end of the second anniversary of the date hereof.

8.    **PROMISE TO PAY, PREPAYMENT AND LINE TERM.**

A-20-11

Loan Number: 0062000489

a. You promise to pay us the amounts of all Advances you obtain under your Home Equity Line of Credit, and any other charges and finance charges due as provided in this Agreement, by the end of the Credit Line Term, thirty (30) years from the date of this Agreement.

b. During the term of your Line of Credit, you will have to pay, for each monthly billing period, the interest that accrued during the billing period.

9. **AUTOMATIC PAYMENT DEDUCTION.** Hudson Valley Bank will automatically deduct your monthly payment from an account maintained at Hudson Valley Bank, or another financial institution. If you do not wish to have your monthly payment automatically deducted, we will charge an annual service fee of $250.00.

10. **FINANCE CHARGES.** **FINANCE CHARGES** begin to accrue on the day an Advance is charged to your Credit Account and continue until the outstanding balance on such Advance is paid in full. **FINANCE CHARGES** on your Credit Account will be determined by applying a daily periodic rate to the daily balance (as described below) of your Credit Account, an amount that will include current transactions. To calculate the daily balance, we take the beginning principal balance of your Credit Account each day, add any new Advances, and subtract any payments or credits applied to this principal balance. This gives us the daily balance against which we apply your daily periodic rate. Then we add up all the daily interest accrued for the number of days in the Monthly Statement Period, which becomes the total **FINANCE CHARGE** for the Monthly Statement Period.

The daily periodic rate and its corresponding **ANNUAL PERCENTAGE RATE** on the date your Credit Account was opened ("Initial Rate") are 0.01438% Daily Periodic Rate and 5.250% corresponding **ANNUAL PERCENTAGE RATE.** The **ANNUAL PERCENTAGE RATE** does not include other costs other than interest.

The daily periodic rate and its corresponding **ANNUAL PERCENTAGE RATE** are variable rates and therefore may increase or decrease on the first day of each calendar month based on changes in the Prime Rate. "Prime Rate" means the Prime Rate as published in the "Money Rates" table in *The Wall Street Journal.* We will use the highest Prime Rate if more than one is published. The Prime Rate is merely a pricing index. It is not intended, and you should not consider it, to represent the lowest or the best interest rate that we or affiliated organizations charge to any borrowers. An increase in the **ANNUAL PERCENTAGE RATE** and the Daily Periodic Rate will result in a higher **FINANCE CHARGE** and higher minimum payments, while a decrease in the **ANNUAL PERCENTAGE RATE** and the Daily Periodic Rate will result in a lower **FINANCE CHARGE** and lower minimum payments, assuming the same principal balance and number of days in the billing cycle.

If the Daily Periodic Rate changes, it will be increased or decreased on the first day of each calendar month using the Prime Rate in effect on the preceding business day. We will determine your Daily Periodic Rate by adding ZERO percentage points (0.00%) to the Prime Rate and dividing the result by 365 (366 in leap years). We refer to this as the "Margin".

The first time or any subsequent time there is a change to your **ANNUAL PERCENTAGE RATE,** it may increase to 16.00%. At no time, however, will your **ANNUAL PERCENTAGE RATE** exceed 16.00% Other than this cap, there are no limits on the amount by which your **ANNUAL PERCENTAGE RATE** can change over the life of your Credit Account or on any individual date on which your **ANNUAL PERCENTAGE RATE** changes.

11. **SECURITY INTEREST.** As part of this transaction, you are granting us a mortgage on the property, as further described in the Mortgage, which is located at :

**30 Brookwood Road
Bedford, NY 10506**

(the "Property"). All of the terms and conditions of the Mortgage are very important and should be read in conjunction with this Agreement.

12. **PAYMENTS.** All payments on your Credit Account must be made by check or money order delivered to us at the address indicated on your billing statement. Any payment may be returned without applying it to your Credit Account if the check or money order is: (1) not drawn on the U.S. Postal Service or a financial institution located in the United States of America; (2) not payable in U.S. Dollars; (3) drawn with different numeric and written amounts; (4) missing a signature; (5) postdated; or (6) unacceptable for any other reason. We may apply all payments and credits in accordance with our standard operating procedures and with the requirements of applicable law. Generally, your payments will be applied in the following order: credit insurance premiums which we have billed to you, interest which we have billed to you, late fees, other fees, principal, insurance premiums which have accrued but which have not yet been billed and interest which has accrued but which has not yet been billed.

We do not process payments on Saturdays, Sundays, or bank holidays, and if the Payment Due Date falls on one of these days, you will incur an additional Finance Charge if your payment is not posted on or before the preceding bank business day. We can accept late payments, partial payments, checks or money orders marked "paid in full" or containing similar language without losing any of our rights under this Agreement.

