UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - X

AGNES CARVEL ESTATE, London England
by PAMELA CARVEL, Delaware Ancillary
Administrator PAMELA CARVEL, Fiduciary-
Creditor, on behalf of herself and others
similarly situated,

                    Plaintiff,

            -against-

LEONARD ROSS and
JOHN/JANE DOE 1-20
DOE CO. 1-20

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - X

Case No. 07-cv-00238-JJF

## DEFENDANT ROSS' REPLY BRIEF IN FURTHER SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT, AND IN OPPOSITION TO MOTION FOR DISCOVERY

David J. Margules (#2254)
Sean M. Brennecke (#4686)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
dmargules@bmf-law.com
sbrennecke@bmf-law.com
Attorneys for Defendant Leonard Ross

OF COUNSEL:

Eve Rachel Markewich, Esquire
Markewich & Rosenstock LLP
8 East 41st Street, 5th Floor
New York, NY 10017
(212) 542-3156

DATED:  December 20, 2007

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................... ii

PRELIMINARY STATEMENT .......................................................... 1

ARGUMENT .................................................................................... 1

    I.  PLAINTIFF FAILS TO MEET HER BURDEN OF PROOF, AND THE MUST BE DISMISSED PURSUANT TO FRCP 12(B)(2) .................... 1

        A.  The Traditional Test of Jurisdiction Is Not Satisfied ...................... 1

        B.  Carvel's Conspiracy Theory is Meritless ....................................... 5

        C.  Plaintiff's Claim of RICO Jurisdiction is Equally Flawed ............. 7

    II.  PLAINTIFF FAILS TO PRESENT ANY FACTS SUGGESTING DISCOVERY IS APPROPRIATE ........................................................... 10

CONCLUSION .................................................................................... 12

i

# **TABLE OF AUTHORITIES**

**Cases**

*B. L. Poe v. Babcock Int'l.* 662 F.Supp. 4 (M.D. Pa. 1985) ................. 10

*Christ v. Cormick*, C. A. No. 06-275-GMS, 2007 U.S. Dist. LEXIS 49825
    (D.Del. July 10, 2007) .......................................................... 1, 10

*Computer People, Inc. v. Best Int'l Group,* C.A. No. 16648, 1999 Del. Ch.
    LEXIS 96 (Apr. 27, 1999) ........................................................ 6

*Iotex Comm., Inc. v. Iota, Inc.,* C. A. No. 15817, 1998 Del. Ch. LEXIS 236
    (Dec. 21, 1998) .................................................................... 6

*Institutio Bancario Italiano SpA v. Hunter Engineering Co., Inc.*,
    449 A.2d 210 (Del. 1982) ...................................................... 5, 7

*Pelullo v. Nat'l Union Fire Ins. Co. of Pittsburgh*, C.A. No. 00-5647, 2004
    U.S. Dist. LEXIS 9138 (E.D. Pa. May 17, 2004), *aff'd* 131 Fed. Appx.
    864 (3d Cir. 2005) ................................................................ 9

*PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d
    65 (2d Cir. 1998) ................................................................... 8

*Reach & Assocs., P.C. v. Dencer*, 269 F.Supp.2d 497
    (D. Del. 2003) ..................................................................... 4

*Rekop v. Berwick Healthcare Corp.*, 95 F.3d 285 (3d Cir. 1996) ................ 7

*Sanitec Indus., Inc. v. Sanitec Worldwide, Ltd.*, 376 F. Supp.2d 571,
    (D. Del. 2005) ..................................................................... 1

*Shadowbox Pictures, LLC v. Global Enter., Inc.*, C.A. No. 05-2284 2006
U.S.9 Dist. LEXIS 6435 (E.D. Pa. Feb. 7, 2006) ........................................ 9

*Telcordia Technologies, Inc. v. Alcatel S.A.*, 2005 C.A. No. 04-874 GMS, U.S.
    Dist. LEXIS 10194 (D. Del. May 27, 2005) .................................... 10

*Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61 (3d Cir.
    1984) ................................................................................ 1

*Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446 (3d Cir. 2003) ............. 10

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, (1980) ............. 4

**Statutes**

*10 Del. C. § 3104(c)* (2007) .................................................... 2

*Fed. R. Civ. P. 12(b)(2)* ........................................................ *1, 8*

*18 U.S.C. §1961* .................................................................... *7*

*18 U.S.C. §1962* .................................................................... *7*

*18 U.S.C. § 1965 (d)* ............................................................. *8*

## PRELIMINARY STATEMENT

Plaintiff Pamela Carvel ("Carvel") has failed to submit competent evidence sufficient to withstand Ross' motion to dismiss the complaint for lack of personal jurisdiction.  Moreover, her assertions of jurisdiction are so "clearly frivolous," they do not warrant granting her discovery at this time.

The complaint should be dismissed, because Carvel has failed to establish that Ross has any contacts with the State of Delaware.

## ARGUMENT

### I.

### PLAINTIFF FAILS TO MEET HER BURDEN OF PROOF, AND THE COMPLAINT MUST BE DISMISSED PURSUANT TO FRCP 12(B)(2)

On a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff must prove, through sworn affidavits or other competent evidence, that sufficient contacts exist between the defendant and the forum so that both the requisites of the Delaware Long Arm Statute and the requirements of Constitutional Due Process are satisfied.  *See Christ v. Cormick*, C.A. No. 06-275-GMS, 2007 U.S. Dist. LEXIS 49825 at *6-*7 (D.Del. July 10, 2007).  The plaintiff may not rely on bare pleadings.  *Id*.  Moreover, plaintiff must meet her burden by a "preponderance of the evidence."  *Sanitec Indus., Inc. v. Sanitec Worldwide, Ltd.*, 376 F. Supp.2d 571, 573 (D. Del. 2005).  *See Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61 (3d Cir. 1984) ("Unlike summary

1

judgment proceedings, in which a party need only submit affidavits which make out disputes of material fact, in establishing *in personam* jurisdiction. [Plaintiff] has a burden of proof to sustain.")

Carvel has not submitted sworn affidavits or other competent evidence in opposition to Ross's motion.    Instead, she submitted a signed, unnotarized statement that includes citations and propositions of law, as well as conclusory assertions without factual support.   Even if one takes her submissions as "evidence," which it is not, it is legally insufficient to meet her burden.

## A.    The Traditional Test of Jurisdiction Is Not Satisfied.

Ross's Opening Papers establish that the requirements of Delaware's Long Arm Statute have not been met. *See* D.I. 11, pp. *6-9.* Ross: (1) does not transact business or perform work or services in Delaware; (2) does not contract to supply services of things here; (3) has not acted or omitted to act in the State to cause tortious injury; (4) does not do or solicit business or engage in any other persistent course of conduct in or derive substantial revenue from services or things used or consumed in Delaware; (5) does not have an interest in, use or possess real property here; and (6)  has not contracted to act as a surety in the State. *10 Del. C. § 3104(c)* (2007).

Plaintiff provides no facts showing a connection between Ross and this forum.  The bulk of her statement of facts relates to alleged conduct

that occurred in New York, assuming it occurred at all.  (*E.g. PC Aff.* ¶¶22-27)[1]

She asserts in conclusory fashion that "Ross acted in Delaware by advising on Delaware corporations and instructing Delaware counsel" (*PC Aff.* ¶ 11), but offers no evidence to support that contention.  *Id*.  The factual support she offers is in sent to her by Ross.  That invoice reflects a single conversation between Ross and a Delaware lawyer but says nothing about "advising" or "instructing" Delaware counsel.

While contending Ross "prepar[ed] Delaware corporate documents" and "attend[ed] Delaware corporate meetings, *id.*, Carvel's exhibits do not show a nexus to the forum.  The shareholders meeting she cites as an example took place in New York, and no "corporate document" was prepared.  *See PC Appendix*[2] at pp. 16-25, and *Ross Aff.* sworn to December 20, 2007.  Although the entity at issue, Andreas, is incorporated in Delaware, its principal place of business is in New York and all of plaintiff's complaints regarding Andreas relate to New York.  *See Defendant's Exhibit 1.*

Carvel also cites a Delaware state court proceeding in which she was a plaintiff, although Ross was not a party or counsel of record. *See Ross Aff.*

---

[1] *PC Aff____ refers to the Plaintiffs' Affidavit in Opposition to Defendants' Motion to Dismiss and in Support of Motion to Stay Pending Discovery,* D.I. 14.
[2] *PC App. ___ refers to the Appendix to Plaintiffs' Affidavit in Opposition to Defendants' Motion to Dismiss and in Support of Motion to Stay Pending Discovery,* D.I. 15.

sworn to December 19, 2007 ("*Ross Reply Aff.*").    Similarly, the Zuga transaction in which plaintiff alleges Ross was involved related to real property in New York.  *See PC App.* pp. 1-15.

Where, as here, a plaintiff cannot establish that one of the Long Arm Statute criteria is satisfied, there is no need to proceed to the question of "minimum contacts."  *Reach & Assocs., P.C. v. Dencer*, 269 F.Supp.2d 497, 505 (D. Del. 2003) (because Delaware Long Arm Statute criteria not met, "the court will not analyze whether personal jurisdiction comports with due process").  See a*lso Christ*, 2007 U.S. Dist. LEXIS 49825 at *7 "First, the court must decide whether jurisdiction is authorized by the long-arm statute ... [i]f jurisdiction is proper per the long arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause").

Even if the circumstances warranted consideration of the minimum contacts requirement, and it does not, Plaintiff fails to satisfy it.  She offers nothing to suggest Ross purposefully availed himself of Delaware's jurisdiction such that he could reasonably anticipate being haled into Court here.  *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In short, Carvel cannot satisfy either pre-requisite for establishing jurisdiction over Ross.  Because either failure requires dismissal, Ross' motion should be granted as a matter of law.

## B.    Carvel's Conspiracy Theory is Meritless.

Apparently recognizing the infirmity of any claim for jurisdiction under the Delaware Long Arm Statute, Carvel relies only on a "civil conspiracy" theory of jurisdiction (*PC Aff.* ¶8)  Her attempt to invoke that theory is legally insufficient.

The elements necessary to satisfy due process through the conspiracy theory have been clearly set forth by Delaware's Supreme Court:

> "We therefore hold that a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, <u>if the plaintiff can make a factual showing</u> that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy."

*Institutio Bancario Italiano SpA v. Hunter Engineering Co., Inc.*, 449 A.2d 210, 225 (Del. 1982) (emphasis supplied) (*Institutio Bancario*).   Plaintiff makes no "factual showing" on any of these elements.

At the threshold, she cannot even show there was, in fact, a conspiracy, as opposed to mere suspicion that there may have been:

> "[t]he conspiracy theory of jurisdiction is narrowly and strictly construed; otherwise, that theory would become a facile way for a plaintiff to circumvent the minimum contacts requirement of *International Shoe Co. v. Washington* ... [f]or that reason, where a conspiracy is alleged and the defendants submit factual evidence controverting personal jurisdiction as to them, the plaintiff may not rely upon conclusory allegations in his pleadings

> that are unsupported by evidence. Such allegations will not be
> sufficient to overcome a motion to dismiss for lack of personal
> jurisdiction."

*See Computer People, Inc. v. Best Int'l Group, Inc.*, C.A. No. 16648, 1999 Del. Ch. LEXIS 96, *20 (April 27, 1999). *See also Christ*, 2007 U.S. Dist. LEXIS 49825 at *17 (dismissing amended complaint in absence of "facts that establish the existence of a conspiracy, let alone that any of these non-Delaware defendants were participants in or knew of a conspiracy to defraud [plaintiff]. The amended complaint merely pleads the existence of relationships and contacts among the defendants.").

As discussed above, Carvel also fails to show that a substantial act or substantial effect occurred in Delaware. Taken at face value, her "evidence" shows only that Ross has some minor involvement with events in New York that happened to relate to a Delaware corporation.

In *Iotex Comm., Inc. v. Iota, Inc.,* C.A. No. 15817, 1998 Del. Ch. LEXIS 236 (Dec. 21, 1998), the Delaware Chancery Court dismissed a complaint for lack of personal jurisdiction where plaintiff asserted a conspiracy theory of jurisdiction. The Court found that the "effects" added up to "only a metaphysical connection with this jurisdiction." *Id.* at *24. There, as here, the Delaware corporation supposedly damages by defendants had no physical presence in the State. The Court held that "as a general rule, in the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused

injury to the corporation by actions wholly outside this State [*sic*] will not satisfy the requirement found in the Supreme Court's opinion in *Instituto Bancario* of a 'substantial effect' ... in the forum state." [citation omitted] *Id.*

Here, none of the allegations in the complaint, even if true, have any effect, let alone a substantial effect, on the State of Delaware. Plaintiff does not reside in Delaware. Nor are the assets of the corporation she claims to have been damaged located in Delaware. Obviously, Ross could not have foreseen that any act or omission by him would have an effect in this state.

### C.    Plaintiff's Claim of RICO Jurisdiction is Equally Flawed.

Nor does plaintiff satisfy her burden to establish jurisdiction by relying on the RICO statute. She cannot demonstrate that she has a RICO at all, and makes no effort to do so other than citing the "Definitions" section of the statute – 18 U.S.C. § 1961.

To state a claim under RICO, a plaintiff must meet two threshold pleading burdens: 1) that the defendant violated the <u>substantive</u> RICO statute, 18 U.S.C. § 1962, and, 2) that the plaintiff has been injured in his or her business or property by reason of the substantive violation. *Rekop v. Berwick Healthcare Corp.*, 95 F.3d 285 (3d Cir. 1996) Since Carvel fails to even identify a substantive section of the statute allegedly violated by Ross, her RICO claim is wholly invalid. Absent a viable RICO claim, of course, there can be no personal jurisdiction predicated upon the RICO statute.

Even if Carvel could rely on RICO as a basis for personal jurisdiction, there still is no jurisdiction over Ross.  In *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir. 1998), the Second Circuit analyzed the RICO service and jurisdiction statute in detail, and held that personal jurisdiction is only present when (i) the Court has personal jurisdiction over at least one defendant pursuant to a minimum contacts analysis and (ii) the "ends of justice" so require:

> Reading all of the subsections of § 1965 together, the court finds that § 1965 does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found.  First, § 1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs.  In other words, a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant.  Second, § 1965(b) provides for nationwide service and jurisdiction over "other parties" not residing in the district, who may be additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants.  This jurisdiction is not automatic but requires a showing that the "ends of justice" so require.  This is an unsurprising limitation.  There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought.  Congress has expressed a preference in § 1965 to avoid, where possible, haling defendants into far flung fora.

Although the Third Circuit has never written on the issue of personal jurisdiction based on 18 U.S.C. § 1965(d), District Courts within the Circuit have generally echoed the holding in *PT United Can*.  For example, in *Pelullo v. Nat'l Union Fire Ins. Co. of Pittsburgh*, C.A. No. 00-5647, 2004 U.S. Dist.

8

LEXIS 9138 (E.D. Pa. May 17, 2004), *aff'd* 131 Fed. Appx. 864 (3d Cir.

2005), the Court wrote:

> "...a better reading of the venue and process provision of RICO requires that a district court has jurisdiction to entertain a civil RICO claim only where personal jurisdiction based on minimum contacts is first established as to at least one defendant pursuant to 19 U.S.C. § 1965(a).  Once minimum contacts is established as to at least one defendant, the nationwide service of process provision of 18 U.S.C. § 1965(b) enables a plaintiff to bring before a single court all members of a RICO conspiracy." *Id.* at *37.

*See also Shadowbox Pictures, LLC v. Global Enter., Inc.*, C.A. No. 05-2284,

2006 U.S. Dist. LEXIS 6435 at *6-7 (E.D. Pa. Feb. 7, 2006) ("a district court

has jurisdiction to entertain a civil RICO claim where personal jurisdiction

based on minimum contacts is first established as to at least one defendant."

*Id.* at 6-7 (*citing Pelullo* and *PT United Can Co.*).

Thus, even if this Court looks past the fact that plaintiff failed to meet

her burden at the pleading stage of a RICO action, since the defendant Ross

does not have minimum contacts with Delaware and personal jurisdiction

has not been established over any other defendants, defendant's FRCP

12(b)(2) motion must be granted.

## II.

### PLAINTIFF FAILS TO PRESENT ANY FACTS SUGGESTING DISCOVERY IS APPROPRIATE.

While a District Court may grant jurisdictional discovery, it should not do so if the plaintiff's claim is 'clearly frivolous.'" *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446 (3d Cir. 2003). Because Carvel's claim is clearly frivolous, discovery should not be granted.

In denying a plaintiff's request for jurisdictional discovery, this Court emphasized in *Telcordia Tech., Inc. v. Alcatel S.A.*, C.A. No. 04-874 GMS, 2005 U.S. Dist. LEXIS 10194, *29 (D. Del., May 27, 2005) that, "[t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum[,]" and that "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id*. at *9 (*citing Toys "R" Us*, 318 F.2d at 475-475). This Court also noted that "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous'". *Telcordia* at *29 (citing *B.L. Poe v. Babcock Int'l*, 662 F. Supp. 4, 7 (M.D.Pa. 1985)("[s]ince plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction.").[3]

---

[3]    Carvel also claims discovery is needed "because of the misrepresentation of substantive material facts made by attorneys Ross and

Plaintiff's claims against Ross are "clearly frivolous."  Carvel does not and can not show he is amendable to suit in Delaware.  She has not submitted any evidence to suggest he acted in Delaware or that Delaware will be affected by his alleged conduct.

Moreover, the discovery Carvel seeks is not focused on jurisdiction – in fact, it is not focused at all.  In her "affidavit," Carvel seeks "discovery to identify, quantify and assert damages inflicted on Plaintiffs by Defendant Leonard Ross and others yet to be identified" and "for discovery of the extent of Defendants' criminal acts and those with whom they conspired to defraud Plaintiffs" (*Carvel Aff.* at ¶ 29(3), (3) (sic)).  Her separate request for a subpoena to issue to Ross includes demands for documents far afield from an attempt to establish jurisdiction, such as "All documents relating to the so-called Thomas Carvel Charitable Remainder Unitrust."  Moreover, Carvel has already had access to these documents in New York.  *See* Appendix A12a to her Complaint.

Discovery plainly would amount to little more than a "fishing expedition" to find something that can be argued as a basis for jurisdiction.  Plaintiff's motion should be denied.

---

his agents in order to justify their motion of dismissal for lack of personal jurisdiction."  *PC Aff.* at ¶ 2.  She offers no support for this assertion.

## CONCLUSION

Carvel fails to meet the burden of proof necessary to overcome a motion to dismiss pursuant to the Federal Rules of Civil Procedure § 12(b)(2). She has submitted no competent evidence to establish that Ross has minimum contacts with the State of Delaware. Moreover, since plaintiff's claim is "clearly frivolous," this Court should deny her motion for discovery, and grant Ross' motion to dismiss the complaint.

**BOUCHARD MARGULES**
**& FRIEDLANDER, P.A.**

/s/ David J. Margules
David J. Margules (#2254)
Sean M. Brennecke (#4686)
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
dmargules@bmf-law.com
sbrennecke@bmf-law.com
**Attorneys for Defendant Leonard Ross**

OF COUNSEL:

Eve Rachel Markewich, Esquire
Markewich & Rosenstock LLP
8 East 41st Street, 5th Floor
New York, NY 10017
(212) 542-3156

DATED: December 20, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - -  X

AGNES CARVEL ESTATE, London England by
PAMELA CARVEL, Delaware Ancillary
Administrator PAMELA CARVEL, Fiduciary-
Creditor, on behalf of herself and others similarly
situated,

Plaintiff,

-against-

LEONARD ROSS and
JOHN/JANE DOE 1-20
DOE CO. 1-20

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

:
:
:    Case No. 07-cv-00238-JJF
:
:    **REPLY AFFIDAVIT OF**
:    **LEONARD ROSS**
:
:
:
:
:
:
:
:
:
:
:
:

STATE OF NEW YORK    )
                                           :ss.:
COUNTY OF NASSAU    )

LEONARD M. ROSS, being duly sworn, deposes and says:

1.    I am a named defendant in the within action, and submit this
affidavit in further support of my motion to dismiss the complaint for lack of
personal jurisdiction.

2.    Annexed hereto are the following documents:

(1)    Complaint filed September 5th 1995, *Agnes Carvel and
Pamela Carvel v. Andreas Holdings Corp., a Delaware
Corporation and Betty Godley*;

(2)    Notice of Andreas Holdings Corp. Shareholder Meeting held
on May 2, 1995 in the State of New York;

(3)    Certification of Minutes of Shareholder Meeting signed by
Pamela Carvel, in New York,   as Secretary of Andreas

Holdings Corporation, certifying the authenticity of the minutes of a Shareholder meeting in Florida.

3.      Exhibit 1 is a copy of a complaint brought by Pamela Carvel against Andreas Holdings Corporation, the entity as to which she says I provided legal services.  As set forth in Exhibit 1, Andreas has its principal place of business in New York, where I reside, not in Delaware.  The action was brought by a Delaware lawyer, and I did not participate in the litigation.

4.      Moreover, despite Carvel's position that I provided legal services to Andreas, I did not.  The bills annexed to Carvel's affidavit ("Carvel Aff.") are addressed to Agnes Carvel, who was my client.  In my capacity as Agnes' attorney, I advised her occasionally regarding Andreas, but I did not represent Andreas.

5.      Furthermore, despite Carvel's attempt to use my bills to show that I did work in the State of Delaware, I never did so, and the bills do not reflect any work I did in Delaware.  Carvel has highlighted an entry that reflects I attended a Delaware corporation shareholders meeting, and did certain work in preparation for that meeting.  However, that did not include any activity in Delaware.  The annexed Exhibit 2 is a notice of the shareholders meeting reflected in my bills.  That notice clearly establishes that the meeting took place in New York, not in Delaware.

6.      Carvel asserts that the bills reflect that I prepared "Delaware corporate documents" (Carvel Aff. ¶11).  The document to which the bill refers is annexed hereto as Exhibit 3.  It is, simply, a "certificate" signed by

2

Pamela Carvel in New York, authenticating the minutes of a shareholders meeting that occurred in Florida. It was not a document filed in the State of Delaware.

7.    The bills reflect that Agnes Carvel was my client. The bills were sent to Agnes Carvel at her residence in Florida. None of the activities reflected in my bills to Agnes Carvel, who was not a Delaware resident, show facts to support Long Arm Jurisdiction or minimum contacts consistent with Constitutional due process

8.    I had no expectation or understanding that my activities would subject me to the jurisdiction of this Court. Indeed, I did all that I could to avoid being involved in matters in Delaware. As stated by the New York Surrogate in a decision set forth at Amended Appendix 10-12a of the amended complaint, "The role of the ancillary administrator is to collect estate assets in New York, satisfy New York creditors and, unless the court directs otherwise, distribute the balance, if any, to the domiciliary fiduciary." That is what I have done.

9.    The gravamen of Carvel's complaint is that I did not act in Delaware to protect Delaware assets. Pursuant to New York law, I was precluded from doing so. Moreover, the same decision annexed at Amended Appendix 10-12a also held that Estate assets should not be provided to Carvel to pursue litigation in Delaware. Thus, the "conspiracy... to stop all inquiries in to the stolen Delaware assets and collusion used to wipe out

Delaware claims by Ross" (Carvel Aff. ¶26-27) is nothing more than my following the law of the State of New York, as held by the Surrogate in that State.

10.    Plaintiff Pamela Carvel does not allege that she is a Delaware resident, nor does she allege that either she or Agnes Carvel were ever Delaware residents, therefore, the State of Delaware has no interest and is not affected in any way by this action.

11.    I respectfully request that this Court grant my motion to dismiss the amended complaint for lack of jurisdiction, and in so doing assess costs against plaintiff.

LEONARD M. ROSS

Sworn to before me this 20th day of December, 2007.

NOTARY PUBLIC

ROSALIE KESSLER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01KE6149590
Qualified in Nassau County
My Commission Expires July 10, 2010

4

# EXHIBIT 1



COPY

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

AGNES CARVEL and
PAMELA CARVEL,

   Plaintiffs,

  v.

ANDREAS HOLDINGS CORP.,
a Delaware corporation and
BETTY GODLEY,

   Defendants.

Civil Action No.



#### COMPLAINT PURSUANT TO 8 Del. C. §225(a)

  Plaintiffs, Agnes Carvel and Pamela Carvel (the "Plain-
tiffs"), by their undersigned attorneys, hereby bring this action
against defendants, Andreas Holdings Corp. ("Andreas") and Betty
Godley ("Godley"), pursuant to 8 Del. C. §225(a), and allege as
follows:

#### The Parties

  1. Plaintiffs Agnes Carvel and Pamela Carvel are
residents of the State of Florida, and are respectively, in spite
of the wrongful acts complained of herein, the President of Andreas
and Vice President and Secretary of Andreas.

  2. Andreas is a Delaware corporation with its principal
place of business in Yonkers, New York. Andreas is a real estate
holding company.

  3. Defendant Godley is a resident of New York, and, by
virtue of the wrongful acts complained of herein, allegedly the
sole director of Andreas and its President and Treasurer.

SEP 03 '95  18:18 814-278-7881LL N SMITH  P.5

## The Controversy

4.  Agnes Carvel and her husband, Thomas Carvel, were married for over 50 years. Throughout their marriage, Thomas Carvel was responsible for the business and financial affairs of the family. As a matter of practice, Thomas Carvel put the ownership of stock, land, buildings and other assets related to the family's business in the joint names of Thomas and Agnes Carvel, as joint tenants with right of survivorship.

5.  On information and belief, at all times relevant hereto, all of the outstanding common stock of Andreas has been owned by Thomas Carvel and Agnes Carvel, as joint tenants.

6.  In October, 1990, Thomas Carvel died, and by operation of law, all of the outstanding common stock of Andreas then became owned solely by Agnes Carvel, the surviving joint tenant.

7.  Shortly after the death of Thomas Carvel, with the consent of Agnes Carvel — the then sole stockholder of Andreas — Agnes Carvel assumed the position of the President of Andreas (the position her husband had previously held) and Pamela Carvel assumed the position of Vice President of Andreas. Thereafter, Pamela Carvel also became Secretary of Andreas.

8.  Despite the fact that Agnes Carvel is the only stockholder of Andreas, the estate of Thomas Carvel, through a majority of its executors, has asserted the right of ownership of all of the common stock, alleging that the stock was owned solely in the name of Thomas Carvel, thus belonging to the estate of

Thomas Carvel under the terms of the last will and testament of Thomas Carvel.

9. The executors of the estate of Thomas Carvel were Plaintiffs, Godley, Herbert Roth, Robert Davis, Mildred Arcadipane, and the executors, other than Plaintiffs (collectively, the "Controlling Executors"), have acted in a manner contrary to the best interests of Agnes Carvel, as the owner of all of the stock of Andreas. These Controlling Executors have attempted to gain control of the management of Andreas and exclude Agnes Carvel and Pamela Carvel from the day to day operations of Andreas.

10. Ultimately, on May 2, 1995, at an invalidly noticed and held meeting of the stockholders of Andreas (the "Illegal Stockholders Meeting"), the Controlling Executors purported to vote all of the outstanding shares of Andreas common stock in favor of (a) removing Plaintiffs as officers of Andreas, and (b) appointing Godley as the sole director, President and Treasurer of Andreas. Since that Illegal Stockholders Meeting, the Plaintiffs have been excluded from the management of Andreas by the Controlling Executors, and Godley has held herself out to the public as the sole director and an officer of Andreas.

11. Thereafter, in the Surrogate's Court in Westchester County, New York, even though that court has no jurisdiction over the internal corporate affairs of a Delaware corporation and no cause was ever shown, the Controlling Executors sought to complete their ouster of Plaintiffs from the management of Andreas by obtaining an Order which allegedly "suspends" the powers of

P.37/40

SEP ... FROM RUSSELL M SMITH ESO

PM.M.GM.

Plaintiffs to act as officers and directors of Andress, but does not remove Plaintiffs as officers of Andress.

12. The Controlling Executors who acted at the Illegal Stockholders Meeting to vote the shares of common stock of Andress had no authority to vote these shares. Such Controlling Executors, other than Plaintiffs, have never offered or provided any proof of their claim that the estate of Thomas Carvel is the rightful owner of all of the common stock of Andress, and Plaintiffs are unaware of any books and records of Andress which reflect that such stock was registered and held in the name of Thomas Carvel only.

13. Agnes Carvel, as the sole holder of common stock of Andress, did not vote any of the shares of the common stock of Andress at the Illegal Stockholders Meeting, nor did she give the estate of Thomas Carvel or the Controlling Executors of the estate a proxy to vote these shares or to vote the shares in favor of removing Plaintiffs as officers or appointing Godley as a director or officer of Andress.

#### COUNT I

14. Plaintiffs hereby repeat and reallege paragraphs 1 through 13 as if fully set forth herein.

15. Under Section 225(a) of the Delaware General Corporation Law, this Court is vested with the authority to hear and determine the validity of any election of directors, and officers of Delaware corporations whose entitlement to office is contested are also entitled under this Section to have this Court

18 '95  12:54PM LOEB AND LOEB NY 18FL

P.39/40

SEP  07 '95  18:12 914-476-7551                     P.8

determine the validity of any election of officers and the right of
any officer to hold such office.

 16. Plaintiff Agnes Carval, as the only holder of common
stock of Andreas, is entitled to a declaration that the alleged
election of Godley as a director of Andreas is void.

 17. Plaintiffs, as officers of Andreas whose entitlement
to office is contested by Defendants, are entitled to a declaration
that they, rather than Godley, are the proper officers of Andreas.

 18. Plaintiffs are further entitled to a declaration
that Agnes Carval is the sole and rightful owner of 100% of the
shares of Andreas, and that only Agnes Carval is entitled to the
exercise and enjoyment of all rights and benefits of such owner-
ship, including the full voting rights with respect to those
shares.

 WHEREFORE, Plaintiffs respectfully request, pursuant to
8 Del. C. 8225(a), that this Court:

 a. Declare that all of the actions taken at the
Illegal Stockholders Meeting of Andreas on May 2, 1995 which
allegedly replaced existing management and elected Godley as a
director and officer are void and of no effect, and that Agnes
Carval remains as President of Andreas and that Pamela Carval
remains as the Vice President and Secretary of Andreas;

 b. Declare that Agnes Carval is the sole stock-
holder of Andreas and entitled to vote all of the shares of Andreas
and exercise all rights thereto;

-5-

c. Award Plaintiffs their costs and disbursements incurred in connection with this action, including without limitation their reasonable attorneys' fees; and

d. Grant such other relief as the Court may deem just and proper.

DUANE, MORRIS & HECKSCHER

By: _____

Thomas P. Preston
Robert J. Valihura, Jr.
1201 Market Street, Suite 1500
P.O. Box 195
Wilmington, Delaware 19899
(302) 571-5560
Attorneys for Plaintiffs
Agnes Carvel and
Pamela Carvel

September 5, 1995

-6-
SEP 15 '95 16:23    FROM KENT HAZZARD ET AL
SEP 15 '95 16:23    FROM KENT HAZZARD ET AL

# EXHIBIT 2

**ANDREAS HOLDINGS CORPORATION**

April 11, 1995

**NOTICE OF SHAREHOLDERS MEETING**

**NOTICE IS HEREBY GIVEN** that a Meeting of the Shareholders of Andreas Holdings Corporation will be held on Tuesday, May 2, 1995, at 9 A.M. at the offices of Graubard, Mollen, Horowitz, Pomeranz & Shapiro at 600 Third Avenue, 32nd floor, New York, NY 10016, for the following purposes:

1] To consider and take action upon the proposal to remove and replace the present officers and directors of the Corporation;

2] To consider and take action upon the proposal to adopt new bank resolutions for each depository of the Corporation, authorizing two of the newly elected officers of the Corporation to execute jointly checks and other withdrawals from the Corporation's accounts; and

3] To take action on such other matters as may properly come before the meeting.