Loan Number: 0052000489

If on December 1, 2035, I still owe amounts under this Agreement, I will pay those amounts in full on that date which is called the "Maturity Date".

**13. COSTS FOLLOWING CLOSING.** As you maintain a Credit Account with us, you will incur other charges assessed under the Mortgage and this Agreement. For example, Closing Costs. Your estimated closing costs are listed below. You may pay these costs in cash at the closing, or charge them to your Credit Account as Advances.

| | |
|---|---|
| **Loan Origination Fee (Finance Charge)** | **$ 0.00** |
| **Loan Discount Fee (Finance Charge)** | **$ 0.00** |
| **Appraisal Fee** | **$ 0.00** |
| **Credit Report Fee** | **$ 0.00** |
| **Mortgage Broker Fee (Finance Charge)** | **$ 0.00** |
| **Attorney Review – Trust Documents (Finance Charge)** | **$ 0.00** |
| **Flood Zone Certification Fee (Finance Charge)** | **$ 0.00** |
| **Commitment Fee** | **$ 0.00** |
| **Underwriting Fee (Finance Charge)** | **$ 0.00** |
| **Processing Fee (Finance Charge)** | **$ 0.00** |
| **Document Preparation Fee - Lender (Finance Charge)** | **$ 0.00** |
| **Courier Fee - Lender (Finance Charge)** | **$ 0.00** |
| **Courier Fee - Broker (Finance Charge)** | **$ 0.00** |
| **Wire Fee - Lender (Finance Charge)** | **$ 0.00** |
| **Wire Fee - Broker (Finance Charge)** | **$ 0.00** |
| **Other Fee (Finance Charge)** | **$ 0.00** |
| **Other Fee - Broker** | **$ 0.00** |
| **Other Fee - Broker** | **$ 0.00** |
| **Settlement or Closing Fee (Finance Charge)** | **$ 0.00** |
| **Abstract or Title Search** | **$ 0.00** |
| **Document Preparation Fee - Settlement Agent** | **$ 0.00** |
| **Attorney's Fees** | **$ 0.00** |
| **Title Insurance** | **$** |
| **Recording/Filing Fees** | **$ 0.00** |
| **City/County Tax/Stamps** | **$ 0.00** |
| **State Tax/Stamps** | **$** |
| **Survey** | **$ 0.00** |
| **Survey Inspection** | **$ 0.00** |
| **Mortgage Satisfaction Fee** | **$ 0.00** |
| **255 Affidavit Fee** | **$ 0.00** |
| | |
| **AMOUNT DUE FROM BORROWER** | **$** |

Any time as we may reasonably require, while you have the right to take Advances on your Credit Account, we may obtain an appraisal on the Property. You agree that you will cooperate with us in obtaining such an appraisal.

**14. RELEASE.** We will release the Mortgage when all amounts due under the Mortgage and this Agreement have been paid. Before giving you a release, you will have to return all unused Draw Checks to us and wait until seven (7) business days after your account has been closed. When we discharge or release the Mortgage or any other documents recorded or filed to perfect our security interest in the Property, you shall pay any recordation or filing costs. Recordation or filing costs are estimated to be $175.00.

**15. LATE FEES.** If you do not make the full current Minimum Payment within 10 days after the date that it is due, a late fee of 2.000% of the current Minimum Payment will be charged.

**16. CREDIT LIFE AND CREDIT DISABILITY INSURANCE.** You may be offered the ability to purchase credit insurance covering your death, disability, or unemployment. If offered, credit insurance is voluntary and is not required to obtain credit. If elected, you may terminate it at any time. Credit Insurance will not be provided unless you sign or initial a separate document requesting such insurance. Premiums for any such insurance will be shown on such separate document and will be included in the amount billed to you each month.

**17. DEFAULT.** You will be in default if:

1. You engage in fraud or material misrepresentation at any time in connection with your Credit Account.

2. We do not receive the full amount of any minimum payment due in any monthly statement period within 60 days of its payment due date, or you fail to meet any of the repayment terms of Section 5 of this Agreement or as set forth in the Mortgage.

3. Your action or inaction adversely affects the Property or our rights in it. Examples of these actions and inactions include, but are not limited to circumstances in which:

A-20-13

Loan Number: 0062000489

a.   You are the sole borrower on this Credit Account and you die.

b.   The Property is used for an illegal purpose.

c.   You transfer or attempt to transfer all or part of your interest in the Property without our written consent.

d.   All or part of the Property is taken by condemnation or eminent domain.

e.   You are in default on any mortgage or lien on the Property.

f.   You fail to keep the Property properly insured.

g.   You fail to pay real property taxes and assessments on the Property when they are due.

h.   You fail to keep the Property properly maintained and in good repair.