Estate of Thomas Carvel

By: *Roley Vm Davi*

Robert M. Davis, as Executor and in behalf of a majority of the Executors.

Distribution List

Mildred Arcadipane
Agnes Carvel
Pamela Carvel
Betty Godley
Herbert F. Roth

# EXHIBIT 3

## CERTIFICATION OF MINUTES

I, Pamela Carvel, Secretary of Andreas Holdings Corporation hereby certify that the annexed is a true and exact copy of the minutes of the meeting of the Board of Directors held on November 9, 1994 and such minutes were duly approved and accepted at a meeting of the Board of Directors held on December 28, 1994.

Pamela Carvel, Secretary
Andreas Holdings Corporation

Dated: May 2, 1995
       New York, NY

**EXHIBIT**


**1**

1 of 1 DOCUMENT



Analysis
As of: Dec 19, 2007

ROBERT D. CHRIST, Plaintiff, v. BRETT J. CORMICK, ELAN SUISSE
INTERNATIONAL HOLDINGS (USA) LLC, ELAN SUISSE (PTY) LTD.,
NICOGEL LTD., JOHN WALTERS, DIANNE MARSHALL and MERCARI
FINANCIAL SERVICES (PTY) LTD., Defendants.

C.A. No. 06-275-GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2007 U.S. Dist. LEXIS 49825*

July 10, 2007, Decided
July 10, 2007, Filed

**PRIOR HISTORY:** *Elan Suisse Ltd. v. Christ, 2006 U.S. Dist. LEXIS 93861 (E.D. Pa., Dec. 28, 2006)*

**COUNSEL:** [*1] For Robert D. Christ, Plaintiff: Thad J. Bracegirdle, LEAD ATTORNEY, Reed Smith LLP, Wilmington, DE.

For Brett J. Cormick, Elan Suisse International Holdings (USA) LLC, Elan Suisse (Pty) Ltd., Nicogel Ltd., John Walters, Dianne Marshall, Defendants: David L. Finger, LEAD ATTORNEY, Finger & Slanina, LLC, Wilmington, DE.

For Mercari Financial Services (Pty) Ltd., Defendant: David L. Finger, Finger & Slanina, LLC, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

On April 27, 2006, the plaintiff, Robert D. Christ ("Christ") filed suit against the defendants, Brett J. Cormick ("Cormick"), Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA"), Elan Suisse (PTY) LTD. ("Elan Suisse"), Nicogel LTD. ("Nicogel"), John A. Walters ("Walters"), Dianne E. Marshall ("Marshall"), and Mercari Financial Services (PTY) LTD. ("Mercari"), (collectively, "the defendants") alleging promissory estoppel (Count 1), breach of contract (Count II), fraud (Count III), and civil conspiracy (Count IV). (D.I. 1.) On May 22, 2006, all of the defendants, except Mercari, filed a Motion To Dismiss Or Stay asking the court to: (1) dismiss the action pursuant [*2] to *Fed. R. Civ. P. 12(b)(2)* for lack of personal jurisdiction; (2) dismiss the conspiracy count pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim; (3) dismiss the fraud and conspiracy counts as being outside the statute of limitations; (4) stay this action pursuant to principles of international comity pending resolution of an action filed by the plaintiff in 2005, which is presently pending in South Africa; and (5) for sanctions. (D.I. 16.) On June 16, 2006, the defendant Mercari also moved to dismiss, and joined in the brief of the other defendants for the reasons supporting its motion. (D.I. 19.)

2007 U.S. Dist. LEXIS 49825, *2

During the pendency of the defendants' motions, Christ amended his complaint. (D.I. 29.) Thereafter, the defendants filed a joint motion to dismiss on March 15, 2007, requesting the same relief sought in their previously mooted motions. (D.I. 30.) For the reasons that follow, the court will grant in part and deny in part the defendants' renewed motion.

## II. BACKGROUND

The court accepts the following background recited in the amended complaint as true for the purpose of this motion only. At the time the amended complaint was filed, Christ was a resident of Abita Springs, Louisiana [*3] and Cormick was a citizen of Australia, but resided in the United Kingdom and the Republic of Zimbabwe. (D.I. 29, at 1.) Christ and Cormick became acquainted in April of 1996, while Christ was operating a tour company, specializing in expeditions to the geographic North and South Poles. (*Id.* at 3.) In January of 2004, Cormick met Christ in Cape Town, South Africa, during which time the two parties discussed a "potential investment in a purported business opportunity devised by Cormick." (*Id.*) Cormick suggested that Christ "invest in a holding company that would operate to promote and sell United States-based financial products and investment vehicles to investors located in South Africa." (*Id.* at 4.) After making various representations to Christ, 1 Cormick asked for an initial investment from Christ to "launch the venture." (*Id.*)

> 1    Christ alleges that Cormick misrepresented that he had (1) access to 8,000 brokers and financial advisors in South Africa who represented one million potential investors in that country, and (2) relationships with investors who intended immediately to invest $ 28.5 million through his proposed business. (D.I. 1, at 4.)

The terms of the investment were negotiated [*4] through email, culminating in a written proposal by Cormick on February 15, 2004. (*Id.* at 4.) According to Christ, the terms were that "plaintiff would invest $ 350,000 in exchange for a 50% equity interest in two entities: (i) Elan Suisse, a South African corporation which would manage the investment operations [of which Cormick was a director and officer]; and (ii) Elan Suisse USA, a Delaware limited liability company which would own certain intellectual property rights." (*Id.* at 4.) Further discussions ensued and the parties agreed to memorialize the terms of the investment in a written

agreement in the future. (*Id.* at 5.)

In March 2004, Christ wired two separate payments of $ 125,000 each to Cormick's personal bank account in London. (D.I. 1, at 5.) Cormick caused Elan Suisse USA to be formed on March 15, 2004; however, no written agreement was ever executed, nor did Christ receive equity shares of Elan Suisse or Elan Suisse USA. (*Id.* at 5.) In September 2004, Christ requested an audit of both Elan Suisse and Elan Suisse USA. (*Id.*) On September 9, 2004 Cormick offered to repay Christ the $ 250,000 investment and Christ accepted the offer in writing on November 30, 2004. (*Id.*) Christ [*5] has yet to receive payment. (D.I. 1, at 5.)

The remainder of Christ's allegations focus upon a conspiracy between the remainder of the defendants and Cormick. The facts alleged are as follows. Cormick was both a director of Mercari and Elan Suisse. (*Id.* at 8.) Cormick operated Elan Suisse out of Mercari's offices while at the same time communicating with Christ. (*Id.*) Christ alleges that the money he invested in Elan Suisse and Elan Suisse USA was diverted to Acquacine (renamed Nicogel in December 2005) through the efforts of Walters, (Nicogel's Chief Executive Officer), Marshall (Nicogel's officer and shareholder), and Cormick. (*Id.*) Elan Suisse promoted investment in Acquacine through print advertisement, and identified Cormick and Walters as managers of the "Elan Suisse Capital Biopharma" investment vehicle. (*Id.* at 9.) To promote Elan Suisse Biopharma Investment Portfolio, Marshall developed a PowerPoint presentation aimed at potential investors. (D.I. 32, at 5.) A key product in the portfolio of the Elan Suisse Capital Biopharma investment portfolio was Nicotea, a product produced by Acquacine. (*Id.*)

In February of 2005, Christ filed suit in the High Court of South Africa, Witwatersrand [*6] Local Division, Case No: 05-2033, naming Cormick as the sole defendant and alleging similar facts to the present action. (D.I. 31, Ex. A-1.) In response to the suit, Cormick disputes the South African court's jurisdiction, alleging that "[n]either the Plaintiff nor the Defendant is ordinarily resident or carries on business within the area of jurisdiction of the Honourable Court . . . and [t]he cause of action herein did not arise within the area of jurisdiction of the Honourable Court . . . and the Honourable Court consequently has no jurisdiction to entertain this action." (*Id.* at Ex. A-2.) Christ represents that he has not pursued the South African case against

Cormick due to his likely inability to secure jurisdiction over Cormick in that court. (D. I. 32-2, Ex. A, at 6.)

## III. STANDARDS OF REVIEW

### A. *Rule 12(b)(2)*

The defendants move to dismiss for lack of personal jurisdiction. "*Rule 12(b)(2) of the Federal Rules of Civil Procedure* requires a court to dismiss a case when the court lacks personal jurisdiction over the defendants." *E.I. duPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, S.A.S., 197 F.R.D. 112, 119 (D. Del. 2000)*. "Once the defense has been raised, then the [*7] plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Patterson by Patterson v. F.B.I., 893 F.2d 595, 603-04 (3d Cir. 1990), cert. denied, 498 U.S. 812, 111 S. Ct. 48, 112 L. Ed. 2d 24 (1990)*. Plaintiff may not rely upon the bare pleadings in order to withstand the motion to dismiss for lack of *in personam* jurisdiction. *Id. at 604.*

The determination of whether personal jurisdiction exists requires a two-step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aereos de Angola v. Ronair, Inc., 544 F. Supp. 858, 864 (D. Del. 1982)*. If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the *Due Process Clause of the Fourteenth Amendment*. *Id. at 864-65* (noting the "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *see also, Compaq Computer Corp. v. Packard Bell Elecs., Inc., 948 F. Supp. 338, 342 (D. Del. 1996)*.

To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between [*8] the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* (citation omitted). In this case, Christ must show that each of the defendants purposefully availed itself of the privilege of conducting activities within Delaware. *See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (citation omitted); *see also, Asahi Metal Indus. Co., Ltd. v. Superior Court of California, 480 U.S. 102, 108-09, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)*.

When reviewing this motion, the "court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor." *Shamrock Holdings of California, Inc. v. Arenson, 421 F. Supp. 2d 800, 803 (D. Del. 2006)*. Christ, however, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over the defendants. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc., 147 F. Supp. 2d 268, 270-71 (D. Del. 2001)*. To meet this burden, Christ must adduce facts which "'establish with reasonable particularity'" that jurisdiction over the defendants exists. [*9] *Id. at 271* (citation omitted).

### B. *Rule 12(b)(6)*

The defendants also move to dismiss Count IV (Civil Conspiracy) for failure to state a claim. Under the *Rule 12* pleading standard, the court must "view the complaint as a whole and [] base.rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 (3d Cir. 1998)*. The court is not obligated to accept as true "unsupported conclusions," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997)*, "bald assertions," *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*, or allegations that are "self-evidently false." *Nami v. Fauver, 82 F.3d 63, 69 (3d Cir. 1996)*. "Similarly, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness." *In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002)*. "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted [*10] under any set of facts consistent with the allegations of the complaint." *Eames v. Nationwide Mut. Ins. Co., 412 F. Supp. 2d 431, 435 (D. Del. 2006)* (citation omitted). The moving party bears the burden of persuasion. *Id.*

## IV. DISCUSSION

### A. Personal Jurisdiction Pursuant To *6 Del. C. § 18-109(a)*

The defendants contend that there is no basis "for exercising personal jurisdiction over the non-Delaware defendants (i.e., all defendants other than Elan Suisse USA), much less justification under the *Due Process*

Clause." (D.I. 31, at 8.) Christ asserts that Cormick is subject to personal jurisdiction in Delaware pursuant to *6 Del. C. § 18-109(a)* because he is "a person who participates materially in the management of Elan Suisse USA." (D.I. 29, at 3.) Under the first step of this analysis, the court must determine if this section of the Delaware long-arm statute "warrant[s] the exercise of jurisdiction over" Cormick. *Telcordia Techs., Inc. v. Alcatel S.A., C.A. No. 04-874 GMS, 2005 U.S. Dist. LEXIS 10194, 2005 WL 1268061, *2 (D. Del. May 27, 2005).* Section 18-109(a) provides in pertinent part that: "[a] manager . . . of a limited liability company may be served with process . . . in all civil actions or proceedings brought [*11] in the State of Delaware *involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company.*" (emphasis added)

The statute contemplates the exercise of jurisdiction over Cormick if he breached a fiduciary duty in a managerial capacity. *See, e.g., Assist Stock Mgmt. L.L.C. v. Rosheim, 753 A.2d 974, 978 (Del. Ch. 2000).* In this case, however, there is no allegation of a breach of fiduciary duty. In *Rosheim,* "Vice Chancellor Lamb respected the General Assembly's decision to write *§ 18-109* more broadly . . . , by investing th[e] court with personal jurisdiction over managers in disputes 'involving or relating to the business of their LLCs." *Cornerstone Techs., L.L.C. v. Conrad, 2003 Del. Ch. LEXIS 34, 2003 WL 1787959, *12 (Del. Ch. Mar. 31, 2003)* (citations omitted). While *§ 18-109* may be "susceptible to too broad an application, . . . . [p]rotection against unconstitutional application of [the] statute[] [may] be provided on a case-by-case basis by applying the minimum-contacts analysis mandated by due process." *Rosheim, 753 A.2d at 980* (citation and internal quotations omitted).

The Vice Chancellor concluded in *Rosheim* that *in* [*12] *personam* jurisdiction was proper over the defendant -- who had no Delaware contact beyond his involvement as founder and manager of AIT, a Delaware corporation -- "to adjudicate the matter because: (1) the allegations against Rosheim focus[ed] centrally on his 'rights, duties and obligations' as a manager of a Delaware LLC; (2) the resolution of this matter [was] 'inextricably bound up in Delaware law;' and (3) Delaware [had] a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their

respective managerial functions." *Id. at 981.*

Under the facts alleged, Cormick meets the definition of manager found in *§ 18-109(a)* and is subject to personal jurisdiction under Delaware's long-arm statute. As defined in *§ 18-109(a),* the term manager refers to (i) a person who is a manager as defined in *§ 18-101(10)* [2] of this title and (ii) a person, whether or not a member of a limited liability company, who although not a manager as defined in *§ 18-101(10)* of this title, participates materially in the management of the limited liability company. Christ has set forth enough facts in his complaint to satisfy the latter [*13] definition of manager, as provided in *§ 18-109(a).* According to Christ's amended complaint, Cormick caused Elan Suisse USA to be formed as a limited liability company in Delaware on March 15, 2004. (D.I. 29, at 5.) As the "sole initial member of the limited liability company," Cormick was the only person capable of managing the affairs of Elan Suisse USA. (*Id.*) Likewise, Cormick participated materially in the formation and management of Elan Suisse USA, a limited liability company.

> 2  Pursuant to *6 Del. C. § 18-101(10),* "manager" is defined as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed."

Christ also sets forth facts showing that Cormick "purposefully availed [himself] of the privilege of conducting activities within the state of Delaware." *See Burger King, 471 U.S. at 475.* Cormick's contacts fall short of continuous and systematic given that the only alleged contact with Delaware is Cormick's formation of Elan Suisse USA. This district has held, however, that "[a] single act of [*14] incorporation in Delaware will suffice to confer personal jurisdiction over a nonresident defendant if such purposeful activity in Delaware is an integral component of the total transaction to which plaintiff's cause of action relates." *Arenson, 421 F. Supp. 2d at 804* (citing *Cairns v. Gelmon, 1998 Del. Ch. LEXIS 79, 1998 WL 276226, *3 (Del. Ch. 1998)*). Cormick's single contact with Delaware is directly related to the cause of action before the court, if it accepts as true as it must, that the formation of Elan Suisse USA was part of a scheme to defraud Christ. [3] Christ further alleges that "Cormick offered to repay plaintiff the $ 250,000 Christ

had wired previously to Cormick." (D.I. 29, at 5.) Accepting these allegations as true, like *Rosheim*, one aspect of this case will fall upon the "rights, duties and obligations" of Cormick as sole founder and manager of Elan Suisse USA to perform on this obligation to repay Christ. Finally, like *Rosheim*, the state of Delaware has a strong interest in providing a forum for the resolution of disputes relating to not only the discharge of managerial functions within an LLC formed in Delaware but also relating to the use of the laws of incorporation of a limited liability [*15] company.

> 3    The record reflects that Christ transferred funds to Cormick both before and after the formation of Elan Suisse USA as a Delaware limited liability company. (*See* D.I. 32-2, Christ Aff., Ex. A.)

Given Cormick's managerial duties over Elan Suisse USA, the long arm statute will operate to bring Cormick within the court's jurisdiction. As Christ's allegations relate to Cormick's act of founding Elan Suisse USA under the limited liability corporate law of Delaware, the maintenance of this suit will not offend traditional notions of fair play and substantial justice.

**B. Personal Jurisdiction Pursuant To *10 Del. C. § 3104***

Christ alleges that Elan Suisse, Elan Suisse USA, Nicogel, Marshall, Walters, and Mercari conspired with Cormick to perpetrate a fraud; therefore, the defendants are subject to personal jurisdiction pursuant to *10 Del. C. § 3104*. [4] (D.I. 29, at 9.) The statute provides in pertinent part:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character [*16] of work or service in the State; ... (3) Causes tortious injury in the State by an act or omission in this State;

*§ 3104(c)*. The Delaware Supreme Court, in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc., 449 A.2d 210, 225 (Del. 1982)*, held that "a conspirator who is absent from the forum state is subject to the jurisdiction

of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy." *See also Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc., 42 F. Supp. 2d 423, 434 (D. Del. 1999)*.

> 4    Under *10 Del. C. § 3104(a)*, the term "person" includes any natural person, association, partnership or corporation.

In short, when a defendant voluntarily participates [*17] in a conspiracy with knowledge of its acts in or effects in the forum state, he "can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws." *Istituto Bancario, 449 A.2d at 225*. This participation qualifies as substantial contact with the jurisdiction such that it would be reasonable to require the defendant to defend an action there. *Id.*

Christ fails to allege facts sufficient to establish that defendants Marshall, Walters, Nicogel, Mercari, and Elan Suisse are subject to personal jurisdiction in Delaware. Christ's amended complaint and associated pleadings do not present facts that establish the existence of a conspiracy, let alone that any of these non-Delaware defendants were participants in or knew of a conspiracy to defraud Christ. The amended complaint merely pleads the existence of relationships and contacts among the defendants. Based on these connections and assumptions, Christ invites the court to speculate as to the defendants' knowledge and participation in an alleged conspiracy for purposes of justifying the court's exercise of jurisdiction over them. While [*18] the court must accept all well-pleaded facts as true, the court need not credit bald assertions and speculation in a complaint. As such, the court finds that, based on the *facts* alleged, the court lacks personal jurisdiction over Marshall, Walters, Nicogel, Mercari, and Elan Suisse. [5]

> 5    While the court would ordinarily entertain a request for leave to amend an insufficiently pled

claim, the court notes that Christ made such an attempt almost a year after filing its initial complaint. (*See* D.I. 29.) Christ's amended complaint, however, falls substantially short of the standard necessary to state a *prima facie* claim for civil conspiracy. Accordingly, the court will deny Christ's request for leave to amend his conspiracy claim.

## C. Motion to Dismiss for Failure to State Claim of Civil Conspiracy

The court finds that Christ fails to allege sufficient facts to claim a civil conspiracy among the defendants. To state a claim of civil conspiracy, in Delaware, the plaintiff must show: "(1) a combination of two or more persons; (2) an unlawful act done to further the conspiracy; and (3) damages." *Eames, 412 F. Supp. 2d at 438*. The Pennsylvania standard is similar, requiring the plaintiff to allege: [*19] "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *In re Student Finance Corp., 335 B.R. 539, 552 (D. Del. 2005)* (citation omitted).

Christ alleges that "Cormick formed Elan Suisse USA in connection with and in furtherance of his unlawful scheme to defraud plaintiff and induce plaintiff to pay Cormick $ 250,000." (D.I. 29, at 8.) Christ's claim lacks any facts or indication that there was a combination or agreement to perpetrate fraud between Cormick, Elan Suisse USA, and Elan Suisse. Christ's conclusory allegations do not satisfy the pleading requirement.

## D. Statute of Limitations

The defendants have failed to meet their burden to show why Christ's fraud claim should be dismissed. "[A] federal court, sitting in diversity, follows the forum's choice of law rules to determine the applicable statute of limitations." *David B. Lilly Co., Inc. v. Fisher, 18 F.3d 1112, 1117 (3d Cir. 1994)* (citations omitted). The court must use the same choice of law rules to determine which jurisdiction's law should [*20] be applied to the claim. *Deutschman v. Beneficial Corp., 132 F.R.D. 359, 379 (D. Del. 1990)* (citation omitted). Generally in tort cases, Delaware courts have followed "the principle of *lex loci delicti*, and [have] appl[ied] the law of the place of the injury." *Id.* (citation omitted). However, "[i]n the case of

intentional torts, such as fraud, the *lex loci deliciti* rule requires a court to apply the substantive law of the state or, in this case, country where the defendant's wrongful conduct primarily occurred." *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp., 576 F. Supp. 107, 127-28 (D. Del. 1983)* (citing *Johnston Assocs., Inc. v. Rohm & Haas Co., 560 F. Supp. 916, 918 (D. Del. 1983)*). The rationale follows that, where there is an action based upon an intentional tort, "the punitive element is dominant, [and the] state finds [the] conduct wrongful because its people regard it as sinful or offensive to public morals and the conduct, not the injury, is critical for applying the applicable law." *Johnston Assocs., 560 F. Supp. at 918 (D. Del. 1983)* (citation and internal quotations omitted). The aforementioned policy appears to be in accord with the Delaware Supreme Court's [*21] adoption of the most significant relationship test, "set forth in the *Restatement (Second) of Conflict of Law § 145(1)* (1971) for analyzing choice of law questions relating to tort claims." *Lilly, 18 F.3d at 1117; see also, Johnston Assocs, 560 F. Supp. at 918* (noting that the Restatement stands for the proposition that "rights and liabilities of parties with respect to tort action are determined by local law of [the] state which has the most significant relationship to the occurrence").

To address the statute of limitations, this court must first discern which forum's laws apply and specifically where Cormick's acts giving rise to this claim occurred. Given Christ's present allegations, it is difficult to determine exactly where Cormick's conduct occurred. Cormick may have caused the formation of Elan Suisse USA in a remote corner of the world, without ever setting foot in Delaware. It is also difficult to locate the origin of emails and phone calls used to negotiate the allegedly fraudulent deal. For the purposes of this motion, however, the defendants have failed to show why this court should not consider the act of incorporation under the laws of Delaware as an act that has one [*22] of the most, if not the most, significant relationship to the alleged fraud upon Christ in Delaware. This act brings Christ's claim of fraud under Delaware law and, therefore, under Delaware's three year statute of limitations. At this stage of the proceedings, in the absence of a clearer and more thorough illumination of the issues by the parties' briefs, the court finds it prudent to allow the claim of fraud to proceed.

## E. Motion to Stay Pending Resolution of Parallel Action in South Africa

International comity has been defined as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to the international duty and convenience." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) (citing *Hilton v. Guyot*, 159 U.S. 113, 163-64, 16 S. Ct. 139, 40 L. Ed. 95 (1895)). While the federal courts have a "virtually unflagging obligation to exercise the jurisdiction conferred on them by Congress, in exceptional cases, a federal court should stay a suit and await the outcome of parallel proceedings as a matter of wise judicial administration, giving regard to the conservation of judicial [*23] resources and comprehensive disposition of litigation." *Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976) (internal quotations omitted)). Ordinarily, "a party invoking the doctrine of international comity seeks the recognition of a foreign judgment." *Royal & Sun*, 466 F.3d at 92. In the present case, the defendants contend that this court should stay the present action in favor of a similar pending action in South Africa, (D.I. 31, at 29,) an "alternate forum [that] is not the tribunal of a state of the federal union to which, under our Constitution, we owe a special obligation of comity." *Finova Capital Corp.*, 180 F. 3d at 898 (citation omitted).

For the most part, "federal courts are reluctant to decline jurisdiction solely on the basis of concurrent proceedings in another jurisdiction." *Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 942 F. Supp. 201, 207 (S.D.N.Y. 1996). "[P]arallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously." *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987) [*24] (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 235 U.S. App. D.C. 207, 731 F.2d 909, 926 (D.C. Cir. 1984)) (internal quotations omitted).

The decision, whether to stay a proceeding based upon the existence of parallel litigation in a foreign forum "does not rest on a mechanical checklist, but on a careful balancing of the important factors . . . as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Royal & Sun*, 466 F.3d at 94 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S. Ct. 927, 74 L. Ed. 2d 765

(1983)). "[A] district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." *Royal & Sun*, 466 F.3d at 94. To address these principles, courts have considered a litany of factors under the guidance of the Supreme Court, including but not limited to: "the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and [*25] the connection between the litigation and the foreign jurisdiction." *Royal & Sun*, 466 F.3d at 94; *see also Finova Capital Corp.*, 180 F.3d at 898-99.

One factor that weighs heavily in favor of a stay pending the resolution of the South African proceedings is that the High Court of South Africa was first to exercise jurisdiction over the subject matter of the current dispute. In addition, the proceedings are parallel, as the main parties, Christ and Cormick, are included in both actions. The actions seek the same relief -- the return of the $ 250,000 investment and other damages related thereto. There is, however, a high risk of inadequate relief in the South African court, given Cormick's decision to dispute personal jurisdiction. As Christ contends, it is unlikely that the South African court will exercise jurisdiction over Cormick. Given the aforementioned precedent that parallel proceedings in such an instance are ordinarily allowed to proceed simultaneously, the court will allow Christ's claim to proceed despite the prior-filed action in South Africa.

**F. Motion for Sanctions**

The defendants request that the court sanction Christ for: (1) maintaining a prior-filed action alleging the [*26] same facts and seeking the same relief against Cormick in South Africa; (2) impleading Cormick, Elan Suisse, Nicogel, Marshall, and Walters; and (3) making false accusations. (D.I. 31, at 32.) The Third Circuit recognizes that the "[i]mposition of attorney's fees and costs . . . is reserved for behavior of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." *In Re: Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 795 (3d Cir. 1999) (internal quotations and citations omitted); *see also, Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (cited for the

proposition that a court may assess fees under inherent powers when a party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons") (internal citations omitted). The defendants have not persuaded the court that sanctions against Christ are warranted.

## V. CONCLUSION

The court will dismiss Elan Suisse, Nicogel, Walters, Marshall, and Mercari for lack of personal jurisdiction, thus retaining jurisdiction over Cormick and Elan Suisse USA. Further, the court will dismiss Christ's civil conspiracy claim for failure to state a claim. The defendants' motion [*27] to dismiss Christ's fraud claim as time-barred under the statute of limitations will be denied. The defendants' motion to stay pending resolution of the parallel action in South Africa will be denied. Last, the defendants' request for sanctions will be denied.

Dated: July 10, 2007

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 30) is GRANTED in part and DENIED in part.

   a. The motion is GRANTED as to defendants Elan Suisse, Nicogel, Marshall, Walters, and Mercari.

   b. The motion is DENIED as to defendants Cormick and Elan Suisse USA.

2. The Defendants' Motion to Dismiss for Failure to State a Claim for Conspiracy (D.I. 30) is GRANTED.

3. The Plaintiff's request for leave to amend his claim for civil conspiracy (D.I. 32, at 29) is DENIED.

4. The Defendants' Motion to Dismiss the Fraud and Conspiracy Claims for Failure to Satisfy the Statute of Limitations (D.I. 30) is DENIED.

5. The Defendants' Alternative Motion to Stay Pending Resolution of Prior-Filed Action in South Africa (D.I. 30) is DENIED.

6. The Defendants' Motion [*28] for Sanctions (D.I. 30) is DENIED.

Dated: July 10, 2007

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT

## 2

1 of 1 DOCUMENT

**COMPUTER PEOPLE, INC., Plaintiff, v. BEST INTERNATIONAL GROUP, INC.,
a Delaware corporation, BEST INTERNATIONAL GROUP PLC, a foreign corpo-
ration, BEST PEOPLE LIMITED, a foreign corporation, and RAYMOND
ARELLO, an individual, Defendants.**

Civil Action No. 16648

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1999 Del. Ch. LEXIS 96*

November 2, 1998, Date Submitted
April 27, 1999, Date Decided

**SUBSEQUENT HISTORY:**    [*1]  Released for Pub-
lication by the Court May 25, 1999.

**DISPOSITION:**    Motion to dismiss granted. Defen-
dants' 12(b)(6) motion with leave to renew based on
briefs that take into account the Court's jurisdictional
ruling denied.

**COUNSEL:** David C. Weiss and Richard S. Cobb, Es-
quires, of DUANE, MORRIS & HECKSCHER LLP,
Wilmington, Delaware; and Michael N. Sheetz and Peter
M. Coppinger, Esquires, of GADSBY & HANNAH
LLP, Boston, Massachusetts, Attorneys for Plaintiff.

Robert J. Steam Jr., Esquire, of RICHARDS, LAYTON
& FINGER, Wilmington, Delaware; and John M. Mur-
phy and Anthony G. Stamato, Esquires, of BAKER &
McKENZIE, Chicago, Illinois, Attorneys for the Best
Defendants.

R. Judson Scaggs, Jr. and William M. Lafferty, Esquires,
of MORRIS, NICHOLS, ARSHT & TUNNELL, Wil-
mington, Delaware; and Bruce L. Atkins and Christine
M. Stevenson, Esquires, of CONTANT, SCHERBY &
ATKINS, Hackensack, New Jersey, Attorneys for De-
fendant Raymond Arello.

**JUDGES:** JACOBS, VICE CHANCELLOR.

**OPINION BY:** JACOBS

**OPINION**

MEMORANDUM OPINION

JACOBS, VICE CHANCELLOR

In this action, the plaintiff, Computer People, Inc.
("Computer People" or "the company"), claims that the
defendants have engaged in a conspiracy to induce sev-
eral [*2] of the company's managers and other high level
employees to leave Computer People and join forces
with the defendants. The named defendants are Best In-
ternational Group PLC ("Best PLC") and Best People
Limited ("Best Ltd."), both United Kingdom corpora-
tions; Best International Group, Inc., a Delaware corpo-
ration ("Best USA"); and Raymond Arello ("Arello"), a
New Jersey resident.

The defendants other than Best USA have moved to
dismiss the complaint as to them under Court of Chan-
cery Rule 12(b)(2) for lack of personal jurisdiction. Ad-
ditionally, all defendants have moved to dismiss the ac-
tion under Court of Chancery Rule 12(b)(6) for failure to
state a claim upon which relief can be granted.

For the following reasons, the Court determines that
it lacks personal jurisdiction over defendants Arello, Best
PLC, and Best Ltd., and grants the motion to dismiss the
complaint as to those defendants. The result is to leave
Best USA as the sole remaining defendant. Because nei-
ther side has adequately briefed the 12(b)(6) motion with
that contingency in mind, the Court denies the Rule
12(b)(6) motion, with leave to renew based on briefs that
take into account the procedural consequences of the
[*3] jurisdictional ruling made here.

I. BACKGROUND

The facts set forth below are derived from the com-
plaint and the affidavits filed in connection with these
motions.