If you default, we have the right, at our option, to cancel your credit privileges, to require the immediate payment of the entire amount owed to us, and/or cause your home to be sold at foreclosure sale. If we refer your account to an attorney for collection or foreclosure, you agree to pay our reasonable attorney's fees as permitted by applicable law, plus court costs and the costs related to foreclosure.

17. **CANCELLATION OF CREDIT PRIVILEGES.** We can refuse to make additional extensions of credit, or reduce your Credit Limit if:

a.   The value of the Property declines significantly below its original appraised value for purposes of this Credit Account.

b.   We reasonably believe you will not be able to meet the repayment requirements set forth in this Agreement due to a material change in your financial circumstances.

c.   You fail to meet any material obligation you have under this Agreement,

d.   You are in default under Section 14 above.

e.   Government action prevents us from imposing the **ANNUAL PERCENTAGE RATE** provided for in this Agreement.

f.   Government action impairs our security interest such that the value of our interest is less than 120 percent of your Credit Limit.

g.   A regulatory agency which supervises us has notified us that continued Advances would constitute an unsafe and unsound practice.

h.   You become the subject of a proceeding in bankruptcy.

i.   There is more than one borrower on this Credit Account, one of you dies, and that adversely affects our interest in the Property.

j.   The maximum **ANNUAL PERCENTAGE RATE** (or rate cap) is reached.

If we refuse to make additional Advances or reduce your Credit Limit under this provision, we may refuse to honor any requests for Advances, including those requests made before but presented to us after we made our decision. We will send you a written notice stating the reason for our action. If for any reason you believe your Credit Limit should be reinstated, you must send us a written request for reinstatement and include in the request the reasons why you believe your credit privilege or Credit Limit should be reinstated.

18. **FORECLOSURE.** The Mortgage signed in connection with this Agreement gives us certain rights to your property. The law gives us other rights you also agree to give us. If you default, we may foreclose on the Mortgage. This means that the real property covered by the Mortgage will be sold in order to pay the amount owed to us under this Agreement.

19. **RIGHT OF SETOFF.** If you are in default of this Agreement, we can apply any of your deposit or other credit balances or other property of yours with us towards payment of what you owe.

A-20-14

Loan Number: 0052000469

20. **INFORMATION.** You agree to provide us with updated financial information, in writing, if we request it. We may request a new credit report on you without telling you. If you ask, we will tell you the name and address of the consumer reporting agency that furnished it. We may furnish information about your performance under this Agreement to our affiliates and other persons.

You also agree to sign any additional or corrective documents in connection with this Agreement, at our request and as allowed by law.

21. **ASSUMPTION.** Someone buying your Property may not assume this loan on these terms.

22. **SENDING OF NOTICES.** Any statement or notice to you under this Agreement will be sufficiently given if sent to your address on file in connection with this account or to a new address of which you have notified us in writing at least 20 days before the sending of the statement or notice.

23. **AMENDMENT.** We may change the terms of this Agreement in accordance with the requirements of applicable law.

24. **DELAY IN ENFORCEMENT.** We may waive or delay enforcing our rights under this Agreement without losing them or relieving you of any of your obligations. We may waive or delay enforcing a right as to one of you without waiving it as to the others. We may release any security or any one of you from responsibility under this Agreement without releasing the others. We need not give anyone notice of our waiver, delay or release. We may sue any one of you without suing the others.

25. **OTHER RULES REGARDING DRAW CHECKS.** You may not use Draw Checks to make payments on your Credit Account. You agree that the Draw Checks we supply you with are our property and that you will return them to us at our request.

We are not responsible if anyone refuses to honor a Draw Check. We may honor postdated Draw Checks and are not responsible if we do so. We are not required to certify Draw Checks.

You may ask us to "stop payment" on a Draw Check. If you do, you must tell us the name of the payee, the amount, date and number of the Draw Check, and who signed it. We are not bound by a stop payment order unless we have a reasonable opportunity to act on it and will not be liable for failing to stop payment if we used ordinary care. You agree to indemnify us and will pay all costs and expenses we incur (including reasonable attorney's fees) as a result of honoring your stop payment order. This indemnity will survive any termination of this Agreement. You agree to pay a fee for each "stop payment" on a Draw Check, as allowed by applicable law.  The "stop payment" fee is currently $30.00.

26. **LEGAL PURPOSES.** You may not use any Advances for purposes that violate any applicable federal, state or local laws or regulations.

27. **APPLICABLE LAW.** Except to the extent that federal law shall be controlling, your rights, our rights, and the terms of this Agreement shall be governed by New York law.