A. The Parties

    1. Computer People

1999 Del. Ch. LEXIS 96, *

Computer People, a Delaware corporation, is a subsidiary of Delphi PLC, a British corporation with branch offices throughout the United Kingdom. Computer People provides specialized employment staffing services on a contract basis within the information technology ("IT") industry. The company has 14 branch offices nationwide grouped into three regions. [1] Its business is to hire IT professionals ("consultants") and then place those consultants with commercial and governmental entities. In those environments, the consultants perform tasks that include programming, system administration, applications development, system analysis and design, and network administration and installation.

> 1   The Western region, which has its headquarters in Los Angeles, includes branch offices in Seattle, Portland, Dallas, and Houston. The Midwest region, which is headquartered in King of Prussia, Pennsylvania, includes branch offices in Chicago, Detroit, Columbus, and Atlanta. The Mid-Atlantic region, which has its headquarters in Wilmington, Delaware, includes branch offices in New York City and King of Prussia, Pennsylvania.

[*4]   Each Computer People branch office has a manager who is responsible for operating that office, and who has access to highly confidential and sensitive information, including a database containing detailed information about Computer People's consultants and clients. Because of the sensitive and confidential nature of this information, all managers are required to sign employment agreements that contain various restrictive covenants covering topics such as employee non-solicitation, customer non-solicitation, and confidentiality. Some Computer People employees are also required to include non-competition provisions in their employment agreements.

2. The Defendants

Best PLC, a British corporation, is the corporate parent of several IT placement subsidiaries throughout the world, including defendants Best USA and Best Ltd. Defendants Best PLC and Best Ltd. do not own any real estate, maintain any office, or conduct any business; and neither company is registered to do business in Delaware. Best PLC and Best Ltd. also have no Delaware mailing address, post office box, telephone number or listing; nor do they generate any substantial revenue from Delaware operations or have a designated [*5] agent for service of process in Delaware.

Best PLC incorporated Best USA in Delaware on August 12, 1998 to take advantage of the administrative convenience and corporate tax considerations associated with being a Delaware corporation. Best USA, like

Computer People, is in the business of placing consultants in the IT field on a contractual basis. Best USA's principal place of business is in Freehold, New Jersey, and it also maintains three branch offices outside New Jersey, none of which are located in Delaware. [2]

> 2   The branches are located in Los Angeles, California; Dallas, Texas; and Seattle, Washington.

Raymond Arello worked for Computer People from May 22, 1989 through May 15, 1998. Originally hired as the New York branch manager, Arello served as Vice President and Regional Manager for Computer People's Northeast region from January 1, 1993 through March 1, 1998. On March 1, 1998, Arello was promoted to Senior Vice President for Computer People and Alpine Computer System (a separate operating division [*6] located in New York), [3] with oversight responsibility for profit improvement in New York and New Jersey.

> 3   Alpine is involved in remote systems management, outsourcing, computer network design, and consulting services.

Although he was a New Jersey resident, Arello initially had many Delaware contacts as a Computer People employee. As a regional Vice President from 1993 to 1996, Arello was responsible for supervising Computer People's Delaware branch office; and in that role he had frequent contacts in Delaware with Michael Stanley, Computer People's Wilmington branch office manager. Arello visited the Delaware branch office weekly and communicated with that office almost daily by telephone and e-mail. He also frequently attended sales and staff meetings in Delaware and was available to answer operational and other questions for Stanley as needed. Arello never lived in Delaware, however, and after 1996 his Delaware contacts declined significantly.

In April 1998, Best Ltd. executives Susan E. Cuff ("Cuff") [*7] and Michael R. Bayfield ("Bayfield") contacted Arello and offered him a position with Best USA. In May 1998, Arello left Computer People after being terminated as part of the company's cost-reduction plan. Thereafter, Arello became Best USA's President and Chief Executive Officer, and presently works out of Best USA's Freehold, New Jersey headquarters. After he left Computer People, Arello's only Delaware contact occurred in 1998, when he had lunch with Stanley in Delaware and toured Computer People's new Wilmington, Delaware facility.

B. The Defendants' Alleged Solicitation of Computer People Employees

Computer People claims that the defendants have conspired to lure away five key Computer People employees (including 4 of its 14 branch managers) who had

access to sensitive and confidential company information. These defecting employees included former branch managers Thomas P. Meola ("Meola"), William Kalinowski ("Kalinowski"), Jon Raymond ("Raymond"), and Brian Mitchell ("Mitchell"), and former employee Chelsey D. English ("English"). What follows is a brief summary of the alleged wrongful acts committed by the defendants. None of those acts occurred in Delaware.

### 1. Meola

[*8] From December 16, 1994 until he resigned on September 8, 1998, Meola was Computer People's New York branch manager. During the summer of 1998, Meola met twice with Bayfield, and he also met with Cuff on an unspecified number of occasions. According to the complaint, at these meetings Bayfield allegedly promised Meola that he would be the "number two" person in charge of Best USA, and he offered Meola a one-year guaranteed employment contract that promised yearly compensation of approximately $ 350,000.

On August 27, 1998, Meola gave Computer People notice of his resignation effective September 25, 1998. Over the Labor Day weekend, Arello, who had remained friends with Meola since he left Computer People, [4] contacted Meola and persuaded him to accept employment with Best USA, where Meola is now currently employed.

    4 Arello and Meola were colleagues working in the same region while both were employed at Computer People. Arello hired and managed Meola in the New York branch office for two years.

### 2. Kalinowski

[*9] From January 1, 1989 until September 30, 1993, Kalinowski was Computer People's Los Angeles branch manager; and from October 1, 1993, to September 30, 1997, he was its Atlanta branch manager. Kalinowski again served as Computer People's Los Angeles branch manager from October 1, 1997, until he resigned on September 4, 1998.

In July or August 1998, Bayfield and Cuff, acting on behalf of Best Ltd. and/or Best PLC, solicited Kalinowski to leave Computer People and join Best USA. On August 6, 1998, Kalinowski tendered his resignation and gave Computer People one month's notice. Kalinowski now works for Best USA in its Los Angeles branch office.

### 3. Raymond

From July 7, 1997, until February 2, 1998, Raymond was an account manager in Computer People's Seattle office. On February 2, 1998, Raymond became the Seattle branch office manager, where he remained until his resignation on May 26, 1998. Shortly thereafter, Bayfield and Cuff, acting on behalf of Best Ltd. and/or Best PLC, offered Raymond a position with Best USA. Raymond is now Best USA's Seattle office branch manager.

### 4. Mitchell

From July 1, 1987 until he resigned on July 28, 1998, Mitchell was employed by Computer People, first [*10] as a contract sales executive in its New York office, then as its Wilmington, Delaware branch manager, and finally as its Dallas, Texas branch manager. By letter dated June 29, 1998, Mitchell tendered his resignation, effective July 28, 1998. Sometime during the summer of 1998, the defendants, including Bayfield and Cuff acting on behalf of Best Ltd. and/or Best PLC, contacted Mitchell in an effort to recruit him for Best USA. It is unclear from the complaint whether this contact occurred during or after Mitchell's employment with Computer People; but in any event, Mitchell now works for Best USA as its Dallas branch manager.

### 5. English

On July 27, 1998, English resigned from Computer People's Dallas office, effective August 14, 1998. At some point, Mitchell allegedly contacted English to recruit her on behalf of Best USA for the Dallas office. It is unclear from the complaint whether this contact occurred before or after English terminated her employment with Computer People. In any event, English now works for Mitchell in Best USA's Dallas office.

### C. Other Alleged Solicitation Efforts

The plaintiff also alleges that beginning in January or February 1998, Bayfield and Cuff [*11] (on behalf of Best Ltd. and Best PLC) began to solicit Computer People's Mid-Atlantic branch manager, Michael Stanley, who is based in Wilmington, Delaware. That is the only solicitation activity claimed to have occurred in Delaware. There were two other alleged telephone call solicitations by Bayfield from outside Delaware to Stanley's Delaware office, during which Bayfield allegedly informed Stanley that Best was "coming to the United States" and invited Stanley to join them. On May 21, Bayfield and Cuff met with Stanley at the Philadelphia Airport and again solicited him to join Best's "United States team." One month later, in June or July 1998, Stanley had a follow up meeting with Bayfield and Cuff in New York, and also received an e-mail from Bayfield at his Wilmington office. Ultimately, however, Stanley resisted these blandishments and decided to stay with Computer People.

In April 1998, Best Ltd. executives Cuff and Bayfield contacted Geoffrey Richardson, who at that time was Computer People's Senior Vice President of Recruit-

ing and the Director of its National Resourcing Office. Cuff and Bayfield offered Richardson a position with Best USA. The complaint does not allege that [*12] Richardson presently works for the defendants or that he intends to work for the defendants in the future.

## II. THE CONTENTIONS

Computer People's complaint has six counts. Count One alleges that the defendants tortiously interfered with Computer People's contractual relationship with its employees through its various solicitations. Computer People contends that its former employees cannot perform similar services for Best USA without violating the express terms of their Computer People employment agreements, because those employees, once employed by Best USA, will inevitably: (i) solicit and/or disclose the names of the customers and consultants that are a part of Computer People's database and/or workforce; and (ii) use and disclose other confidential Computer People information in the course of performing their managerial duties.

Count Two alleges that the defendants have tortiously interfered with Computer People's business relations by intentionally recruiting Computer People's key managerial employees. This depletion of its upper-level employees, Computer People claims, has caused or will cause the termination of Computer People's present or prospective business relations with [*13] its clients.

Count Three alleges that Arello's solicitation of Computer People's employees (in particular Meola) violated his employment agreement with Computer People. Count Four contends that that same conduct breached Arello's common law fiduciary duty owed by him to Computer People. Count Five alleges that Best Ltd. and Best PLC, through Bayfield and Cuff, knowingly participated and assisted in Arello's breach of fiduciary duty to Computer People.

The final count, Count Six, alleges that the defendants are parties to a conspiracy to create and operate Best USA as the vehicle for defendants' efforts to interfere tortiously with Computer People's contractual and business relationships.

Defendants Arello, Best PLC, and Best Ltd., have moved to dismiss this action under Court of Chancery Rule 12(b)(2) for lack of jurisdiction over the person. (The defendants concede that the Court has personal jurisdiction over Best USA, which is a Delaware corporation.). In addition, all four defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Only the first of these motions is addressed, for the reasons [*14] discussed later herein.

## III. ANALYSIS

### A. Applicable Legal Standards

To overcome a challenge to personal jurisdiction under Court of Chancery Rule 12(b)(2), a plaintiff must establish, prima facie, that this Court has personal jurisdiction over the moving defendant. [5] In that context all factual inferences are viewed in the light most favorable to the plaintiff. [6] Where, as here, the plaintiff attempts to effect service of process under the Delaware Long Arm Statute, *10 Del. C. § 3104*, the plaintiff must prove that (i) the defendants' alleged conduct falls within one or more of the statutorily enumerated categories that confer jurisdiction and that (ii) the Court's exercise of personal jurisdiction satisfies the due process requirements of the *Fourteenth Amendment of the United States Constitution.* [7]

> 5   *Newspan, Inc. v. Hearthstone Funding Corp., 1994 Del. Ch. LEXIS 52,* *10, Del. Ch., C.A. No. 13304, Allen, C. (May 10, 1994).* The plaintiff bears the burden of showing by evidence that the fact finder could determine that the factual predicate for jurisdiction has been proven. *1994 Del. Ch. LEXIS 52, * 3* (citing *Hart Holding Co. v. Drexel Burnham Lambert, Inc., Del. Ch., 593 A.2d 535, 539 (1991)).*

[*15]

> 6   See *Outokumpu Eng. Entrs., Inc. v. Kvaerner Enviropower, Inc., Del. Super., 685 A.2d 724, 727 (1996).*

> 7   *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd., Del. Supr., 611 A.2d 476, 480 (1992),* cert. dismissed, *507 U.S. 1025, 113 S. Ct. 1836, 123 L. Ed. 2d 463 (1993).*

The pertinent provisions of Delaware's Long Arm Statute, *10 Del. C. § 3104(c),* state:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

> > (1)  Transacts any business or performs any character of work or service in the State;

> > ***

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

Subsections [*16] (c)(1) and (c)(3) authorize "transactional" or "specific" jurisdiction in cases where the cause of action arises out of the defendant's conduct in the State of Delaware. [8] Under those subsections a single act in Delaware will suffice. Subsection (c)(4), on the other hand, creates "general" jurisdiction in cases where the cause of action is unrelated to the relevant Delaware contacts. [9] General jurisdiction under subsection (c)(4) requires a greater, more continuous pattern of contacts with the forum than does "single act" jurisdiction under subsection (c)(1), (2), or (3). The "tradeoff" for this stricter requirement is that the activities which create that general presence need not be the basis for the plaintiff's cause of action.

8  Sears, Roebuck & Co. v. Sears PLC, D. Del., 744 F. Supp. 1289, 1292 (1990).

9  Id.

In narrowly defined circumstances, personal jurisdiction may also be established under a common law "conspiracy theory." The conspiracy theory of jurisdiction is not, strictly speaking, [*17] an independent jurisdictional basis, but rather, is a shorthand reference to an analytical framework where a defendant's conduct that either occurred or had a substantial effect in Delaware is attributed to a defendant who would not otherwise be amenable to jurisdiction in Delaware. [10]

10  Newspan, 1994 Del. Ch. LEXIS 52, * 27 (citing Hercules Inc. v. Leu Trust & Banking, Del. Supr., 611 A.2d 476, 482 n.6 (1992)).

## B. The Jurisdictional Motion

In opposition to the defendants Rule 12(b)(2) motion, Computer People has identified three categories of "Delaware contacts" that, it claims, support personal jurisdiction over the defendants. These contacts are: (i) Arello's continuing presence in Delaware as a Computer People employee from 1993 to 1996; (ii) two telephone calls and one e-mail made by Bayfield and Cuff to Stanley at his Delaware office; and (iii) the incorporation of Best USA in Delaware. These three sets of contacts, Computer People argues, are sufficient to establish personal jurisdiction (a) [*18] over Arello under 10 Del. C. § 3104(c)(1), (c)(3), (c)(4), and under the conspiracy theory; and (b) over Best PLC and Best Ltd. under 10 Del. C. § 3104(c)(1) and the conspiracy theory. I disagree, and conclude that the plaintiff has failed to establish that this Court has personal jurisdiction over any of these defendants. [11]

11  That finding makes it unnecessary to reach the due process component of the jurisdictional analysis.

### 1. The Conspiracy Theory

Computer People first attempts to support jurisdiction over Best Ltd., Best PLC, and Arello on the basis that Best USA was incorporated in Delaware and then was operated as part of a conspiracy among the non-Delaware defendants to interfere tortiously with Computer People's contractual and business relationships with employees, consultants, and customers. This alleged conspiracy forms the linchpin of Computer People's jurisdictional argument.

Under the "conspiracy theory" of jurisdiction, a plaintiff may establish personal jurisdiction over a [*19] nonresident only if it satisfies five elements, namely, by showing that:

(1) a conspiracy...existed; (2) the defendant was a member of the conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. [12]

The test ultimately "turns on the imputation to the [alleged] conspirator of meaningful activity on behalf of the

conspiracy which occurred and caused effects in Delaware." [13]

> 12   *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Del. Supr., 449 A.2d 210, 225 (1982); Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140, * 38,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (the "proper invocation of this basis of jurisdiction requires factual proof of each enumerated element."), appeal refused, *Del. Supr., 676 A.2d 908* (Jan. 22, 1996); *Newspan, 1994 Del. Ch. LEXIS 52, * 25-26* ("all [five elements] must be satisfied before a Delaware court may exercise personal jurisdiction").

[*20]

> 13   *HMG/Courtland Properties, Inc. v. Gray, 729 A.2d 300, 307,* Strine, V.C. (Jan. 13, 1999) (emphasis added).

The conspiracy theory of jurisdiction is narrowly and strictly construed; otherwise, that theory would become a facile way for a plaintiff to circumvent the minimum contacts requirement of International Shoe Co. v. Washington. [14] For that reason, where a conspiracy is alleged and the defendants submit factual evidence controverting personal jurisdiction as to them, the plaintiff may not rely upon conclusory allegations in his pleading that are unsupported by evidence. [15] Such allegations will not be sufficient to overcome a motion to dismiss for lack of personal jurisdiction.

> 14   *326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).*

> 15   See *Newspan, 1994 Del. Ch. LEXIS 52, * 28-29; Carlton Invs., 1995 Del. Ch. LEXIS 140, * 31; Naartex Consulting Corp. v. Watt, D.C. Cir., 232 U.S. App. D.C. 293, 722 F.2d 779, 787 (1983)* (Wald, J.) ("bald speculations that defendants are alleged co-conspirators do not constitute the threshold showing needed to carry the burden of establishing personal jurisdiction"), cert. denied, *467 U.S. 1210, 81 L. Ed. 2d 355, 104 S. Ct. 2399 (1984); Jarmuth v. Turetsky, D.D.C., 815 F. Supp. 4, 6 (1993)* (noting that the "'bare allegation' of conspiracy or agency is insufficient to establish personal jurisdiction"); *Hasenfus v. Corporate Air Servs., D.D.C., 700 F. Supp. 58, 62 (1988)* (noting the insufficiency of an "argument...based solely on conclusory statements and allegations that the nonresident defendants were co-conspirators.").

[*21]   The Delaware contacts upon which Computer People relies to support its conspiracy theory of jurisdiction are (i) the two phone calls and one e-mail directed to Stanley at his Delaware office, and (ii) the incorporation of Best USA in Delaware. I find, for the reasons next discussed, that these contacts are insufficient to support personal jurisdiction in Delaware over Best PLC, Best Ltd., or Arello.

First, assuming there was a conspiracy, there is no evidence (or even a claim) that any meaningful, "substantial act or effect" in furtherance of that conspiracy took place in Delaware. [16] As discussed below, the aforementioned Delaware contacts are insufficient to sustain personal jurisdiction over any of the defendants, because those contacts are not a sufficiently significant basis to support jurisdiction under § 3104(c). For this reason also, these contacts are also not "substantial acts or effects" in furtherance of the conspiracy that would support personal jurisdiction under the conspiracy theory.

> 16   See *Istituto Bancario, 449 A.2d at 225* (requiring for jurisdiction that a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"); *Abajian v. Kennedy, 1992 Del. Ch. LEXIS 6, * 35,* Del. Ch., C.A. No. 11425, Allen, C. (Jan. 17, 1992) ("The conspiracy theory...requires that a substantial act or substantial effect [occur] in the forum state in furtherance of the alleged conspiracy.").

[*22]   Second, Computer People has furnished the Court with only conclusory and unsupported allegations that there was a conspiracy. [17] In the face of the contrary evidence offered by the defendants, the plaintiff has failed factually to support the conclusory allegation in its complaint that the defendants conspired to interfere tortiously with Computer People's contractual and business relationships. That is, there is no record evidence of any conspiracy among Arello, Best PLC, and Best Ltd. (through Bayfield and Cuff) to solicit Computer People employees. Accordingly, the plaintiff has failed to satisfy the first of Instituto Bancario's five elements.

> 17   In fact, many of the critical allegations in their complaint are based solely "upon information and belief."

2. Arello's Delaware Contacts as a Computer People Employee

Despite the plaintiff's contrary argument, Arello's Delaware contacts as a Computer People employee between 1993 and 1996 are not sufficient to sustain general personal jurisdiction [*23] over him under *10 Del. C. § 3104(c)(4).* That provision (to repeat) authorizes jurisdic-

tion in cases where the defendant (or the defendant's agent) has a "general presence in the State," even if both the tortious act and the injury occur outside of Delaware. [18] The exercise of "general" jurisdiction under § 3104(c)(4) requires a higher level of activity within the forum state than does the exercise of "specific" jurisdiction under (c)(3). [19] Specifically, subsection (c)(4) jurisdiction arises only "when a defendant has had contacts with this state that are so extensive and continuing that it is fair and consistent with state policy to require that the defendant appear here and defend a claim." [20]

> 18  *Applied Biosystems, Inc. v. Cruachem Ltd., D. Del., 772 F. Supp. 1458, 1469 (1991).*

> 19  *United States v. Consolidated Rail Corp., D. Del., 674 F. Supp. 138, 145 (1987).*

> 20  *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Prods., Inc., 1991 Del. Ch. LEXIS 113, * 8,* Del. Ch., C.A. No. 12036, Allen, C. (July 10, 1991).

[*24]  Computer People argues that Arello's extensive Delaware contacts during the 1993 to 1996 period while he was employed with Computer People, were extensive and continuing. The difficulty, however, is that to establish general jurisdiction under subsection (c)(4), the defendant must have current contacts with the forum state. [21] That Arello may have had substantial contacts with Delaware from 1993 to 1996 is not probative of whether this Court has general jurisdiction over him today, where (as here) (i) the cause of action does not arise out of those earlier contacts, and (ii) Arello's post-1996 Delaware contacts are too attenuated to support personal jurisdiction grounded upon his "general presence in this state." [22]

> 21  See § 3104(c)(4) (providing for jurisdiction when "person regularly *does* or *solicits* business, *engages* in any other persistent course of conduct in the State or *derives* substantial revenue from services, or things used or consumed in the State." (italics added)).

> 22  Cf. *J. Royal Parker Assocs. Inc. v. Parco Brown & Root, Inc., 1984 Del. Ch. LEXIS 559, * 7,* Del. Ch., C.A. No. 7013, Berger, V.C. (Nov. 30, 1984) (finding that general jurisdiction was satisfied where defendant "regularly advertises in Delaware or carries on some other continuous course of activity in the State"); *Red Sail, 1991 Del. Ch. LEXIS 113, * 8* (holding that statutory provision will only apply where defendant "has had contacts with [Delaware] that are so extensive and continuing that it is fair and consistent

with state policy to require the defendant [to appear and] defend a claim.").

[*25]  3. The Two Phone Calls and One E-mail to Stanley at his Delaware Office

Computer People next argues that the two telephone calls and one e-mail directed to Stanley at his Delaware office suffice to support personal jurisdiction over Best PLC, Best Ltd., and Arello under § 3104(c)(1). Again, I cannot agree.

*Section 3104(c)(1)* authorizes a court, in its discretion, to exercise jurisdiction over a non-resident defendant who "transacts any business or performs any character of work or service in" Delaware and whose cause of action arises from that transaction or work. Under that subsection, an act or acts must have occurred in Delaware, and the plaintiff's causes of action must arise from that act or acts. [23] To "transact business" in Delaware, a party must purposefully avail itself of the privileges and benefits of Delaware law. [24]

> 23  *Applied Biosystems, 772 F. Supp. at 1466.*

> 24  *Consolidated Rail Corp., 674 F. Supp. at 142; Regency Housing & Drilling L.P.I. v. Cohen, 1991 Del. Super. LEXIS 341,* Del. Supr., C.A. No. 89 C-DE-70, 1991 WL 190311, at * 4, Gebelein, J. (Sept. 11, 1991).

[*26]  As to Best PLC and Best Ltd., Computer People's argument fails because as a general matter telephone calls and an e-mail do not, in and of themselves, automatically constitute "transacting business" within Delaware sufficient to invoke jurisdiction under § 3104(c)(1). [25] Even when the argument is considered in this specific factual context it does not work, because the two telephone calls and one e-mail cannot be a basis for the plaintiff's causes of action for tortious interference. The company does not claim these Delaware contacts induced Stanley to leave Computer People to work for Best USA; indeed, plaintiff concedes that Stanley remained a Computer People employee. Nor are these "contacts" relevant as evidence of a conspiracy because, for the reasons earlier discussed, the plaintiff's conspiracy theory is legally deficient.

> 25  See *Fischer v. Hilton, D. Del., 549 F. Supp. 389, 390 (1982)* (finding that mere "phone calls do not constitute a transacting of business within the State of Delaware for purposes of subsection (c)(1)."); *Koster v. Automark Indus., Inc., 7th Cir., 640 F.2d 77, 79 (1981)* (discussing minimum contacts, court found that telephone calls, in and of themselves, could not confer personal jurisdiction).

[*27] Computer People next claims that Arello is subject to personal jurisdiction under § 3104(a)(1) because Bayfield and Cuff's solicitation of Stanley on behalf of Best USA may be attributed to Arello as the president and CEO of Best USA. Stated differently, Computer People argues that Bayfield and Cuff were Arello's agents, and that therefore Bayfield's two telephone calls to Stanley and the e-mail to Stanley's Delaware office should be attributed to Arello.

This argument also lacks merit. Under the agency theory of personal jurisdiction, only acts of the agent that are directed by the principal may serve as a basis to assert jurisdiction over the principal. [26] The complaint here does not allege, nor does the factual record show, that Arello directed anyone -- Bayfield included -- to contact Stanley in Delaware to induce him to join Best USA. Therefore, Bayfield and Cuffs Delaware contacts with Stanley may not be imputed to Arello to establish personal jurisdiction over him under § 3104(c)(1). [27]

> 26   Applied Biosystems, 772 F. Supp. at 1465-66.

> 27   the plaintiff in its complaint invokes jurisdiction under 10 Del. C. § 3104(c)(3), they do not make any argument based upon subsection (c)(3) in their brief. Accordingly, that argument is deemed to have been abandoned.

[*28]  4. The Incorporation of Best USA in Delaware

Finally, the plaintiff asserts that the act of incorporating Best USA in Delaware is enough, in and of itself, to establish jurisdiction over Best PLC and Best Ltd. The plaintiff relies on a line of cases that raise the issue presented here: whether the creation, ownership, and operation of a Delaware subsidiary (Best USA) is sufficient to invoke personal jurisdiction over the foreign parent (Best PLC). [28]

> 28   Shaffer v. Heitner, 433 U.S. 186, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977); Sternberg v. O'Neil, Del. Supr., 550 A.2d 1105 (1988); Papendick v. Robert Bosch GmbH, Del. Supr., 410 A.2d 148 (1979).

In Shaffer v. Heitner ("Shaffer"), [29] the United States Supreme Court held that the mere ownership of stock in a Delaware corporation is not a sufficient "minimum contact" with Delaware to permit a Delaware court to exercise personal jurisdiction over a nonresident defendant consistent with due process. Thereafter, in Papendick v. Robert Bosch GmbH ("Papendick"), [30] the Delaware [*29] Supreme Court confronted the issue of whether the "mere ownership" principle of Shaffer precluded a Delaware court from exercising jurisdiction

over a foreign corporation in a case where the cause of action was related to and arose out of the foreign parent's creation and operation of a Delaware subsidiary. Later, in a somewhat different context, the Delaware Supreme Court revisited the Shaffer issue in Steinberg v. O'Neil ("Steinberg"). [31]

> 29   433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977).

> 30   Del. Supr., 410 A.2d 148 (1979).

> 31   Del. Supr., 550 A.2d 1105 (1988).

In Papendick, a German corporation (Bosch) formed a Delaware subsidiary (RBNA) to serve as a vehicle to acquire the stock of another company. The plaintiff filed a breach of contract action in Delaware. The action arose out of that stock acquisition transaction. Bosch argued that because its sole Delaware contact was its "mere" ownership of RBNA stock, under Shaffer that was an insufficient basis to establish personal jurisdiction. The [*30] Delaware Supreme Court disagreed. It held that Delaware could exercise jurisdiction over Bosch because the formation of RBNA was an integral part of the scheme of wrongdoing challenged in the complaint, and because in forming RBNA, Bosch had purposefully utilized the benefits and protections of Delaware law in connection with the challenged stock acquisition transaction. [32]

> 32   Papendick, 410 A.2d at 152.

Papendick stands for the proposition that while the stock ownership of a Delaware subsidiary is not, without more, a sufficient contact upon which to predicate jurisdiction, that contact may be sufficient where the cause of action arises from the creation and operation of the Delaware subsidiary. In this case, Computer People alleges that the defendants incorporated Best USA in Delaware in furtherance of a conspiracy to cause key Computer People employees to desert the company. Accordingly, the plaintiff contends, the creation and operation of Best USA supports personal jurisdiction over Best USA [*31] for the same reason that the formation of RBNA supported jurisdiction over Bosch in Papendick.

I have already determined that the plaintiff's conspiracy theory argument fails, not as a matter of theory but as a matter of evidence. As earlier discussed, the plaintiff has not satisfied the conspiracy theory requirements for establishing jurisdiction, because there is no record evidence (save, perhaps, for Computer People's suppositions based on "information and belief") to support that conspiracy theory. Having rejected the conspiracy theory, the Court will not now reverse itself and permit plaintiff to use that theory to prop up its Papen-

dick/Sternberg argument. The plaintiff has failed to show, in a procedurally proper way, that Best USA was created to further a conspiracy to steal Computer People's employees.

Also misplaced is the plaintiff's reliance on Steinberg. There, a plaintiff brought a double derivative action against an Ohio corporation (GenCorp) and its wholly-owned Delaware subsidiary (RKO). Although no claim was alleged directly against the parent, GenCorp, the parent was named as a defendant because "in double derivative actions, both parent and subsidiary corporations [*32] are indispensable parties." [33] In upholding personal jurisdiction over GenCorp, the Supreme Court articulated two separate grounds for its decision. The first was that GenCorp had consented to general jurisdiction in the Delaware courts, because it had registered as a foreign corporation and had appointed a Delaware agent for service of process. [34] Second (and even though the Court could have ended its analysis at that point), it proceeded to uphold personal jurisdiction over GenCorp on the ground that its ownership of RKO was a sufficient minimum contact, since the basis for the double derivative action was GenCorp's operation of RKO. [35]

33  Steinberg, 550 A.2d at 1124.

34  550 A.2d at 1115-16. The same is not true of the defendants in the instant case.

35  550 A.2d at 1116-26. Specifically, the Court held that "a foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play." Id. at 1121.

[*33]  Commentators have interpreted Steinberg in two quite different ways. One interpretation views Steinberg as recognizing a narrow "double derivative suit exception" to the Shaffer rule. The other interpretation reads Steinberg more broadly, as expanding Shaffer to validate personal jurisdiction in Delaware over a majority stockholder of a Delaware subsidiary, in any suit "relating to the operation of the subsidiary." [36] In this case, the Court need not decide which interpretation is correct, because under either view the plaintiff's argument falls short.

36  See Donald J. Wolfe, Jr. and Michael A. Pittenger, Corporate and Commercial Practice in the

Delaware Court of Chancery (1998), at § 3-5(c)(3); William A. Voxman, Jurisdiction Over a Parent Corporation in its Subsidiary's State of Incorporation, 141 U. Pa. L. Rev. 327, 363-66 (1992); see also Outokumpu, supra note 6, at 728 (rejecting the broad interpretation of Steinberg by stating that the decision "cannot mean that Delaware courts may always exercise personal jurisdiction over the foreign parent of a Delaware subsidiary or any cause of action arising out of the operation or acts of that subsidiary, regardless of where the operative facts transpired or the parent's contacts with Delaware. Otherwise, mere ownership of a Delaware subsidiary would in practice subject a foreign parent to our jurisdiction, a result inconsistent with due process.").