28. **JOINT ACCOUNT.** On a joint account each of you may use the Credit Account, but the total unpaid balance may not exceed the Credit Limit. Each of you is individually responsible for payment of the entire balance regardless of who actually requested the Advance. Each of you has the right, upon proper written notice to us, to have the Credit Limit reduced or to suspend the privilege of obtaining new Advances. We have five business days after receipt of your request to take action on it. A request to suspend the privilege of obtaining Advances, even if made only by one of you, will be effective against all of you who are eligible to obtain Advances under this Agreement. In order to restore the Credit Account, we may require financial information from all of you and may refuse to restore the Credit Account if you no longer qualify under the criteria then in effect for new Credit Accounts. Any request for reinstatement would have to be made by all of you, despite the fact that only one of you may have requested the suspension of Advances. You agree to indemnify us and hold us harmless, and will pay all costs and expenses we incur (including reasonable attorney's fees) as result of honoring the request made by any one of you under this provision.

29. **TAX CONSEQUENCES.** You acknowledge that we have given you no assurances that the interest paid on your Credit Account is tax deductible. You are urged to consult your own tax advisor concerning the deductibility of interest and other costs charged in connection with this Credit Account. The Internal Revenue Service requires you to furnish to us, the interest recipient, your tax payer identification number ("TIN") in order to verify any deduction for mortgage interest. Your failure to provide us with your TIN may subject you to a $50 penalty imposed by the Internal Revenue Service.

A-20-15

Loan Number: 0062000489

# YOUR BILLING RIGHTS
## Keep This Notice For Future Use

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

Notify Us In Case of Errors or Questions About Your Bill.  If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your statement. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error.

If you need more information, describe the item your are not sure about.

Your Rights and Our Responsibilities After We Receive Your Written Notice.  We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to the mistaken amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question on your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE NOTICE SPECIFYING THE CIRCUMSTANCES AND TIME UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

A-20-16

Loan Number: 0062000489

You agree to the terms and conditions contained in this Agreement and you acknowledge receipt of a completed copy of this Agreement, including "When Your Home is on the Line."

WITNESS:                                    ACCEPTED AND AGREED TO:

_Anna M. Mont'Etna_                         _Anthony A. Scarpino_
                                            Signature          Anthony A. Scarpino Jr

                                            _Eleanor L. Scarpino_
                                            Signature          Eleanor L. Scarpino

                                            _____
                                            Signature

                                            _____
                                            Signature

Dated: ___12/30/04___

EXHIBIT

LC HELOC AADS                    Page 7 of 7                    6/8/2004
NY - 30 year

Loan Number : 0062000489

### 25. MORTGAGE RECORDING TAXES AND FILING FEES

To the extent permitted by law, I will pay any additional mortgage recording taxes and filing fees which may become due in connection with this Mortgage. This will include the costs of filing and affidavits or other documents which may become necessary in order to obtain the priority of this Mortgage's lien, release this lien or enforce this Mortgage.

If I fail to pay any of these mortgage recording taxes or filing fees which may become due, the Lender may make these payments and the amounts paid will be added to the amount due under the Agreement.

### 26. ADDITIONAL CHARGES

I agree to pay reasonable charges as allowed by law in connection with the servicing of this loan including, without limitation, the costs of obtaining tax searches and subordinations. Provided, however, that nothing contained in this section is intended to create and shall not be construed to create any duty or obligation by Lender to perform any such act, or to execute or consent to any such transaction or matter, except a release of the Mortgage upon full repayment of all Sums Secured thereby.

### 27. AFFIDAVITS AND OTHER DOCUMENTS

I will, on the Lender's request, sign any affidavits or other documents which may be necessary in order to maintain the priority of this Mortgage's lien, release the lien or enforce this Mortgage.

### 28. RIDERS TO THIS MORTGAGE

If I execute one or more riders and recorded together with this Mortgage, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider(s) were a part of this Mortgage. [Check applicable box(es)]

☐ Condominium Rider      ☐ 1-4 Family Rider

☐ Planned Unit Development Rider      ☐ Other(s) Due On Transfer Rider

By signing this Mortgage I agree to all of the above.

Witnesses            Borrower(s)

_____    _____ (Date)
                               Seal
                 Signature    Anthony A. Scarpino Jr

_____    _____ (Date)
                               Seal
                 Signature    Eleanor L. Scarpino

_____    _____ (Date)
                               Seal
                 Signature

_____    _____ (Date)
                               Seal
                 Signature

_____    _____ (Date)
                               Seal
                 Signature

**ACKNOWLEDGEMENT**

REG... ...T CORP.
YO... ...10704
(914) 476-2381

STATE OF: NEW YORK    )
                     ) ss.:
COUNTY OF: WESTCHESTER    )

On the 30th day of December 2004 before me, the undersigned, personally appeared Anthony A. Scarpino Jr - Eleanor L. Scarpino personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he executed the same in his capacity(ies), and that by his signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)
ANNA M. MONTE INA
Notary Public, State of New York
No. 01MO6003422
Qualified in Queens County
Certificate Filed in New York County
Commission Expires March 2, 2006

Page 8 of 8        NY CLM 30 Year        (1/3/2004)

A-20-18