[*34]  Under the narrow ("double derivative suit exception") reading of Steinberg, the plaintiff's argument fails because the plaintiff here has not brought a double derivative action. Under the broad interpretation, the argument falters because Computer People has failed to show in a factually sufficient way that its causes of action arise out of Best PLC's operation, control, or ownership of Best USA. Although the complaint alleges conclusorily that all four defendants were involved in incorporating Best USA for wrongful purposes, all that the undisputed evidence shows is that Best USA "was established as a subsidiary of [Best PLC]...in Delaware exclusively for reasons of administrative convenience and corporate tax considerations." [37] That, without more, does not support this conclusory allegation for purposes of sustaining jurisdiction over Best USA's foreign corporate parent, Best PLC. That evidence is also insufficient to establish personal jurisdiction over Best Ltd., a separate subsidiary of Best PLC (and sister corporation of Best USA), which is not alleged to have played any role in incorporating Best USA in Delaware.

37  Bayfield Aff. at 8.

[*35]  ***

For the foregoing reasons, the Court determines that it lacks personal jurisdiction over defendants Arello, Best PLC, and Best Ltd., and grants their motion to dismiss under Rule 12(b)(2). Because Best USA will remain in the case as the sole defendant, I deny the defendants' 12(b)(6) motion with leave to renew based on briefs that take into account the Court's jurisdictional ruling. IT IS SO ORDERED.

# EXHIBIT

## 3

1 of 1 DOCUMENT

**IOTEX COMMUNICATIONS, INC., a Delaware corporation, Plaintiff and Counterclaim Defendant, v. ANTHONY DEFRIES and DAVID BAYENDOR, Defendants, and IOTA, INC., a Delaware corporation, Defendant and Counterclaim and Third-Party Plaintiff, v. ioWAVE, INC., Third-Party Defendant.**

Consolidated Civil Action No. 15817

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1998 Del. Ch. LEXIS 236*

**November 10, 1998, Date Submitted
December 21, 1998, Date Decided**

**SUBSEQUENT HISTORY:**   [*1]  Released for Publication by the Court, January 15, 1999.

**DISPOSITION:**   Motions to dismiss granted.

**COUNSEL:** Grover C. Brown, Esquire, Michael J. Maimone, Esquire and Joseph C. Schoell, Esquire, of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware, Attorneys for Plaintiff and Counterclaim Defendant Iotex Communications, Inc.

Iota, Inc., Defendant and Counterclaim and Third-Party Plaintiff (C.A. No. 15817); Anthony Defries and David Bayendor, Defendants (C.A. No. 15817); Urs Maag, Plaintiff and Counterclaim Defendant (C.A. No. 16082); Neosoft, A.G., Plaintiff (C.A. No. 16036). *.

> *   On December 18, 1998, an Order was entered permitting counsel for these parties to withdraw his representation and allowing 60 days for Iota, Inc. to secure new counsel.

Allen M. Terrell, Jr., Esquire and Srinivas M. Raju, Esquire, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Blair G. Brown, Esquire and Lynn F. Kaumann, Esquire, of ZUCKERMAN, SPAEDER, GOLDSTEIN, TAYLOR & KOLKER, L.L.P., Washington, D.C., Attorneys for Counterclaim Defendant ioWave, Inc.

**JUDGES:** Stephen P. Lamb, Vice Chancellor.

**OPINION BY:** STEPHEN P. LAMB

**OPINION**

MEMORANDUM OPINION

LAMB, Vice Chancellor

I. INTRODUCTION

[*2]  These motions arise out of a complex, multiparty, multi-suit [1] litigation begun in July 1997. Various motions to dismiss were filed by several of the parties and oral argument on these motions was held on November 10, 1998. At the conclusion of the hearing held in these consolidated matters, I reserved decision on the motion of David Bayendor to dismiss the complaint against him in C.A. No. 15817 for want of personal jurisdiction, the motions of David Bayendor ("Bayendor") and Anthony Defries ("Defries") to dismiss the Eighth Claim for Relief alleged by counterclaim in C.A. No. 15817 for failure to state a claim (as well as the motion of Defries to dismiss for lack of personal jurisdiction over the Eighth Claim for Relief), and the motion of Urs Maag ("Maag") to dismiss the counterclaims filed against him in C.A. No. 16082 for failure to state a claim upon which relief may be granted. For the reasons that follow, these motions will be granted.

> 1   Three actions have been consolidated for all purposes, C.A. Nos. 15817-NC, 16036-NC, and 16082-NC.

[*3]  A. Background [2]

> 2   Except as otherwise noted, the facts recited herein are taken from the Amended Complaint in C.A. No. 15817 and the counterclaim in C.A. No. 16082.

In 1991, Defries caused the formation of Iota, Inc. ("Iota"), a Delaware corporation, to serve as a vehicle for continuing research into certain wireless communications technology ("Technology') under development since the late 1980s. In 1993, Iota succeeded in inventing the

Technology and undertook further development work in order to create a commercially viable product. That same year, Defries caused Iota to transfer its rights to all of the intellectual property associated with the Technology to NeoSoft, A.G. ("Neosoft"), a Swiss company he created for that purpose.

In 1994, Defries entered into discussions with Peter Friedli ("Friedli") concerning a commitment to invest $ 5.4 million in the further development of the Technology. On July 22, 1994, a certificate of incorporation was filed with the Delaware Secretary of State organizing [*4] a corporation that is now known as IOTEX COMMUNICATIONS, INC. ("IOTEX"). Defries and Maag were named as directors of IOTEX. It is not alleged that Defries, or persons or entities affiliated or associated with him, controlled IOTEX. Rather, it appears from one or more pleadings that a majority of the shares of IOTEX were issued to Friedli or persons associated with him.

In July 1994, IOTEX began negotiations over a License Agreement with NeoSoft whereby NeoSoft would grant IOTEX restricted rights to certain applications of the Technology in North America for a fifteen year term. In return, IOTEX would pay NeoSoft royalties based on a percentage of revenues from the use of these applications. As part of these discussions, IOTEX also negotiated a Project Management Agreement with Iota, whereby Iota would agree to act as project manager for IOTEX's research and development of the Technology licensed from NeoSoft.

Maag resigned as a director of IOTEX on October 24, 1994. There is no allegation of fact in the counterclaims filed in C.A. No. 16082 that Maag participated in the negotiation of either of these agreements. Nor is there any allegation that Maag did anything, while he was an [*5] IOTEX director or afterward, in furtherance of or in connection with either of them.

The License Agreement and Project Management Agreement (collectively, the "Agreements") were executed on or about November 2, 1994. Under the terms of the Project Management Agreement, IOTEX agreed to fund the costs and expenses associated with the development of the Technology in accordance with a detailed, four-page document (the "Budget") establishing the amounts, timing and manner in which all of the money invested by IOTEX would be spent by Iota. Iota agreed to comply with the provisions of the Budget and further agreed that no material changes would be made to the Budget without first submitting a variance report and obtaining IOTEX's approval for the change. Iota was also required to submit written reports detailing its expenditures to IOTEX. The Budget provided for an 18-month development period that was to be continued only if the

parties were satisfied with the progress in the development of the Technology.

In late 1995 and early 1996, IOTEX became concerned that Iota was not complying with the provisions of the Budget and was not developing the Technology as required under the Agreements. [*6] Allegedly having concluded that Iota breached the Project Management Agreement, IOTEX stopped making payments to Iota in February 1996. Iota then terminated the Project Management Agreement. Thereafter, IOTEX transferred all of its employees and operations to ioWave, Inc. ("ioWave"), also a Delaware corporation.

On July 18, 1997, IOTEX filed C.A. No. 15817 against Defries, David Bayendor, [3] and Iota, alleging claims of breach of fiduciary duty, fraud, aiding and abetting and civil conspiracy arising out of the negotiation and performance of the Project Management Agreement. IOTEX amended its complaint on November 7, 1997, inter alia, to add claims against Defries and Bayendor under the federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, et seq. Iota answered and counterclaimed against IOTEX on August 19, 1997. On October 27, 1997, Iota amended its counterclaims to assert claims against ioWave, as an additional third-party-defendant.

> 3 Bayendor is Defries' nephew. Bayendor was a former President of IOTEX, resigning his position on October 14, 1994, and a former director and Vice President of iota. He resigned from these latter position on June 18, 1997.

[*7] On November 13, 1997, NeoSoft filed C.A. No. 16,036 against IOTEX for failure to make payments as required by the License Agreement. On December 10, 1997, Maag, as a stockholder of IOTEX, filed C.A. No. 16082, a derivative suit on behalf of IOTEX against Friedli, alleged to be the sole director of IOTEX, Taher Behbehani, the former CEO of IOTEX, and ioWave, alleging that they wrongfully transferred the business of IOTEX to ioWave. In response, IOTEX brought five counterclaims against Maag, alleging essentially the same claims it set forth in its July 18, 1997 complaint against Defries, Bayendor and Iota.

II. DISCUSSION

A. Standard

A claim will be dismissed where it fails to allege facts that entitle plaintiff to relief. See Ch. Ct. R. 12(b)(6); Rabkin v. Philip A. Hunt Chem. Corp., Del. Supr., 498 A.2d 1099, 1104 (1985). In evaluating a motion to dismiss, the allegations of fact must be construed in the light most favorable to the plaintiff and all well-

pleaded facts must be accepted as true. *In re Tri-Star Pictures, Inc., Lit., Del. Supr., 634 A.2d 319, 326 (1993).* Conclusions "will not be accepted as true without specific allegations of fact to support them." [*8] *Id.*

Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this Court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." *Atlantis Plastics Corp. v. Sammons, Del. Ch., 558 A.2d 1062, 1066 (1989)* (citing Court of Chancery Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The particularity requirements will be met where the complaint "specifies the time, place, speaker, and sometimes even the content of the alleged misrepresentations. . . ." *Luce v. Edelstein, 2d Cir., 802 F.2d 49, 54 (1986).*

B. The Maag Motion

In the counterclaim filed in C.A. No. 16082, IOTEX alleges that Maag (plaintiff in that derivative action), together with Defries, Bayendor, Iota and NeoSoft "devised, agreed upon and pursued a scheme" to defraud IOTEX and its stockholders that has resulted in a loss of over $ 5.2 million and forced IOTEX to abandon its operations. IOTEX alleges that Maag and the others fraudulently induced IOTEX to "(i) incur significant expenses in becoming a newly created [*9] entity to invest funds in connection with the Technology, (ii) realize substantial costs in negotiating and entering into the License Agreement with NeoSoft and the Project Management Agreement with Iota, and operating as an ongoing entity, and (iii) raise funds from individual investors and forward an amount greater that $ 5.2 million to Iota in accordance with the terms of the Budget." IOTEX's Answering Br. at 12 (citations omitted). IOTEX also alleges that monies contributed by IOTEX according to the Agreements have been misappropriated by various individuals associated with Iota and NeoSoft, including, "possibly" Maag.

In his Motion to Dismiss, Maag attacks each of the five counterclaim allegations alleged by IOTEX, which are: (1) breach of fiduciary duty, (2) breach of duty of disclosure, (3) aiding and abetting breach of another's fiduciary duty, (4) common law fraud and (5) civil conspiracy. I will address allegations (1), (2) and (3) together and will do the same for allegations (4) and (5).

1. Breach of Fiduciary Duty, Duty of Disclosure and Aiding and Abetting Breach of Fiduciary Duty

IOTEX claims Maag breached his fiduciary duties, owed in his capacity as an IOTEX [*10] director, by allowing IOTEX to negotiate and enter into the Agreements and further, to invest funds over the course of performance of the Project Management Agreement, *knowing* that NeoSoft and Iota "would not satisfy their respective contractual obligations" and would use the Agreements to "fraudulently induce IOTEX to forward funds to Iota," and in failing to inform the IOTEX board of directors of this knowledge. [4] Further, IOTEX claims that Maag aided and abetted a breach of Defries' fiduciary duties, owed by Defries in his capacity as an IOTEX director, by failing to prevent Defries from "causing and permitting" IOTEX to enter into the Agreements, when Maag *knew* that Iota and NeoSoft would not meet their contractual obligations. [5] In support of these claims, IOTEX alleges with particularity the following: (1) Maag was a director of IOTEX during the negotiation of the Agreements (but had resigned before the Agreements were approved), (2) Maag was a director of NeoSoft during the negotiation of the Agreements, (3) Maag was associated with Defries and (4) Iota, it is alleged, breached the Project Management Agreement.

4 For the purpose of this motion, I accept as true IOTEX's averment that Maag was a director of IOTEX between July and October 1994. I do note, however, that this is a disputed fact.

[*11]

5 IOTEX contends that Maag's actions must be evaluated under the entire fairness standard, since he was a director of both IOTEX and NeoSoft between July 22, 1994 and October 24, 1994, the period in which the Agreements were negotiated. I do not reach this issue, as I find IOTEX's claims are not adequately substantiated by specific allegations of fact.

Thus, a central element of the claims against Maag for breach of fiduciary duty rests on the general allegation that he "knew" as a "fact" (and failed to disclose) something about the state of mind of Defries and others during the period of negotiation of the Agreements. The "fact" that he is alleged to have known is not itself alleged with particularity but, rather, as a conclusion based on events which transpired during the course of performance of the Project Management Agreement. There are also no allegations of fact that Maag played any substantial role in the negotiation or execution of the Agreements, as a director of IOTEX or otherwise. [6] Finally, there is no allegation that he profited from the alleged misapplication of the development [*12] funds. The best IOTEX is able to say is that funds were transferred to a Swiss bank where it is "possible" that Maag has an account.

6 IOTEX's only claim of Maag's participation in the negotiation or approval of the Agreements is made by reference to an October 27, 1994 letter from Defries, on behalf of Iota, addressed to

Maag, which states: "Enclosed find three copies of the Project Management Agreement that we have signed on behalf of Iota Inc. Please have Peter Friedli sign and date yellow tabs where indicated on behalf of [IOTEX] retaining one copy for your records and returning one copy to us for our files." Of course, IOTEX concedes that Maag resigned as an IOTEX director on October 24, 1994. Moreover, it makes no allegation of fact that Maag either obtained Friedli's signature or otherwise participated in securing IOTEX's approval of the Project Management Agreement.

While recognizing that Court of Chancery Rule 9(b) provides that "knowledge . . . may be averred generally," where pleading a claim [*13] of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. IOTEX contends the scant well-pleaded facts in its counterclaim support the conclusion that Maag knew that Defries and Iota were not acting in good faith in negotiating the Agreements. I cannot agree. Speculative conclusions unsupported by fact do not allege breaches of fiduciary duty. *See In re Tri-Star, Del. Supr., 634 A.2d at 326* (conclusions "will not be accepted as true without specific allegations of fact to support them."). For the same reasons, I reject IOTEX's argument that Maag aided and abetted Defries alleged breach of duty.

My decision in this regard is premised importantly on the general rule of law that one cannot "bootstrap" a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations. *See* discussion pages 11 to 12, *infra.* The same considerations lead me to conclude that one cannot, ordinarily, [*14] premise a claim for breach of fiduciary duty on the assertion that a director knew and failed to disclose that a party negotiating a contractual arrangement with the corporation did not intend to perform its obligations under the contract. I do recognize that there are rare circumstances in which this general rule should not apply. This is not one of them. Here, there is no allegation that the Technology was not valuable at the time the Agreements were executed. Indeed, it is alleged that Defries had been working on the Technology for some years and it is clear from the positions of the parties that they all regard the Technology as having substantial value. There also is no allegation that Iota failed to begin its performance under the Project Management Agreement and continue rendering some performance for more than a year. In short, despite the conclusory allegations of fraud and breach of fiduciary duty, the dispute between the parties is essentially one for breach of contract, and the well-pleaded facts alleged in that regard do not support the inference that Defries and Iota did not intend to perform the Agreements. In the circumstances, the claims for breach of fiduciary duty [*15] against Maag must be dismissed.

2. Fraud and Conspiracy to Commit Fraud

IOTEX's final two counterclaim allegations contend that Maag committed fraud and conspired to commit fraud. Again, these charges are predicated on the allegations that Maag *knew* that Defries and Iota did not intend to meet their contractual obligations and were "merely using the [Agreements] to fraudulently induce IOTEX to forward funds to Iota." In failing to disclose this *knowledge,* IOTEX argues, Maag participated in a scheme to defraud IOTEX, as it "would not have expended the time and resources negotiating, entering into and satisfying its obligations under the [Agreements] had it been aware of the actual intent of NeoSoft, Iota, Defries and Maag." Further, IOTEX argues that Maag's knowledge and participation in the scheme to defraud IOTEX makes him liable as a conspirator for any other wrongful acts committed in furtherance of the conspiracy.

Under New York law, [7] a scheme to defraud is shown where the complaint asserts facts that demonstrate: (1) a scheme, (2) involving defendants (3) directed against the interests of plaintiffs and (4) defendant's conduct in connection with the scheme. [*16] *See Shearson Lehman Bros. Inc. v. Bagley, N.Y. App. Div., 205 A.D.2d 467, 614 N.Y.S.2d 5, 6 (1994).* Fraudulent misrepresentation is shown where facts are alleged that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 2d Cir., 57 F.3d 146, 153 (1995).* The courts have noted that "it is almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge of the party against whom the (fraud) is being asserted." *CPC Int'l Inc. v. McKesson Corp., N.Y., 70 N.Y.2d 268, 519 N.Y.S.2d 804, 812, 514 N.E.2d 116 (1987)* (quoting *Jered Contracting Corp. v. New York City Transit Auth., N.Y., 22 N.Y.2d 187, 292 N.Y.S.2d 98, 104, 239 N.E.2d 197 (1968)).* However, a complaint must "allege the misconduct complained of in sufficient detail to inform the defendants of the substance of the claims." *Bernstein v. Kelso & Co., Inc., N.Y. App. Div., 231 A.D.2d 314,* [*17] *659 N.Y.S.2d 276, 280 (1997).*

7    The parties are in agreement that New York law governs these claims for fraud.

IOTEX's fraud claims suffer from the same defect as its breach of fiduciary duty claims. Moreover, IOTEX has failed to allege sufficient facts to establish that, even if there was fraud, Maag participated in it. *See In re Tri-Star, Del. Supr., 634 A.2d at 326* (Conclusions "will not be accepted as true without specific allegations of fact to support them.").

IOTEX does allege the elements of a claim for breach of contract against Iota. That claim, however, cannot be "bootstrapped" into a fraud claim merely by adding the words "fraudulently induced" or alleging that the contracting parties never intended to perform. *See Dann v. Chrysler Corp., Del. Ch., 40 Del. Ch. 103, 174 A.2d 696, 700 (1961)* ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

New York law is decisively [*18] to the same effect: "It is well settled under New York law that 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.'" *International CableTel Inc. v. Le Groupe Videotron LTEE, S.D.N.Y., 978 F. Supp. 483, 486 (1997)* (quoting *Rocanova v. Equitable Life Assurance Soc'y of the U.S., N.Y., 83 N.Y.2d 603, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940 (1994)).* New York law does recognize that a promise made "with a preconceived and undisclosed intention" of non-performance "constitutes a misrepresentation of a 'material existing fact.'" *978 F. Supp. at 487* (quoting *Sabo v. Delman, N.Y., 3 N.Y.2d 155, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906 (1957).* Nevertheless, this rule is limited by the requirement that "a false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties." *Id.* IOTEX has alleged no facts showing that Maag was aware or participated in a "false promise" that was "collateral or extraneous" to the terms of the Agreements. On the contrary, the false promise alleged by IOTEX [*19] goes to the heart of the Agreements. Therefore, I do not find IOTEX to have met the requirements for pleading a fraud claim where, as is true here, the underlying action is for breach of contract.

Since I find IOTEX has failed to meet the pleading requirements for fraud, I need not address the conspiracy claim, as there is no underlying independent claim of fraud sufficient to withstand a motion to dismiss. *See Demalco Ltd. v. Feltner, S.D.N.Y, 588 F. Supp. 1277, 1278 (1984)* ("It is well settled in New York that 'civil conspiracy to commit fraud, standing alone, is not actionable.' Instead, the gravamen of a claim of conspiracy is the underlying independent tort, and if the independent tort has not been adequately pleaded, the conspiracy claim will also fail." (quoting *Cullen v. BMW of North*

*Am., Inc., E.D.N.Y., 490 F. Supp. 249, 254 (1980)* and citing *Danahy v. Meese, N.Y. App. Div., 84 A.D.2d 670, 446 N.Y.S.2d 611, 614 (1981))).*

B. The Bayendor Motion

The complaint in C.A. No. 15817 was served on Bayendor in the manner described in *10 Del. C. § 3114,* the Delaware director service statute. Apparently, IO-TEX relied on that statute due to Bayendor's status as [*20] a director of Iota, his codefendant. On August 19, 1997, Bayendor moved to dismiss for lack of personal jurisdiction and insufficiency of service of process, contending that *Section 3114* was unavailable for use by IOTEX as its complaint was unrelated to Bayendor's fiduciary duties to Iota. In response, IOTEX served Bayendor again, this time under *10 Del. C. § 3104,* the general long-arm service statute, and directed certain discovery at him in connection with his motion to dismiss. On November 21, 1997, IOTEX filed an amended complaint that added claims against Bayendor for civil conspiracy and violations of the federal Racketeer Influenced and Corrupt Organization Act ("RICO"). That amended complaint was served in reliance on *Section 3104.*

As a result of the briefing on Bayendor's motion, the issue has narrowed to whether or not IOTEX is entitled to rely on the "civil conspiracy" theory of personal jurisdictional to obtain jurisdiction over Bayendor in Delaware. That is, I understand IOTEX fairly to concede that *Section 3114* has no application to its claim and that no other head of jurisdiction under *Section 3104* is available in this case.

The civil conspiracy theory of personal [*21] jurisdiction was recognized by the Delaware Supreme Court in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Del. Supr., 449 A.2d 210, 225 (1982),* but, because it affords "an easy technique to evade the thrust of the International Shoe holding," it has been narrowly construed by this Court. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140, *38, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995).* In *Istituto Bancario,* the Supreme Court surveyed the law from other jurisdictions regarding the conspiracy theory of jurisdiction and determined to adopt what it characterized as the "strict test" requiring a plaintiff to satisfy each of five elements:

(1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside

the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario,* [*22] *Del. Supr., 449 A.2d at 225.* While not conceding the existence of elements (1) and (2), Bayendor's argument focuses on the final three elements, and in particular on the absence of any allegation of an act or effect in Delaware in furtherance of the alleged conspiracy.

IOTEX cites three matters that it characterizes as "substantial acts and effects in the State of Delaware." None of these bear analysis.

IOTEX argues that the "principal effect involving Delaware" was "the use of a Delaware corporation -- Iota -- as the vehicle through which the fraud was committed." Mere use of a Delaware corporate entity in connection with a civil conspiracy has never been held to satisfy this element of the *Istituto Bancario* test. In support of this position, IOTEX cites to *Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd., Del. Supr., 611 A.2d 476 (1992); Istituto Bancario, Del. Supr., 449 A.2d 210;* and *Macklowe v. Planet Hollywood, Inc., 1994 Del. Ch. LEXIS 179,* Del. Ch., C.A. No. 13689, Steele, V.C. (Oct. 13, 1994). I do not read any of these cases to hold that "use" of a Delaware corporation in furtherance of a civil conspiracy can alone be found to have a substantial effect in Delaware sufficient [*23] to satisfy the "strict" test of *Istituto Bancario.* In *Hercules,* of course, the plaintiff corporation was headquartered in Delaware. *Hercules, Del. Supr., 611 A.2d at 478.* Thus, the effect of the conspiracy was actually felt in this State. In *Istituto Bancario,* a substantial act in furtherance of the civil conspiracy -- the filing of a certificate of amendment with the Delaware Secretary of State authorizing the issuance of the shares there in question -- actually took place in the Delaware. *Istituto Bancario, Del. Supr., 449 A.2d at 226-27.*

*Macklowe* held that personal jurisdiction over a Florida limited partnership could be obtained in Delaware by service on its Delaware incorporated general partner. *Macklowe, Del. Ch., C.A. No. 13689,* slip op. at 11. This result was followed by Chancellor Allen in *Carlton* in relation to a New York limited partnership. *Carlton Invs., Del. Ch., C.A. No. 13950,* slip op. at 27. Moreover, while *Macklowe* also discusses the applicability of the civil conspiracy of jurisdiction, nothing in that opinion suggests that persons affiliated with a Delaware corporation who are alleged to "use" that corporation to the [*24] injury of a third party by actions wholly outside of Delaware thereby subject themselves to the juris-

diction of our courts. *Macklowe,* Del. Ch., C.A. No. 13689, slip op. at 14-17.

The second and third arguments are that Defries' alleged breach of his fiduciary duties as one of IOTEX's directors caused a "substantial effect" in Delaware simply by virtue of IOTEX's incorporation in this State and that Bayendor's alleged breach of fiduciary while he was President of IOTEX's predecessor (Iotel, Inc.) caused injury in this State. Indeed, IOTEX goes so far as to describe Bayendor's alleged breach of fiduciary (which is not alleged to have happened physically in Delaware) as an "additional act in Delaware [that] supports the assertion of jurisdiction here." These alleged "effects" add nothing to the analysis because they have only a metaphysical connection with this jurisdiction. In my judgment, as a general rule, in the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused injury to the corporation by actions wholly outside this States will not satisfy the requirement found in the Supreme Court's opinion in [*25] *Istituto Bancario* of a "substantial effect . . . in the forum state. *Istituto Bancario, Del. Supr., 449 A.2d at 225.*

For these reasons, I conclude that IOTEX cannot satisfy elements (3), (4) or (5) of the *Istituto Bancario* test for the assertion of personal jurisdiction over persons alleged to be participants in a civil conspiracy. Thus, service under *10 Del. C. § 3104* was improper and the amended complaint must be dismissed as to defendant Bayendor.

C. Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief (RICO) [8]

8   Since I have dismissed the amended complaint as it pertains to defendant Bayendor, my discussion of the RICO claim applies only to defendant Defries.

In the amended complaint in C.A. No. 15817, IOTEX alleges that Defries and Bayendor engaged in a pattern of racketeering activity in violation of RICO. Specifically, Defries and Bayendor are alleged to have schemed (through Iota) "to defraud (among others) IOTEX and its stockholders of approximately [$ 5.2 million] [*26] and in devising, agreeing upon and pursuing such scheme to have: (i) misappropriated the approximately $ 5.2 million that IOTEX invested in connection with the Technology, (ii) forced IOTEX to abandon its operations, (iii) forced IOTEX to defend itself -- and expend significant funds -- in a recent action concerning the Technology brought against IOTEX by a former employee of Iota, and (iv) forced IOTEX to defend itself in connection with the unmeritorious counterclaim brought by Iota, and in the unmeritorious claims brought by an-

other entity (Neosoft, A.G.) and individual (Urs Maag) controlled by Defries and Bayendor." IOTEX's Answering Br. at 3-4.

The RICO statute provides for civil damages for any person or entity injured in his, her or its business or property by reason of a violation of *18 U.S.C. § 1962. See 18 U.S.C. § 1964(c)*. The statute is violated where the injured party demonstrates that defendants are engaged in a "pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*. A pattern is defined as "requiring 'at least two acts of racketeering activity within a ten year [*27] period.'" *Tabas v. Tabas, 3d Cir., 47 F.3d 1280, 1290 (1995)* (quoting *18 U.S.C. § 1961(5)*). Racketeering activity is defined as, *inter alia*, any act that is indictable under *18 U.S.C. § 1961(1)*, and includes wire fraud and mail fraud, the specific acts alleged to have occurred by IOTEX. *See 18 U.S.C. §§ 1341* (mail), 1343 (wire), 1961(1)(B) (definition); *Tabas, 47 F.3d at 1290.*

Courts have held that a "pattern of racketeering activity" is shown where the plaintiff has alleged two or more acts of an indictable offense and further shown "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." [9] *H.J. Inc., 492 U.S. at 239*. "Predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Tabas, 47 F.3d at 1292* (quoting *H.J. Inc., 492 U.S. at 240*). Continued criminal activity, i.e., continuity, may be one of two types: closed-end, referring to "a closed period of repeated conduct"; or open-ended, referring to "past conduct that by [*28] its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc., 492 U.S. at 241*). Analysis of either of the two types is temporal, so "a party may establish continuity as a closed-ended concept by 'proving series of related predicates extending over a substantial period of time.'" *Id.* (quoting *H.J. Inc., 492 U.S. at 242*).

    9  The pleading requirements to allege a violation of RICO are the same as previously discussed, see *1998 Del. Ch. LEXIS 236* at *8.

IOTEX contends that both items necessary to establish a pattern of racketeering activity have been met; pointing first to Defries and Bayendor's allegedly false statements made during the IOTEX/Iota negotiations concerning the Project Management Agreement and to Iota's allegedly false status reports as the related predicate acts; and second, to the fact that the conduct "intended to defraud IOTEX had occurred over several years, continues through the present, and represents the

normal course of doing business for defendant Defries and [*29] defendant Bayendor," as evidence of a continued threat of criminal activity.

In addressing IOTEX's argument, I focus on the latter aspect of the United States Supreme Court's RICO analysis, that the defendants' acts "amount to or pose a threat of continued criminal activity." *H.J. Inc., 492 U.S. at 239*. [10] IOTEX argues that both types of continuing criminal activity (open-ended and closed-ended) are present in the instant case.

    10  Defendants apparently concede that IOTEX has plead sufficiently to meet the requirement that "the racketeering predicates are related," as they do not address this aspect of the *H.J. Inc.* test in their brief. *See H.J. Inc., 492 U.S. at 239.*

Defendants contend that the allegedly criminal activities (if at all) could in no event have lasted past February 1996 (the last date that IOTEX made payments to Iota) thereby making an open-ended analysis inapplicable. In response, IOTEX cites three events alleged to meet the open-ended standard: (1) Iota's assertion of contract [*30] claims in this Court, (2) Iota's alleged refusal to provide an accounting of the funds IOTEX has paid to Iota and (3) Defries alleged grant of an option in IOTEX stock to a former Iota employee. [11] In my judgment, these mere conclusory allegations do not evidence continuing fraudulent conduct and require no further discussion. *See Continental Realty Corp. v. J.C. Penney Co., Inc., S.D.N.Y., 729 F. Supp. 1452, 1455 (1990)* ("[The plaintiff's] conclusory allegations fail to satisfy *Fed. R. Civ. P. 9(b)*'s requirement that averments of fraud be stated with particularity and therefore cannot be relied upon to demonstrate a continuing pattern of fraudulent acts.").

    11  The option arises out of a Separation Agreement between Iota and Andrew Denis, which grants Denis the choice of either, "shares equal and equivalent to two hundred and fifty shares of Series A Preferred Stock in Iota, or:

        b) Shares in IOTEX, Incorporated equal and equivalent to that percentage as may be represented by the like number and proportion of shares issued in Iota pursuant to paragraph 6.C.a above when calculated against the IOTEX shares which Iota or its associates may hold or control following the initial public offering of IOTEX as such offering is defined by the Securities and Exchange Commission.

Defendants argue persuasively that the quoted provision obligates only Iota (and not IOTEX) to perform and, in any event, relates to shares of IOTEX owned or to be owned by Iota.

[*31]  In the alternative, IOTEX contends that defendants' actions have met the closed-ended requirement of continuing criminal activity, i.e., a "series of related predicates extending over a substantial period of time." *H.J. Inc., 492 U.S. at 242.* In making this determination, courts look to a number of factors, which can include: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the number of schemes involved and the occurrence of distinct injuries. *Vicom, Inc. v. Harbridge Merchant Services, 7th Cir., 20 F.3d 771, 781-82* "(1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity." (citing *Barticheck v. Fidelity Union Bank/First Nat'l State, 3d Cir., 832 F.2d 36 (1987)))*.

IOTEX relies primarily on the Third Circuit's decision in *Tabas* as support for its argument. In *Tabas,* the plaintiff alleged that two brothers formed a partnership to conduct real estate and other business ventures. *47 F.3d at 1282.* In the event of the death [*32] of either partner, the partnership agreement provided that the surviving partner would distribute partnership income jointly to himself and the estate of the deceased partner. *Id.* One of the partners died, and the surviving partner began making partnership income payments to the deceased partner's estate. *Id.*

Some years thereafter, the estate filed a civil RICO claim, alleging misappropriation based on its contention that the surviving partner was not allocating an equal share to the deceased partner's estate, in violation of the partnership agreement. *Id. at 1282-83.* The Third Circuit agreed, reversing the district court and finding that the RICO continuity requirement was satisfied. *Id. at 1281.* In its assessment of whether or not continuing criminal activity was shown, the Court focused on "the duration of the underlying scheme," noting that plaintiffs had provided evidence tending to show that the alleged acts of mail fraud began on November 10, 1987 and ended in July 1991, a period of three and a half years. *Id. at 1294.* The Court found a three and a half year period constituted a "substantial" period of time, and comported with the type of "long-term criminal [*33] conduct that RICO was enacted to address." *Id.* [12]

12  IOTEX makes further argument as evidence of the applicability of the closed-ended type by contending that defendants' criminal conduct "began on or before July 20, 1994 (the date IOTEX was formed for the sole purpose of investing capital in connection with the Technology)". Even if this were true, the resulting period is still substantially shorter than that addressed in *Tabas,* and the multi-factor analysis would lead me to conclude that the element of continuity is not present.

*Tabas* is distinguishable from the instant case. While *Tabas* involved conduct occurring over a three and a half year period, the activities here lasted only 15 months, a decidedly shorter period, and one that, alone, will not satisfy the RICO continuity requirement. *See Vemco, Inc. v. Camardella, 3d Cir., 23 F.3d 129, 135 (1994)* ("We cannot conclude that [defendant's] alleged actions here, involving a single victim and single scheme for a single purpose over [*34] seventeen months, constitute the type of 'long-term criminal conduct' Congress sought to prohibit with RICO." (quoting *H.J. Inc., 492 U.S. at 241-42)*). The other factors identified in the case law lead me to conclude that the RICO claim is not properly plead.

First, the predicate acts that IOTEX rely on all arise out of or are related to the same transaction, the Project Management Agreement. This Agreement required periodic status reports and such reports, while independent of each other, were all dependent on and related to the Agreement. Common sense, which the Supreme Court mandates be used in a RICO analysis, requires a finding that these reports are not separate predicate acts as contemplated by the RICO statute, but are mutually dependent on the Agreement. *See H.J. Inc., 492 U.S. at 241* (promulgating an approach to analyzing the continuity requirement that is based on a "common sense, everyday understanding of RICO's language and Congress' gloss on it"). As one court has stated, "courts must take care to ensure that the plaintiff is not artificially fragmenting a single act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Andy Warhol,* [*35] *2d Cir., 119 F.3d 91, 98 (1997).* [13]

13  This same analysis applies to the other predicate acts attacked by IOTEX, that the defendants made fraudulent communications during the negotiation of the Project Management Agreement that led to IOTEX's payments to Iota. These payments were directly related to the Budget and are an integral part of the Project Management Agreement. They cannot be segmented to create the predicate acts necessary to meet the RICO continuity requirement.

Second, notwithstanding IOTEX's footnote argument to the contrary, the predicate acts allegedly injure

1998 Del. Ch. LEXIS 236, *

only one party, IOTEX itself. IOTEX contends that in addition to itself, allegedly injured by defendants' misappropriation of its funds and fraudulent status reports, its stockholders have also been injured, since the corporation was formed specifically for the purpose of investing in the Technology and by misappropriating funds paid by IOTEX to Iota for the Technology, the defendants injured the stockholders investing in IOTEX. I reject [*36] this argument because it would require me to disregard the existence of IOTEX as a legal entity. IOTEX alone experiences any effect of defendants' allegedly fraudulent acts. The shareholders do not suffer any injury separate from or unrelated to that alleged to be experienced by IOTEX. *See Kramer v. Western Pac. Indus., Inc., Del. Supr., 546 A.2d 348, 351 (1988)* (by analogy in derivative standing cases, "plaintiff must allege more than an injury resulting from a wrong to the corporation").

Lastly, the alleged injury itself is a single injury. If defendants, through Iota, did breach the Project Management Agreement by sending false status reports and not complying with the Budget's directives regarding the allocation of the IOTEX funds, then the end result of Iota's noncompliance is a single injury to IOTEX, not multiple injuries based on each allegedly fraudulent communication. To find otherwise would fragment the Project Management Agreement, which is contrary to law and common sense.

For all of the foregoing reasons, I find that IOTEX has failed to meet the continuity requirement necessary to show a pattern of racketeering activity under the RICO statute. Therefore, defendant [*37] Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief are hereby granted. [14]

> 14  Having reached this conclusion, I do not address Defries' argument that the consent to jurisdiction under *10 Del. C. § 3114* is not broad enough to subject him to the personal jurisdiction of this Court for the purpose of adjudicating the RICO claim.

### III. CONCLUSION

For all of the foregoing reasons, the motions to dismiss addressed in this Memorandum Opinion, i.e., (1) Urs Maag's Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted (C.A. No. 16082), (2) David Bayendor's Motion to Dismiss for Lack of Personal Jurisdiction (C.A. No. 15817), and (3) Anthony Defries and David Bayendor's Motions to Dismiss the Eighth Claim for Relief (C.A. No. 15817), are all GRANTED. IT IS SO ORDERED.

Stephen P. Lamb

Vice Chancellor

# EXHIBIT

# 4

**SHADOWBOX PICTURES, LLC et al. v. GLOBAL ENTERPRISES, INC. et al.**

**CIVIL ACTION NO. 05-2284**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 6435*

**February 7, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion granted by *Shadowbox Pictures, LLC v. Global Enters., Inc., 2006 U.S. Dist. LEXIS 64943 (E.D. Pa., Aug. 22, 2006)*

**PRIOR HISTORY:** *Shadowbox Pictures, LLC v. Global Enters., Inc., 2006 U.S. Dist. LEXIS 1135 (E.D. Pa., Jan. 11, 2006)*

**COUNSEL:** [*1] For SHADOWBOX PICTURES, LLC, LAST CONSPIRACY, LLC, Plaintiffs: PHILIP A. YAMPOLSKY, NARBERTH, PA.

For TESSLER, RUBIN & CO., ALAN K. RUBIN, CPA, Defendants: MARC L. GELMAN, JENNINGS SIGMOND, PHILADELPHIA, PA.

For STRATEGIC SECURITIES, LLC, WILLIAM J. LEYTON, Defendants: FREDERICK A. TECCE, ANTHONY J. DIMARINO, III, MCSHEA TECCE, P.C., PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION**

***ORDER - MEMORANDUM***

**Padova, J.**

AND NOW, this 7th day of February, 2006, upon consideration of Defendants Strategic Securities, LLC's and William J. Leyton's "Motion to Dismiss Plaintiffs' Complaint Pursuant to *Fed. R. Civ. P. 12(b)(2)*" (Docket No. 35), and the Plaintiffs' responses in opposition thereto, **IT IS HEREBY ORDERED** that said Motion is **DENIED.**

Plaintiffs Shadowbox Pictures, LLC and Last Conspiracy, LLC, both Pennsylvania limited liability companies wholly owned by Kenneth Barbet and operating from the same address, were co-producers on a film project, a thriller entitled *Last Conspiracy* (hereinafter "the Motion Picture"). They have brought this action against Defendants Global Enterprises, [*2] Inc. ("Global") and its president, Anthony Stroup; Tessler, Rubin & Co. ("Tessler Rubin") and one of its partners, Alan Rubin, CPA; and Strategic Securities, Inc. ("Strategic") and its president and sole employee, William Leyton, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1961-68 (2000)*, and pendent state law claims for breach of contract, conversion, common law fraud, and unjust enrichment. Plaintiffs contend they were victimized in a funding scheme, designed to defraud them out of $ 250,000, and that William Leyton and his financial services firm, Strategic, ("Moving Defendants") sent communications to Plaintiffs that were incident to the essential success of the alleged RICO conspiracy.

The present litigation arises from the following circumstances. In October 2003, Anthony Stroup represented to Kenneth Barbet that Global, a Delaware corporation, would fund the Motion Picture if Kenneth Barbet or Shadowbox posted 20% of the film's 1.25 million dollar budget as collateral. (Barbet Aff. PP6-7.) Global then sent to Plaintiffs in Pennsylvania a Motion Picture Financing Agreement ("MPFA") and related Custody Instructions [*3] Agreement ("CIA"), which incorporated the MPFA. (Barbet Aff. P15.) The MPFA

stated that Tessler Rubin, a California corporation, and its approved principal, Alan Rubin, would be the custodial agents of the bank account into which the loan proceeds and the collateral were to be deposited, and that they would manage the custodial account in accordance with the CIA. (Compl. Ex. A, MPFA P5.) Shadowbox entered into the MPFA with Global, and into the CIA with Global and Tessler Rubin, in December 2003, by means of facsimile transmission to Plaintiffs' Pennsylvania office. (Compl. P18; Barbet Aff. P15.) In January 2004, Tessler Rubin took custody via interstate wire transmission of Plaintiffs' $ 250,000 in collateral. (Compl. P24; Barbet Aff. P16.) Throughout February and March, Global made a series of excuses as to why it could not fully fund the account. (Compl. PP27, 29.) In April 2004, Kenneth Barbet requested that Alan Rubin confirm the collateral was still on deposit in the custodial account. (Comp. P31; Barbet Aff. P26.) Alan Rubin did not initially respond. (Barbet Aff. P26.) Plaintiffs demanded verification of the funds on deposit from Anthony Stroup at Global. (Compl. P36; *id.* [*4] ) Global replied that Tessler Rubin would have to be replaced as the custodial agent and named Strategic and William Leyton as the new custodial agents. (*Id.*) Anthony Stroup and Alan Rubin then advised Plaintiffs that the funds in the custodial account had been transferred to Strategic. (Barbet Aff. P27.) Unbeknownst to Plaintiffs, by that time, Alan Rubin had already distributed $ 247,400 of Plaintiffs' collateral to Global as financing fees without Global actually having provided any financing. (Compl. P34; Barbet Aff. P31.)

On May 21, 2004, William Leyton forwarded Plaintiffs an electronic statement of account, which represented that non-party Strategic Capital Investments, LLC, a company that operates as a financial advisor and of which William Leyton is also president and sole employee, held a letter of credit for Global in the amount of $ 500,000 in the name of the Motion Picture. (Compl. Ex. J; Barbet Aff. P28.) On June 2, 2004, Plaintiffs, operating through counsel, contacted William Leyton to inquire further into the status of their funding. (Compl. P46.) William Leyton sent an email in reply, indicating only that Plaintiffs' project was part of "a very complex financial [*5] infrastructure that moves according to very controlled paths and schedules which Mr. Stroup has no control over" and that Strategic "was moving diligently toward a mutual goal of closing the project. . . ." (Compl. Ex. F.) On June 11, 2004, William Leyton informed Plaintiffs via telephone that either Global would provide

the financing sought by Plaintiffs or Strategic would find another investor to fund the Motion Picture. (Compl. P124.) By June 21, 2004, Anthony Stroup's email was inactive and he was not returning telephone calls. (Compl. P48.) William Leyton falsely assured Plaintiffs via telephone that their collateral was secure and suggested that Plaintiffs contact Hill Crest Capital Resource, Ltd. as an alternate source of funding; Hill Crest ultimately decided not to make an offer. (Compl. PP51, 124.) In July 2004, Anthony Stroup finally informed Plaintiffs that no funding would take place. (Compl. P52.) By letter dated July 7, 2004, Anthony Stroup wrote to William Leyton requesting that he liquidate the custodial account and transfer $ 250,000 to Plaintiffs. (*Id.*) William Leyton then told Plaintiffs that he was not holding any funds designated for the Motion Picture and [*6] that while he had received a letter of credit from an associate of Anthony Stroup, it was for an unrelated project. (Compl. PP54-55, 124; Barbet Aff. P30.) Strategic confirmed that information in a facsimile transmission dated August 10, 2004. (Compl. P124.) As of the date of the Complaint, no portion of Plaintiffs' money had been returned and the Motion Picture had not been produced. (Barbet Aff. P32.) Plaintiffs contend that Moving Defendants' actions were pivotal in obscuring from them the fact that their collateral had been converted and in persuading them to delay seeking the return of their collateral, thereby enabling the disappearance of the money.

Moving Defendants argue that the Court does not have personal jurisdiction over them because they were not purposely directed their activities towards Pennsylvania. However, a district court has jurisdiction to entertain a civil RICO claim where personal jurisdiction based on minimum contacts is first established as to at least one defendant. *Pelullo v. Nat'l Union Fire Ins. Co., 2004 U.S. Dist. LEXIS 9138, Civ. A. No. 00-5647, 2004 WL 1102782, at *11 (E.D. Pa. May 17, 2004), aff'd 131 Fed. Appx. 864 (3d Cir. 2005).* "Once [*7] minimum contacts is established as to at least one defendant, the nationwide service of process provision of *18 U.S.C. § 1965(b)* enables a plaintiff to bring before a single court all members of a RICO conspiracy." *Id. See also PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 71 (2d Cir. 1998); Butcher's Union Local No. 498 v. SDC Investment, Inc., 788 F.2d 535, 539 (9th Cir. 1986)* (adopting this approach).

Plaintiffs have named Tessler Rubin as a Defendant

2006 U.S. Dist. LEXIS 6435, *7

in this action, and in an Order and Memorandum dated January 12, 2006, the Court found that Tessler Rubin has the minimum contacts with Pennsylvania necessary for the exercise of personal jurisdiction in this case. (Docket No. 37.) Moving Defendants were validly served pursuant to *18 U.S.C. § 1965(d).* [1] Thus, the Court holds that it also has jurisdiction over Moving Defendants with respect to Plaintiffs' RICO claims. [2] Moreover, since the state law claims Plaintiffs assert against Moving Defendants arise from a common nucleus of operative facts as the RICO claims, the Court concludes that it has pendent jurisdiction over the state claims [*8] and personal jurisdiction over Moving Defendants with regards to them. *Am. Trade Partners, L.P. v. A-1 Int'l Importing Enters., Ltd., 757 F. Supp. 545, 556 (E.D. Pa. 1991)* (finding that district court has jurisdiction over state law claims that were pendent to RICO claims and personal jurisdiction over the defendant against whom the claims were asserted); *see also ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 628-29 (4th Cir. 1997)* (recognizing that district court, which had obtained personal jurisdiction over a defendant by reason of the RICO statute, could adjudicate related state claims).

1  *18 U.S.C. 1965(d)* says: "All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Plaintiffs forwarded a copy of their Summons and Complaint to Moving Defendants by certified mail in California, where William Leyton is a resident, and counsel for Moving Defendants executed an Acknowledgment of Service.

[*9]

2  Moving Defendants argue that the exercise of personal jurisdiction over them would not satisfy *Fifth Amendment* due process requirements. Moving Defendants emphasize that they have no presence in Pennsylvania but are based in Wyoming and California and that defending suit in Pennsylvania would, therefore, create an undue burden in terms of time and monetary expense. The hardship asserted by Moving Defendants does not rise to the level of unreasonableness for constitutional purposes. *See Leonard A. Feinberg, Inc. v. Central Asia Capital, 936 F. Supp. 250, 258-59 (E.D. Pa. 1996)* (requiring defendant to submit to jurisdiction even though all witnesses

and evidence were located thirteen time zones away in Hong Kong).

Moving Defendants argue that, even if the Court has personal jurisdiction over Strategic, the corporate shield doctrine means there is no basis for the exercise of personal jurisdiction over William Leyton. Under the corporate shield doctrine, "the actions of corporate employees and officers that are conducted within their corporate capacity do not constitute contacts [*10] with the forum that support jurisdiction over them." *Perry v. Markman Capital Mgmt., 2002 U.S. Dist. LEXIS 19103, Civ. A. No. 02-744, 2002 WL 31248038, at \*4 (E.D. Pa.2002)* (citing *D & S Screen Fund II v. Ferrari, 174 F.Supp.2d 343, 347 (E.D. Pa.2001))*. The United States Court of Appeals for the Third Circuit has never expressly adopted the corporate shield doctrine, but courts within the Third Circuit have specifically noted that it does not apply to RICO claims. *See, e.g., Am. Trade Partners, L.P. v. A-1 Int'l Importing Enters., Ltd., 755 F. Supp. 1292, 1304 n.17 (E.D. Pa.1990)* (stating that defendant who allegedly used the corporate forum to violate RICO "cannot hide behind the corporate shield"). "Nor does [the corporate shield doctrine] apply to torts, for the 'courts have refused to permit a corporate officer to invoke the shield when the officer was involved in tortious conduct . . . .'" *Lexington Ins. Co. v. Forrest, 263 F. Supp. 2d 986, 994 n.8 (E.D. Pa. 2003)* (quoting *Lautman v. Loewen Group, Inc., 2000 U.S. Dist. LEXIS 8241, Civ. A. No. 99-75, 2000 WL 772818, at \*5 (E.D. Pa. June 15, 2000))*; *see also Applied Tech. Int'l, Ltd. v. Goldstein, 2004 U.S. Dist. LEXIS 21219, Civ. A. No. 03-848, 2004 WL 2360388,* [*11] *at \*3 n.1 (E.D. Pa. Oct. 20, 2004)* (citing cases). Since Plaintiffs have alleged that William Leyton violated RICO and perpetrated the intentional torts of conversion and fraud, the Court finds that he is amendable to personal jurisdiction irrespective of the capacity in which he was acting.

For the reasons stated above, the Court concludes that it has personal jurisdiction over Defendants Strategic and William Leyton. Accordingly, their Motion to dismiss for lack of personal jurisdiction is denied.

BY THE COURT:

John R. Padova, J.

1 of 1 DOCUMENT

**TELCORDIA TECHNOLOGIES, INC., Plaintiff, v. ALCATEL S.A. and AL-CATEL USA, INC., Defendants.**

**Civil Action No. 04-874 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 10194*

**May 27, 2005, Decided**

**COUNSEL:** [*1] For Telcordia Technologies Inc., Plaintiff: Steven J. Balick, John G. Day, Ashby & Geddes, Wilmington, DE.

For Alcatel S.A., Defendant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Alcatel USA Inc., Defendant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Kevin M. Baird, Connoly Bove Lodge & Hutz, Wilmington, DE.

For Alcatel USA Inc., Counter Claimant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Kevin M. Baird, Connoly Bove Lodge & Hutz, Wilmington, DE.

For Telcordia Technologies Inc., Counter Defendant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

On July 16, 2004, the plaintiff, Telcordia Technologies, Inc. ("Telcordia"), filed this patent infringement action against Alcatel S.A. ("Alcatel S.A.") and Alcatel USA, Inc. ("Alcatel USA"). Presently before the court is Alcatel S.A.'s motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will grant the motion.

**II. BACKGROUND**

Alcatel S.A. is a French corporation [*2] with its principal place of business in Paris, France. Alcatel S.A. is the parent company of Alcatel USA, a Delaware corporation with its principal place of business in Plano, Texas. (D.I. 18 Ex. 2 PP 2-3.) It is a holding company that does not manufacture, sell, advertise, offer to sell, trade or import any goods or services in the United States or anywhere in the world. (*Id.* PP 3-5.) It does not maintain any offices or other facilities in Delaware, or the United States. (*Id.* P 7.) It neither owns nor leases any real property in Delaware or the United States, but it does own United States patents. (*Id.* P 8.) Alcatel S.A. does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. (*Id.* PP 9-10.)

Telcordia, a Delaware Corporation with its principal place of business in Piscataway, New Jersey, is the assignee and owner of the patent-in-suit, *U.S. Patent No. 4,893,306* (the "'306 patent"). [1] The *'306 patent* relates to a method and apparatus for multiplexing circuit and packet traffic. The patent discloses a data transmission technique, [*3] or Dynamic Time Division Multiplexing ("DTDM"), that is compatible with the digital circuit transmission format, as well as the packet transmission format, thereby providing "a flexible migration strategy between present circuit networks and future broadband packet networks." (*U.S. Patent No. 4,893,306* Abstract.) The complaint alleges that Alcatel S.A. and Alcatel USA have infringed, induced infringement of, and/or contributorily infringed one or more claims of the *'306 patent* by making, using, offering for sale, selling and/or importing into the United States communication network products embodying the patented invention. (D.I. 1 PP 13-14.)

1 The *'306 patent* was issued on January 9, 1990 and assigned to Bell Communications Research,

Inc. ("Bellcore"), which became Telcordia in 1999.

## III. STANDARD OF REVIEW

Alcatel S.A. moves to dismiss the complaint for lack of personal jurisdiction over the defendant. *"Rule 12(b)(2) of the Federal Rules of Civil Procedure* [*4] requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[].." E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, 197 F.R.D. 112, 119 (D.Del.2000).* In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aereos de Angola v. Ronair, Inc., 544 F. Supp. 858 at 864-65 (D. Del. 1982).* If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the *Due Process Clause of the Fourteenth Amendment. Id.* (noting, however, "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elecs., 948 F. Supp. 338, 342 (D. Del. 1996)* (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions [*5] of fair play and substantial justice.'" *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)* (citation omitted). Specifically, Telcordia must show that Alcatel S.A. "purposefully availed itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)); see also Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 108-09, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).* Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 414-15, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984).*

In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp., 542 F. Supp. 53, 56 (D. Del. 1982).* However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Alcatel S.A. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc., 147 F. Supp. 2d 268, 270-71 (D. Del. 2001).* [*6] To meet this burden, Telcordia must adduce facts which "'establish with reasonable particularity'" that jurisdiction over Alcatel S.A. exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc., 936 F. Supp. 177, 193 (D. Del. 1996)).*

## IV. DISCUSSION

### A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, *Del. Code Ann. tit. 10 § 3104*, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections *(c)(1)* and *(c)(3)* of the long-arm statute.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." *DEL. CODE ANN. tit. 10 § 3104(c)(1).* Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission [*7] in this State." *DEL. CODE ANN. tit. 10 § 3104(c)(3).* Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab, 724 A.2d 1150, 1156-57 (Del. Super. 1997).* The Delaware Supreme Court has interpreted subsections *(c)(1)* and *(c)(3)* as specific jurisdiction provisions that require a "nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See La Nuova D & B, S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986).* In order to meet the requirements of subsections *(c)(1)* and *(c)(3)*, Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. v. Micron Technology, 821 F. Supp. 272, 274 (D. Del. 1993).*

Telcordia asserts that the court should exercise jurisdiction under *§ 3104(c)(1)* and/or *(c)(3)* because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of [*8] agency.[2] The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, "the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp., 997 F. Supp. 556, 559 (D. Del. 1998)* (citing *Mobil Oil Corp. v. Linear Films, Inc., 718 F. Sup. 260, 266 (D. Del. 1989)).* Thus, the agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1463 (D. Del. 1991).*

The factors relevant to the court's examination include: (1) "the extent of overlap of officers and directors"; (2) "methods of financing"; (3) "the division of responsibility for day-to-day management"; and (4) "the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Id.* If the court determines that an agency relationship exists, it may attribute certain [*9] actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id. at 1465* ("[A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its 'or through an agent' provision.")

> 2  Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1463 (D. Del. 1991).* Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to "pierce the corporate veil," or attribute the actions of a subsidiary to the parent corporation. *Id.; see Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 266 (D. Del. 1989).* Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

[*10]  Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because "Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, *i.e.* property, in the United States; (3) it fails to distinguish among its multinational subsidiaries - that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley ("Quigley") is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that,"at the very least," Alcatel USA has

offered to sell in Delaware products accused of infringing the *'306 patent* and, therefore, transacts business in the state. In addition, because Alcatel USA committed these [*11] acts as Alcatel S.A.'s agent, they are attributable to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation obtains its business. After having considered these factors, the court concludes that Telcordia has not carried its burden. As to the first factor, Telcordia points to some overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 P 6.) This minor overlap, however, is not dispositive, [*12] as "it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods, 524 U.S. 51, 69, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998)* (citations omitted) (noting that it is "well established principle . . . that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). As such, this factor does not weigh in favor of a finding of agency.

Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 PP 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard, 997 F. Supp. at 561.* In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of [*13] Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 P 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 P 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns filed by Alcatel S.A. (*Id.* P 12.) Alcatel USA finances its day-to-day activities

through funds generated from its business activities, including the manufacture, marketing and distribution of the accused infringing products. (*See id.* P 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections *(c)(1)* and *(c)(3)* do not warrant the exercise of jurisdiction over Alcatel S.A. [3]

> 3   The court need not address whether jurisdiction in Delaware comports with the requirements of the *Due Process Clause* because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

[*14] **B.  *Federal Rule of Civil Procedure 4(k)(2)***

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to *Rule 4(k)(2) of the Federal Rules of Civil Procedure. Rule 4(k)(2)* provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

*FED. R. CIV. P. 4(k)(2).* In order to establish jurisdiction pursuant to *Rule 4(k)(2)*, (1) Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States [*15] as a whole to satisfy due process. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 258-59 (3d Cir. 2000).* Telcordia contends that all three requirements of *Rule 4(k)(2)* are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed, induced infringement of, and/or contributorily infringed the *'306 patent.* Patents and the protection of patent rights are the subject of Title 35 of the United States Code. 35 U.S.C. § *271* specifically provides the elements of patent infringement. Additionally, *28 U.S.C. § 1338* gives district courts original jurisdiction over patent actions. A patent

original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises under federal law. Telcordia has thus satisfied the first requirement of *Rule 4(k)(2).*

Having found that the first requirement of *Rule 4(k)(2)* is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See United States v. Offshore Marine Ltd., 179 F.R.D. 156, 160, 38 V.I. 422 (D.V.I. 1998); Revak v. Locatum A.B., 2005 U.S. Dist. LEXIS 11076, No. Civ. A. 03-4822, 2005 WL 1017771, at *2 (E.D. Pa. Apr. 28, 2005).* [*16]  As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.,* the United States District Court for the District of the Virgin Islands noted that "the question [of] which party bears the burden of proving. . . that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." *Offshore Marine Ltd., 179 F.R.D. at 160.* Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See Base Metal Trading Ltd. v. OJSC "Novokuznetsky Aluminum Factory", 47 Fed. Appx. 73, 75 (3d Cir. 2002)* (unpublished) (determining that negation issues need not be reached because the Due Process requirement of *Rule 4(k)(2)* was [*17]  not satisfied). [4] Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See Offshore Marine Ltd., 179 F.R.D. at 160* ("Accordingly to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the defendant] is not otherwise subject to service of process in any state."); *see also Commissariat A L 'Energie Atomique v. Chi Mei Optoelectronics Corp., 293 F. Supp. 2d 423, 430 (D. Del. 2003), vacated on other grounds by 395 F.3d 1315 (Fed. Cir. 2005)* (issue abandoned on appeal) ("Plaintiffs must also demonstrate that defendant is 'not subject to the jurisdiction of *any state*' under *Rule 4(k)(2).* Therefore, *Rule 4(k)(2)* 'provides 'a narrow exception which may subject an alien defendant to a federal court's jurisdiction.'") The court agrees with the Third Circuit district courts that have addressed the negation requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject [*18] to jurisdiction in any state.

4    Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be "significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then *Rule 4(k)(2)* applies. (*Id.*) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement [*19] of *Rule 4(k)(2)*.

Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of *Rule 4(k)(2)* because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. *The Due Process Clause* requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.'" *See International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)*(citations omitted). In order for the court to find that Alcatel S.A. has "minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. *Helicopteros Nacionales de Columbia v. Hall, 466 U.S. 408, 414 (1984)*. The court can assert specific jurisdiction over a nonresident defendant that has "purposefully directed his activities at residents of the forum and the litigation [*20] results from alleged injuries that 'arise out of or related to' those activities." *Burger King, 471 U.S. at 472* (citations omitted). The court can assert general jurisdiction over a defendant when its contacts with the forum, regardless of their relation to the litigation, are "continuous and systematic." *Helicopteros Nacionales, 466 U.S. at 416*. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, "it is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *BP Chems., 229 F.3d at 259* (quoting *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286*). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)*. [*21] Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. *See Burger King, 471 U.S. at 475-76*. In the present case, however, the court need not make this determination because Telcordia bases its argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., *supra*, do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not "continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is "ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish [*22] among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its activities in the United States, but never discloses that its United States activities are performed by one of its subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does not find the evidence sufficient to support Telcordia's assertion.

First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt ("ADR"), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 330 (S.D.N.Y. 2003)*; [*23] *Doe v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001)*("The Court is not persuaded

that Congress intended for the courts to assert jurisdiction under *Rule 4(k)(2)* whenever a corporation lists its stock on a United States exchange."). Likewise, "ownership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 1996 U.S. Dist. LEXIS 11696, No. C-95-3577 DLJ, 1996 WL 467293, at *6 n. 5 (N.D. Cal. July 24, 1996)* (citing *35 U.S.C. § 293*). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems, 772 F. Supp. at 1468.* Additionally, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via [*24] its web site." *Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 454 (3d Cir. 2003).* Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States. [5]

> 5  Telcordia asserts that there can be "no question that Alcatel S.A.'s website solicits requests for information concerning its products (including allegedly infringing products) from Delaware residents, pointing to a "website page concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I. 20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with [*25] Telcordia's assertion that Alcatel's website "never discloses that its U.S. activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on "United States" as its country/region the web address changes from "www.alcatel.com" to "www.usa.alcatel.com." Further, when one clicks on the "About Alcatel" dropdown menu and selects "Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states "it is the policy of *Alcatel USA* to satisfy the expectation of our                                      customers." www.usa.alcatel.com/company/ausa_info.jhtml     (last visited May 23, 2005)(emphasis added). Thus, the Al-

catel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a "continuous and systematic" presence in the United States.

Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis [*26] to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp., 229 F.3d 254 (3d Cir. 2000)* is instructive on this point. In *BP Chemicals,* the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of *Rule 4(k)(2)* jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id. at 263.* The Court of Appeals also found that the cumulative effect of the defendants contacts did not meet the requirements for general jurisdiction. In the present case, Alcatel S.A.'s alleged contacts fall short of those alleged by the plaintiff in *BP Chemicals.* As such, the court finds that there is no basis for exercising *Rule 4(k)(2)* jurisdiction over Alcatel S.A.

**C. Jurisdictional Discovery**

Lastly, Telcordia asserts that if the court does not conclude that Alcatel S.A. "is subject to personal jurisdiction under the *Delaware long-arm statute,* [*27] " it should permit limited jurisdictional discovery rather than granting Alcatel S.A.'s motion to dismiss. (D.I. 23, at 11)(emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the "limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversly, Alcatel S.A. contends that Telcordia's claims against it are clearly frivolous, because Telcordia has not carried its burden of making "a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it "strains belief that Plaintiff (1) did not know which entities in the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17.) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is "arguably the most [*28] knowledgeable company in the telecommunications field with respect to what products

are sold by the various players in the market." (*Id.* at 1.) Thus, it "is hard to believe that it [Telcordia] does not know exactly who the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa, 482 U.S. 522, 546, 96 L. Ed. 2d 461, 107 S. Ct. 2542 (1987)*)). The court is persuaded by Alcatel S.A.'s argument.

"Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003)* (internal citations omitted). Thus, resolution of Telcordia's request [*29] "begins with the presumption in favor of allowing discovery to establish personal jurisdiction." *Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474 (D. Del. Oct. 5, 1995)*. However, "the court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id. at 475*. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id. at 476*. Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous.'" *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 107 F.3d 1026, 1042 (3d Cir. 1997)*; *see B.L. Poe v. Babcock Int'l, 662 F. Supp. 4, 7 (M.D. Pa. Mar. 14, 1985)* ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction [*30] over [a] defendant might exist before allowing discovery to proceed." *Hansen, 163 F.R.D. at 475*. Furthermore, "when the lack of personal jurisdiction is clear, . . . further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc., 62 Fed. Appx. 322, 338 (Fed. Cir. 2003)* (unpublished).

Here, as previously discussed in Section IV.A., *supra*, the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel S.A.'s agent. In addition, Telcordia did not assert that the court could exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny [*31] Telcordia's request for jurisdictional discovery.

Dated: May 27, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. Alcatel S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 17) is GRANTED.

2. Telcordia's request for jurisdictional discovery is DENIED.

Dated: May 27, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT

**5**

Page 1

1 of 1 DOCUMENT



Analysis
As of: Dec 19, 2007

PELULLO, et al. v. THE NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, et al.

CIVIL ACTION, NO. 00-5647

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2004 U.S. Dist. LEXIS 9138*

May 17, 2004, Decided
May 17, 2004, Filed

**PRIOR HISTORY:** *United States v. Pelullo, 65 Fed.
Appx. 766, 2003 U.S. App. LEXIS 6863 (2003)*

**DISPOSITION:** Plaintiff's motion to file supplemental
memorandum and defendants' motion to dismiss granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff businessman
sued defendants, an insurer, law firms, and individuals
who were involved in events related to the businessman's
civil and criminal liability, for relief under the Racketeer
Influenced and Corrupt Organizations Act (RICO), *18
U.S.C.S. § 1961 et seq.*, as well as under state law for
breach of fiduciary duty, professional negligence, bad
faith, and breach of contract. The insurer, law firms, and
individuals moved to dismiss.

**OVERVIEW:** The businessman claimed that the actions
of the insurer, the law firms, and the individuals caused
him to be civilly liable for their involvement in a number
of different business transactions, and caused him to be
wrongfully convicted for his role in those same business
transactions. The businessman argued that the insurer, the
law firms, and the individuals engaged in a RICO
conspiracy to keep him incarcerated, in an attempt to
limit the insurer's exposure and the law firms' and the

individuals' personal and professional liability. The
district court found that it had personal jurisdiction over
all the named parties. The district court also found that
the businessman's RICO claims were barred by the
applicable statute of limitations. Further, based upon the
businessman's allegations, the businessman failed to
properly plead and could not prove that fraudulent
concealment tolled the statute of limitations.
Furthermore, the businessman failed to state a cause of
action for which relief could be granted under the RICO
statute, and thereby the conspiracy claim as well. Finally,
the district court declined to exercise supplemental
jurisdiction over the state law claims.

**OUTCOME:** The motions to dismiss were granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Motions to Dismiss*
[HN1] In considering motions to dismiss, a court may
consider a Racketeer Influenced and Corrupt
Organizations Act case statement filed by a plaintiff,
which is a pleading that may be considered part of an
operative complaint for purposes of a motion to dismiss.

2004 U.S. Dist. LEXIS 9138, *

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
[HN2] When considering a motion to dismiss a complaint for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, a district court must accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under *Rule 12(b)(6)* is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved. For this reason, district courts strongly disfavor *Rule 12(b)(6)* motions. A court will only dismiss a complaint if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Nevertheless, a court need not credit a plaintiff's bald assertions or legal conclusions when deciding a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3] See *Fed. R. Civ. P. 12(b)(6)*.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN4] Racketeer Influenced and Corrupt Organizations Act (RICO) claims are generally subject to notice pleading requirements under *Fed. R. Civ. P. 8(a)*. It is enough that a RICO complaint put the defendant on notice of the claims against him. It is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action. Pursuant to *Rule 8(a)* pleading requirements, a RICO plaintiff need not state every element necessary for recovery with precision in his or her complaint.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN5] Racketeer Influenced and Corrupt Organizations Act allegations constituting fraud are subject to the heightened pleading requirements of the Federal Rules, which state that in all averments of fraud or mistake, the circumstances constituting fraud or mistake are to be pleaded with particularity. *Fed. R. Civ. P. 9(b)*.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN6] The purpose of *Fed. R. Civ. P. 9(b)* is to provide notice of the precise misconduct with which defendants are charged and to prevent false or unsubstantiated charges. However, courts should apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants. To satisfy *Rule 9(b)*, plaintiffs may plead the specific conduct alleged to be fraudulent along with the date, place and time that the alleged fraud occurred or use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN7] In deciding a motion to dismiss, courts generally may consider only the allegations contained in the complaint, exhibits attached thereto, and matters of public record.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Venue > General Overview*
[HN8] The venue and process provision of the Racketeer Influenced and Corrupt Organizations Act (RICO) requires that a district court has jurisdiction to entertain a civil RICO claim only where personal jurisdiction based on minimum contacts is first established as to at least one defendant pursuant to *18 U.S.C.S. § 1965(a)*. Once minimum contacts is established as to at least one defendant, the nationwide service of process provision of *18 U.S.C.S. § 1965(b)* enables a plaintiff to bring before a single court all members of a RICO conspiracy.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN9] There is a four-year statute of limitations for civil Racketeer Influenced and Corrupt Organizations Act claims.

*Civil Procedure > Discovery > General Overview*
*Governments > Legislation > Statutes of Limitations >*

2004 U.S. Dist. LEXIS 9138, *

*Time Limitations*
[HN10] The United States Supreme Court has adopted the injury discovery rule for determining when the statute of limitations begins to run on a civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim. Under this rule the statute begins to run when a plaintiff knew or should have known of his injury. In adopting this rule the court specifically rejected the injury and pattern discovery rule under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity. The Court also rejected the last predicate act rule under which each predicate act forming a part of the same pattern starts the statute anew.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN11] The four-year statutory period for civil Racketeer Influenced and Corrupt Organizations Act (RICO) claims begins to run when the plaintiff has discovered or, by the exercise of reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that the injury has been caused by another party's conduct. This approach does not require any knowledge of the other RICO elements.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN12] In a civil Racketeer Influenced and Corrupt Organizations Act (RICO) case where all the requisite elements are present, a claim accrues immediately upon the plaintiff's discovery of her injury. Absent equitable tolling doctrines, ignorance of the remaining elements of her claim, including the pattern required by RICO, is immaterial. A plaintiff has four years from the time she discovers her injury to investigate, gather evidence, and bring suit. At the end of the four years, her claim expires.

*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Statutes of Limitations > Tolling*
[HN13] To establish fraudulent concealment, a plaintiff has the burden of proving: (1) active misleading by the defendant, (2) which prevents the plaintiff from recognizing the validity of her claim within the

limitations period, (3) where the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting to uncover the relevant facts. A key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim she now brings.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > Elements*
[HN14] As with all allegations constituting fraud, fraudulent concealment must be pled subject to the heightened pleading requirements of *Fed. R. Civ. P. 9(b)*.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN15] To state a civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim under *18 U.S.C.S. § 1962(c)*, a plaintiff must allege (1) standing to bring a RICO claim, i.e., that he or she has been injured in his or her business or property by reason of a violation of *18 U.S.C.S. § 1962*; (2) that the defendants were employed by or associated with an enterprise affecting interstate commerce; and (3) that the defendants participated in the conduct of the enterprise's affairs through at least two predicate acts of racketeering activity. *18 U.S.C.S. §§ 1964(c), 1962(c), 1961*.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Obstruction of Justice > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN16] *18 U.S.C.S. § 1961(1)(B)* defines "racketeering activity" to include, inter alia, acts which are indictable under the federal mail fraud, wire fraud, and obstruction of justice statutes, *18 U.S.C.S. §§ 1341, 1343, 1503*.

2004 U.S. Dist. LEXIS 9138, *

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN17] It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt. *18 U.S.C.S. § 1962(c)*. A pattern of racketeering requires at least two acts of racketeering activity, one of which occurred after the effective date of the chapter and the last of which occurred within 10 years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity. *18 U.S.C.S. § 1961(5)*. An enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. *18 U.S.C.S. § 1961(4)*. A plaintiff has standing to sue under the Racketeer Influenced and Corrupt Organizations Act statute if he has been injured in his business or property by reason of a violation of *section 1962. 18 U.S.C.S. § 1964(c)*.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN18] The Third Circuit requires that a Racketeer Influenced and Corrupt Organizations Act plaintiff, under *18 U.S.C.S. § 1964(c)*, make a threshold showing (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of *18 U.S.C.S. § 1962*.

*Civil Procedure > Justiciability > Standing > General Overview*
[HN19] Standing to assert Racketeer Influenced and Corrupt Organizations Act (RICO) claims requires that an alleged RICO violation proximately caused a plaintiff's injury--i.e., the violation is not too remote from the injury. It is not enough that the defendant's violation was the but for cause of plaintiff's injury. The Third Circuit has identified the formal factors of proximate

cause as: (1) the directness of the injury--the more indirect the injury, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to defendant's wrongdoing, as distinct from other, independent, factors; (2) the difficulty of apportioning damages among potential plaintiffs and, (3) the possibility of other plaintiffs vindicating the goals of RICO--direct victims could generally be counted on to vindicate the policies underlying RICO in a better manner than indirect victims. Plaintiffs must show a direct relation between the injury asserted and the injurious conduct alleged.

*Torts > Negligence > Causation > Proximate Cause > General Overview*
[HN20] Normally, the proximate cause of a criminal conviction is the defendant's own actions unless the defendant has obtained relief from that conviction.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN21] In Pennsylvania, a fraud claim has six elements, all of which must be pleaded with particularity: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Criminal Law & Procedure > Preliminary Proceedings > Entry of Pleas > General Overview*
[HN22] An attorney's decision to file a motion to dismiss a complaint based on a plaintiff's failure to plead fraud with particularity is a proper litigation strategy, regardless of what information that attorney may or may not have known regarding the allegations, as the burden to plead fraud properly falls on the plaintiff, not on the defendant. *Fed. R. Civ. P. 9(b)*.

*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Obstruction of Justice > Elements*

*Torts > Intentional Torts > Malicious Prosecution > General Overview*
[HN23] See *18 U.S.C.S. § 1503(a)*.

*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Obstruction of Justice > Elements*
*Governments > Courts > Judges*
*Torts > Intentional Torts > Malicious Prosecution > General Overview*
[HN24] The Third Circuit has stated that the elements of a prima facie case of obstruction of justice are (1) the existence of a judicial proceeding, (2) knowledge or notice of the pending proceeding, (3) acting corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice, and (4) that the action had the natural and probable effect of interfering with the due administration of justice.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview*
[HN25] A United States District Court may decline to exercise supplemental jurisdiction over state law claims when the District Court has dismissed all claims over which it has original jurisdiction.

**COUNSEL:** [*1] For Plaintiff: LEONARD A. PELULLO, PETER D. PELULLO, TRUST, ARIANNA G. PELULLO, TRUST, ARIANNA G. PELULLO, TRUST, G.I.I. ENTERPRISES, INCORPORATED, GROWTH FINANCIAL CORPORATION, OLYMPIA RESOURCE CORPORATION, OLYMPIA HOLDING CORPORATION, OHA, INCORPORATED, ONE PLAZA CORPORATION, PETER F. PELULLO, represented by, JOSEPH M. FIORAVANTI, MEDIA, PA.

For Defendant: THE NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, represented by, JOHN J. SOROKO, DUANE MORRIS LLP, MICHAEL E. ADLER, BLANK, ROME, COMISKY & McCAULEY, PHILADELPHIA, PA. WILENTZ, GOLDMAN &

SPITZER, represented by, ALIZA R. KARETNICK, M. NORMAN GOLDBERGER, WOLF BLOCK SCHORR AND SOLIS-COHEN L.L.P., PHILADELPHIA, PA. KENNETH FALK, represented by, JOEL M. EADS, FREY, PETRAKIS, DEEB, BLUM, BRIGGS & MITTS, PATRICK W. KITTREDGE, KITTREDGE, DONLEY, ELSON, FULLEM & EMBICK LLP, PHILADELPHIA, PA. ADORNO & ZEDER, PA., represented by, JEFFREY B. MCCARRON, RICHARD J. WALL, SWARTZ, CAMPBELL & DETWEILER, PHILADELPHIA, PA. FRED SCHWARTZ, HANK ADORNO, represented by, JEFFREY B. MCCARRON, RICHARD J. WALL, SWARTZ, CAMPBELL & DETWEILER, PHILADELPHIA, PA. KERR, RUSSELL AND WEBER, P.L.C., ROBERT GISSELL, represented by, RICHARD [*2] G. PLACEY, MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, PHILADELPHIA, PA. D'AMATO & LYNCH, LEWIS, D'AMATO, BRISBOIS & BIGARRD, represented by, JOHN J. SOROKO, DUANE, MORRIS LLP, MICHAEL E. ADLER, BLANK, ROME, COMISKY & McCAULEY, PHILADELPHIA, PA. RICHARD GEORGE, ALFRED D'AGOSTINO, ALSTON & BIRD, LLP, THEODORE SAWICKI, represented by, JOHN J. SOROKO, DUANE, MORRIS LLP, PHILADELPHIA, PA.

**JUDGES:** R. Barclay Surrick, Judge.

**OPINION BY:** R. Barclay Surrick

**OPINION**

MEMORANDUM SURRICK, J.

May 17, 2004

Presently before the Court are four Motions to Dismiss filed by four groups of Defendants (Doc. Nos. 65, 67, 68, and 69), and Plaintiffs' Motion for Leave to File Supplemental Memorandum in Opposition to Defendants' Motions to Dismiss Second Amended Complaint (Doc. No. 89.) For the following reasons, we have granted Plaintiffs' Motion for Leave and we have granted Defendants' motions to dismiss.

**I. FACTS**

The instant action arises out of years of criminal and civil litigation regarding various business transactions involving Plaintiff Leonard A. Pelullo ("Pelullo") as well

as entities under his control. Pelullo has faced three federal criminal prosecutions and was ultimately convicted by juries in two of [*3] those prosecutions, one in the Eastern District of Pennsylvania and the other in the District of New Jersey. [1] Pelullo has made a number of attempts at recovering damages based on some, if not all, of the significant fines, judgments, fees, forfeitures, and settlements that have been imposed on him and the entities under his control as a result of these criminal and civil actions. Now, Plaintiffs--who are comprised of Pelullo, two trusts, a trustee, and six corporations--have filed the instant action against various law firms and individuals who were involved in the events related to Pelullo's civil and criminal liability. Plaintiffs seek relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1962(c)* and*(d)*, as well as relief under state law for breach of fiduciary duty, professional negligence, bad faith, and breach of contract. Plaintiffs claim that the Defendants' actions caused Plaintiffs to be civilly liable for their involvement in a number of different business transactions, and caused Pelullo to be wrongfully convicted for his role in those same business transactions. Plaintiffs essentially argue that the Defendants [*4] engaged in a RICO conspiracy to keep Pelullo incarcerated, in an attempt to limit both Defendant National Union's insurance exposure and the other Defendants' personal and professional liability. Several Defendants have raised the statute of limitations as a bar to Plaintiffs' claims. We have concluded that they are correct. We have also concluded that Plaintiffs have failed to state a cause of action for which relief can be granted under the RICO statute. Finally, we have declined to exercise supplemental jurisdiction over the state law claims.

---

1 On January 27, 1995, Pelullo was convicted for racketeering in violation of *18 U.S.C. § 1962(c)*, by a jury in the United States District Court for the Eastern District of Pennsylvania. *United States v. Pelullo, 65 Fed. Appx. 766, 767 (3d Cir. 2003)* (citing Criminal Action No. 91-cr-00060). Pelullo received a twenty-four year sentence, but was released after 107 months. (Resp. of Pls. in Opp'n to Mot. of Schwartz Defs. to Dismiss Second Am. Compl., Ex. A, at 128.) Pelullo is currently on parole for that conviction, which concludes in 2016. In November 1996, a jury in the United States District Court for the District of New Jersey found Pelullo "guilty on

one count charging him with conspiracy to embezzle $ 4.176 million from two employee pension benefits plans and to engage in money laundering, on 11 counts of embezzlement from these employee pension benefit plans, and on 42 counts of money laundering." *United States v. Pelullo, 961 F. Supp. 736, 739 (D.N.J. 1997)*. Pelullo was sentenced to 210 months, to be served concurrently with his Pennsylvania sentence. United States v. Pelullo, Criminal Action No. 94-276, Doc. No. 233, at 2. On May 17, 2002, Pelullo was granted a new trial in the New Jersey matter. Id. After having served forty-seven months of his conviction, the New Jersey court released Pelullo from prison on a $ 2 million bond, and noted that Pelullo was still subject to the requirements of his supervised release from his Pennsylvania conviction. Such requirements included "remaining in the Eastern District of Pennsylvania, monthly reporting to the parole officer, no violation of the law or association with the persons involved in criminal activity...." (Resp. of Pls. in Opp'n to Mot. of Schwartz Defs. to Dismiss Second Am. Compl., Ex. A, at 128.) The circumstances surrounding the New Jersey matter will be discussed hereinafter in more detail.

[*5] The following facts, which for purposes of a Motion to Dismiss are taken as true, have been alleged in Plaintiffs' Second Amended Complaint and RICO Case Statement. [2]

---

2 [HN1] "In considering the Motions to Dismiss, the Court may also consider the RICO Case Statement filed by Plaintiff which 'is a pleading that may be considered part of the operative complaint for purposes of a motion to dismiss.'" *State Farm Mut. Auto. Ins. Co. v. Makris, 2003 U.S. Dist. LEXIS 3374, 2003 WL 924615, at *4 (E.D. Pa. Mar. 4, 2003)* (quoting *Allen Neurological Assocs., Inc. v. Lehigh Valley Health Network, 2001 U.S. Dist. LEXIS 284, 2001 WL 41143, at *3 n.1 (E.D. Pa. Jan. 18, 2001)*).

*Parties*

Pelullo is an adult individual who has had various business interactions with the named Defendants. As of the filing of the Second Amended Complaint ("SAC"), Pelullo was incarcerated at F.C.I. Fort Dix, New Jersey

for criminal activity related to these business transactions. (SAC P 1.) However, on May 17, 2002, the United States District [*6] Court for the District of New Jersey granted Pelullo's motion for a new trial in one of his criminal cases "solely on the ground that the government failed to comply with its obligations [to disclose certain documents] under *Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)*." Pelullo was released on an appeal bond, and is currently under supervised release.

The Peter D. Pelullo Trust and the Arianna G. Pelullo Trust (collectively "Pelullo Trusts" or "Trusts") are Plaintiffs in the instant case, as is Peter F. Pelullo, trustee of each of these trusts. (SAC PP 2-4.) Six corporations are also Plaintiffs in this action. G.I.I. Enterprises, Inc. ("G.I.I."), Growth Financial Corporation ("Growth"), Olympia Resource Corporation ("Olympia Resource"), Olympia Holding Corporation ("Olympia Holding"), OHA, Inc. ("OHA"), and One Plaza Corporation ("One Plaza") are all corporations and/or businesses owned, operated, and controlled by the Peter D. Pelullo and/or Arianna G. Pelullo Trusts. [3] (SAC P 5.)

> 3    In the Rico Case Statement, Plaintiffs state that the "Pelullo Trusts" refers to: "(1) Peter D. Pelullo Trust; (2) Arianna G. Pelullo Trust; (3) Peter F. Pelullo; (4) G.I.I. Enterprises, Incorporated; (5) Growth Financial Corporation; (6) Olympia Resource Corporation; (7) Olympia Holding Corporation; (8) OHA, Incorporated; and (9) One Plaza Corporation."

[*7] The Defendants have aligned themselves into four broad groups. The so-called "National Union Defendants" include an insurer, three law firms who represented the insurer in various actions, and certain partners and/or associates at those law firms. Specifically, National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union"), is an insurer whose insureds include some of the law firm Defendants in this action. Since initiating the instant action, Pelullo has dismissed all claims against National Union pursuant to a court order issued in the United States District Court for the Northern District of Georgia.[4] The law firm of D'Amato & Lynch ("D'Amato & Lynch") and two of its partners, Richard George and Alfred D'Agostino, served as counsel for both National Union and certain of the law firm Defendants. The law firm of Lewis, D'Amato, Brisbois & Bisgaard LLP ("the Lewis Firm") allegedly "was related

in practice to D'Amato & Lynch." (SAC P 3.) Plaintiffs at times collectively refer to the D'Amato & Lynch and Lewis law firms as the "D'Amato Firms." Finally, the law firm of Alston & Bird LLP ("Alston") and its attorney, Theodore J. Sawicki, represented National Union against Pelullo [*8] in district court actions in Georgia and Pennsylvania.

> 4    This court order will be discussed in more detail in Section II., infra.

The second group of Defendants consists of the law firm of Wilentz, Goldman & Spitzer ("Wilentz") and its partner Kenneth Falk. Wilentz received legal malpractice insurance coverage from National Union during the time period at issue in the instant case. (SAC PP 7-8.)

The third group of Defendants consists of the law firm of Adorno & Zeder, P.A. ("Adorno Firm"), one of its partners, Hank Adorno, and another of its attorneys, Fred Schwartz. The Adorno Firm received legal malpractice insurance coverage from National Union during the time period at issue in the instant case. (SAC PP 9-11.)

Finally, the fourth group of Defendants includes the law firm of Kerr, Russell, Weber, P.L.C. ("the Kerr Firm") and one of its attorneys, Robert Gissell. The Kerr Firm received legal malpractice insurance coverage from National Union during the time period at issue in the instant case. (SAC [*9] PP 12-13.)

*Events*

The Second Amended Complaint alleges a series of facts related to several business transactions involving Pelullo and the Plaintiff entities over which he exercised control. (SAC PP 22-95.)

**A. The PIE and Transcon Transactions**

In April 1990, Growth and Olympia Holding acquired trucking companies Transcon Lines ("Transcon") and PIE Nationwide ("PIE"), respectively. (SAC PP 39, 41.) Both Transcon and PIE were approaching insolvency at the time of these acquisitions, but plaintiffs claim they were unaware of the financial condition of these companies. (SAC PP 24, 32.) Transcon became delinquent in its health, welfare, and pension fund obligations administered by the Central States Fund in July 1989, which put Transcon in jeopardy of a potential withdrawal liability of $ 20 million. [5] By the

2004 U.S. Dist. LEXIS 9138, *9

spring of 1990, PIE's similar financial difficulties resulted in a potential withdrawal liability to the Central States Fund of $ 45 million. Plaintiffs allege that the PIE Board of Directors and its law firm, Kerr, Russell, did not inform either Pelullo or the Trusts of either Transcon and/or PIE's financial circumstances when Plaintiffs conducted due diligence. [*10] Rather, both the Kerr Firm and the PIE Board of Directors advised the Pelullo Trusts that in order for the post-acquisition trucking company to succeed, it was necessary to simultaneously acquire PIE and Transcon and consolidate the two entities.

> 5     According to Plaintiffs, "under the *Multi-Employer Pension Plan Amendments Act of 1980 ("MEPAA")*, employers were required to pay their proportionate shares of unfunded vested benefit liabilities of pension funds when they completely or partially withdrew or terminated participation in the pension fund." (SAC P 25.) And "because of the MEPAA, if Transcon failed, it would trigger a withdrawal liability ... to the Central States Fund." (Id. P 26.)

As part of the consolidation of PIE and Transcon, the entities agreed to: (1) an equipment agreement involving a transfer of equipment leases from Transcon to OHA, and the subsequent leasing of this equipment from OHA to PIE; and (2) a consulting agreement between PIE and Plaintiff One Plaza, in which One Plaza would receive [*11] two percent of PIE's operating revenues in exchange for various financial consulting services, including, among other services, assistance in the day-to-day operations of PIE "in order to extricate PIE from its financial difficulty." [6] (SAC PP 44, 50.)

On May 1, 1990, Transcon's creditors filed an involuntary bankruptcy petition against it in federal bankruptcy court in Los Angeles, California. PIE filed its own voluntary Chapter 11 bankruptcy petition on October 16, 1990, in federal court in Jacksonville, Florida. By March 1991, PIE's petition was converted to a Chapter 7 liquidation, and a bankruptcy trustee was appointed. (SAC PP 53, 55.)

> 6     We note that this statement appears to be inconsistent with Plaintiffs' earlier allegations that it was unaware of the financial condition of PIE.

The Transcon and PIE bankruptcy trustees filed lawsuits against Pelullo and his wife, as well as against

OHA, One Plaza, and various law firms, seeking the return of millions of dollars. In 1994, a federal grand jury in the [*12] Jacksonville, Florida indicted Pelullo for fraudulent acts arising out of PIE's business operations. (SAC PP 56, 57.)

*1. Wilentz's and Falk's Role in the PIE and Transcon Transactions*

Plaintiffs allege that during the acquisition of PIE and Transcon, (1) Wilentz and Falk served as counsel to Transcon, (2) Wilentz and Falk represented Pelullo individually and provided legal advice to Pelullo and the Pelullo Trusts, and (3) Falk served as an officer of OHA. (SAC PP 60-63.)

As counsel to Pelullo and the Trusts, Plaintiffs allege that Wilentz and Falk drafted the equipment lease and consulting agreements that were conceived to sell Transcon's assets and assign its equipment leases to OHA. (SAC P 64.) Plaintiffs claim that Wilentz and Falk, who had prepared all of the relevant documents for the lease transaction, advised Pelullo and the Trusts that the lease transaction could be accomplished without adverse legal consequences. (SAC PP 44-45, 50-51, 64-67.) However, Plaintiffs claim that after the Transcon and PIE bankruptcy filings, when OHA sued the PIE bankruptcy trustee for the return of equipment, the PIE bankruptcy trustee counterclaimed and obtained a judgment of $ 6.5 [*13] million against OHA "and others" on allegations that the payments made under the lease and consulting agreements were fraudulent conveyances and preferences constituting a breach of fiduciary duty by the PIE board members. (SAC PP 68-70.) As a result of this judgment against OHA, the Pelullo Trusts were required to pay $ 2.4 million as part of an October 1997 settlement agreement. (SAC P 71.) In addition, certain of the Pelullo Trusts were found liable for PIE's withdrawal liability to Central States, because the transfer of fifteen percent of PIE's stock to OHA as part of the lease agreement triggered the Trusts' liability. Default judgment was entered in favor of Central States and against Pelullo in excess of $ 45 million. When Pelullo filed for personal bankruptcy protection, Central States filed a complaint seeking a declaration that the $ 45 million judgment was not dischargeable (SAC P 72.) [7] Pelullo and the Trusts incurred damages in connection with these litigations. (SAC P 75.)

> 7     The Second Amended Complaint does not allege the result of this legal action.

[*14] In 1992, the PIE and Transcon bankruptcy trustees commenced separate actions against Wilentz seeking damages arising from the law firm's role in the PIE/Transcon transaction. Plaintiffs allege that by drafting the lease and consulting agreements, Wilentz participated in looting PIE and Transcon before their bankruptcy filings. (SAC PP 76-77, 80-81.) Wilentz settled these claims with the PIE trustee for $ 2 million, and with the Transcon trustee for $ 1.8 million. Its insurer, National Union, paid each settlement. (SAC PP 78-79, 82-83.)

**B. The Compton Press Transaction**

Plaintiffs also allege that in 1989, Wilentz and Falk, in connection with the Pelullo Trusts' acquisition of Compton Press, Inc., simultaneously represented Pelullo and the Pelullo Trusts as well as the Compton sellers, including Moshe Milstein, without obtaining conflict waivers from any of the parties. (SAC PP 84-85.) Then, in 1990, Wilentz and Falk represented Pelullo, the Pelullo Trusts, and the Compton sellers in a federal court lawsuit in which the former trustees of Compton's pension fund sought to recover money which they alleged was unlawfully transferred out of the pension fund. (SAC PP 84-86.) Subsequently, [*15] Milstein and the other Compton sellers sued Wilentz and Falk for allegedly providing conflicting representation. (SAC PP 88-89.) As part of a settlement in the lawsuit against Wilentz and Falk, National Union paid Milstein $ 750,000, and paid $ 250,000 to "purchase[] the approximate $ 3.0 million civil judgment" that had been entered against Milstein in the Compton pension fund lawsuit. (SAC PP 90-91.)

On November 8, 1996, Pelullo was convicted in federal court in New Jersey for (1) improperly transferring Compton's pension funds to a Florida travel agency called "Away to Travel South" ("ATTS"); (2) removing Compton pension funds to enable a corporation controlled by the Pelullo Trusts to acquire another corporation; and (3) transferring pension funds from a UNUM Annuity Contract. (SAC P 96.) Pelullo was found guilty of multiple counts of embezzlement and money laundering, and conspiracy to commit those acts. The Third Circuit affirmed Pelullo's conviction in 1999. As mentioned above, in May 2002 the New Jersey district court granted Pelullo a new trial "solely on the ground that the government failed to comply with its obligations under *Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).* [*16] " In the Second Amended Complaint, Plaintiffs allege that during this trial, Falk "falsely swore that Mr. Pelullo possessed no attorney client privilege vis-a-vis the Wilentz Firm, leaving him free to testify against Mr. Pelullo" and that Falk did, in fact, testify against Pelullo. (SAC P 97.) Plaintiffs claim that Pelullo was convicted and sentenced in the New Jersey federal action as a result of Wilentz's "dual representation" and advice in connection with the Compton pension fund.

**C. The Lyons Transportation Transaction**

Plaintiffs also allege that Wilentz and Falk simultaneously represented Pelullo and the Pelullo Trusts in a 1990 proposed acquisition of Lyons Transportation, Inc. (SAC PP 92-93.) Sherwin-Williams, Lyons's parent company, sued Wilentz and Falk and others for fraud in connection with the proposed acquisition and the conflict of interest. National Union paid Lyons over $ 1 million to settle this lawsuit on behalf of Wilentz. (SAC PP 94-95.)

**D. The Kerr Firm and Attorney Robert Gissell**

Plaintiffs allege that the Kerr Firm and attorney Gissell served as outside counsel to PIE at all times relevant to the instant lawsuit. (SAC P 99.) In connection with [*17] the 1990 acquisition of PIE, the Kerr Firm and Gissell simultaneously represented PIE, Maxitron [8], and Plaintiff Olympia Resources and its affiliates. (SAC P 100.) Additionally, Plaintiffs allege that connections between Gissell, Gissell's wife, and Maxitron were concealed from both the directors of PIE and the Plaintiffs. Specifically, Gissell was the nephew of a Mr. Rogers "of Rogers & Doyle - the controlling Maxitron entity," and Gissell's wife owned a partnership interest in Rogers-Doyles Associates. (SAC P 101.)

   8 Prior to the sale of PIE to Olympia Holding, Maxitron owned 65% of PIE. (SAC P 38.)

During PIE's Chapter 7 liquidation, the PIE bankruptcy trustee sued the Kerr Firm and Gissell, seeking reimbursement for PIE's payments to the Kerr Firm and Gissell of over $ 1 million between 1987 and October 1990, for services rendered to Rogers-Doyle Associates and Maxitron. (SAC PP 103, 104.) In connection with that lawsuit, on July 28, 1993, the PIE bankruptcy trustee sent a confidential memorandum to the [*18] Kerr Firm and Gissell. In this memorandum--which the PIE bankruptcy trustee instructed the Kerr Firm and Gissell to not disclose to

Pelullo, the Pelullo Trusts, and their affiliates--the PIE trustee allegedly threatened to expand the lawsuit against the Kerr Firm and Gissell for their failure to advise Olympia Resource of PIE's financial condition. (SAC PP 105-106.) Plaintiffs allege that in violation of their fiduciary duty to do so, the Kerr Firm and Gissell never showed this memorandum to Pelullo, the Pelullo Trusts, or their affiliates. (SAC P 107.) Pelullo discovered this document in 2000 during the Jacksonville criminal action.

National Union ultimately paid $ 5 million to settle the dispute between the Kerr Firm and Gissell, and the PIE bankruptcy trustee. Plaintiffs claim that also pursuant to this settlement, the Kerr Firm and Gissell, through their attorneys at D'Amato & Lynch, "the law firm handpicked by National Union," turned over confidential documents related to their representation of Pelullo, the Pelullo Trusts, and their affiliates to the PIE trustee. (SAC P 107-108.) Plaintiffs state that the use of these documents was key to various civil and criminal actions. [*19] First, they claim that the PIE bankruptcy trustee used these documents in the action against OHA, which settled in 1997 for $ 2.5 million. (SAC P 109.) Plaintiffs claim that if OHA had known in 1997 that these events had occurred, it would have moved to exclude these documents from evidence based on work product and attorney-client privileges, and would have successfully defended against the PIE bankruptcy trustee's action. (SAC P 111.) Second, the PIE bankruptcy trustee referred these documents to the FBI. (SAC P 109.) In 1994, Pelullo was indicted in the Jacksonville criminal action. This indictment was dismissed in 2000. (SAC P 109.) Third, the PIE bankruptcy trustee used these documents in various civil cases involving Pelullo and the Trusts, "and as a result prevented and/or substantially delayed Mr. Pelullo" from obtaining proceeds from a Directors and Officers ("D & O") insurance policy. Plaintiffs claim that this delay resulted in Pelullo's conviction in the Newark criminal action and forced Pelullo to pay for significant attorneys fees to defend against the Jacksonville criminal action. (SAC P 110.)

Plaintiffs also assert that the Kerr Firm and Gissell falsely filed a motion [*20] to dismiss when they claimed that, in a 1996 action, Pelullo failed to allege fraud with particularity, despite having in their possession the PIE trustee's memorandum "exhaustively detailing the Kerr, Russell defendants' gross lapses in judgment, multitudinous breaches of fiduciary duty, and, most importantly, knowledge of PIE's insolvency prior to Olympia [Resource's] 1990 purchase of PIE." (SAC PP 112-114.)

In 1999, Pelullo and the Trusts requested that the Kerr Firm turn over documents related to civil and criminal proceedings involving Pelullo. Plaintiffs allege that, upon the advice of D'Amato & Lynch, the Kerr Firm denied that it represented Pelullo, the Trusts, or the Trusts' affiliates, and continued to conceal the July 28, 1993 memorandum. (SAC P 115.)

Plaintiffs state that the collective actions of the Kerr Firm and attorney Gissell outlined above "were part of a hub-and-spoke conspiracy to obstruct justice between the Kerr Firm defendants, National Union and other law firms." (SAC P 116.) Plaintiffs claim that the Kerr Firm and Gissell's purpose in this conspiracy was to conceal their role in the PIE bankruptcy trustee's lawsuit against Plaintiffs; to shield the Kerr [*21] Firm and Gissell from criminal and civil liability; to limit National Union's exposure as their insurer; and to ensure Pelullo's conviction in the Jacksonville criminal action so that Pelullo would be required to reimburse National Union for the legal fees and costs it paid under PIE's D & O policy. (SAC P 117.)

Plaintiffs claim that in 2000, they discovered both the 1993 confidential memorandum and the Kerr Firm's 1994 disclosure of confidential documents to the PIE bankruptcy trustee. (SAC P 118.)

### E. The Adorno Firm and Fred Schwartz

The Adorno Firm served as counsel to Pelullo, the Trusts, corporations controlled by the Trusts, Compton Press, Inc., and the Compton Press Pension Fund on a variety of civil and criminal litigation matters over a five-year period. (SAC P 120.) Plaintiffs allege that as the partner who handled these litigation matters, Fred Schwartz was also an officer and board member of ATTS, the travel agency to which Pelullo was convicted of transferring Compton pension funds. (SAC P 121.) Fred Schwartz and the Adorno Firm served as counsel to ATTS, "and possessed an undisclosed interest in the company." (SAC P 123.) The Adorno Firm utilized the assets of [*22] ATTS for legal fees, expenses, and travel costs. (SAC P 124.)

### 1. The Newark Criminal Action

Plaintiffs allege that Fred Schwartz provided perjured testimony during Pelullo's 1996 Newark criminal action in an effort to obstruct justice. (SAC PP 128, 145.) Fred Schwartz was the key government witness concerning the transfer of Compton's pension funds to ATTS. (SAC P 125.) Plaintiffs claim that the government relied on Fred Schwartz's testimony to support its theory that Pelullo disguised the transfer to ATTS as a loan that had been secured by worthless assets. (SAC PP 125-126.) In originally upholding Pelullo's conviction, the district court found that the ATTS transfer was an elaborate scheme to extract money from the Compton funds for his own use. (SAC P 127.) Plaintiffs allege that Fred Schwartz committed perjury during the Newark criminal action. Plaintiffs further allege that, based on Fred Schwartz's perjured testimony, the jury concluded that Pelullo's civil action testimony was false. (SAC P 136.)

Plaintiffs assert that documents discovered after Pelullo's Newark conviction, support Plaintiffs' claim that Fred Schwartz provided perjured testimony, and that these [*23] documents will demonstrate the veracity of Pelullo's defense. However, we note that in his decision to grant Pelullo a new trial in the Newark criminal action, Judge Debevoise addressed the significance of these documents in light of the evidence as a whole against Pelullo:

> It can be observed that even if [Pelullos's] version of all the transactions were accepted by the jury, the jury could still have found that he had the criminal intent requisite to establish the charges of conspiracy, embezzlement, and money laundering. The loans and investments of pension plan funds that [Pelullo] admittedly directed were shocking and outrageous. However [Pelullo's characterization of] them would not have precluded the jury from finding that he had the requisite criminal intent. Nevertheless the government relied on particular characterizations of the relevant transactions upon which the new evidence casts doubt and the government relied upon witnesses whose credibility is challenged by evidence that was not produced.

United States v. Pelullo, Crim. No. 94-276 (DRD), Civ. No. 01-124 (DRD) (D.N.J. filed May 17, 2002) (emphasis added).

### 2. The Philadelphia Federal Criminal [*24] Action

Plaintiffs claim that the Adorno Firm and Fred Schwartz also obstructed justice in Pelullo's Philadelphia criminal action. (RICO Case Statement at 19.) In the Philadelphia action, the government argued that Pelullo made certain admissions of guilt during an FBI interview in which Pelullo and Fred Schwartz were present. (SAC PP 149-150.) Despite the government's position that Fred Schwartz could testify in Pelullo's defense, "[Fred] Schwartz repeatedly refused to testify for Mr. Pelullo and refused to turn over exculpatory work-product materials for Mr. Pelullo's defense, even though he knew that Mr. Pelullo never made any admissions of guilt at the FBI interview in question." (SAC PP 151-52.) However, Fred Schwartz, who was a government informant against Pelullo, did turn over confidential records to the government "in an attempt to assist in Pelullo's prosecution in both the Philadelphia and Newark actions." (SAC PP 152, 154.) Plaintiffs allege that as a result of an agreement with the government "which was unknown to Mr. Pelullo," Fred Schwartz was unwilling to provide testimony about the FBI interview during the trial.

Plaintiffs claim that Fred Schwartz's refusal [*25] to either testify or turn over documents during the same time that he and the Adorno Firm represented Pelullo and the Trusts was done in furtherance of a conspiracy between the Adorno Defendants and National Union. The purpose of this conspiracy was to limit National Union's exposure as Adorno's insurer, and limit the Adorno Firm's civil and criminal liability. (SAC P 154.) Furthermore, Plaintiffs claim that at the same time Fred Schwartz and the Adorno Firm were representing Pelullo and the Trusts, Fred Schwartz provided attorney-client information to the government and others which was used against Pelullo in the Philadelphia and Newark criminal actions as well as in civil litigation. (SAC P 156.)

### 3. Civil Actions

The RICO Case Statement alleges that Fred Schwartz gave perjured testimony in civil litigation with the Compton Press Pension Fund in 1991 and 1993, and filed false pleadings from 1991 through 1994, which the

Fund used to force the Pelullo Trusts to pay civil judgments and fees in excess of $ 2 million. In addition, Fred Schwartz gave perjured testimony and filed false pleadings in civil litigation with Wilentz in 1994. (RICO Case Statement at 26.)

### F. The [*26] D'Amato and Lewis Firms

Plaintiffs assert that the D'Amato and Lewis law firms, which were retained by National Union to represent Wilentz, the Kerr Firm, and the Adorno Firm, coordinated the misconduct of these law firms and their attorneys "along with defendants Alston & Bird, Todd Sawicki and National Union." (SAC P 158.) Plaintiffs allege that the D'Amato and Lewis firms, and D'Amato partners, George and D'Agostino, used confidential, attorney-client information obtained from the firms that had represented Pelullo and the Trusts in order to protect the law firms from civil and criminal litigation, as well as to limit the exposure of National Union. Plaintiffs further allege that the D'Amato and Lewis firms "have turned over this confidential, attorney-client privileged information to the government or to other individuals in the course of civil litigation (including . . . Fred Schwartz, Moshe Milstein, the PIE trustee and the Transcon trustee), who in turn turned them over to the government for use against Mr. Pelullo." (SAC P 159.) Plaintiffs assert that D'Amato and Lewis "have made numerous false statements in written correspondence, and have filed false and fraudulent pleadings" [*27] in the various litigations. (SAC P 160.)

### G. National Union, Alston & Bird, and Attorney Sawicki

In addition to providing malpractice insurance coverage to the Wilentz, the Kerr Firm, and Adorno firms, National Union also provided a D & O Policy to PIE. As a director of PIE, Pelullo is insured under this policy. (SAC PP162-163.) Plaintiffs allege that National Union and the D'Amato and Lewis law firms sought to limit National Union's exposure by refusing to provide coverage to Pelullo in the Jacksonville criminal action until a Georgia district court ordered National Union to provide such coverage in March 1997, and that National Union, D'Amato, and Lewis took steps to "sabotage" Pelullo and the Trusts. (SAC PP 164-167.) Notwithstanding this allegation, however, the Georgia court record shows that National Union did not contest Pelullo's claims for the advancement of certain defense costs in the Jacksonville Criminal Action, as is discussed

in Section II, infra.

Despite the March 1997 court order to provide coverage, Plaintiffs allege that National Union, through the law firm of Alston & Bird, "continued to deny Mr. Pelullo counsel of his choice" in the Jacksonville criminal [*28] action. (SAC P 168.) The Second Amended Complaint asserts that in 1998, due to a defense funding agreement executed by Pelullo and National Union, Pelullo did retain an attorney. (SAC P 169-170.) Plaintiffs claim that although National Union did pay some of the costs associated with the Jacksonville criminal action, National Union, through Alston & Bird and Sawicki, breached this funding agreement because it refused to pay the balance of the costs associated with that representation, and has refused to pay for the shipment of records recovered in the Jacksonville action that were needed in the Philadelphia and Newark criminal actions and civil cases. Plaintiffs claim that National Union took these actions despite having notice of the importance of these documents, and despite the direct connection between the Jacksonville and Newark criminal actions. (SAC PP 171-78.) Plaintiffs claim that National Union's refusal to provide coverage for Pelullo's defense in the Newark and Philadelphia actions, as required by the parties' funding agreement and the D & O policy, amount to a subversion of Pelullo's efforts to defend himself in these actions. (SAC P 179.) [9] Plaintiffs assert that National [*29] Union's conduct has made it impossible for Pelullo to comply with court orders in the Newark criminal action, and "continues to threaten his freedom and well being." (SAC PP 180-81.)

> 9 Despite this allegation, however, as discussed in Section II, infra, a Georgia district court granted summary judgment to National Union in an interpleader action on all of Pelullo's claims for coverage and defense costs in the Philadelphia and Newark Criminal Actions. This ruling was affirmed by the Eleventh Circuit Court of Appeals.

*Damages*

Based on the above allegations, Plaintiffs assert that Pelullo has suffered damages totaling $ 33.393 million, and that the Pelullo Trust entities have suffered damages totaling $ 28.08 million, in the form of attorneys fees, fines, settlements, forfeitures, and judgments. (SAC P 182.)

*Claims*

Plaintiffs seek relief pursuant to the following claims: all Defendants violated *18 U.S.C. §§ 1962(c)*, RICO (Count I); all Defendants engaged in a RICO [*30] conspiracy in violation of *18 U.S.C. § 1962(d)* (Count II); Wilentz's and Kenneth Falk's actions constituted a breach of fiduciary duty owed to the Plaintiffs (Count III); the Kerr Firm's and Gissell's actions constituted a breach of fiduciary duty owed to the Plaintiffs (Count IV); the Adorno Firm, Hank Adorno, and Fred Schwartz breached their fiduciary duty to the Plaintiffs (Count V); a claim of professional negligence against Wilentz and Falk (Count VI); a claim of professional negligence against the Adorno Firm, Hank Adorno, and Fred Schwartz (Count VII); a claim of professional negligence against the Kerr Firm and Gissell (Count VIII); a claim of bad faith (asserted by all Plaintiffs except Pelullo) against National Union for its refusal to comply with the parties' defense funding agreement (Count IX); and a claim for breach of contract and breach of the implied covenant of good faith and fair dealing (asserted by all Plaintiffs except Pelullo) against National Union for its breach of the funding agreement and its efforts to subvert the interests of Pelullo (Count X). (SAC PP 208.)

Plaintiffs seek compensatory damages, treble damages under *18 U.S.C. § 1964* [*31] *(c)*, punitive damages, and other relief the Court deems appropriate. (SAC, "Wherefore" Clause.)

## II. NATURE AND STAGE OF PROCEEDINGS

Plaintiffs initially filed a Complaint in the instant action on November 7, 2000, [10] and subsequently filed the Amended Complaint on February 26, 2001. After Defendants filed various motions to dismiss the Amended Complaint, the Court granted leave for Plaintiffs to file a Second Amended Complaint ("SAC"), which was filed on November 21, 2001. The Second Amended Complaint alleged RICO violations based on a pattern of predicate acts of mail fraud, wire fraud, and obstruction of justice. Plaintiffs then filed a RICO Case Statement pursuant to a Court order on December 14, 2001. In the RICO Case Statement, Plaintiffs expressly declined to pursue RICO violations based on predicate acts of mail fraud or wire fraud. Instead, Plaintiffs rely only on the predicate acts characterized as obstruction of justice.

10   It appears that this original Complaint was not served on any of the defendants.

[*32] On January 9, 2002, a federal district court in the Northern District of Georgia held Pelullo and one of his attorneys in the instant action, Joseph M. Fioravanti, in civil contempt of a permanent injunction for filing the instant lawsuit naming National Union as a defendant. That court had presided over an interpleader action instituted by National Union, in which the insurer sought to resolve competing claims under the PIE D & O policy at issue in the instant action. In that action, the district court granted summary judgment to National Union on all of Pelullo's claims for coverage and defense costs in the Philadelphia criminal action and in the Newark criminal action, as well as Pelullo's other claims for coverage under the D & O Policy. Regarding the Jacksonville criminal action, the Georgia district court also explained that "because National Union did not contest Pelullo's claims for the advancement of certain defense costs in the Jacksonville Criminal Action, the court granted Pelullo's motion for partial summary judgment as to those claims." The Eleventh Circuit Court of Appeals affirmed the district court ruling on an appeal filed by Pelullo. The Georgia district court entered [*33] an amended judgment on March 31, 1997, which, inter alia, granted National Union a permanent injunction pursuant to *28 U.S.C. § 2361*, permanently enjoining Pelullo "from commencing or prosecuting any action affecting the proceeds of the [PIE D & O] policy." In its January 2002 civil contempt order, the Georgia district court held that Pelullo and Fioravanti violated its permanent injunction when they commenced the instant lawsuit, ordered dismissal of claims against National Union in the instant action, and imposed sanctions. Pelullo dismissed his claims against National Union on January 17, 2002.

## III. STANDARD OF REVIEW

[HN2] When considering a motion to dismiss a complaint for failure to state a claim under *Rule 12(b)(6)*, [11] this Court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under *Rule 12(b)(6)* . . . is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990)* (citing *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988))*; [*34] see *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*. For this reason, district courts strongly disfavor *Rule 12(b)(6)* motions. *Melo-Sonics*

2004 U.S. Dist. LEXIS 9138, *34

*Corp. v. Cropp, 342 F.2d 856 (3d Cir. 1965); Kuromiya v. United States, 37 F. Supp. 2d 717, 722 (E.D. Pa. 1999).* A court will only dismiss a complaint if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *H.J. Inc., 492 U.S. at 249-50* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)); Neitzke v. Williams, 490 U.S. 319, 326-327, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1984).* Nevertheless, a court need not credit a plaintiff's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).*

    11  *Rule 12(b)(6)* provides that:

    [HN3] Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted. . . .

    *Fed.R.Civ.P. 12(b)(6).*

    [*35] [HN4] RICO claims are generally subject to notice pleading requirements under *Federal Rule of Civil Procedure 8(a)*: "It is enough that a [RICO] complaint put the defendant on notice of the claims against him. It is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action." *Rose v. Bartle, 871 F.2d 331, 356 (3d Cir. 1989)* (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 790 (3d Cir. 1984)).* Pursuant to *Rule 8(a)* pleading requirements, a RICO plaintiff need not state every element necessary for recovery with precision in his or her complaint. *Id. at 356.*

    However, [HN5] RICO allegations constituting fraud are nevertheless subject to the heightened pleading requirements of the Federal Rules, which state that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake are to be pleaded with particularity." *Fed. R. Civ. P. 9(b).* See also *Nolan Bros., Inc. v. United States, 266 F.2d 143, 145-46 (10th Cir. 1959)* (holding that *Rule 9(b)* merely requires that [*36] circumstances constituting fraud be pleaded with particularity, regardless of whether the terms "fraud" or "fraudulent" appear on the face of a pleading). [HN6] The purpose of *Rule 9(b)* "is to provide notice of the 'precise

misconduct' with which defendants are charged and to prevent false or unsubstantiated charges. . . . However, courts should apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Livingston v. Shore Slurry Seal, Inc., 98 F. Supp. 2d 594, 597 (D.N.J. 2000)* (citations omitted). To satisfy *Rule 9(b)*, "plaintiffs may plead the specific conduct alleged to be fraudulent along with the 'date, place and time' that the alleged fraud occurred or use some 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Poling v. K. Hovnanian Enters., 99 F. Supp. 2d 502, 508 (D.N.J. 2000)* (citing *Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984),* cert. denied, *469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985)).*

    Finally, "it is well-settled that [HN7] in deciding [*37] a motion to dismiss, courts generally may consider only the allegations contained in the complaint, exhibits attached thereto, and matters of public record." *Beverly Enters., Inc. v. Trump, 182 F.3d 183, 190 n.3 (3d Cir. 1999).*

## IV. DISCUSSION A. Personal Jurisdiction

    As an initial matter, two of the Motions to Dismiss assert that this Court lacks personal jurisdiction as to at least some of the Defendants. Many courts have held that, pursuant to the RICO statute's nationwide service provision contained within *18 U.S.C. § 1965*, a RICO defendant "need only have sufficient minimum contacts with the United States to satisfy due process." *American Trade Partners, L.P v. A-1 Int'l Importing Enters., Ltd., 757 F. Supp. 545, 556 (E.D. Pa. 1991).* However, upon a review of *18 U.S.C. § 1965*, a better reading of [HN8] the venue and process provision of RICO requires that a district court has jurisdiction to entertain a civil RICO claim only where personal jurisdiction based on minimum contacts is first established as to at least one defendant pursuant to *18 U.S.C. § 1965(a).* Once minimum [*38] contacts is established as to at least one defendant, the nationwide service of process provision of *18 U.S.C. § 1965(b)* enables a plaintiff to bring before a single court all members of a RICO conspiracy. See also *PT United Can Co. v. Crown Cork & Seal Co., Inc., 138 F.3d 65, 71 (2d Cir. 1998)* (adopting this approach); *Boone v. Thompson, 2002 U.S. Dist. LEXIS 21548, No. 02-CV-1580, 2002 WL 31478834, * 3 (E.D. Pa. Nov. 1, 2002)* (requiring sufficient contacts with the forum state

to establish personal jurisdiction over RICO defendant). Here, since Plaintiffs (minus Pelullo) have named National Union as a defendant in this action with minimum contacts in Pennsylvania, and since the parties do not dispute the existence of personal jurisdiction with respect to the RICO claims, this Court has jurisdiction over all of the named Defendants.

**B. Plaintiffs' RICO Claims are Barred by the Statute of Limitations**

12

      12 Statute of limitations defenses were raised by the National Union and Kerr Firm Defendants.

[*39] The Second Amended Complaint alleges that Defendants collectively, by and through their individual members, have constituted an enterprise through which the Defendants participated in a pattern of racketeering in violation of *18 U.S.C. § 1962(c)* and(d). (SAC PP184-194.) Two of the Motions to Dismiss raise statute of limitations defenses. We agree that the instant RICO claims are barred by the statute of limitations.

[HN9] There is a four-year statute of limitations for civil RICO claims. *Agency Holding Corp.*

v. *Malley-Duff & Assocs. 483 U.S. 143, 97 L. Ed. 2d 121, 107 S. Ct. 2759 (1987).* In *Rotella v. Wood 528 U.S. 549, 145 L. Ed. 2d 1047, 120 S. Ct. 1075 (2000),* [HN10] the Supreme Court adopted the injury discovery rule for determining when the statute of limitations began to run on a civil RICO claim. Under this rule the statute begins to run when plaintiff knew or should have known of his injury. In adopting this rule the court specifically rejected the injury and pattern discovery rule under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity. Citing its decision in *Klehr v. A.O. Smith Corp. 521 U.S. 179, 138 L. Ed. 2d 373, 117 S. Ct. 1984 (1997),* [*40] the Court also rejected the last predicate act rule under which each predicate act forming a part of the same pattern starts the statute anew. In adopting and applying the injury discovery rule in a civil RICO malpractice case, the Court observed:

      A person suffering from inadequate treatment is thus responsible for determining within the limitation period then running whether the inadequacy was

malpractice. We see no good reason for accepting a lesser degree of responsibility on the part of a RICO plaintiff. It is true, of course, as Rotella points out, that RICO has a unique pattern requirement.... And it is true as well that a pattern of predicate acts may well be complex, concealed, or fraudulent. But identifying professional negligence may also be a matter of real complexity, and its discovery is not required before the statute starts running.... Although we said that the potential malpractice plaintiff "need only ask" if he has been wronged by a doctor, considerable enquiry and investigation may be necessary before he can make a responsible judgement about the actionability of the unsuccessful treatment he received. The fact, then, that a considerable effort may be required [*41] before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable does not place him in a significantly different position from the malpractice victim. A RICO plaintiff's ability to investigate the cause of his injuries is no more impaired by his ignorance of the underlying RICO pattern than a malpractice plaintiff is thwarted by ignorance of the details of treatment decisions or of prevailing standards of medical practice.

*Rotella, 528 U.S. at 556-57.*

In the case of Forbes v. Eagleson, the Third Circuit applied the injury discovery rule to civil RICO, indicating that [HN11] the four-year statutory period begins to run when the plaintiff "has discovered or, by the exercise of reasonable diligence, should have discovered (1) that he or she has been injured, and (2) that the injury has been caused by another party's conduct." *228 F.3d 471, 485 (3d Cir. 2000).* This approach "[does] not require any knowledge of the other RICO elements." *Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 245 (3d Cir. 2001).*

Plaintiffs filed their initial complaint in the matter on November 7, 2000. Obviously, Plaintiffs were aware [*42] of much of the injury that they allegedly suffered

2004 U.S. Dist. LEXIS 9138, *42

well before November of 1996. Count 1 of Plaintiffs' Second Amended Complaint alleges that, pursuant to the RICO statute, the Defendants comprised an enterprise whose individuals engaged in a pattern of racketeering activity in violation of *18 U.S.C. § 1962(c)*. [13] Plaintiffs state that as a proximate result of the Defendants' alleged RICO conduct, which included, inter alia, obstruction of justice in the Philadelphia federal criminal action, Plaintiffs suffered the following injuries in the Philadelphia federal criminal action: $ 3.6 million in legal fees, $ 3.48 million in fines, $ 2.02 million in restitution, and $ 14.5 million in forfeitures. (RICO Case Statement at 7.) Court records indicate that Pelullo was convicted in Philadelphia in 1995, and initiated proceedings before the Third Circuit to appeal his judgment and vacate his sentence on September 27, 1995 and October 12, 1995. Moreover, publicly available records indicate that the court entered an order of forfeiture in the Philadelphia action on September 14, 1995. *United States v. Pelullo, 1996 U.S. Dist. LEXIS 6511, No. Crim. 91-00060, 1996 WL 257345,* [*43] *\*1 (1996 E.D. Pa. May 10, 1996).* Also, we note that on June 4, 1996, the district court in Georgia handling the interpleader action granted summary judgment to National Union for all of Pelullo's claims for coverage and defense costs in the Philadelphia and Newark actions, but granted judgment to Pelullo for the advancement of certain costs in the Jacksonville action.

13  Specifically, Count I states:

> 184. From in or about 1989 to up through and including the present, the defendants National Union and the Wilentz Firm (and Falk), the Kerr Firm (and Gissell), the Adorno Frim (and [Fred] Schwartz) and the D'Amato Firm, by and through their individual members, have constituted an association in fact which comprised an enterprise, as that term is defined at Title *18, U.S. Code, § 1961(4).*

> 185. At all times herein referenced, the defendants participated in the affairs of the enterprise through a pattern of racketeering activity, which pattern

> of racketeering activity affected interstate commerce, in violation of *18 United States Code, § 1962(c).*

(SAC P 184.)

[*44]  In addition to having knowledge of injuries in the Philadelphia action prior to November 1996, based upon their allegations, Plaintiffs were on notice that these injuries were caused by another party's conduct. According to Plaintiffs, Pelullo and Fred Schwartz met with Assistant United States Attorney Ronald Cole and FBI agents in 1990. At this meeting, Fred Schwartz witnessed Pelullo give an exculpatory statement and took notes. (RICO Case Statement at 19.) After promising Pelullo that he would testify at trial in the Philadelphia criminal action that Pelullo was innocent of the offenses charged, Fred Schwartz failed to honor a subpoena, despite being able to provide exculpatory testimony and "other exculpatory work-product materials," and refused to testify in any of the four Philadelphia criminal trials in 1991, 1993, 1994, and 1995. (RICO Case Statement at 19.) Plaintiffs allege that this failure to testify was part of the pattern by Defendants to obstruct justice in effort to further the goals of the RICO enterprise. (RICO Case Statement at 20.) Plaintiffs assert that these actions caused their injuries in the Philadelphia criminal action. (RICO Case Statement at 6.) Clearly, [*45] Plaintiffs' RICO cause of action began to accrue more than four years prior to November 7, 2000.

These are only a few examples of Plaintiffs' knowledge of their injury at the hands of Defendants well before November of 1996. There are many others. It is ludicrous to suggest that, prior to November 1996, Plaintiffs did not know of the injury which they allegedly suffered as a result of this alleged RICO enterprise.

[HN12] "In a civil RICO case where all the requisite elements are present, a claim accrues

immediately upon the plaintiff's discovery of her injury. Absent equitable tolling doctrines, ignorance of the remaining elements of her claim, including the pattern required by RICO, is immaterial. A plaintiff has four years from the time she discovers her injury to investigate, gather evidence, and bring suit. At the end of the four years, her claim expires." *Matthews, 260 F.3d at 257, n.26* (citations omitted). This is exactly the case

here.

Plaintiffs suggest that the four-year limitations period is tolled because of Defendants' fraudulent concealment of the existence of a RICO claim. As explained in Matthews, [HN13] to establish fraudulent concealment, the plaintiff has [*46] the burden of proving:

> (1) "active misleading" by the defendant, (2) which prevents the plaintiff from recognizing the validity of her claim within the limitations period, (3) where the plaintiff's ignorance is not attributable to her lack of "reasonable due diligence in attempting to uncover the relevant facts."

*Id. at 256* (citations omitted). As emphasized in *Davis v. Grusemeyer*, "[a] key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim he now brings." *996 F.2d 617, 624 (3d Cir. 1993)*.

Assuming for the sake of argument that Plaintiffs were actually mislead by Defendants, we fail to see how this prevented Plaintiffs from recognizing their claim, given the activities and interaction of these parties between 1990 and 1995, as alleged by Plaintiffs and as recited above. Moreover, given these activities and this interaction, it is clear that if Plaintiffs were ignorant of their claim, that ignorance is attributable to Plaintiffs' lack of due diligence, not Defendants' active misleading.

In addition, it appears that Plaintiffs do not allege facts [*47] sufficient to support the claim of fraudulent concealment of the RICO claims. [HN14] As with all allegations constituting fraud, fraudulent concealment must be pled subject to the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)*. *Byrnes v. DeBolt Transfer, Inc., 741 F.2d 620, 626 (3d Cir. 1984)*. Plaintiffs have made no allegations concerning their exercise of reasonable due diligence in uncovering the RICO claim. Given the massive injury that Plaintiffs' allege that they sustained between 1990 and 1995 and given Plaintiffs' unique propensity for litigation, this is particularly significant. Despite all of the assertions of perjury, of fraudulent pleadings in order to hide the conspiracy, and of concealed documents, Plaintiffs do not point us to any reasonably diligent efforts on their part to uncover any wrongdoing of which

they were unaware. Based upon the allegations contained in the Second Amended Complaint and the RICO Case Statement, we reject any assertion that Plaintiffs have properly plead or can prove that fraudulent concealment tolled the statute of limitations in this matter.

**C. Plaintiffs have [*48] not Stated Any RICO Claims Pursuant to *18 U.S.C. § 1962(c)***

[HN15] To state a RICO claim under *18 U.S.C. § 1962(c)*, a plaintiff must allege (1) standing to bring a RICO claim, i.e., that he or she has been injured in his or her business or property by reason of a violation of *18 U.S.C. § 1962*; (2) that the defendants were employed by or associated with an enterprise affecting interstate commerce; and (3) that the defendants participated in the conduct of the enterprise's affairs through at least two predicate acts of racketeering activity. See *18 U.S.C. §§ 1964(c),1962(c),1961(3)-(5)*. [14] See also *Rose v. Bartle, 871 F.2d 331, 358 (3d Cir. 1989)* (stating elements of a RICO claim under *section 1962(c)*). *Section 1961 of Title 18 of the United States Code* [HN16] defines "racketeering activity" to include, inter alia, acts which are indictable under the federal mail fraud, wire fraud, and obstruction of justice statutes, *18 U.S.C. §§ 1341,1343,1503*. *18 U.S.C. § 1961(1)(B)*. Upon careful review of the Second Amended Complaint and [*49] the RICO Case Statement, we conclude that Plaintiffs have failed to state a claim under *18 U.S.C. § 1962(c)*.

14    The RICO statute states:

> [HN17] It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt. *18 U.S.C. § 1962(c)*.

> A "pattern of racketeering" requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years

(excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *18 U.S.C. § 1961(5)*. An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*. A plaintiff has standing to sue under the RICO statute if he has been "injured in his business or property by reason of a violation of *section 1962*." *18 U.S.C. § 1964(c)*.

### [*50] I. Wilentz and Falk

[HN18] The Third Circuit requires that a RICO plaintiff, under *18 U.S.C. § 1964(c)*, make a threshold showing "(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of *18 U.S.C. § 1962*." *Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000)*. Since we find that Plaintiffs have failed to allege facts which demonstrate that either Wilentz or Falk proximately caused Plaintiffs' injuries, Plaintiffs lack standing to assert RICO claims against these Defendants.

[HN19] "Standing to assert RICO claims requires that the alleged RICO violation proximately caused a plaintiff's injury--i.e., the violation is not too remote from the injury." *Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 443 (3d Cir. 2000)* (citing *Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992))*. It is not enough that the defendant's violation was the "but for" cause of plaintiff's injury. *Holmes, 503 U.S. at 268 (1992)*. The Third Circuit has identified [*51] the formal factors of proximate cause as:

(1) the directness of the injury--"the more indirect the injury, 'the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to [defendant's wrongdoing], as distinct from other, independent, factors;'" (2) the

difficulty of apportioning damages among potential plaintiffs . . . and, (3) the possibility of other plaintiffs vindicating the goals of RICO--"direct victims could generally be counted on to vindicate the policies underlying" RICO in a better manner than indirect victims.

*Allegheny Gen. Hosp., 228 F.3d at 443* (first alteration in original). Plaintiffs must show a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes, 503 U.S. at 268*. Although we will assume that the second and third factors in the Third Circuit's proximate causation test will not bar Plaintiffs' claims, we conclude that Plaintiff is unable to establish a direct relation between the injury asserted and the injurious conduct alleged with respect to Wilentz and Falk. With respect to Wilentz and Falk, Plaintiffs' RICO Case Statement and Second Amended Complaint [*52] makes the following allegations. Wilentz withheld, concealed, and responded falsely to requests for documents vital to Pelullo's defense and post-conviction relief in the Newark criminal action. Falk obstructed justice by providing perjured testimony in the Newark criminal action. Specifically, Falk falsely swore that Pelullo possessed no attorney-client privilege with respect to Wilentz, and testified against him. Wilentz obstructed justice by giving perjured testimony and filing false pleadings and documents in civil litigation brought by Milstein against Wilentz. Wilentz obstructed justice when it used attorney-client privileged documents obtained while representing Plaintiffs in defending civil actions brought by Fred and Murray Schwartz, the PIE and Transcon trustees, Milstein, and civil litigation in Ohio involving Sherwin-Williams and Lyons Transportation. Plaintiffs allege that the PIE trustee obtained these confidential records and subsequently submitted them to the government, which used them to indict Pelullo in Jacksonville and Newark, and force OHA to enter into a $ 2.4 million settlement with the PIE trustee. Plaintiffs then allege that as a result of Wilentz's dual representation [*53] of Pelullo and the Trusts, as well as the sellers of Compton Press during the Compton Press transaction, Pelullo was convicted in the Newark criminal action. With respect to the PIE and Transcon acquisitions, the SAC alleges that due to Wilentz's and Falk's erroneous advice and poor drafting of the Lease Agreement, Pelullo and the Pelullo Trusts were forced to pay a settlement of $ 2.4 million to the PIE bankruptcy

estate and $ 45 million to the Central States Fund.

The above averments fail to allege that Wilentz's or Falk's actions were the proximate cause of Plaintiffs' harm. [HN20] Normally, the proximate cause of a criminal conviction is the defendant's own actions unless the defendant has obtained relief from that conviction. A number of cases establish this point. In *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1287 (11th Cir. 2002), the plaintiff sought relief for allegations that defendants had lost or destroyed exculpatory evidence that would have proven that he was arrested and prosecuted without probable cause.

The Eleventh Circuit rejected this claim, finding:

"Without obtaining relief from the conviction or sentence, the criminal defendant's own actions [*54] must be presumed to be the proximate cause of the injury." . . . That is, until Rowe won his release, a court would have had to presume that proximate cause of any impairment in his ability to prove he was maliciously prosecuted was the fact that he was *not*, in fact, maliciously prosecuted, but instead had been validly convicted as a consequence of his own actions. . . . Without such a presumption there would be a real danger of the "relitigation of supposedly settled matters."

Id. (citations omitted) (relying on Florida law) (emphasis in original). Similarly, under Pennsylvania law, in order for a plaintiff to establish that a defense lawyer's actions were the proximate cause of his conviction, he "must prove that he is innocent of the crime or any lesser included offense." *Bailey v. Tucker*, 533 Pa. 237, 621 A.2d 108, 113 (Pa. 1993). See also, e.g., *McCurvin v. Law Offices of Koffsky & Walkley*, 2003 U.S. Dist. LEXIS 1378, No. Civ. A. 3:98CV182(SRU), 2003 WL 223428, at *3 (D.Conn. Jan. 24, 2003) .

Although it is true that Pelullo was granted a new trial on his conviction in the federal court in New Jersey, this development does not alter our assessment [*55] that Plaintiffs have failed to establish that Wilentz's or Falk's alleged actions proximately caused Pelullo's harm. First, the grant of a new trial is not based on assertions regarding either Wilentz or Falk. Second, in granting a

new trial to Pelullo, the district court noted that a jury could have still convicted him despite this new evidence, as the evidence went to the credibility of the government's case and did not, on its own, serve to exonerate Pelullo: "It can be observed that even if defendant's version of all the transactions were accepted by the jury, the jury could still have found that he had the criminal intent requisite to establish the charges of conspiracy, embezzlement, and money laundering." United States v. Pelullo, Crim. No. 94-276 (DRD), Civ. No. 01-124 (DRD) (D.N.J. filed May 17, 2002).[15] Third, the above allegations did not appear in Pelullo's motion for a new trial, or in any other attempt by the Plaintiff to obtain relief from his convictions that we have been able to locate. Plaintiff did not provide us with any information that would disclose this. Therefore, the fact that Pelullo was granted a new trial due to the discovery of new documents which [*56] the district court found might affect the credibility of some of the government witnesses, (including, we note, Defendant Fred Schwartz), fails to establish a connection between Wilentz and Falk's actions, and Plaintiffs' harm.

15  We also note that in a more recent opinion, Judge Debevoise, the same judge who granted Pelullo a new trial, describes Pelullo's career as having "consisted of engineering one fraudulent transaction after another," and "has left in his wake many victims." United States v. Pelullo, Criminal Action No. 94-276, Doc. No. 233, at 4.

Moreover, Plaintiffs have not alleged how any of the Defendants' actions have proximately caused the injuries alleged. Plaintiffs have not provided us with any substantiation of the alleged role these actions played in his conviction or civil judgments. Plaintiffs claim that Falk falsely swore that testimony offered by him would not be subject to attorney-client privilege and then proceeded to testify against Pelullo, yet Plaintiffs provide no evidence that [*57] they ever objected to this testimony--at trial, on appeal, or in any legal proceeding--until now. We find this particularly remarkable given Pelullo's extensive efforts to avoid incarceration and civil liability. In fact, Plaintiffs utterly fail to state how Falk's testimony played any role whatsoever in any of the jury convictions, settlements, or judgments awarded against Pelullo. We have no indication of the content of this testimony, its significance, or the extent to which it was ever challenged. This lack of information is fatal to the

allegations surrounding Falk, particularly given the fact that these allegations would be within Plaintiffs' knowledge, and that Plaintiffs did not take the opportunity to clarify their allegations in their RICO Case Statement. See *First Commodity Corp. of Boston v. Jasek, 1987 U.S. Dist. LEXIS 33*, No. 85 C 2266, 1987 WL 5229, *5 (N.D. Ill. 1987) (finding that a RICO counterclaim failed to state how the counterdefendants' alleged obstruction of justice proximately caused injury to the counterplaintiffs, despite the fact that "the allegations that are missing . . . should be within [the counterplaintiffs'] personal knowledge); see also *Northland Ins. Co. v. Shell Oil Co., 930 F. Supp. 1069, 1075 (D.N.J. 1996)* [*58] ("The mission of the [RICO] case statement is to amplify the allegations of the complaint. It provides clarity and precision in the statement of a civil RICO claim and . . . may help in the early screening of ill conceived RICO claims . . . ." ) (citation omitted).

In addition to the perjury allegations, Plaintiffs allege that "the Wilentz firm corrupted the Newark Criminal Action by withholding documents in its possession which it knew were critical to Mr. Pelullo's defense." (RICO Case Statement at 11.) Plaintiffs substantiate this statement by alleging that in connection with the Milstein/Wilentz Action from 1995 to 1999, Wilentz represented in discovery and court documents that it had not represented Plaintiffs from 1989 through 1991; that in January 1999, Milstein's lawyers filed a court document containing Falk's testimony which demonstrated that Wilentz had in fact represented Plaintiffs during that time period; that the sworn declaration of a lawyer at the D'Amato firms contradicts that lawyer's earlier statement that the Wilentz firm did not represent Pelullo individually; and that the Wilentz firm "corrupted the Newark Criminal Action and Jacksonville Criminal Action by [*59] withholding documents necessary to the defense of Mr. Pelullo which it had in its possession, and which it knew would be critical to Mr. Pelullo's defense." (RICO Case Statement at 11; SAC PP 187 (k, l, n, s).) After a thorough review of Plaintiffs' Second Amended Complaint and RICO Case Statement, we do not see the connection between these allegations and Pelullo's multiple criminal convictions, civil settlements, and judgments. The Second Amended Complaint gives no indication of how these actions led to Plaintiffs' injuries. There is no indication as to what type of evidence was included in this information or the role it played in these lawsuits. Moreover, as with Falk's alleged perjury, we

note that Plaintiffs have failed to include these missing allegations despite having access to all of this information, despite having amended their complaint twice, despite having been given the opportunity to file a supplemental RICO Case Statement, and despite filing multiple memoranda in opposition to Wilentz and Falk's Motion to Dismiss.

As a final observation, we note that despite asserting in the Second Amended Complaint and Rico Case Statement that Wilentz and Falk engaged in RICO predicate [*60] acts of obstruction of justice under *18 U.S.C. § 1503*, actions which would normally be subject to notice pleading standards, Plaintiffs repeatedly characterized these RICO allegations as "fraud" throughout the Second Amended Complaint. See, e.g., SAC P 187(a)-(v) (entitling subsections as "The Wilentz Firm: Fraud" and "The Wilentz Firm: Obstruction of Justice and Fraud" and encompassing the above RICO allegations). We agree with Plaintiffs that the above allegations constitute circumstances involving fraud. [16] This provides support for the conclusion that Plaintiffs have failed to sufficiently allege a connection between the Wilentz Defendants' actions and Plaintiffs' injuries.

> 16   [11N21] In Pennsylvania, a fraud claim has six elements, all of which must be pleaded with particularity: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Huddleston v. Infertility Ctr. of America, Inc., 700 A.2d 453, 461 (Pa.Super.1997).*

## [*61] 2. The Kerr Firm and Attorney Gissell

With respect to the Kerr Firm and Gissell, Plaintiffs have made the following allegations. In 1990, the Kerr Firm and Gissell represented Plaintiffs in the acquisition of the PIE and Transcon trucking companies, but simultaneously represented PIE in a conflict of interest that resulted in negligent representation. The Kerr Firm and Gissell then gave Plaintiffs improper legal advice regarding the acquisition, concealed the fact that these trucking companies were insolvent, advised Pelullo that the transactions were legal, and prepared the documentation for these transactions. Despite these

representations, Transcon and PIE suffered bankruptcies in 1990 which led to lawsuits against certain of the Plaintiffs, and civil liability resulted. In 1993, the PIE bankruptcy trustee sent a "confidential" memorandum [17] to the Kerr Firm and Gissell threatening to expand the PIE bankruptcy action to seek damages from Kerr and Gissell for alleged breaches of duty. The PIE trustee instructed the Kerr Defendants not to disclose the memorandum to Plaintiffs, and the Kerr Defendants did not disclose the memorandum despite having a fiduciary duty to do so. [*62] Plaintiffs did not discover this memorandum until 2000 in the Jacksonville criminal action. National Union later paid the PIE trustee $ 5 million dollars to settle the action. Also as part of the settlement, the Kerr Defendants turned over numerous confidential documents that pertained to Plaintiffs. In 1997, the PIE trustee then used these documents in litigation, to force a $ 2.5 million settlement with OHA. If Plaintiffs had realized the source of these documents during the litigation, they would have moved to exclude them from evidence and would have successfully defended against this action.

17  Although neither the RICO Case Statement nor the Second Amended Complaint goes into detail regarding the contents of this 1993 memorandum, Plaintiffs' Memorandum in Opposition to the Kerr Defendants' Motion to Dismiss describes it:

> [The memorandum] describes Kerr's gross negligence in connection with the PIE transaction and demonstrates that Kerr knew or should have known of PIE's troubled condition before plaintiff Olympia purchased the company. The memorandum establishes that Kerr should have advised Olympia of PIE's precarious state prior to Olympia's purchase but failed to do so because of a severe conflict of interest, viz., defendants' simultaneous representation of PIE, Olympia and other related parties.

(Pl. Mem. in Opp'n to Kerr Mot. at 12.)

[*63] The Kerr Defendants then allegedly concealed the disclosure by filing false pleadings in a 1996 action brought by Pelullo. On December 9, 1996, the Kerr Defendants responded to Pelullo's Complaint which alleged fraud, breach of fiduciary duty, and malpractice by filing a motion to dismiss for failure to allege fraud with particularity. The Kerr Defendants filed this motion despite having in their possession the 1993 memorandum detailing their "gross lapses in judgment, multitudinous breaches of fiduciary duty, and . . . knowledge of PIE's insolvency prior to Olympia's 1990 purchase of PIE." (RICO Case Statement at 31.) Finally, the Kerr Defendants failed to turn over documents in 1999 to Plaintiffs that were germane to various civil and criminal proceedings involving Pelullo, denying that they represented Pelullo or the Trusts.

Again, Plaintiffs have failed to sufficiently allege facts, which would establish that the Kerr Defendants' RICO predicate actions proximately caused Plaintiffs' harm. First, with regard to the 1993 memorandum from the PIE trustee to the Kerr Defendants, according to Plaintiffs' pleadings, the contents of this memorandum would have put Plaintiffs on notice [*64] of the Kerr Defendants' conflict of interest and knowledge of the poor financial condition of PIE prior to Olympia's purchase. However, Pelullo sued the Kerr Defendants on exactly these issues in an adversary complaint in Pelullo v. Kerr, Russell & Weber, PLC, No. 96-2254 (filed Bankr. E.D. Pa. 1996). [18] We reject Plaintiffs' contention that the alleged concealment of this letter, which Plaintiffs say they did not discover until 2000, concealed the wrongdoing by Kerr. Accordingly, the alleged concealment of this letter could not have caused any of Plaintiffs' injuries alleged herein. [19]

18  Specifically, the 1996 adversary complaint states, in pertinent part:

> 4. Defendants represented P*I*E and performed legal services on behalf of P*I*E beginning in October 1987. . . .

> 6. Kerr, Russell also acted as the escrow agent for [Olympia's] P*I*E acquisition. . . .

> 7. During the negotiations and due diligence Olympia conducted, defendants made material

misrepresentations and failed to disclose the following information:

a) The true financial condition of P*I*E in and before April 1990, i.e. P*I*E was insolvent;

b) The 1989 P*I*E financial statements were materially misleading;

c) The preparation of a bankruptcy plan for P*I*E before the April 1990 sale to Olympia, and that they had discussed the bankruptcy plan with the then officers and directors of P*I*E . . .

11. If defendants had disclosed accurate information, and not omitted material facts, Olympia would not have purchased P*I*E. . . .

[*65]

19   We note also that any claims based on the supposed role of this letter would be barred by res judicata, as this letter, as alleged, only provides evidence of claims for which Plaintiffs have already unsuccessfully sought relief.

With respect to the allegations that the Kerr Defendants turned over confidential documents as part of a settlement with the PIE trustee, and then concealed this fact from Plaintiffs, which eventually allowed the PIE trustee to force a settlement with OHA, such allegations are not pleaded with sufficient particularity. These assertions--although Plaintiffs have attempted to characterize them as obstruction of justice in violation of 18 U.S.C. § 1503--allege circumstances involving fraudulent concealment for purposes of federal civil pleading requirements. Plaintiffs have provided the Court with the declaration of Charles B. Tomm, PIE's executive vice-president and chief operating officer of PIE's bankruptcy estate, to support their claim that Kerr turned over privileged documents. However as to the Kerr Defendants, Tomm's statements provide [*66] little more information than do the SAC and the Rico Case Statement. In fact, Tomm's declaration essentially parrots the allegations made by Plaintiffs. Plaintiffs provide no

indication of what type of information the Kerr Defendants handed over, and make no factual allegations to support the assertion that these documents were attorney-client privileged or that the PIE bankruptcy trustee relied upon these documents in forcing a settlement.

Moreover, the actions that Plaintiffs claim the Kerr Defendants took to conceal the disclosure of these documents, do not establish that Plaintiffs were injured by reason of any predicate acts of obstruction of justice by the Kerr Defendants. [HN22] An attorney's decision to file a motion to dismiss a complaint based on a plaintiff's failure to plead fraud with particularity is a proper litigation strategy, regardless of what information that attorney may or may not have known regarding the allegations, as the burden to plead fraud properly falls on the plaintiff, not on the defendant. FED. R. CIV. P. 9(b). We reject the effort by Plaintiffs to portray this pleading as obstruction of justice [20] or any other criminal [*67] predicate act. Finally, the Kerr Defendants' failure to turn over documents in 1999 based on a claim that they did not represent Plaintiffs amounts, at best, to a discovery dispute which Plaintiffs did not pursue. Although Plaintiffs now claim that the Kerr Defendants took this action in an effort to conceal their prior disclosure of documents to the PIE trustee, they do not support this allegation involving circumstances of fraudulent concealment with any particularity, nor do they allege facts which would allow us to conclude that such actions amounted to obstruction of justice pursuant to 18 U.S.C. § 1503.

20   The obstruction of justice statute states, in its so-called "Omnibus Clause":

[HN23] Whoever corruptly . . . endeavors or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). . . .

18 U.S.C. § 1503(a). [HN24] The Third Circuit has stated that the elements of a prima facie case of obstruction of justice are "(1) the existence of a judicial proceeding, (2) knowledge or notice of the pending proceeding, (3) acting corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of

justice, and (4) that the action had the 'natural and probable effect' of interfering with the due administration of justice." *In re Impounded, 241 F.3d 308, 317 n.8 (3d Cir. 2001).*

### [*68] 3. The D'Amato and Lewis Firms

Plaintiffs assert that the D'Amato and Lewis Firms, through Defendants George and D'Agostino, have been using confidential attorney-client privileged information obtained from the law firms that previously represented Plaintiffs to protect these law firms from civil and criminal prosecution, and to limit the exposure of National Union in the lawsuits that have been filed against these law firms. (RICO Case Statement at 33.) Plaintiffs further allege that the D'Amato and Lewis Firms have turned over this confidential, attorney-client privileged information to the government and other individuals, who in turn provided this information to the government for use against Pelullo. To support these assertions, Plaintiffs allege as follows.

First, the D'Amato and Lewis Firms have made false statements in written correspondence, and "have filed false and fraudulent pleadings" in the courts having jurisdiction over these matters. (Id. at 34.) Specifically, D'Amato & Lynch deliberately denied that Wilentz and Falk represented Plaintiffs to avoid turning over documents that Plaintiffs had requested. D'Amato & Lynch also instructed Falk to testify [*69] falsely during the Newark criminal action that neither he nor Wilentz represented Plaintiffs. This misconduct prevented Pelullo and the Trusts from obtaining documents that were necessary to their defenses in criminal and civil cases. (Id.)

Second, the Lewis Firm used privileged documents without Plaintiffs' permission in defending actions brought by the PIE trustee, the Transcon trustee, Milstein, and in civil litigation in Ohio involving Sherwin-Williams and Lyons Transportation. The Lewis Firm used these documents in the course of defending the Wilentz Firm. Then, "Mr. Pelullo's adversaries obtained these confidential records" and submitted them to grand juries in Jacksonville and Newark who used them to indict Pelullo. (Id. at 35.) Further, the Lewis Firm used these documents without Plaintiffs' permission in defending Wilentz in a Florida civil action brought by Fred Schwartz. Fred Schwartz then turned over these documents to the government for use against Pelullo in the Newark and Jacksonville

criminal actions.

With regard to the allegations involving D'Amato & Lynch, these allegations amount to circumstances involving fraud that have not been pleaded [*70] with sufficient particularity to establish that any of these actions proximately caused Plaintiffs' harms. This is particularly so given Plaintiffs' own knowledge concerning these allegations. Plaintiffs chose to characterize these allegations as fraud in their Second Amended Complaint, and were given the opportunity to clarify these documents in their RICO Case Statement, but did not do so. Plaintiffs do not allege how these actions prevented Pelullo from obtaining the documents he needed in his defense, what type of information these documents allegedly contain, or the role that these missing documents would have played in Pelullo's defense--despite having access to all of these missing documents. Rather, we are only assured that these documents were necessary to Pelullo's defense. As discussed with respect to the allegations regarding Wilentz above, Plaintiffs have not alleged that any of these actions proximately caused Plaintiffs' injuries. Furthermore, although Plaintiffs assert that these actions constitute obstruction of justice, they have not provided any factual allegations which, taken as true, would support the claim that Defendants acted corruptly with the intent of influencing, [*71] obstructing, or impeding the proceeding in the due administration of justice.

With regard to the Lewis Firm, Plaintiffs fail to support these assertions with factual allegations which would demonstrate either that these acts constituted obstruction of justice, or that these actions proximately caused Plaintiffs' harm. Plaintiffs claim the Lewis Firm used documents without Plaintiffs' permission, and that this caused harm to Plaintiffs. However, there are no factual allegations to support the conclusion that the Lewis Firm took these actions, even though such facts would be within Plaintiffs' own knowledge. Moreover, Plaintiffs' base allegations, that adversaries then obtained these documents and used them against Plaintiffs, fail to overcome proximate causation problems. We fail to see how the Lewis Firm can be the proximate cause of Plaintiffs' harm which resulted from actions allegedly taken by others. [21]

> 21   And, in any event, as discussed below, the allegations that Fred Schwartz turned over documents to federal authorities cannot be the

proximate cause of Plaintiffs' harm.

[*72] *Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992).*

### 4. National Union, Alston & Bird and Attorney Sawicki ("National Union Defendants")

Plaintiffs assert that the following allegations demonstrate that National Union denied insurance coverage and access to records as part of a pattern of racketeering designed to protect its insureds from civil and criminal prosecution, to limit National Union's exposure in the lawsuits filed against these firms, and to keep Pelullo subject to criminal penalties imposed in the Newark Criminal Action. National Union's law firm, Alston & Bird (and its attorney, Sawicki) refused to provide Pelullo with his counsel of choice in the Jacksonville criminal action even though the district court in Georgia directed National Union to provide coverage for Pelullo's defense of the Jacksonville action. [22] Also, National Union breached the parties' Defense Costs Funding Agreement by refusing to pay fees and costs incurred by Pelullo in the Jacksonville action, and for refusing to pay for the movement of records recovered in the Jacksonville action "which Pelullo desperately needed in order to defend [*73] himself in the Philadelphia and Newark Criminal Actions, and which the Pelullo trusts desperately need in order to defend themselves in various civil actions." Finally, National Union, "through Alston & Bird and Sawicki," refused to provide coverage for the Newark action even though it has been held to be substantially related as a matter of law to the Jacksonville action. [23] In their RICO Case Statement, Plaintiffs assert that they are not seeking D & O proceeds from National Union, but rather are seeking damages based on their pattern of obstructing justice.

> [22] We note that, as stated earlier, National Union never contested their obligation to provide coverage in the Jacksonville action in the Georgia action.

> [23] As noted earlier, the Georgia district court granted summary judgment to National Union on all claims for coverage and defense costs in the Philadelphia and Newark actions.

Plaintiffs provide no facts to support the notion that

any of these actions were improper, let alone obstructions of justice. [*74] Regarding the assertion that Alston & Bird did not give Pelullo his lawyer of choice, Plaintiffs provide no facts which would establish that Pelullo was unilaterally entitled to the lawyer of his choice pursuant to the parties' policy, or that such an action was taken corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice pursuant to *18 U.S.C. § 1503*. With respect to allegations that National Union breached the party's defense funding agreement by refusing to pay certain Jacksonville criminal action costs or pay for the movement of documents needed in the Newark Criminal Action, and that National Union has refused to provide coverage in the Newark criminal action even though the action is related to the Jacksonville action as a "matter of law", Plaintiffs make no factual allegations to support the claim that National Union violated any of its contractual or legal obligations. In fact, the only available information regarding such accusations is that the Georgia district court granted summary judgment for National Union in the interpleader action, regarding the Newark criminal action. Absent any [*75] factual support allegations, we fail to see how National Union's alleged failure to pay for costs and the movement of documents in the Newark criminal action, or certain Jacksonville criminal action costs, could constitute obstruction of justice for purposes of the RICO statute. It is particularly significant that Plaintiffs have provided no indication of National Union's obligations or of any corrupt intent to influence, obstruct, or impede any proceedings in the due administration of justice, where such in formation would clearly be within Plaintiffs' knowledge.

Moreover, we have no indication what statements such as "through Alston & Bird and Sawicki" mean. Such an assertion does not demonstrate obstruction of justice on the part of the Alston & Bird Defendants. There are no allegations to support the pleading requirement that they acted corruptly with the intent of influencing, obstructing, or impeding the proceeding in the due administration of justice.

### 5. The Adorno Firm and Fred Schwartz

**Philadelphia Criminal Action.** The pattern of racketeering asserted regarding the Adorno Firm and Fred Schwartz includes the following allegations regarding the Philadelphia [*76] Criminal Action. Fred

2004 U.S. Dist. LEXIS 9138, *76

Schwartz became a government informant while at the same time representing Pelullo. According to Plaintiffs, Fred Schwartz refused to testify on Pelullo's behalf [24] in any of the four trials that took place in the Philadelphia Criminal Action, despite the fact that Fred Schwartz represented Pelullo during the pre- and post-indictment stages of the Philadelphia criminal action, and would have been able to provide exculpatory testimony for Pelullo. Plaintiffs state that "due to his status as government informant, [Fred] Schwartz refused to produce notes of a 1990 meeting involving himself, Mr. Pelullo, the federal prosecutor and FBI agents which would have exculpated Mr. Pelullo" in Pelullo's four trials in the Philadelphia Criminal Action.

> 24   Plaintiffs do not appear to be concerned with the likelihood that were Fred Schwartz to testify as Pelullo's lawyer, Pelullo would be waiving his attorney-client privilege.

**Newark Criminal Action.** Fred Schwartz gave perjured testimony in the [*77] Newark Criminal Action trial in 1996. Pelullo did not realize he was a government informant until that trial. Fred Schwartz also destroyed and/or concealed crucial documents in the Newark Criminal Action. Plaintiffs allege that newly discovered documents will demonstrate that Fred Schwartz's statements constituted perjury, and that Pelullo's defense was legitimate.

**Civil Litigation.** Fred Schwartz gave perjured testimony in civil litigation with the Compton Press Pension Fund in 1991 and 1993, and filed false pleadings in 1991 through 1994, which the Fund used to force the Pelullo Trusts to pay civil judgments and fees in excess of $ 2 million. In addition, Fred Schwartz gave perjured testimony and filed false pleadings in civil litigation with Wilentz in 1994.

With regard to the Philadelphia Criminal Action, as explained above, Pelullo's own actions, and not those of anyone else, are the proximate cause of his conviction unless he obtains relief or demonstrates his innocence, neither of which has occurred. With regard to the Newark criminal action, any assertion that Fred Schwartz's testimony, whether or not it qualifies as obstruction of justice, caused Pelullo's conviction [*78] is belied by Judge Debevoise's statement in granting Pelullo a new trial in the Newark Criminal Action. As above discussed,

Judge Debevoise stated: "It can be observed that even if defendant's version of all the transactions were accepted by the jury, the jury could still have found that he had the criminal intent requisite to establish the charges of conspiracy, embezzlement, and money laundering." Moreover, we do not agree that Fred Schwartz's status as a government informant amounts to obstruction of justice. Finally, the allegations regarding Fred Schwartz's testimony in civil actions, if taken as true, are not sufficient to establish a connection between his actions and Plaintiffs' injuries.

Thus, for all of these reasons, Plaintiffs have failed to properly allege a violation of RICO pursuant to *18 U.S.C. § 1962(c)*.

**D.  Plaintiffs have Failed to Allege a RICO Conspiracy Pursuant to *18 U.S.C. § 1962(d)*.**

Since Plaintiffs' *§ 1962(c)* claim has not survived, the *§ 1962(d)* claim must similarly fail. *Jaguar Cars v. Royal Oaks Motor Car Co., 46 F.3d 258, 262 (3d Cir. 1995)* ("The viability of [a [*79] plaintiffs'] section [1962](d) claim depends on the legal sufficiency of its § 1962(c) claim.").

**E. The Court Will Not Exercise Jurisdiction over Plaintiffs' State Law Claims**

Plaintiffs invoked this Court's federal question jurisdiction over their RICO claims. *28 U.S.C. § 1331*. [HN25] "The District Court may decline to exercise supplemental jurisdiction over state law claims when the District Court has dismissed all claims over which it had original jurisdiction." *Shaev v. Saper, 320 F.3d 373, 384 (3d Cir. 2003)*. Accordingly, we decline to exercise jurisdiction over Plaintiffs' remaining state law claims. V. **CONCLUSION**

For the foregoing reasons, we entered the Order granting Plaintiffs' Motion for Leave to File Supplemental Memorandum in Opposition to Defendants' Motions to Dismiss Second Amended Complaint, and granting the four motions to dismiss filed by the Defendants.

BY THE COURT:

R. Barclay Surrick, Judge

## <u>CERTIFICATE OF SERVICE</u>

I, Sean M. Brennecke, hereby certify that on December 20, 2007, I caused to be electronically filed a true and correct copy of **Defendant Ross' Reply Brief In Further Support Of His Motion To Dismiss The Complaint, And In Opposition To Motion For Discovery** with the Clerk of Court by CM/ECF.

I further certify that I served a true and correct copy of the foregoing document on the plaintiff in the manner indicated below:

### <u>By Federal Express</u>

Ms. Pamela Carvel
23 Old Brompton Road
Suite 159
London SW7 3SS
England

/s/ Sean M. Brennecke
David J. Margules (#2254)
Sean M. Brennecke (#4686)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
dmargules@bmf-law.com
sbrennecke@bmf-law.com
Attorneys for Defendant Leonard Ross